No. 24-2701

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

STATE OF CALIFORNIA, *et al.*,

Plaintiffs-Appellees,

v.

UNITED STATES BUREAU OF ALCOHOL,
TOBACCO, FIREARMS & EXPLOSIVES, *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**OPENING BRIEF FOR APPELLANTS**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

COURTNEY L. DIXON
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................1

STATEMENT OF JURISDICTION .................................................3

STATEMENT OF THE ISSUES.........................................................3

PERTINENT STATUTES AND REGULATIONS .........................3

STATEMENT OF THE CASE.............................................................4

      A.    Legal and Factual Background....................................4

      B.    Procedural Background.................................................9

SUMMARY OF ARGUMENT........................................................ 12

STANDARD OF REVIEW .............................................................. 15

ARGUMENT ..................................................................................... 15

I.     Plaintiffs Failed to Establish Standing to Sue ...................... 15

      A.    Plaintiffs Have Not Suffered a Legally Cognizable Harm........................16

      B.    Plaintiffs' Theory of Standing Fails as a Factual Matter ...........................23

II.    ATF's Determination Regarding AR-15 Blanks Was Reasonable and Reasonably Explained .......................... 27

III.   The District Court Erred in Vacating the Challenged Actions .......................... 35

CONCLUSION .................................................................................. 41

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                                       **Page(s)**

*Allied Concrete & Supply Co. v. Baker,*
 904 F.3d 1053 (9th Cir. 2018) ....................................................................... 15

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
 988 F.2d 146 (D.C. Cir. 1993) ................................................................... 37, 39

*Arizona v. Biden,*
 40 F.4th 375 (6th Cir. 2022) ........................................................................... 36

*Bondi v. VanDerStok,*
 145 S. Ct. 857 (2025) ............................................................................. 8, 9, 29

*California v. Texas,*
 593 U.S. 659 (2021) ........................................................................................ 23

*California Cmtys. Against Toxics v. US EPA,*
 688 F.3d 989 (9th Cir. 2012) ........................................................................... 36

*California Wilderness Coal. v. U.S. Dep't of Energy,*
 631 F.3d 1072 (9th Cir. 2011) ......................................................................... 35

*City of Los Angeles v. Lyons,*
 461 U.S. 95 (1983) .......................................................................................... 23

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013) ................................................................................... 18, 23

*eBay Inc. v. MercExchange, LLC,*
 547 U.S. 388 (2006) ........................................................................................ 36

*FCC v. Prometheus Radio Project,*
 592 U.S. 414 (2021) ........................................................................................ 27

*FDA v. Alliance for Hippocratic Med.,*
 602 U.S. 367 (2024) ................................................................. 13, 19, 20, 22

*Florida v. Mellon,*
 273 U.S. 12 (1927) ..................................................................................... 23, 24

*Linda R.S. v. Richard D.,*
 410 U.S. 614 (1973) ................................................................................... 12, 16

ii

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................. 15, 26, 27

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................... 35

*National Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ............................................................ 36

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................ 18

*Pollinator Stewardship Council v. U.S. EPA*,
    806 F.3d 520 (9th Cir. 2015) ............................................................ 36

*Sacora v. Thomas*,
    628 F.3d 1059 (9th Cir. 2010) ...................................................... 27, 31

*Sierra Club v. US EPA*,
    346 F.3d 955 (9th Cir. 2003) ............................................................ 28

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ........................................................................ 16

*Trump v. CASA, Inc.*,
    145 S. Ct. 2540 (2025) ................................................................. 36-37

*United States v. Texas*,
    599 U.S. 670 (2023) ........................... 13, 17, 18, 19, 21, 22, 35, 37

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................ 18

**Statutes:**

Gun Control Act of 1968:
    18 U.S.C. § 921 *et seq.* ................................................................... 4
        18 U.S.C. § 921(a)(3) .............................................................. 4
        18 U.S.C. §§ 922-923 .............................................................. 4
        18 U.S.C. § 922(t) .................................................................... 4
        18 U.S.C. § 923(a) ................................................................... 4
        18 U.S.C. § 923(g)(1)(A) ........................................................ 4
        18 U.S.C. § 923(i) .................................................................... 4
        18 U.S.C. § 926(a) ................................................................... 4

5 U.S.C. § 702 ................................................................................... 36

5 U.S.C. § 703 ................................................................................... 35

5 U.S.C. § 706(2) .............................................................................. 35

28 U.S.C. § 1291 ................................................................................. 3

28 U.S.C. § 1331 ................................................................................. 3

**Regulations:**

27 C.F.R. § 478.11 ............................................................................ 32

27 C.F.R. § 478.12(c) ....................................................................... 27

28 C.F.R. § 0.130 ............................................................................... 4

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ............................................................... 3

**Other Authorities:**

ATF, Open Letter to All Federal Firearms Licensees, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/7457-VZ94 ........................................7

*Definition of "Frame or Receiver" and Identification of Firearms,* 87 Fed. Reg. 24,652 (Apr. 26, 2022) ........................... 1, 5, 6, 7, 24, 28, 30, 32, 33, 34

33 Fed. Reg. 18,555 (Dec. 14, 1968) .................................................. 5

87 Fed. Reg. 51,249 (Aug. 22, 2022) ................................................ 1

*The Federalist No. 84* (Alexander Hamilton) (Clinton Rossiter ed., 1961) ....................19

## INTRODUCTION

This case concerns a Rule promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to respond to a recent rise in the number of untraceable firearms commonly known as "ghost guns." *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24,652 (Apr. 26, 2022); *see also* 87 Fed. Reg. 51,249 (Aug. 22, 2022) (technical corrections). At a high level, the Rule clarifies (among other things) that a partially complete "receiver"—that is, the main structural component of a rifle—constitutes a "receiver" subject to regulation if it is "readily" completed. The manufacture and sale of such partially complete receivers are therefore subject to federal licensing, background check, and recordkeeping requirements. The Rule also reflects ATF's determination that one specific product, an unindexed AR-15 variant receiver blank, is not "readily" converted to function as a receiver and is thus not subject to regulation as a firearm.

Plaintiffs—the State of California and the Giffords Law Center to Prevent Gun Violence—brought this suit. They do not take issue with the Rule's overarching aim of increasing regulation of untraceable "ghost guns." Nor, at this point, do they contest ATF's legal determination that a partially complete receiver is a regulated "receiver" if and only if it may be readily converted to function as such. Instead, they contend only that ATF's factual determination as to AR-15 variant blanks specifically was arbitrary and capricious. The district court accepted that contention and universally vacated ATF's determination.

That decision was erroneous on all levels. At the outset, plaintiffs lack standing to sue. ATF's determination that one specific product is not a regulated "receiver" has no direct consequences for California or the Giffords Center; it does not require them to do anything or prohibit them from doing anything. Nonetheless, the district court concluded that plaintiffs had standing because they would, in the court's view, experience downstream costs from ATF's asserted under-regulation of third parties. But the Supreme Court has recently twice rejected attempts by litigants—including States and an organization—to leverage those sorts of attenuated, downstream costs into standing to challenge the government's alleged under-regulation of others. Those principles preclude standing here.

Regardless, ATF's determination is reasonable and reasonably explained. In concluding that AR-15 blanks are not readily converted to function, ATF was drawing on decades of expertise developed by many evaluations of specific partially complete receivers. That expertise reasonably informed ATF's conclusion that AR-15 blanks require substantial skill, time, and experience to convert into functional receivers.

The district court compounded its errors by vacating ATF's determinations. Not only may ATF be able to correct any asserted defects on remand, but the regulated public and the agency have substantial interests in maintaining the certainty and predictability that ATF's determinations provide. And conversely, plaintiffs can claim only attenuated, speculative harm from ATF's determinations.

The district court's judgment should be vacated or reversed.

2

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. § 1331. ER-094. That court lacked jurisdiction because plaintiffs failed to establish standing to sue. *See infra* pp. 15-27. The district court entered an order granting summary judgment in part to both parties and directing the entry of final judgment on February 26, 2024. *See* ER-049. The clerk of the district court then entered final judgment on March 4, 2024. ER-259. The government filed a timely notice of appeal on April 26, 2024. ER-260; *see also* Fed. R. App. P. 4(a)(1)(B) (providing for a 60-day period for filing the notice of appeal in cases involving the federal government). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether plaintiffs have standing to challenge ATF's determination that AR-15 blanks are not regulated firearms;

2. Whether ATF adequately explained its determination that AR-15 blanks are not regulated firearms; and

3. Whether the district court erred in vacating ATF's challenged determination.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Legal and Factual Background

1. Through the Gun Control Act of 1968, codified as amended at 18 U.S.C. § 921 *et seq.*, Congress has enacted requirements for persons who import, manufacture, or deal in "firearms." *Id.* §§ 922-923. Such persons must obtain a federal firearms license, *id.* § 923(a), maintain certain records of firearm acquisition and transfer, *id.* § 923(g)(1)(A), and conduct a background check before transferring firearms to a non-licensee, *id.* § 922(t). In addition, Congress has required importers and manufacturers to identify each firearm they import or manufacture with a serial number on the receiver or frame. *Id.* § 923(i).

The statutory scheme hinges on the definition of "firearm." Congress defined that term as follows:

> The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18 U.S.C. § 921(a)(3).

Congress did not define "frame" or "receiver" in the statute, instead leaving it to ATF to do so. *Cf.* 18 U.S.C. § 926(a) (providing the Attorney General with authority to issue "rules and regulations as are necessary to carry out the provisions of this chapter"); 28 C.F.R. § 0.130 (delegating this authority to the Director of ATF). Thus, in 1968, ATF defined "frame or receiver" as "[t]hat part of a firearm which

4

provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion." 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968). In addition, as far back as the 1970s, ATF had concluded that certain partially complete frames and receivers qualified as regulated firearms, generally when they had reached a "critical stage of manufacture." *See* ER-238-39 (collecting ATF letters).

2. In the last half-century, advances in weapon design have rendered ATF's regulatory definition incomplete; technological advances have made it easier to create and sell standalone frame or receiver parts and easy-to-complete frames or receivers. Although these items may meet the statutory definition of "firearm," some entities had been selling these items to unlicensed buyers without complying with the Gun Control Act. 87 Fed. Reg. at 24,652. Such sales permit unlicensed persons, who have not completed a background check, to assemble firearms quickly and easily. And because these privately made firearms usually lack serial numbers, it is difficult for law enforcement to trace them when they are used in crimes. *Id.* at 24,652, 24,659.

In response to these developments, ATF promulgated the Rule at issue in this case in April 2022. *See* 87 Fed. Reg. 24,652. As relevant here, the Rule amends the definition of "receiver." The Rule defines the "receiver" of long guns and other projectile weapons as the housing or structure for the primary component designed to block or seal the breech before initiating the firing sequence. *See id.* at 24,727, 24,735. In addition, the Rule clarifies that receivers that are partially complete, disassembled,

5

or nonfunctional constitute receivers subject to regulation if they are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a" receiver. *Id.* at 24,663, 24,727-28, 24,739.

The Rule also contains additional provisions addressing that readily-converted standard. First, the Rule defines "readily" as a "process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 87 Fed. Reg. at 24,735. The Rule includes eight "factors relevant in making this determination," including "time," "ease," "expertise," "equipment," "parts availability," "expense," "scope," and "feasibility." *Id.* (capitalization altered).

Second, the Rule clarifies that, in determining whether a particular partially complete receiver is "readily" converted to functional, ATF "may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the" partially complete receiver or that are "otherwise made available by the seller or distributor of the [partially complete receiver] to the purchaser or recipient." 87 Fed. Reg. at 24,739. By contrast, ATF will not consider templates or other specialty tools that are not made available to the purchaser by the recipient, even if they are otherwise publicly available.

The regulatory text also includes a number of "examples that illustrate" application of the readily-converted standard. 87 Fed. Reg. at 24,739. As relevant here, Example 4 addresses the "billet or blank of an AR-15 variant receiver." *Id.* At a high

6

level, a "blank" receiver is a piece of aluminum or polymer that has been manufactured into the shape of a receiver but that requires complex additional operations (e.g., drilling out the fire cavity) before it can be functional. The "majority" of such receiver blanks are manufactured or purchased by federally licensed manufactures "as unfinished, unregulated items" and are then completed by the licensee and "sold as either serialized receivers or complete weapons." ER-244; *see also* ER-242-44 (providing examples and pictures of receiver blanks). In Example 4, ATF determined that a "billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." 87 Fed. Reg. at 24,739.

ATF has also taken steps to implement the Rule with respect to specific products. As relevant here, in September 2022, ATF issued an open letter providing additional detail regarding the "critical interior areas" of an AR-15 blank that must not be indexed or machined in order for Example 4's not-a-firearm determination to apply. ATF, Open Letter to All Federal Firearms Licensees, *Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers* (Sept. 27, 2022), https://perma.cc/7457-VZ94. And ATF has issued 23 classification letters in which the agency concluded that a partially complete AR-15-type blank was not a firearm on the basis that the blank did not have indexing or machining in the fire control cavity. *See* ER-238-39 (describing letters).

7

3. Following ATF's publication of the Rule, a group of plaintiffs in a different case challenged the Rule's clarification that partially complete frames and receivers qualify as regulated "firearms" if they are readily converted to function (as well as the Rule's separate clarification, not directly at issue in this case, that certain weapon parts kits qualify as regulated "firearms"). *See generally Bondi v. VanDerStok*, 145 S. Ct. 857 (2025). Those plaintiffs contended generally that the Rule's provision was facially inconsistent with the statute, which the plaintiffs argued reached only functional or complete frames and receivers. The Supreme Court rejected those facial challenges to the Rule.

First, the Supreme Court held that the Rule's provisions regarding weapon parts kits are not "inconsistent on their face with the" statute. *VanDerStok*, 145 S. Ct. at 866. In reaching that conclusion, the Court discussed the statute's ready-conversion standard, explaining that Congress determined that a so-called "starter gun"—which can be converted into a working firearm by "a person without any specialized knowledge" with "everyday tools in less than an hour"—satisfies that standard. *Id.* at 868-69. Because by comparison some weapon parts kits "requir[e] no more time, effort, expertise, or specialized tools to complete," the Court reasoned that at least those kits must also satisfy the standard and so the Rule "is not facially invalid." *Id.* at 869. The Court cautioned, however, that some kits "may be so incomplete or cumbersome to assemble that" they "can no longer fairly be described" as meeting the statutory definition of a "firearm." *Id.*

8

Second, the Court held that the Rule's provisions regarding incomplete frames and receivers are also not "facially inconsistent with the" statute. *VanDerStok*, 145 S. Ct. at 872. In reaching that conclusion, the Court focused on a partially complete frame described in the record that "[a]n ordinary person, using ordinary tools, can finish" in "minutes." *Id.* at 872-73. And the Court emphasized that ATF's "contemporary and consistent vie[w]" for "decades" has been that "some unfinished frames and receivers" are "firearms" under the statute. *Id.* at 873-74. But again, in rejecting plaintiffs' facial challenge, the Court emphasized that "[s]ome products may be so far from a finished frame or receiver that they cannot fairly be described using those terms." *Id.* at 874.

## B. Procedural Background

Plaintiffs in this case are the State of California and the Giffords Law Center to Prevent Gun Violence.[1] Their operative complaint contains two claims. First, plaintiffs claim that ATF's determination that AR-15-type blanks are not regulated "firearms" is contrary to law and that such banks are categorically "firearms" under the Gun Control Act. *See* ER-155-58. Second, plaintiffs claim that ATF's determination is arbitrary and capricious because ATF has failed to reasonably explain

---

[1] This case originally also included two individual plaintiffs. The district court concluded that those plaintiffs lacked standing, and plaintiffs have not appealed that determination. *See* ER-073-77.

its conclusion that AR-15-type blanks are not "readily" converted to functional receivers. *See* ER-158-60.

The parties cross-moved for summary judgment, and the district court granted in part and denied in part each party's motion. At the outset, the court concluded that California and the Giffords Center had established standing to challenge ATF's non-regulation of AR-15 blanks. ER-016-22. The court relied on evidence that some firearms recovered at California crime scenes were unserialized AR-type firearms to conclude that ATF's non-regulation of certain AR-type blanks would predictably lead to an increase in crime committed with untraceable firearms in California. On that basis, the court concluded that California had standing because of the "increased cost of policing and law enforcement" to respond to those crimes and because of the need to "enac[t] and implemen[t]" state legislation to fill the perceived regulatory gap. ER-017. The court relied on similar reasoning to hold that the Giffords Center had standing, concluding that ATF's non-regulation "frustrates its core mission of saving lives from gun violence" and "has forced the organization to divert its resources to focus on ghost guns." ER-019 (alterations and quotation omitted).

On the merits, the district court rejected plaintiffs' arguments that AR-15 variant blanks categorically qualify as regulated "firearms" as a matter of law. ER-027-35. The court thus held that ATF's determination was not contrary to law. *See id.* Plaintiffs have not appealed that conclusion.

10

The district court concluded, however, that ATF's determination was inadequately explained in two respects. First, the court took issue with ATF's asserted failure to expressly consider—in the Rule or the implementing actions—the length of time that it takes to convert an AR-15 varian blank into a functional receiver, even though the length of time is one of the eight factors given in the Rule's definition of "readily." ER-037-40. Second, the court took issue with ATF's alleged failure to explain in the Rule why it will consider in its analysis only the use of templates or other tools made available with the receiver blank and not such items that may be purchased separately, even if the templates or tools "are easy to obtain" and make it relatively easy to convert a blank into a functional receiver. ER-043-47.[2]

Finally, as to the appropriate remedy, the court rejected ATF's argument that any remedy should be limited to remand without vacatur. In reaching the conclusion that vacatur was warranted, the court stated without substantial additional elaboration that it was "questionable whether the deficiencies identified by the Court can be redressed on remand"—seemingly because he found the explanation provided in the litigation unconvincing—and that "vacatur will not be substantially disruptive" because the court was leaving in place the "core guiding principle" in the Rule that

---

[2] The court also rejected a third arbitrary-and-capricious argument focused on ATF's determination to regulate AR-15 blanks with "machining of more than 0.800 inch in the area near the fire control cavity" but not blanks with "machining of 0.800 inch or less." ER-040 (emphasis omitted). The court concluded that ATF's decision to draw the relevant line at 0.800 inch was adequately explained. ER-041-43. Plaintiffs have not appealed that conclusion.

partially complete receivers qualify as "firearms" if they are readily converted to function as such. *See* ER-048. The court thus declared Example 4 "and related agency actions" unlawful, vacated them, and enjoined ATF from enforcing them. ER-049.

## SUMMARY OF ARGUMENT

I. Plaintiffs lack Article III standing to challenge ATF's determination because they have not identified any cognizable injury. ATF's determination does not directly regulate either the State of California or the Giffords Center; it does not require plaintiffs to do anything or prohibit them from doing anything. Instead, the effect of that determination is that manufacturers may sell AR-15 blanks—with no machining or indexing and with no associated jigs, templates, or other materials—without treating them as "regulated firearms."

Despite the disconnect between plaintiffs and ATF's determination, the district court concluded that plaintiffs had established an Article III injury because, in the court's view, ATF's determination will predictably lead to increased crime in California and the State and the Giffords Center will purportedly incur costs in response to that crime. But two recent Supreme Court cases make clear the error in that theory of standing. First, in *United States v. Texas*, the Supreme Court reiterated that plaintiffs generally lack any "judicially cognizable interest" in how the government enforces laws against third parties, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), and the Court therefore rejected two States' attempts to leverage claims that the government's under-enforcement of federal law would cause the States to

12

spend additional money into Article III standing. *See* 599 U.S. 670, 676-78 (2023). Second, in *FDA v. Alliance for Hippocratic Medicine*, the Supreme Court made clear that standing does not exist when a litigant merely "diverts its resources in response to a defendant's actions." 602 U.S. 367, 395 (2024). Those principles preclude plaintiffs' ability to establish any cognizable injury here.

Moreover, even on their own terms, plaintiffs have failed to demonstrate standing because they have not shown that ATF's determination will lead to any imminent or perceptible increase in crime in California. In concluding otherwise, the district court relied on record evidence generally demonstrating that some portion of firearms recovered at crime scenes in California were unserialized AR-15-type firearms. But the court identified no evidence establishing that the specific products at issue in this case—AR-15 variant blanks standing alone and without any indexing or machining—are likely to be used in criminal activity. And any such conclusion would be particularly surprising given both ATF's determination that such blanks are not easily converted into functional firearm receivers and record evidence showing that most such blanks are used by legitimate manufacturers, not unlicensed members of the public.

II. In any event, ATF reasonably concluded that AR-type blanks are not, standing alone, readily converted into functional receivers. As the Rule explains, ATF has determined that how easily a receiver may be converted to functional is largely a result of the machining operations that must be performed on the receiver. And

ATF's decades of experience examining individual partially complete receivers have led it to the conclusion that an AR-type blank standing alone requires substantial machining operations—operations that themselves take substantial time, skill, and experience to properly complete—to convert it into a functional receiver. That conclusion, supported by decades of agency expertise, was reasonable and reasonably explained.

ATF also reasonably explained its decision to consider only those jigs, templates, tools, and other materials sold (or made available) with a partially complete receiver—and not the whole universe of materials possibly available in the world—in determining whether any particular receiver is readily converted to functional. As the Rule suggests, it would be infeasible for ATF to consider the whole universe of possible materials, and any attempt at such consideration would improperly render ATF's regulatory approach wholly unpredictable. That conclusion was reasonable and reasonably explained.

III. Apart from its errors on jurisdiction and the merits, the district court independently erred in concluding that vacatur of various agency actions reflecting ATF's determination was appropriate. This Court's precedents make clear that vacatur is discretionary and equitable, not automatic or compelled, and constitutional and equitable principles required a more limited remedy in this case. The asserted inadequate explanation identified by the district court may well be corrected on remand. ATF and the regulated public have substantial interests in the clarity and

14

predictability generated by ATF's determination. And, conversely, plaintiffs have identified—at most—only attenuated downstream effects from ATF's determination.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1060 (9th Cir. 2018).

## ARGUMENT

### I.    Plaintiffs Failed to Establish Standing to Sue

To establish Article III standing, a plaintiff must prove (1) that it has "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that the injury is "fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations, citations, and quotations omitted).

ATF's determination that AR-15 blanks are not, standing alone, regulated firearms does not directly affect plaintiffs; it does not require them to do, or forbid them from doing, anything. Nonetheless, the district court held that plaintiffs had established standing to challenge that determination based on the court's conclusions that ATF's non-regulation of such blanks will lead to an increase in crime committed

15

in California and that such an increase in crime will lead California and the Giffords Center to incur additional costs. *See* ER-016-22. That holding was incorrect.

### A.  Plaintiffs Have Not Suffered a Legally Cognizable Harm

Plaintiffs have failed to identify any legally cognizable injury stemming from ATF's determination that AR-15 blanks are not, standing alone, "firearms" subject to regulation. In two recent cases, the Supreme Court has rejected similar attempts by plaintiffs to leverage the downstream effects of federal agency actions that do not directly regulate them into standing to challenge those policies. Those cases make clear plaintiffs lack standing here.

1. The challenged ATF determination does not impose any direct obligations or prohibitions on California or on the Giffords Center. Instead, the direct effect of the challenged determination is that ATF will not enforce the Gun Control Act's requirements that attach to the sale of "firearms" against sellers or purchasers of unindexed AR-15 receiver blanks (at least, so long as the blanks are sold without additional templates or tools that enable their ready conversion into functional receivers). Plaintiffs disagree with that determination, but a third party—including a State or an organization—"lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). An individual who does not face prosecution "lacks standing to contest the policies of the prosecuting authority." *Id.*; *see also, e.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (explaining that an individual similarly has "no judicially cognizable interest in

16

procuring" or preventing "enforcement of the immigration laws" against someone else).

The Supreme Court recently applied these principles to hold that two States lacked standing to challenge the Executive's immigration enforcement policies. *See United States v. Texas*, 599 U.S. 670, 677 (2023). In so holding, the Court rejected the States' argument that they had standing because, for example, the States might spend money on incarceration and social services for "noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 674. The Supreme Court held that the States' asserted injury, which flowed from the Executive's determination not to enforce certain provisions of the immigration laws against certain noncitizens, was not judicially cognizable under the principles articulated above. *See id.* at 676-78.

The inability of States, in particular, to leverage downstream financial consequences of federal policy decisions into standing to challenge those decisions reflects "bedrock Article III constraints." *Texas*, 599 U.S. at 680 n.3. "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* Virtually any federal action—from taxes to federal land management to immigration enforcement to regulatory and enforcement policies of all sorts—could be said to have some incidental impact on a State's fisc. Adopting the view that such incidental effects suffice to satisfy Article III would draw the federal courts into all manner of generalized grievances at the behest of States seeking to secure by court order what they were unable to obtain through

17

the political process. That result cannot be squared with Article III, which "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013), by preserving the "proper—and properly limited—role of the courts in a democratic society," *Warth v. Seldin*, 422 U.S. 490, 498 (1975); *cf. Texas*, 599 U.S. at 681 (emphasizing concerns that if the Court "green-lighted" Texas's suit, federal courts could expect "complaints in future years about alleged Executive Branch under-enforcement of any similarly worded laws—whether they be drug laws, gun laws, obstruction of justice laws, or the like").

Nor could that result be squared with the basic principles of our federal system. The Framers established a National Government with the power to act directly on individuals, not through the States as under the Articles of Confederation. *See New York v. United States*, 505 U.S. 144, 162-66 (1992). It was to be expected at the time of the Framing, as it is now, that when the federal government takes actions affecting individuals within a State, there may be incidental effects on that State's own actions affecting those same individuals. But the necessary autonomy of the national and state sovereigns, each acting directly upon individuals, is inconsistent with the notion that a State has a legally protected interest in avoiding those incidental and derivative effects.

Instead, whatever additional expenditures or other responses the State may make in light of those incidental effects are an expression of its own distinct sovereignty, not a judicially cognizable injury caused by the federal government. The

18

proper channel for seeking a change in the federal policy incidentally affecting the State is for the State's citizens to advocate that change to their representatives in Congress or to the federal agency concerned. That course—not resort to the judiciary—is the one the Framers anticipated. *See, e.g.*, *The Federalist No. 84*, at 516-17 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Thus, as the Supreme Court emphasized in *Texas*, "federal courts have not traditionally entertained lawsuits of this kind." 599 U.S. at 681; *see also id.* ("Our constitutional system of separation of powers contemplates a more restricted role for Article III courts." (quotation omitted)).

2. Similarly, the Supreme Court has also recently rejected the proposition that an organization—or any other litigant—may establish standing to sue by incurring costs in response to a defendant's challenged action. In that case, four associations challenged FDA's relaxation of "regulatory requirements for mifepristone, an abortion drug." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 372-73, 376 (2024). Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they

19

had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (quotation omitted). Those activities, the associations asserted, had required them to expend "considerable resources to the detriment of other spending priorities." *Id.* (quotation omitted).

The Supreme Court unanimously held that the associations lacked Article III standing. The Court reasoned that organizations—like other litigants—"cannot spend [their] way into standing simply by expending money to gather information and advocate against the defendant's action." *Alliance for Hippocratic Med.*, 602 U.S. at 394. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394-95. And the Court squarely rejected the proposition that "standing exists when an organization diverts its resources in response to a defendant's actions," stating "[t]hat is incorrect." *Id.* at 395. Nor did the Court consider sufficient the associations' allegation that FDA had failed to "properly collec[t] and disseminat[e] information about" mifepristone and thereby made "it more difficult" for the plaintiffs "to inform the public about safety risks" of the drug. *Id.* That generic setback to the associations' missions without any actual "impediment to [their] advocacy businesses" did not support Article III standing. *Id.*

3. The principles articulated in *Texas* and *Alliance for Hippocratic Medicine* foreclose the theory of standing that the district court relied on in permitting

California and the Giffords Center to challenge ATF's determination that AR-15 receiver blanks are not, standing alone, regulated "firearms." As explained, the court concluded that California had standing because, in the court's view, ATF's under-regulation of AR-15 blanks will lead to increased crime in California, which will cause California to experience "increased cost[s] of policing and law enforcement" and "to incur costs to regulate because ATF is not regulating." ER-017-18 (quotation omitted). Similarly, the court concluded that the Giffords Center had standing because ATF's asserted under-regulation will cause "the organization to divert its resources to focus on ghost guns." ER-019 (quotation omitted).

Those theories are not viable in light of *Texas* and *Alliance for Hippocratic Medicine*. At most, California asserts that it will expend additional funds on law-enforcement and other regulatory activities as a result of ATF's regulatory choices, but *Texas* makes clear that such "indirect effects" on "state spending" as the result of federal policies do not suffice to confer standing. 599 U.S. at 680 n.3. And Giffords cannot even claim that ATF's choices will impose any—even indirect—costs on the organization, instead relying on allegations that it will choose to divert its own resources to expend additional funds on activities related to ghost gun violence as a result of ATF's determination. These asserted harms are not cognizable injuries. And were the rule otherwise, States and organizations could claim standing to second-guess nearly any federal regulatory or enforcement decision on the theory that the

21

decision has a downstream effect on State or organizational resources. That is not the law. *See id.*

The Supreme Court's decision in *Alliance for Hippocratic Medicine* removes any doubt. ATF's alleged under-regulation of AR-15 blanks does not require California or the Giffords Center to conduct, or to refrain from conducting, their activities—be they policing, legislative, or advocacy activities—in any particular way. Plaintiffs are thus "unregulated parties who seek to challenge [ATF's] regulation *of others*." *Alliance for Hippocratic Med.*, 602 U.S. at 385.

Similar to the associations in *Alliance for Hippocratic Medicine*, plaintiffs here contend that ATF's actions will lead to them expend additional funds on their own activities. Although the district court did not have the benefit of the Supreme Court's decision in *Alliance for Hippocratic Medicine*, it is telling that the court's description of plaintiffs' injuries mirrors precisely what the Supreme Court deemed insufficient. The district court stated that California had established an injury "based on" the "increased cost[s]" of the law-enforcement and legislative activities it would undertake in response to ATF's actions, ER-017, and that Giffords had established an injury based on its choice "to divert its resources to focus on ghost guns" because "ATF's regulatory approach undermines every other firearm policy that [Giffords] advocates for," ER-019 (quotation omitted). But the Supreme Court made clear that a litigant's decision to "diver[t] its resources in response to a defendant's actions" does not establish standing. *Alliance for Hippocratic Med.*, 602 U.S. at 395.

### B. Plaintiffs' Theory of Standing Fails as a Factual Matter

Plaintiffs' standing theory thus fails as a matter of law. But even taking plaintiffs' theory on its own terms, it still fails because plaintiffs have not demonstrated that ATF's purported under-regulation of AR-15 receiver blanks will lead to any imminent or perceptible increase in crime in California. As the Supreme Court has emphasized, "where a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish." *California v. Texas*, 593 U.S. 659, 675 (2021) (quotation omitted); *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). The plaintiff's burden is heightened still further if the alleged future behavior involves unlawful conduct. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Those principles apply with special force to suits by States: Where the possible effects of the federal policy on a State's spending decisions are mediated through the actions of, or the policy's effects on, the State's own inhabitants—as here, where the claims of harm are premised on commission of crimes—the structure of the Constitution counsels strongly against concluding that those incidental effects on the State are "fairly traceable" to the federal policy. The Supreme Court applied those principles in *Florida v. Mellon*, 273 U.S. 12 (1927). There, the Court rejected Florida's assertion that it had standing to challenge a federal tax law that would assertedly cause "tax-payers to withdraw property from the state," thereby diminishing its tax

23

revenues. *Id.* at 17. The Court explained that the State's asserted injury was, "at most, only remote and indirect" and that the State had failed to establish "any direct injury" attributable to the federal law. *Id.* at 18.

Plaintiffs have failed to meet that heightened burden here. In concluding that plaintiffs had established a connection between ATF's determination and crime in California, the district court primarily relied on record evidence demonstrating that some portion of firearms recovered at crime scenes in California were unserialized "ghost guns" and that some portion of those "ghost guns" ("approximately 15-20%") "were made with AR-style receivers." ER-020 (quotation omitted). But plaintiffs do not challenge ATF's regulation of "ghost guns" generally. As ATF explained in issuing the Rule, unserialized firearms commonly known as "ghost guns" had proliferated in recent years and the ability of persons—especially persons, such as felons, who are prohibited by law from possessing firearms—to order easily assembled, untraceable firearms online created substantial public safety risks. *See generally* 87 Fed. Reg. at 24,654-57. Indeed, the entire point of issuing the Rule was to clarify that such easily assembled firearms are subject to statutory licensing, background check, and recordkeeping requirements and to thereby combat that public safety threat. Plaintiffs do not take issue with that aim, or the majority of ATF's Rule.

Plaintiffs challenge ATF's specific determination that AR-15 receiver blanks are not readily converted into functional receivers and are thus not subject to regulation

24

as "firearms," on the theory that ATF's under-regulation of that particular product contributes to crime that affects them. The relevant question is thus not whether unserialized firearms generally contribute to crime, but rather whether plaintiffs have demonstrated a sufficiently imminent, non-speculative increase in crime stemming from the determination they challenge as unlawful. And as to that specific question, the district court relied only on layers of speculation: that "ghost guns are commonly used in crimes"; that "a notable percentage of the ghost guns recovered in the state are AR-type ghost guns"; and that it is "predictable" to the court "that a significant portion of the AR-type ghost guns used in crimes will have been assembled using" the AR-type blanks that are at issue in this case (rather than, for example, the more easily assembled indexed or machined AR-type blanks or the AR-type weapon parts kits that ATF does understand to be covered by the statute). ER-021.

In engaging in that speculation, the district court did not identify even a single example in the record of a crime committed with a firearm assembled by the purchaser from an AR-type blank like those at issue in this case, *see* ER-020-22— much less did the court identify evidence to support any finding that those blanks are so likely to be assembled into firearms used in criminal activity that they will inflict imminent, non-speculative injuries on the State of California or the Giffords Center. And any such finding would be particularly unsupported given the record evidence establishing that most such blanks are manufactured by, or sold to, legitimate, licensed firearms manufacturers, not to unlicensed members of the public. *See* ER-244.

25

These errors are compounded by the fact that the district court decided this case at the summary judgment stage, where plaintiffs "bea[r] the burden" of setting forth "specific facts" to establish their standing. *Lujan*, 504 U.S. at 561 (quotation omitted). Indeed, although the court's opinion is not entirely clear, it seems as if the court did not actually conclude that plaintiffs had met their burden to demonstrate the requisite non-speculative injury. Instead, the court emphasized its view that "it is only Defendants"—not plaintiffs—"who are moving for summary judgment on standing." ER-019. And in at least some places, the court explicitly couched its conclusions in terms of what "a reasonable jury could infer," ER-022, about plaintiffs' factual demonstration.

The district court thus may have believed only that the government's "motion based on standing" should be "denied," ER-022—but not that plaintiffs were entitled to summary judgment on the standing question. Nevertheless, the court then entered summary judgment for plaintiffs on some of their claims on the merits. *See* ER-049. To the extent that the district court based its holding that plaintiffs have adequately demonstrated standing only on its conclusion that a reasonable jury could infer the requisite injury-in-fact—rather than on a conclusion that plaintiffs' factual submission was adequate as a matter of law—that error alone warrants vacatur of the district court's judgment. Standing is, of course, an essential element of the court's jurisdiction to adjudicate plaintiffs' claims on the merits, and to obtain summary judgment on the merits, plaintiffs also needed to demonstrate their entitlement to

summary judgment on standing "with the manner and degree of evidence required" at the summary judgment stage. *Lujan*, 504 U.S. at 561.

## II. ATF's Determination Regarding AR-15 Blanks Was Reasonable and Reasonably Explained

As explained, ATF has concluded that a partially complete receiver like an AR-type blank is a regulated "firearm" if it "may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). Plaintiffs do not now challenge that legal conclusion. ATF has also determined that a "billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed" is *not* readily completed (and is thus not a regulated "firearm") if it is sold without "instructions, jigs, templates, equipment, or tools" that enable its ready completion. *Id.*

It is this determination—reflected in the Rule's Example 4 and applied in various follow-on letters—that the district court concluded was arbitrary and capricious. The "highly deferential" arbitrary-and-capricious standard provides only for narrow review. *Sacora v. Thomas*, 628 F.3d 1059, 1068 (9th Cir. 2010) (quotation omitted). To clear that bar, agency action need only be "reasonable and reasonably explained," meaning that the agency has "reasonably considered the relevant issues and reasonably explained the [agency's] decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). And in particular when an agency's action involves "primarily issues of fact" whose resolution "requires a high level of technical expertise," courts

27

"must defer to the informed discretion of the responsible federal agencies." *Sierra Club v. US EPA*, 346 F.3d 955, 961 (9th Cir. 2003) (quotation omitted).

1.a. ATF's determination that AR-15 variant blanks, standing alone, are not readily converted to functional receivers—so long as they do not have any indexing or machining on their critical interior areas—was reasonable and reasonably explained. As ATF explained in the Rule, "how quickly and easily an item" may be converted into functional status "is largely determined by which machining operations still nee[d] to be performed" on the item. 87 Fed. Reg. at 24,668. ATF concluded—consistent with its previous classifications of partially complete receivers—that it "continues to maintain that a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations," including "milling out the fire control cavity of an AR-15 billet or blank." *Id.* In such a circumstance, ATF explained, the agency's longstanding experience reflects that the AR-15 blank "may not readily be completed." *Id.*

This conclusion, articulated in the Rule, built on decades of experience that ATF had developed in considering whether individual partially complete receivers qualified as regulated "firearms." As those previous case-by-case analyses reflected, ATF had determined that an AR-15 blank with no additional machining required significant time and skill to convert into a functional receiver. Thus, for example, the record contains a classification letter from 2013 in which ATF detailed the additional "machining operations" required to convert such a blank into a functional receiver.

28

ER-179-80. These include (1) "milling out of [the] fire-control cavity"; (2) "drilling of [the] selector-level hole"; (3) "cutting of [the] trigger slot"; (4) "drilling of [the] trigger pin hole"; and (5) "drilling of [the] hammer pin hole." *Id.* (capitalization altered). Based on its expertise, ATF concluded that correctly completing these multiple machining steps required sufficient time and skill such that the AR-type blank would "not be sufficiently complete to be classified as the frame or receiver of a firearm." ER-180; *cf. Bondi v. VanDerStok*, 145 S. Ct. 857, 874 (2025) (suggesting that the statute does not reach, and ATF may not "regulate, any combination of parts susceptible of conversion into a frame or receiver with sufficient time, tools, and expertise" because "[s]ome products may be so far from a finished frame or receiver that they cannot fairly be described using those terms").

By contrast, ATF had long understood that AR-type blanks that had already been "partially machined" were more easily converted into functional receivers and qualified as "firearms." *See, e.g.*, ER-173-74 (2006 classification letter). Thus, for example, in 2002, ATF concluded that a "partially machined" AR-15-type receiver was a regulated "firearm" because it had previously found that similar partially machined receivers could be "finished in approximately 75 minutes['] time using a 5/8-inch drill and a rotary file." *See* ER-167-68.

ATF relied on this previous agency experience in arriving at the determination reflected in Example 4. *Cf. VanDerStok*, 145 S. Ct. at 873-74 (relying on the agency's previous practice in evaluating the lawfulness of the Rule). Thus, the Rule recounts

29

comments explaining that ATF had previously "refus[ed] to classify unfinished lower receivers as firearms" "based on concurring expertise from" the Department of Justice. 87 Fed. Reg. at 24,688. And ATF explained that it continued to adhere to this longstanding view, explaining that the "lack" of "[m]achining" or "indexing" in "the fire-control cavity remain[ed] an important factor in the readily completed" analysis. *Id.* at 24,689. By the same token, the Rule explains that AR-15-type blanks that are machined or indexed *are* readily converted to functional and thus do constitute firearms. The Rule thus explicitly distinguishes AR-15 blanks from partially complete receivers that are "indexed or 'dimpled,'" *i.e.*, when the receiver "indicates the location for drilling or milling the holes or cavities necessary to install the fire control components." 87 Fed. Reg. at 24,668. Because ATF's experience reflected that "indexing allows partially complete frames or receivers to be completed efficiently, quickly, and easily," *id.* at 24,689, such indexed blanks are treated as "firearms," even though blanks without any indexing are not.

In short, ATF's determination that AR-15 blanks are not, standing alone, regulated "firearms" was based on decades of experience evaluating and classifying individual blanks. The Rule reasonably relied on that experience—which demonstrates that such blanks require a number of additional machining operations, which take substantial time and skill to complete properly, to become functional receivers—in concluding that AR-15 blanks are not readily converted to function as receivers.

30

b. The district court's bases for invalidating ATF's determination under the "highly deferential" arbitrary-and-capricious standard, *Sacora*, 628 F.3d at 1068 (quotation omitted), do not withstand scrutiny. At the outset, the district court concluded that ATF had improperly failed to "conside[r] the actual time it takes to convert" an AR-15 blank "into a functional" receiver when determining that such blanks are not "readily" converted to function. ER-039; *see generally* ER-038-40. But that conclusion was incorrect on all levels.

For one, the record reflects that ATF has in fact considered the amount of time it takes to convert an AR-15 blank into a functional receiver. As explained, the line drawn by the Rule between AR-15-type blanks with no machining (not readily converted) and blanks with partial machining (readily converted) builds on the agency's decades of experience evaluating individual products on a case-by-case basis. And those previous individual classifications were indeed attentive, both explicitly and implicitly, to the amount of time that the conversion process takes. Thus, in some circumstances, ATF expressly pointed to the relatively small amount of time that partially machined receivers take to be converted to functional in concluding that they constituted regulated "firearms." *See* ER-167-68 (noting that the product in question could be "finished in approximately 75 minutes"). And in other circumstances, ATF detailed the many steps that a purchaser must complete to turn a blank with no machining into a functional receiver. *See, e.g.*, ER-179-80. Although ATF did not expressly discuss in that letter how many minutes the conversion would take, it is

31

natural to understand ATF's explanation of the many steps required to complete the conversion as implicitly incorporating consideration of the time required; it will necessarily require more time to complete the additional machining operations that ATF detailed than it would to complete the relatively fewer operations required, for example, in the case of the partially machined receiver. *Cf.* 87 Fed. Reg. at 24,668 (explaining that "how quickly" a partially complete receiver may be converted into functional status "is largely determined by which machining operations still nee[d] to be performed").

Regardless, ATF's clearer focus on the extent of the machining operations required to turn an AR-15 blank into a functional receiver than on the time required to complete those operations was reasonable. Of course, as the Rule reflects, time is one relevant factor in determining whether a particular process may be completed "readily." *See* 27 C.F.R. § 478.11 (listing "[t]ime" as one of eight "factors relevant in" determining whether a process may be completed "readily"). But the Rule reflects ATF's conclusion, derived from its previous experience, that an AR-15 blank "may not readily be completed" if "it still requires performance of certain milling operations," including "milling out the fire control cavity." 87 Fed. Reg. at 24,668. Even apart from the time to complete that process, it is clear that properly milling out the fire control cavity—without any indexing or dimpling demonstrating where the necessary precise drilling must occur—requires substantial skill and expertise. ATF

32

thus reasonably determined that, even apart from the time factor, an unmilled blank may not readily be converted.

2.a. ATF also reasonably explained its decision with respect to what associated materials it may consider when determining whether AR-15 blanks are readily converted to functional. As the Rule explains, "the aggregation of a template or jig with a partially complete frame or receiver can serve the same purpose as indexing, making" it relatively "efficien[t], quic[k], and eas[y]" to convert the receiver into a functional one. 87 Fed. Reg. at 24,668; *see also id.* at 24,689 (similar). ATF concluded, however, that in evaluating specific AR-15 blanks under the readily-converted standard, it would consider only those "associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold" with the blank (or that are "otherwise made available by the seller" of the blank to the purchaser), 87 Fed. Reg. 24,678—rather than considering all possible templates, jigs, equipment, tools, and instructions that might exist in the world and that the buyer might be able to procure through other sources.

This limitation reflects practical realities and provides "clarity" to regulated parties on the Rule's applications. 87 Fed. Reg. at 24,678. ATF acknowledged that, in response to its proposed rule, a commenter had expressed concern that "no one" would be able to "predict" which templates or jigs "the ATF Director will rely on in any given case." 87 Fed. Reg. at 24,699. ATF responded to that concern in the Rule, explaining that such additional materials may be considered in the agency's analysis

33

only if the seller "provides, or makes available to the purchaser," the particular

material. *Id.* at 24,700.

Thus, the record reflects that ATF reasonably concluded that it could not

feasibly consider the entire universe of possible jigs, templates, instructions, and other

materials that a purchaser might separately acquire and that ATF was therefore

required as a practical matter to limit its review to materials sold or made available

with the AR-15 blank itself.

b. In nevertheless concluding that ATF had failed to offer a reasonable

explanation for this feature of the Rule, the district court erred. The court failed to

properly engage with ATF's reasonable explanation that it would be infeasible to take

into account any specialty jigs, templates, tools, or other materials that exist in the

world, and that feasibility and predictability required ATF to limit its analysis to those

materials sold or made available with the blank. Instead, the court relegated its

discussion of those concerns to a footnote and primarily dismissed them on the basis

that "ATF did not expressly assert that these concerns were the basis for its line-

drawing that Plaintiffs are now challenging." ER-045-46 n.17. But ATF expressly

responded to comments raising these sorts of concerns about the limitless approach

that plaintiffs now advocate for, explaining that ATF was not adopting that approach

and instead was limiting itself to materials sold or made available with the partially

complete receiver. *See supra* pp. 33-34. And even if that explanation was "of less than

ideal clarity," the path that ATF's reasoning took "may reasonably be discerned" from

34

that response to the comments. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). That is all that arbitrary-and-capricious review requires.

## III. The District Court Erred in Vacating the Challenged Actions

The district court independently erred in vacating various agency actions reflecting the challenged determination. In imposing that remedy, the district court failed to seriously consider either the balance of equities or the public interest. Instead, the court treated such relief as flowing presumptively from its conclusion that ATF's determination violated the APA. That reasoning was erroneous, and constitutional and equitable principles preclude any vacatur in this case.

1. Even apart from its errors on justiciability and the merits, the district court erred in vacating the challenged provisions of the Rule without any serious consideration of equitable principles. Although this Court's precedents identify vacatur as an available remedy for a successful APA challenge to a regulation, *see, e.g.*, *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011), the APA itself does not reference vacatur, instead remitting plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency "action, findings, and conclusions." *Id.* § 706(2); *see Texas*, 599 U.S. at 693-702 (Gorsuch, J., concurring in

35

the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

In any event, this Court has treated vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *National Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (stating that the court "is not required to set aside every unlawful agency action."); *see also California Cmtys. Against Toxics v. US EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam) (declining to enter vacatur in favor of remand). Indeed, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702, and equitable relief does not "automatically follo[w] a determination" that a defendant acted illegally, *see eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392-93 (2006). Thus, this Court will "leave an invalid rule in place" if "equity demands" that outcome, including if "the disruptive consequences" of vacatur outweigh "the seriousness of the agency's errors." *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (quotation omitted).

The problems caused by universal injunctions are well catalogued. Such injunctions conflict with principles of Article III and equity, circumvent Rule 23's class-action requirements, "incentivize forum shopping," "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law," and overburden courts' "emergency dockets." *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring); *see also Trump v. CASA, Inc.*, 145 S.

36

Ct. 2540, 2559-60 (2025). And those concerns apply equally to vacaturs like the one entered by the district court. *Texas*, 599 U.S. at 702-03 (Gorsuch, J., concurring in the judgment). Vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary circumstances." *Id.* No such circumstances exist here.

2. The relevant equitable principles make clear that the district court erred in vacating ATF's determination, reflected in Example 4 and elsewhere, that AR-15 blanks, standing alone, are not regulated "firearms." The asserted errors identified by the district court are relatively minor and may well be corrected on remand. The government and the public have a substantial interest in the clarity provided by the determination and vacated actions. And plaintiffs' asserted harms are relatively insubstantial.

First, the asserted errors identified by the district court are relatively minor errors that ATF may be able to remedy on remand. As explained, the district court rejected plaintiffs' argument that ATF's determination was inconsistent with the statute as a matter of law. Instead, the court held only that ATF's determination was inadequately explained in two respects. That reasoning leaves open the possibility that ATF "may develop a reasoned explanation" on remand, and that possibility weighs against vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993).

That possibility is particularly acute in this case, where ATF has already expounded on its reasoning. Thus, ATF submitted a declaration to the district court

explaining in more detail its conclusion that AR-15 blanks are not, standing alone, readily converted to functional receivers. As that declaration explained, in developing its position, ATF "conducted dozens of firearm builds from partially complete AR-type receivers to determine when the partially complete or unfinished AR-type may readily be completed." ER-249. In conducting those builds, ATF explicitly considered in each case the amount of time needed to complete the build. *See* ER-251 (including example worksheet recording data about the builds, including "[t]ime needed to complete build"). And ATF concluded that AR-type blanks with no machining require substantial time—in addition to skill and experience—to convert into functional receivers. Thus, ATF's declarant explained that he completed his first AR-type receiver, using a jig, a hand drill, and a drill press, in approximately "four and a half hours"—and that even with that substantial time and his own "considerable experience," the completed product "was substandard." ER-256.

Similarly, ATF explained in additional detail in its briefing in district court why it would be infeasible to consider the whole universe of possible jigs, tools, and other materials in determining whether a particular blank is readily converted to functional and why criminal law may fill some of that gap. *See* ER-043-44; ER-045-46 & n.17 (citing some of these explanations). Although the district court properly did not rely on these extrarecord materials in determining whether ATF's underlying determination was adequately explained, those materials make clear that ATF has "at

38

least a serious possibility" of being able "to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151.

Second, the "consequences of vacating may be quite disruptive." *Allied-Signal*, 988 F.2d at 151. As ATF explained to the district court, the "majority of AR-type partially complete receivers are not utilized by the public" to create firearms. ER-244. Instead, most AR-type receiver blanks are created by or sold to "licensed manufacturers," who "then complete them to be sold as either serialized receivers or complete weapons." *Id.*

Vacatur of ATF's actions thus may create substantial confusion and uncertainty—and may result in substantial practical and financial burdens—among legitimate, licensed firearms manufacturers, who will not know whether they need to treat AR-15 blanks as regulated "firearms" even before they are completed or incorporated into functional firearms. And any attempt to treat AR-15 blanks as "firearms" may have its own negative public safety consequences. As ATF explained to the district court, treating those blanks as firearms would require that they be serialized, even though "[s]erializing firearms too early in their production could hinder the manufacturing processes of licensed manufacturers by requiring markings where additional material still needs to be removed from the outside of the item to complete it." ER-244-45. This early serialization may thus "result in removal, alteration, or obliteration of the manufacturer's serial number" once the

39

manufacturing process is completed, which will generate the precise problem of untraceable firearms that plaintiffs complain about. ER-245.

Third, and conversely, plaintiffs have very little interest in vacatur of ATF's actions. As explained, plaintiffs have not established a sufficient cognizable injury to even support Article III standing. *See supra* pp. 15-27. But even if the Court were to believe that plaintiffs surmounted that jurisdictional hurdle, plaintiffs rest their claim to harm entirely on attenuated downstream financial effects of ATF's determination. Those speculative, attenuated financial harms cannot outweigh the agency's and the public's interest in regulatory clarity and in avoiding the harms that would attend serializing firearms too early in the manufacturing process.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be vacated or reversed.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

CRAIG H. MISSAKIAN
  *United States Attorney*

COURTNEY L. DIXON

*s/ Sean R. Janda*

SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*
  *sean.r.janda@usdoj.gov*

August 2025

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of no related case pending in this Court.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9799 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

## TABLE OF CONTENTS

18 U.S.C. § 921 .................................................................................................A1

27 C.F.R. § 478.12 ............................................................................................A1

**18 U.S.C. § 921**

**§ 921. Definitions**

(a) As used in this chapter—

. . .

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

**27 C.F.R. § 478.12**

**§ 478.12. Definition of Frame or Receiver**

. . .

**(c)** ***Partially complete, disassembled, or nonfunctional frame or receiver.*** The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, *i.e.,* to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be. The terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (*e.g.,* unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit. The following are nonexclusive examples that illustrate the definitions:

*Example 1 to paragraph (c)—Frame or receiver:* A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

A1

*Example 2 to paragraph (c)—Frame or receiver:* A partially complete billet or blank of a frame or receiver with one or more template holes drilled or indexed in the correct location is a frame or receiver, as a person with common hand tools may readily complete the billet or blank to function as a frame or receiver.

*Example 3 to paragraph (c)—Frame or receiver:* A complete frame or receiver of a weapon that has been disassembled, damaged, split, or cut into pieces, but not destroyed in accordance with paragraph (e), is a frame or receiver.

*Example 4 to paragraph (c)—Not a receiver:* A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

*Example 5 to paragraph (c)—Not a receiver:* A flat blank of an AK variant receiver without laser cuts or indexing that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools is not a receiver, as a person cannot readily fold the flat to provide housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence.

A2