No. 24-2701

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

STATE OF CALIFORNIA, *et al.*,

Plaintiffs-Appellees,

v.

UNITED STATES BUREAU OF ALCOHOL,
TOBACCO, FIREARMS & EXPLOSIVES, *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**EXCERPTS OF RECORD**

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

CRAIG H. MISSAKIAN
*United States Attorney*

COURTNEY L. DIXON
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# INDEX

**Page**

Summary Judgment Opinion and Order
 (Feb. 26, 2024), Dkt. No. 207.................................................................ER-004

Motion to Dismiss Opinion and Order
 (Feb. 9, 2025), Dkt. No. 135.................................................................ER-050

Supplemental First Amended Complaint
 (Sep. 7, 2023), Dkt. No. 177.................................................................ER-083

 Exhibit 6: 1983 Classification Letter ............................................ER-163

 Exhibit 7: 2002 Classification Letter ............................................ER-166

 Exhibit 8: 2004 Classification Letter ............................................ER-169

 Exhibit 9: 2006 Classification Letter ............................................ER-172

 Exhibit 10: 2012 Classification Letter ..........................................ER-175

 Exhibit 11: 2013 Classification Letter ..........................................ER-178

 Exhibit 12: 2014 Classification Letter ..........................................ER-181

 Exhibit 13: ATF Ruling 2015-1......................................................ER-184

 Exhibit 14: 2015 Classification Letter ..........................................ER-191

 Exhibit 15: 2015 Classification Letter ..........................................ER-194

 Exhibit 16: 2017 Classification Letter ..........................................ER-214

 Exhibit 17: 2013 Classification Letter ..........................................ER-222

 Exhibit 18: 2013 Classification Letter ..........................................ER-233

Excerpt from Defendants' Motion for Summary Judgment
 (Oct. 5, 2023), Dkt. No. 182.................................................................ER-237

Declaration of Daniel Hoffman
  (Dec. 7, 2023), Dkt. No. 198 .......................................................... ER-240

Judgment
  (Mar. 4, 2024), Dkt. No. 208 ......................................................... ER-259

Notice of Appeal
  (Apr. 26, 2024), Dkt. No. 209 ....................................................... ER-260

Docket Sheet .................................................................................... ER-262

1

2

3

4                          UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    STATE OF CALIFORNIA, et al.,              Case No.  20-cv-06761-EMC

8                     Plaintiffs,

9           v.                                 **ORDER GRANTING IN PART AND
                                               DENYING IN PART DEFENDANTS'
10   BUREAU OF ALCOHOL, TOBACCO,               MOTION FOR SUMMARY
     FIREARMS, AND EXPLOSIVES, et al.,         JUDGMENT; AND GRANTING IN PAT
11                                             AND DENYING IN PART
                     Defendants.               PLAINTIFFS' MOTION FOR
12                                             SUMMARY JUDGMENT**

13                                             Docket Nos. 182, 184

14

15          The dangers of "ghost guns" – guns that are assembled from parts, that are unregistered,

16   and that are therefore untraceable – are without doubt real and substantial.  The Bureau of

17   Alcohol, Tobacco, Firearms, and Explosives ("ATF") has responded with regulations addressing,

18   *inter alia*, ghost guns and their components.  The instant case concerns those regulations.  The

19   issue in the case at bar, however, is narrow – though important and potentially consequential.  It

20   does not concern the general merits or constitutionality of gun control legislation.  Rather, the

21   question before this Court concerns the legality of two specific aspects of ATF's technical

22   regulations and rulings addressing ghost guns.  ATF has ruled that the regulatory provisions of the

23   Gun Control Act ("GCA") apply to certain parts used to assemble a fully functioning firearm

24   under some circumstances but not others.  Plaintiffs challenge the lines drawn by the ATF in this

25   regard.  Mindful of the deference generally afforded to agency regulations implementing a statute,

26   the Court, for the reasons stated below, upholds one part of the challenged regulations/rulings but

27   finds another portion invalid.

28          Plaintiffs are the State of California and the organization Giffords Law Center to Prevent

United States District Court
Northern District of California

1  Gun Violence ("GLC").  They have filed suit against ATF as well as the Department of Justice

2  ("DOJ") and several federal employees (all in their official capacities).  In April 2022, ATF issued

3  a new final rule that addressed, *inter alia*, ghost guns.  *See* 87 Fed. Reg. 24,652 (2022).  According

4  to Plaintiffs, certain of ATF's determinations related to ghost guns, as codified in the final rule and

5  as reflected in, *e.g.*, Open Letters and Classification Letters applying the final rule, violate the

6  Administrative Procedure Act ("APA").

7  Currently pending before the Court are the parties' cross-motions for summary judgment.

8  An amicus brief has also been submitted in support of Plaintiffs' motion.  The issues pending

9  before the Court are: (1) whether Plaintiffs have standing to pursue this case and (2) whether

10  ATF's determinations related to certain AR-type partially complete receivers violate the APA,

11  either because the determinations are contrary to the plain text of the GCA or because they are

12  arbitrary and capricious.  Having considered the parties' briefs and accompanying submissions,

13  the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion and **GRANTS** in

14  part and **DENIES** in part Plaintiffs' motion.  The Court finds that there is no genuine dispute of

15  material fact that Plaintiffs have standing.  The Court further finds that ATF acted arbitrarily and

16  capriciously with respect to its categorical determinations that AR-type partially complete

17  receivers that are not indexed or machined and not sold with, *e.g.*, a jig or tools are not firearms

18  for purposes of the GCA.  In other respects, the Court finds that the regulations are not arbitrary

19  and capricious.

20  **I.  FACTUAL & PROCEDURAL BACKGROUND**

21  A.  Supplemental First Amended Complaint

22  In the operative pleading (*i.e.*, the supplemental first amended complaint), Plaintiffs allege

23  as follows.

24  The GCA imposes restrictions on the purchase and sale of firearms in the United States.

25  *See* Supp. FAC ¶ 1.  The statute defines "firearm," in relevant part, as follows: "(A) any weapon

26  (including a starter gun) which will or is designed to or may readily be converted to expel a

27  projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon."  18

28  U.S.C. § 921(a)(3); *see also* 27 C.F.R. § 478.11.

2

With respect to the definition in (B), Congress has never defined the terms "frame" and "receiver." Thus, ATF has enacted regulations that define those terms. In essence, the receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the hammer, bolt, or breechblock, as well as the firing mechanism." Supp. FAC ¶ 3.[1] It is a significant piece of a firearm, as reflected by the fact that "the GCA expressly provides that a 'frame or receiver' *is* a 'firearm.'" Supp. FAC ¶ 3 (emphasis in original).

Included among the GCA's restrictions on the purchase and sale of firearms are requirements that any firearm sold or imported in the United States "must have a unique serial number"[2] and that "licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer. These requirements allow law enforcement to trace guns recovered at crime scenes to their first retail purchaser." Supp. FAC ¶ 1; *see also* Supp. FAC ¶ 37 ("Identifying [the] initial purchaser is critical to law enforcement's ability to investigate and solve crimes committed with the recovered firearm."). In addition, "licensed gun dealers [must] conduct criminal background checks on would-be gun purchasers," which "ensur[es] that weapons do not fall into the wrong hands." Supp. FAC ¶ 1. Furthermore, certain categories of people are prohibited from purchasing firearms, including minors as well as individuals with disqualifying criminal convictions (*i.e.*, "those who pose the greatest threat of violence"). Supp. FAC ¶ 1.

Ghost guns are weapons that evade the restrictions imposed by the GCA. *See* Supp. FAC ¶ 44. They are weapons that anyone can build at home to be fully operable firearms – and "within

---

[1] The current definitions for "frame" and "receiver" can be found in 27 C.F.R. § 478.12. *See* 27 C.F.R. § 478.12(a)(1) (providing that a firearm frame is the part of a handgun that "provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt or similar primary energized component prior to initiation of the firing sequence"); *id.* § 478.12(a)(2) (providing that a firearm receiver is the part of a long gun that "provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent)").

[2] It is the frame or receiver that must bear a serial number. *See* 18 U.S.C. § 923(i) ("Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Attorney General shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer.").

United States District Court
Northern District of California

minutes."[3]  Supp. FAC ¶ 2.  Ghost guns are "'ghosts' because, lacking serial numbers, they are not traceable by law enforcement when they are used in a crime."  Supp. FAC ¶ 2; *see also* Proposed Rule, 86 Fed. Reg. at 27,722 & 27,724.  Today, ghost guns

> can be purchased by anyone with an internet connection and a credit card or other form of online payment (as well as at gun shows and from brick-and-mortar gun stores) – including people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms.

Supp. FAC ¶ 44.

In recent years, the ghost gun market has expanded, with "ghost gun retailers widely report[ing] substantially increased demand."  Supp. FAC ¶ 10.  And in recent years, there has been an increase in the use of ghost guns to commit crimes, which is unsurprising given that ghost guns bear no serial numbers and therefore cannot be traced.  "Law enforcement agencies [have] connected at least 2,513 ghost guns to criminal activity between 2010 and April 2020," and, "[o]f that number, more than half . . . were used or sold by criminal enterprises to facilitate crimes including gun trafficking, robbery, drug trafficking, terrorism, and murder."  Supp. FAC ¶ 56.  In May 2020, *60 Minutes* reported that "[g]host guns were linked to criminal cases in at least 38 states between late 2018 and May 2020," Supp. FAC ¶ 56, and that "ghost guns were used in 'at least four mass shootings, violent police shootouts . . . and cases involving terrorism and white supremacists.'"  Supp. FAC ¶ 11; *see also* Supp. FAC ¶¶ 51-53, 55 (describing multiple incidents in which ghost guns were used in crimes, including mass shootings).

The federal government has expressly acknowledged that "the number of crimes committed with ghost guns is 'increasing significantly and rapidly.'"  Supp. FAC ¶ 12.  In fact,

> [t]he number of ghost guns recovered in connection with criminal activity is growing each year.  [For instance,] [i]n 2017, the District of Columbia recovered only three ghost guns.  But by 2019, law enforcement recovered 116 ghost guns in one year, before recovering another 106 ghost guns in just the first five months of 2020.  According to information from the District of Columbia's

---

[3] Because ghost guns can be built at home, they are also called privately made firearms, or "PMFs."  See Proposed Rule, 86 Fed. Reg. 27,720, at 27,722 (2021).

> Department of Forensic Sciences, of the 250 ghost guns recovered in Washington D.C. between 2017 and May 29, 2020, at least 208, or 83.2%, were manufactured by a single company, Polymer80.

Supp. FAC ¶ 57.

The situation in California is similar.

> According to California law enforcement agencies, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of firearms recovered at crime scenes." The "vast majority" of these weapons were wielded by individuals prohibited from owning a firearm. In Los Angeles, the number of ghost guns recovered increased by 144% from 2015 to 2019. In San Francisco, no ghost guns were recovered in 2015, but beginning in 2016, ghost gun recoveries began to sharply rise – increasing by 1517% from 2016 to 2019.

Supp. FAC ¶ 58.

The problem is nationwide. "From 2016 to 2021, 'approximately 45,240 suspected PMFs' were reported to have been recovered by law enforcement agencies[:] 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021." Supp. FAC ¶ 59. Notably, these statistics likely underreport the problem "because they rely on instances where ghost guns are [actually] recovered by law enforcement." Supp. FAC ¶ 60.

In 2020, Plaintiffs initiated their lawsuit challenging ATF's approach toward ghost guns. Specifically, they challenged ATF's determinations that certain products known in the industry as 80% receivers and frames were not firearms for purposes of the GCA.[4] As noted above, a receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the hammer, bolt, or breechblock, as well as the firing mechanism." Supp. FAC ¶ 3. The GCA expressly provides that a receiver or a frame *is* a firearm. An 80% frame or receiver is an unfinished frame or receiver – *i.e.*, a partially complete one. *See* Supp. FAC ¶ 3. According to Plaintiffs,

> [g]host gun manufacturers have . . . developed tools that make it easier than ever to convert 80 percent receivers and frames into fully

---

[4] As Defendants note, the GCA and implementing regulations do not use the term "80% frame" or "80% receiver." "80%" is an industry term – *i.e.*, a term that the ghost gun industry uses to market certain products. *See* Mot. at 4-5, 15-16; *see also* Final Rule, 87 Fed. Reg. at 24,663 n.47 ("The term '80% receiver' is a term used by some industry members, the public, and the media to describe a frame or receiver that has not yet reached a stage of manufacture to be classified as a 'frame or receiver' under Federal law. However, that term is neither found in Federal law nor accepted by ATF.").

5

United States District Court
Northern District of California

> operable firearms in as little as **15 minutes**.  These tools include jig kits (a collection of tools, measurements, and physical guides designed to quickly make unfinished or 80 percent receivers functional), milling machines (a pre-programmed "mill" that automatically turns 80 percent receivers into functioning weapons) and even free, easy to use printable blueprints for building ghost guns.  Even without these products however, anyone with internet access can easily find detailed instructions for completing their frame or receiver with common household tools.

Supp. FAC ¶ 5 (emphasis in original).

Subsequently, litigation in this case was put on hold because, in 2021, following several mass shootings in Boulder, Colorado, and Atlanta, Georgia, "the White House announced that it intended to 'issue a proposed rule to help stop the proliferation of "ghost guns."'"  Supp. FAC ¶ 89.  In May 2021, ATF issued a proposed rule, and, in April 2022, the final rule (which is currently the subject of this lawsuit).  *See* Supp. FAC ¶¶ 89-90.

In the final rule, "ATF stated that the goals of the Rule were to 'provide a more comprehensive definition of "frame" or "receiver" so that these terms more accurately reflect how most modern-day firearms are produced and function' *and* to 'reduce unserialized "ghost guns."'"  Supp. FAC ¶ 89 (emphasis added).  Regarding the latter, the final rule provides that it is possible for a partially complete frame or receiver to be deemed a frame or receiver, and therefore a firearm, for purposes of the GCA.  The final rule provides in relevant part as follows:

> The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver . . . .  [But] [t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. § 478.12(c).

The term "readily" is defined as follows:

> A process, action, or physical state that is fairly or reasonably

6

efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state.  With respect to the classification of firearms, factors relevant in making this determination include the following:

(1)  Time, i.e., how long it takes to finish the process;
(2)  Ease, i.e., how difficult it is to do so;
(3)  Expertise, i.e., what knowledge and skills are required;
(4)  Equipment, i.e., what tools are required;
(5)  Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;
(6)  Expense, i.e., how much it costs;
(7)  Scope, i.e., the extent to which the subject of the process must be changed to finish it; and
(8)  Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction.

*Id.* § 478.11.

The final rule also gives examples of what is and what is not a receiver/frame:

Example 1 to paragraph (c) – Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template **is** a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

. . . .

Example 4 to paragraph (c) – **Not** a receiver: A billet or blank of an AR-15 variant[5] receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

*Id.* § 478.12(c) (emphasis added).

As reflected by the parties' briefs, the parties' current dispute essentially boils down to Example 4 and related determinations (including ATF's decision to disregard, *e.g.*, jigs and tools sold by third parties in the open market in determining when a partially complete receiver is readily convertible to a fully functional one).  *See, e.g.*, Opp'n at 14-15 (noting that ATF *repeated* its determination in Example 4 "in multiple final agency actions that followed the Final Rule,

_____

[5] "The terms 'variant' and 'variants thereof' mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments."  27 C.F.R. § 478.12(a)(3).

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1   including the 23 Challenged Classification Letters, the September 2022 Open Letter, and ATF's

2   slide deck and YouTube video"); *see also* Opp'n at 2 (arguing that, even though "ATF will

3   consider at least certain categories of partially complete frames and receivers to be 'firearms,'

4   even if they are sold standalone[,] . . . ATF is still not fully complying with federal law" because it

5   has "unlawfully determined that many partially complete AR-style receivers – the fundamental

6   component of deadly AR-style assault rifles – are not 'firearms' under the GCA").

7          Because Example 4 is now the focus, it bears repeating what the parameters of Example 4

8   are.  Example 4 specifies that, if a partially complete AR-15 type receiver is not machined or

9   indexed in critical interior areas *and* is not sold with, *e.g.*, a jig or tools, then it is not a receiver

10  (and therefore not a firearm for purposes of the GCA).  This is true even if jigs and tools may be

11  purchased easily from sources other than the seller of the partially complete receiver.  However, if

12  a partially complete AR-15 type receiver is machined or indexed in critical interior areas, then it ***is***

13  a receiver (and therefore a firearm for purposes of the GCA).  *See, e.g.*, 27 C.F.R. § 478.12(c)

14  ("Example 2 to paragraph (c) – Frame or receiver: A partially complete billet or blank of a frame

15  or receiver with one or more template holes drilled or indexed in the correct location is a frame or

16  receiver, as a person with common hand tools may readily complete the billet or blank to function

17  as a frame or receiver.").  As for a partially complete AR-15 type receiver that is not machined in

18  critical areas but is sold with, *e.g.*, a jig or tools, that ***may*** be a receiver (and therefore a firearm for

19  purposes of the GCA).  *See, e.g.*, ATF Supp. 240 (Classification Letter) ("[E]ven when a sample is

20  <u>not classified as a "**receiver**," or "**firearm**," that determination can change if it is sold, distributed,</u>

21  <u>marketed, possessed, or otherwise made available with any associated templates, jigs, molds,</u>

22  <u>equipment, tools, instructions, or guides, such as within a receiver parts kit</u>.") (all emphasis in

23  original).

24          Plaintiffs make various legal arguments challenging Example 4 but underlying those

25  arguments is their position that a partially complete AR-type receiver[6] that is not machined or

26

27  ───────────────

28  [6] Example 4 focuses on partially complete AR-15 type receivers.  However, Plaintiffs' challenge is not limited to partially complete AR-15 type receivers but expands more broadly to other partially complete AR-type receivers (*e.g.*, partially complete AR-10 receivers).

8

1    indexed in critical areas and is not sold with, *e.g.*, a jig or tools should still be deemed a receiver

2    (and therefore a firearm) because jigs, tools, and so forth are easy to obtain or purchase from open

3    sources other than the seller/distributor of the receiver, and, with these items, it does not take

4    much time or effort to make the partially complete receiver a fully functional one – *i.e.*, it may be

5    readily converted.  Plaintiffs maintain:

> As a result of ATF's decisions, no background check is required to
> buy 80 percent receivers and frames, no records of the buyers'
> identities must be kept, and no 80 percent receiver or frame has to
> carry federal serial numbers or other markings that clearly identify
> the product's manufacturer, importer, make, model, or caliber. Thus,
> while a person cannot purchase an assembled gun at a gun store
> without passing a background check to ensure that he is not a
> prohibited person under the GCA, a prohibited person can purchase
> an 80 percent frame or receiver from the very same gun store
> without any background check or any questions asked. With an 80
> percent receiver or frame in hand, that prohibited person can then
> purchase all ancillary products needed to complete the firearm (like
> jigs and templates), either in a different contemporaneous
> transaction or from a different seller, and quickly and easily
> assemble a firearm functionally indistinguishable from the firearm
> he would have been . . . barred from buying after a background
> check.

15   Supp. FAC ¶ 44.

16   B.   Record Evidence

17         In terms of record evidence, there is both the original administrative record that Defendants

18   filed, *see* Docket No. 144 (notice of administrative record), and the supplemental administrative

19   record.  *See* Docket No. 179 (notice of certified supplement administrative record).  The

20   supplemental administrative record contains the main evidence relevant to the pending dispute.  It

21   includes, *inter alia*, the final rule (Ex. 1), an Open Letter that ATF issued in September 2022 (Ex.

22   6), and the classification letters challenged by Plaintiffs (Exs. 9, 12-13, 18, 27-30, 33-34, 36-37,

23   40-42, 45, 51-54, 57, 62-63).  The September 2022 Open Letter (Ex. 6) is significant because it

24   addresses partially complete AR-type receivers specifically.  *See* ATF Supp. 199 *et seq.*  An

25   exemplar classification letter that addresses a partially complete AR-type receiver is Classification

26   Letter #313696 (Ex. 9).  *See* ATF Supp. 221 *et seq.*

27   C.   Extra-Record Evidence

28         Although APA cases are typically resolved based on the administrative record, both parties

United States District Court
Northern District of California

9

have submitted declarations.

        1.    <u>Declarations Submitted by Plaintiffs</u>

Plaintiffs have submitted three declarations. Defendants agree that two of the declarations (the Gonzalez and Cutilletta Declarations) may be considered, even though this is an APA case, because they are relevant to standing. *See* Gonzalez Decl. (focusing on the standing of California); Cutilletta Decl. (focusing on the standing of GLC).

Defendants, however, do object to the third declaration (the Yurgealitis Declaration) on the basis that it is relevant only to the merits and therefore is impermissible extra-record evidence. Mr. Yurgealitis is a former ATF employee. *See* Yurgealitis Decl. ¶ 1.

It is appropriate to consider parts of the Yurgealitis Declaration, specifically, so that the Court has an understanding of the technical aspects of AR-type receivers. *See Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (noting that, "[g]enerally judicial review of agency action is limited to review of the administrative record" but "certain circumstances may justify expanding review beyond the record or permitting discovery – *e.g.*, "if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action"). In this regard, the Court takes into account the following testimony from the Yurgealitis Declaration.

- "AR-15 type firearms are semiautomatic rifles . . . ." Yurgealitis Decl. ¶ 9; *see also* Yurgealitis Decl. ¶¶ 18-19 (providing similar testimony).

- Semiautomatic "means that the rifle fires one round per each pull of the trigger. After the cartridge is fired, the rifle automatically extracts and ejects the spent cartridge case and loads another cartridge into the chamber. This is different than a full-automatic firearm (or machine gun) which will fire continuously with a single pull of the trigger until it is released or the supply of ammunition is exhausted." Yurgealitis Decl. ¶ 19.

- "AR-15 type rifles . . . have little recoil as compared to larger caliber rifles, which facilitates rapid and accurate firing." Yurgealitis Decl. ¶ 21.

- "The original design [of an AR-15] features a two piece receiver assembly. The

upper receiver is the portion which houses the bolt and is attached to the barrel. The lower receiver (which is the serialized portion and considered the 'firearm' under the GCA) is the part which houses the fire control components and the attachment point for the magazine." Yurgealitis Decl. ¶ 18 & Fig. 1 (example of two-piece receiver assembly). For purposes of the pending motions, the parties use – and the Court uses – the term "receiver" to mean the lower receiver since that is the piece that is considered a firearm for purposes of the GCA.

- "The 'fire control cavity' in an AR-15 type receiver is the area behind the magazine well and above the trigger guard where the trigger mechanism, or 'fire control' mechanism, is located." Yurgealitis Decl. ¶ 31.



**Figure 4: Description of the control cavity and
where pin holes should be drilled**

- The "main steps" to convert a partially complete receiver for an AR-15 rifle into a fully functional receiver are: "removing excess material (either aluminum or polymer depending on the product purchased) and drilling a small number of holes for various pins." Yurgealitis Decl. ¶ 27; *see also* Yurgealitis Decl. ¶ 28 (referring to "metal roll pins installed horizontally across the receiver to support or provide pivot points for trigger mechanism components").

1   Yurgealitis Decl. ¶ 35, Fig. 4.

2          Plaintiffs, however, maintain that the Yurgealitis Declaration should also be considered for

3   the merits of the case – *e.g.*, he addresses "which factors ATF failed to consider and how it failed

4   to properly explain its decisions classifying partially complete AR-style receivers."  Opp'n at 15

5   n.9.  Plaintiffs note that

6              exceptions exist to the rule that review of agency action is limited to
               the administrative record.  A court may consider evidence outside
7              the administrative record as necessary to explain agency action.
               *Asarco, Inc. v. United States Environmental Protection Agency*, 616
8              F.2d 1153, 1159 (9th Cir. 1980).  *See also Arizona Past & Future
               Foundation v. Lewis*, 722 F.2d at 1426 n.5.  When there is "such a
9              failure to explain administrative action as to frustrate effective
               judicial review," the court may "obtain from the agency, either
10             through affidavits or testimony, such additional explanations of the
               reasons for the agency decision as may prove necessary."  *Public
11             Power Council v. Johnson*, 674 F.2d 791, 793-94 (9th Cir. 1982),
               *quoting*, *Camp v. Pitts*, 411 U.S. 138, 142, 36 L. Ed. 2d 106, 93 S.
12             Ct. 1241 (1973) (per curiam).  The purpose of the court's enquiry
               should be to ascertain whether the agency considered all relevant
13             factors or fully explicated its course of conduct or grounds of
               decision.
14

15   *Friends of Earth v. Hintz*, 800 F.2d 822, 829 (9th 1986).  As indicated below, the Court does not

16   rely on the Yurgealitis Declaration to determine whether ATF failed to consider relevant factors or

17   failed to provide an explanation for its determinations.

18          2.    <u>Declaration Submitted by Defendants</u>

19          Defendants have submitted a single declaration (the Hoffman Declaration).  Mr. Hoffman

20   is a firearms enforcement officer at ATF and the Chief of the Firearms Technology Industry

21   Services Branch.  Since 2016, he has worked in the Firearms & Ammunition Technology

22   Division.  "The Division is the federal technical authority relating to firearms and ammunition and

23   their classification under federal laws and regulations."  Hoffman Decl. ¶ 1.

24          Defendants take the position that the Court does not need to consider the Hoffman

25   Declaration unless it decides to consider the Yurgealitis Declaration (implicitly, on the merits).

26   Plaintiffs argue that Defendants are improperly trying to use the Hoffman Declaration as a post-

27   hoc rationalization of ATF's determinations on partially complete AR-type receivers.  Because the

28   Court is not considering the Yurgealitis Declaration for the merits, it does not consider the

1   Hoffman Declaration for the merits.

2                                    **II.      LEGAL STANDARD**

3          Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

4   [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

5   the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is

6   genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

7   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a

8   scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

9   reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

10  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

11  are to be drawn in the nonmovant's favor.  *See id.* at 255.

12         In the case at bar, Defendants are moving for summary judgment on two grounds: (1)

13  because Plaintiffs lack standing and (2) because Plaintiffs have failed to show a violation of the

14  APA, *i.e.*, that ATF failed to act in accordance with the law or otherwise acted arbitrarily and

15  capriciously (*i.e.*, with respect to Example 4).

16         In turn, Plaintiffs move for summary judgment on the merits only – *i.e.*, contending that

17  ATF did in fact fail to act in accordance with the law and further acted arbitrarily and capriciously.

18                                   **III.     STANDING**

19         A party may move to dismiss for lack of subject matter jurisdiction, including lack of

20  standing, under Federal Rule of Civil Procedure 12(b)(1).

21                    To have standing, plaintiffs must establish (1) that they have
                     suffered an injury in fact, (2) that their injury is fairly traceable to a
22                   defendant's conduct, and (3) that their injury would likely be
                     redressed by a favorable decision. . . . At the pleading stage,
23                   "general factual allegations of injury resulting from the defendant's
                     conduct may suffice."
24

25  *Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

26         In a multi-plaintiff suit, only one plaintiff need have standing in order for the case to

27  proceed.  *Cf. Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to

28  federal court suits with multiple plaintiffs is that once the court determines that one of the

United States District Court
Northern District of California

13

**ER-016**

1  plaintiffs has standing, it need not decide the standing of the others.").

2  A.  <u>Prior Order on Standing</u>

3       Previously, the Court denied Defendants' *facial* challenge to Plaintiffs' standing.  *See*

4  Docket No. 135 (Order at 7).  Now, at summary judgment, Defendants launch another attack on

5  standing, but one *factual* in nature.  Only Defendants move for summary judgment on standing;

6  Plaintiffs do not.

7       Although Defendants' current challenge is a factual attack on standing, the Court reviews

8  its prior order on standing as it is informs how the Court evaluates the current challenge.  In its

9  prior order, the Court  held that Defendants' facial attack on standing lacked merit as to the state

10  of California and GLC.  For both Plaintiffs, the issue was whether they had adequately alleged an

11  injury in fact.

12       As to **California**, the Court held that the state had sufficiently alleged an injury in fact

13  based on (1) increased cost of policing and law enforcement and (2) the enactment and

14  implementation of state legislation.

15       With respect to (1), Defendants argued that California had failed to allege that there were

16  crimes that involved receivers/frames not deemed firearms under the final rule.  The Court

17  rejected the argument:

18         As an initial matter, the Court notes that the final rule was not issued
   until April 2022 and, thereafter, a period of time passed during
19         which ATF's interpretation of the final rule was being clarified (*e.g.*,
   through its September 2022 Open Letter).  Thus, the fact that
20         California has not yet pointed to a specific instance in which an 80
   percent frame/receiver was sold standalone and then used in a crime
21         is not dispositive.  Moreover, California fairly contends that its
   ability to point to a specific instance has been hampered by the very
22         fact of the final rule.  In other words, the final rule leaves 80 percent
   receivers/frames when sold standalone unregulated, which means
23         that they are not serialized, which is then an obstacle to California to
   tracking down their sale.
24

25  Docket No. 135 (Order at 9).

26       The Court then stated that, "when all reasonable inferences are made in California's favor

27  – including the predictable effects of government action or inaction on third parties – there is a

28  'substantial risk' that California will be harmed by the final rule which leaves 80 percent

1   receivers/frames sold standalone unregulated."  Docket No. 135 (Order at 10 & n.5) (with respect

2   to predictable effects, citing *Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551 (2019), where the

3   Supreme Court recognized that a citizenship question on the census questionnaire would provoke

4   a predictable reaction from certain third parties).

- "First, it is predictable that 80 percent receivers/frames will be sold standalone. Indeed, in the FAC, Plaintiffs allege that ghost gun manufacturers have already advised consumers to purchase such receivers/frames standalone to avoid regulation under the final rule – *i.e.*, buying the 80 percent receiver/frame separate from the other tools or components needed to build a functional weapon."  Docket No. 135 (Order at 10).

- "Second, it is predictable that at least some of the 80 percent receivers/frames sold standalone will be used in crimes.  The entire point of buying an 80 percent receiver/frame standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law enforcement to track sales."  Docket No. 135 (Order at 11).  "California's basic contention is that the final rule contains a loophole/exception which enables people to avoid regulation.  *If that loophole/exception is substantial*, it is entirely predictable that crimes involving such guns will occur and thereby injure the state.  California has alleged that the size of the loophole/exception is substantial: to wit, there is an easy way to avoid regulation by making a purchase of an 80 percent receiver/frame standalone without, *e.g.*, an accompanying kit."  Docket No. 135 (Order at 11) (emphasis added).

23   As for the injury identified in (2), *i.e.*, the enactment and implementation of state

24   legislation, the Court noted that "standing may be based on 'reasonably incur[red] costs to

25   mitigate or avoid' harm or a '"substantial risk"' of harm.  That is the gist of California's position

26   here – *i.e.*, it has had to incur costs to regulate because ATF is not regulating, which has led to the

27   proliferation of ghost guns."  Docket No. 135 (Order at 14).

28   For **GLC**, the Court found that there were sufficient allegations supporting an injury in fact

United States District Court
Northern District of California

15

because the organized had alleged that (1) "the rule frustrates its 'core mission [of] sav[ing] lives from gun violence,'" and (2) "the rule has forced the organization to divert its resources to focus on ghost guns." Docket No. 135 (Order at 19). With respect to (2), the Court noted that, as alleged,

> ATF's actions on ghost guns [*i.e.*, not regulating them] have required [GLC] to expend more resources and staff time because ATF's regulatory approach undermines every other firearm policy that [GLC] advocates for. This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level," for all firearms *in general*. FAC ¶ 136 (adding that "[b]ackground check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF"). GLC has shifted resources to activity related to ghost guns *in particular* and away from activity related to other firearms.

Docket No. 135 (Order at 23) (emphasis added).

B.  <u>Factual Challenge to Standing</u>

Defendants mount a factual challenge to Plaintiffs' standing. At summary judgment, Defendants make the same basic argument that they did in their prior motion challenging standing. To wit:

> Plaintiffs have submitted no evidence to establish that their expenditures would decrease if ATF regulated any products that the Rule does *not* treat as firearms. Relatedly, Plaintiffs also have failed to submit evidence that their purported injuries are caused by any of the particular products that ATF has classified as *not* firearms . . . .

Mot. at 8 (emphasis added). Defendants underscore that their argument has even more bite now because the size of the alleged loophole/exception has narrowed – *i.e.*, Plaintiffs are contesting the validity of ATF's actions with respect to partially complete AR-type receivers only (Example 4). This is a subset of the partially complete frames/receivers in the market.

As an initial matter, the Court bears in mind that it is only Defendants who are moving for summary judgment on standing. Plaintiffs have submitted unrebutted evidence that they have suffered an injury in fact and thus Defendants are not entitled to summary judgment.

**California** has submitted the Gonzalez Declaration to support its claim of injury (*i.e.*, increased cost of policing and law enforcement and the enactment and implementation of state legislation). *See* Gonzalez Decl. ¶ 2 (testifying that he is "a Special Agent Supervisor for the

California Department of Justice ('CA DOJ'), Division of Law Enforcement, Bureau of Firearms

('BOF')").  In his declaration, Mr. Gonzalez discusses injury resulting from ghost guns generally.

The question is what in his declaration addresses AR-type ghost guns specifically, as only AR-

type receivers are allegedly underregulated.  Below is the portion of his declaration that mentions

AR-type ghost guns.

> 13.  As reflected in the AFS chart [at Exhibit E[7]], the number of ghost guns recovered by California state and local LEAs [*i.e.*, law enforcement agencies] has increased dramatically since 2016.   For example, in July 2016, LEAs recovered 2,106 guns in Los Angeles County, but only two were ghost guns without serial numbers.   By July 2020, that number exploded to 82 ghost guns in Los Angeles County, accounting for nearly 6% of all weapons recovered.   July 2021 saw another dramatic increase, with 321 ghost guns recovered in Los Angeles County, accounting for over 9% of all recovered firearms.   In 2022 through January 2023, the percentage of ghost guns recovered in Los Angeles County remained high, accounting for approximately 5 to 8% of firearms recovered each month.

> 14.  Other counties saw a similar increase in both the raw numbers of ghost guns recovered and ghost guns as a percentage of overall firearms recovered.   For example, Alameda County recovered just four ghost guns in the entire second half of 2016, but recovered 50 ghost guns in October 2021 alone.   And while there were only eight ghost guns recovered in San Bernardino County from July to December 2016, by 2022 ghost guns accounted for over 10% of the over 1,000 guns recovered per month in that jurisdiction.  Based on my knowledge and experience, the vast majority of these ghost guns were assembled using commercially-available firearm precursor parts known colloquially as "80% frames" or "80% receivers," or other precursor part variants.   **Moreover, since 2018 approximately 15-20% of the ghost guns recovered statewide were made with AR-style receivers.**

Gonzalez Decl. ¶¶ 13-14 (emphasis added); *see also* Yurgealitis Decl. ¶ 24 noting that ("the Santa

Monica mass shooter who killed five people in the summer of 2013 used an AR-15-style 'ghost

gun'"); *cf.* Yurgealitis Decl., Ex. F (NPR article, "How AR-15-style rifles write the tragic history

of America's mass shootings," dated 5/2023) (at page 4, noting that "an AR-15-style weapon was

---

[7] "California law requires all recovered firearms to be recorded in the statewide Automated Firearm System (AFS)."  Gonzalez Decl. ¶ 12.

United States District Court
Northern District of California

1    used in [multiple] mass shooting[s]," including in San Bernardino, California, in 2015).[8]

2    In addition to the Gonzalez Declaration, the Cutilletta Declaration submitted by GLC takes

3    note that, "[i]n 2021, . . . the *New York Times* published an article in which California law

4    enforcement officials estimated that ghost guns [generally] accounted for 25 to 50 percent of all

5    firearms recovered at crime scenes over the previous 18 months." Cutilletta Decl. ¶ 6.

6    Based on the Gonzalez and Cutilletta Declarations, it is predictable that crimes will be

7    committed in California with AR-type ghost guns because ghost guns are commonly used in

8    crimes and a notable percentage of the ghost guns recovered in the state are AR-type ghost guns.

9    To be sure, the issue in this case focuses on the alleged loophole in the new ATF final rule

10   which regulates some ghost guns but leaves untouched those that can be readily converted by use

11   of easily available jigs or tools not sold with the receiver blanks. Hence, the question is whether

12   this alleged shortcoming in the final rule gives rise to California's injuries. In this regard, it is also

13   predictable that a significant portion of the AR-type ghost guns used in crimes will have been

14   assembled using partially complete AR-type receivers that are not deemed firearms because they

15   were not sold with jigs or tools – *i.e.*, the partially complete AR-type receivers described in

16   Example 4. This likelihood is supported by the supplemental administrative record which reflects

17   that more than twenty Classification Letters were issued by ATF, each concluding that a partially

18   complete AR-type receiver was not a firearm because it was not indexed or machined and not sold

19   with, *e.g.*, a jig or tools. It is further substantiated by the Cutilletta Declaration which notes that a

20   company known as Juggernaut Tactical "continues to offer an 'AR-15 80% Lower Receiver' for

21   sale on its webpage" which states as follows: "If you would like to finish your AR-15 80% Lower

22   Receiver at home, we offer AR-15 jig kits here. Because 80% Lower Receivers are not considered

23   firearms by ATF, we can ship them right to your front door with no FFL [federal firearms license]

24   required." Cutilletta Decl. ¶ 8 & Ex. A (Juggernaut Tactical webpage). The Court acknowledges

25   Defendants' point that "[t]he [Final] Rule makes clear that sellers or distributors may not

26   undermine the Rule's requirements 'by working with others or structuring transactions to avoid

27

28   ───────────────
     [8] The Court considers these parts of the Yurgealitis Declaration as they bear on standing (*i.e.*, the
     Court is not restricted to the administrative record).

18

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the appearance that they are not commercially manufacturing and distributing firearms.'"  Mot. at 30.  Nevertheless, the Juggernaut Tactical webpage demonstrates that an end run is simple: jigs and tools are easily obtainable and can be purchased separately from the partially complete receiver.  Defendants also do not dispute that jigs and tools can be purchased from the open market with relative ease; there is no evidence to the contrary.

Furthermore, a reasonable jury could infer that, because California has not dismantled or otherwise walked back its regulatory scheme put in place to fill in the gap left by the final rule, the gap is still significant.  In other words, one would not expect the state to spend sums on a problem of little to no significance.

Finally, Plaintiffs make a fair point that, "[e]ven if ATF were to regulate all ghost gun products other than partially complete AR-style receivers, the 'predictable effect of [ATF's] action[s]" is increased demand for and use of those partially complete AR-style receivers.'"  Sur-Reply at 21.  The resulting increase in the demand for the unregulated partially complete receivers increases the chances of ghost guns with such receivers being used in crimes.

As for **GLC**, the same evidence above also supports that it has sustained an injury in fact, even if the only concern at this point is partially complete AR-type receivers.  That is, the alleged loophole/exception left by the final rule is big enough that the organization will continue to have to divert resources to addressing ghost guns instead of other kinds of firearms.

At bottom, the fact of, and not the precise magnitude of, the harms alleged by Plaintiffs is what counts for standing.  Defendants have thus failed to show either Plaintiff lacks standing to proceed with this suit; the record evidence of injuries to the Plaintiffs establishes standing.  Defendants' motion based on standing is thus denied.

### IV.    APA

The Court now turns to the merits of the case where both parties have moved for summary judgment.  As noted above, Plaintiffs assert that Defendants have violated the APA because ATF has determined that certain partially complete AR-type receivers are not firearms.

Under the APA, an agency's decision should not be overturned unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

19

706(2)(A). "'Agency action is "not in accordance with the law" when it is in conflict with the language of the statute'" relied upon by the agency. *Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008). As for the arbitrary and capricious standard,

> [a] decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise."
>
> *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)). . . . "[R]eview under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *Id.* (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 104 L. Ed. 2d 377, 109 S. Ct. 1851 (1989)); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1160 (9th Cir. 1998) (citations omitted).

*United States v. Snoring Relief Labs., Inc.*, 210 F.3d 1081, 1085 (9th Cir. 2000); *see also Kalispel Tribe of Indians v. United States DOI*, 999 F.3d 683, 688 (9th Cir. 2021).

In an APA case, "'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). That is, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Engineering Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985).

A. **AR-Type Receivers**

As noted above, the basic dispute between the parties is over Example 4 as provided for in the relevant regulation.

> Example 4 to paragraph (c) – **Not** a receiver: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver.

27 C.F.R. § 478.12(c) (emphasis added). Plaintiffs contend that this determination by ATF

United States District Court
Northern District of California

20

violates the APA because it is not in accordance with the law (*i.e.*, the GCA) and further is arbitrary and capricious.[9]

Example 4 is expanded upon in other ATF determinations, including, most notably, the September 2022 Open Letter and certain Classification Letters.

1.      September 2022 Open Letter

"ATF periodically publishes Open Letters to the industries it regulates in order to remind or assist licensees with understanding their regulatory compliance responsibilities under the laws and regulations administered by ATF."  ATF Supp. 173 (ATF website).

A copy of the September 2022 Open Letter (issued after the final rule) can be found in the supplemental administrative record.  *See* ATF Supp. 199 *et seq.*  The letter addresses AR-type weapons specifically and states in relevant part as follows:

> In an AR-15 variant weapon, the "fire control cavity is the critical area of the receiver because this area "provides housing for the trigger mechanism and hammer."  27 CFR 478.12(f)(1)(i).  To be a "functional" receiver, an AR-type receiver must include a cavity sufficient to house the relevant internal parts, including a hole for a selector and 2 pin holes (trigger pin and hammer pin) in precise locations.  Removing or indexing any material in this critical area, or completing or indexing any of these holes, is therefore a crucial step in producing a functional receiver.

> Thus, in order <u>not</u> to be considered "**readily**" completed to function, ATF has determined that a partially complete AR-type receiver must have no indexing or machining of any kind performed in the area of the trigger/hammer (fire control) cavity.  <u>A partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**receiver**," or "**firearm**," if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.</u>

> [Photos omitted.]

> Because the front of the takedown-pin lug clearance area merges with the back of the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the takedown-pin lug clearance area stops, and the fire control cavity begins.  AFT has determined that drilling or milling a standard

---

[9] Again, Plaintiffs' challenge implicates partially complete AR-type receivers generally, and not just partially complete AR-*15* type receivers specifically.  *See* note 7, *supra*.  However, the parties have often focused on partially complete AR-15 type receivers since that is the specific example (Example 4) given in the regulation.

United States District Court
Northern District of California

21

0.800-inch takedown-pin area, measured from immediately forward of the front of the buffer retainer hole next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer. Provided this length is not exceeded, the fire control cavity remains "*without critical interior areas having been indexed, machined, or formed*" as stated in 27 CFR 478.12(c), Example 4.

The following illustration demonstrates the fire control cavity of an AR-type receiver.



September 2022 Open Letter, ATF Supp. 201-02 (all emphasis in original).[10]

The letter further states:

It is important that persons engaged in the business of manufacturing, importing, or dealing in these items do not take any steps to avoid [the requirements of the GCA] by selling or shipping the parts or parts kits in more than one box or shipment to the same person, or by conspiring with others to do so (18 U.S.C. §§ 2, 371).

September 2022 Open Letter, ATF Supp. 205 (emphasis in original).

2.   <u>Exemplar Classification Letter</u>

ATF issues not only Open Letters but also Classification Letters. As alleged in the complaint,

---

[10] As indicated above, for purposes of the pending motions, the Court often focuses on partially complete AR-15 type receivers. However, Plaintiffs have also challenged ATF's determinations related to partially complete AR-10 type receivers on similar grounds. *See* Opp'n at 10 n.6 (noting that "ATF's analysis of partially complete AR-10 receivers is identical to its analysis of partially complete AR-15 receivers, except that ATF considers whether the forward edge of the takedown pin lug clearance area measures more than 1.600 inch (instead of 0.800 inch)").

22

United States District Court
Northern District of California

> [i]n [Classification] [L]etters, ATF responds to questions that manufacturers, distributors, and others submit to ATF to adjudicate, such as whether the product they are proposing to sell is subject to the GCA's requirements, including background checks and serialization.  According to the ATF Handbook, ATF encourages firearms manufacturers to "seek an ATF classification of its product prior to manufacture" in order to "avoid an unintended classification and violations of the law."  The ATF Handbook further explains that such Classification Letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms law."

FAC ¶ 34.

The Classification Letters that Plaintiffs are challenging relate to AR-type weapons.  An exemplar letter is Classification Letter #315916 which can be found in the supplemental administrative record as Exhibit 12.  *See* ATF Supp. 238 *et seq.*; *see also* Supp. FAC ¶ 109.

The content of the Classification Letter is similar to that in the September 2022 Open Letter.  For example, the Classification Letter states:

> FTISB has determined that the submitted sample[] may not "readily be completed, assembled, restored or otherwise converted to function as a frame or receiver."  Therefore, taken alone, the submitted partially complete AR-type receiver is not a "**firearm**" as defined in the GCA, 18 U.S.C. § 291(a)(3). . . .
>
> . . . .
>
> . . . ATF conducts its classification review of the submitted sample, precisely as submitted.  Based on the statutory and regulatory definitions above, a partially complete AR-type receiver alone, with no indexing or machining of any kind performed in the area of the fire control cavity (except the .800 inch takedown pin area, explained below) will be examined to ascertain if it can "readily be completed, assembled, restored or otherwise concerted to function as a frame or receiver."  We note that even when a sample is not classified as a "**receiver**," or "**firearm**," that determination can change if it is sold, distributed, marketed, possessed, or otherwise made available with any associated templates, jigs molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.
>
> . . . .
>
> The forward edge of the takedown pin lug clearance area of this sample item does not measure more than .800 inch immediately forward of the front of the buffer retainer hole.  Additionally, the trigger/hammer recess of your submitted sample is sold with exception of the previously noted takedown pin clearance lug, and there are no index detents machined for the safety lever or the trigger/hammer pins.

23

1    ATF Supp. 240-41 (all emphasis in original).

2        The Classification Letter also states:

3            It is important that persons engaged in the business of
            manufacturing, importing, or dealing in firearms do not take any
4            steps to avoid [the requirements of the GCA] by selling or shipping
            the parts or parts kits in more than one box or shipment to the same
5            person, or by conspiring with others to do so (18 U.S.C. §§ 2, 371).

6    ATF Supp. 242.

7        It is apparent from Example 4, the Open Letter, and the Classification Letters that if a

8    receiver blank without indexing or machining is not sold with any associated templates, jigs

9    molds, equipment, tools, instructions, or guides, it categorically will not be deemed a "receiver" or

10   "firearm" irrespective of the availability of such ancillary tools from other sources.

11   B.    Not in Accordance with Law

12       The APA provides that a court shall "hold unlawful and set aside agency action, findings,

13   and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A). According to

14   Plaintiffs, ATF's determinations above (*e.g.*, Example 4, the September 2022 Open Letter, and the

15   exemplar Classification Letter) are not in accordance with law because they do not comply with

16   the GCA. Plaintiffs underscore: "Agency action is not in accordance with the law *when it is in*

17   *conflict with the language of the statute*." *Northwest Envtl. Advocates*, 537 F.3d at 1014 (internal

18   quotation marks omitted; emphasis added); *see also* Opp'n at 22 (arguing that the Court need not

19   defer to the ATF's construction of the GCA because its interpretation is "'manifestly contrary to

20   the statute'" and "'the statute is unambiguous'").

21       The relevant provision of the GCA is 18 U.S.C. § 921(a)(3). This provision defines

22   "firearm" in relevant part as "(A) any weapon (including a starter gun) which will or is designed to

23   or may readily be converted to expel a projectile by the action of an explosive" or "(B) the frame

24   or receiver of any such weapon." 18 U.S.C. § 921(a)(3). Below the Court addresses §

25   921(a)(3)(A) and § 921(a)(3)(B) separately.

26       1.    Section 921(a)(3)(A)

27       Under § 921(a)(3)(A), a "firearm" for purposes of the GCA includes "any weapon

28   (including a starter gun) which will or is designed to *or* may readily be converted to expel a

United States District Court
Northern District of California

24

1    projectile by the action of an explosive."  *Id.* § 921(a)(3)(A) (emphasis added).  According to

2    Plaintiffs, a partially complete AR-type receiver that is not machined or indexed in critical interior

3    areas and not sold with, *e.g.*, a jig or tools, is still a weapon "designed" to expel a projectile or

4    "may readily be converted to expel a projectile."  *Id.*

5                                    a.      Designed

6            Plaintiffs argue that a partially complete AR-type receiver is a firearm under §

7    921(a)(3)(A), even if it is not machined or indexed and not sold with a jig or tools, because it is

8    "designed for a single purpose: to become an operable gun.  Unlike a raw block of metal, [such a

9    partially complete receiver is] too far along in the manufacturing process to be turned into

10   anything but a firearm."  Opp'n at 17.  Plaintiffs assert: "A bicycle is 'designed to' operate as a

11   bicycle before it gets its pedals, seat, or handlebar."  Opp'n at 17.  They also note: "ATF's Final

12   Rule and implementing guidance never mention, let alone evaluate, the design purpose of these

13   AR-style receivers."  Opp'n at 17.

14          Although Plaintiffs' position has some appeal,  the Court rejects it.  The problem for

15   Plaintiffs is that they have strayed from the language of the GCA.  Section 921(a)(3)(A) provides

16   that a "firearm" for purposes of the GCA includes "any *weapon* (including a starter gun) which

17   will or is designed to or may readily be converted to expel a projectile by the action of an

18   explosive."  18 U.S.C. § 921(a)(3)(A) (emphasis added).  A partially complete AR-type receiver

19   cannot fairly be characterized as a weapon.

20          First, the ordinary meaning of weapon is "something (such as a club, knife, or gun) used to

21   injure, defeat, or destroy."  https://www.merriam-

22   webster.com/dictionary/weapon?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last

23   visited on 1/10/2024); *see also* Webster's 3d New Int'l Dictionary (1966) (defining "weapon" as

24   "an instrument of offensive or defensive combat: something to fight with: something (as a club,

25   sword, gun, or grenade) used in destroying, defeating, or physically injuring an enemy").  A

26   partially complete receiver does not satisfy that definition.

27          Second, additional text from the GCA indicates that a partially complete receiver cannot be

28   deemed a weapon.  Section 921(a)(3)(B) provides that a "firearm" also includes "the frame or

United States District Court
Northern District of California

25

1    receiver *of any such weapon*." 18 U.S.C. § 921(a)(3)(B) (emphasis added).  This language from

2    the GCA underscores that a receiver is not a weapon in and of itself but rather is *part* of a weapon.

3                              b.     <u>May Readily be Converted</u>

4           Plaintiffs argue that, even if a partially complete AR-type receiver that is not machined or

5    indexed and not sold with a jig or tools is not "designed" to expel a projectile, it still is a firearm

6    under the GCA because it "may readily be converted to expel a projectile." 21 U.S.C. §

7    921(a)(3)(A) (defining a firearm as, *inter alia*, "any weapon (including a starter gun) which will or

8    is designed to or may readily be converted to expel a projectile by the action of an explosive"). In

9    support, Plaintiffs look to the National Firearms Act ("NFA") which governs machineguns. The

10   NFA provides in relevant part: "The term 'machinegun' means any weapon which shoots, or is

11   designed to shoot, or can be readily restored to shoot, automatically more than one shot, without

12   manual reloading, by a single function of the trigger." 28 U.S.C. § 5845(b). Plaintiffs cite NFA

13   cases holding that a weapon is a machinegun because it can be restored to shoot automatically in

14   two hours using ordinarily tools (Ninth Circuit) or even in six to eight hours using particular

15   machinery (Sixth and Eighth Circuits). *See* Opp'n at 19-20.

16          The problem for Plaintiffs is, once again, that their position runs up against the text of §

17   921(a)(3)(A). Section 921(a)(3)(A) requires that the item be a *weapon* that may readily be

18   converted to expel a projectile. As discussed above, a partially complete AR-type receiver is not a

19   weapon but rather is a part of a weapon.

20          2.     <u>Section 921(a)(3)(B)</u>

21          Section 921(a)(3)*(B)* of the GCA provides that a "firearm" also includes "the frame or

22   receiver of any such weapon [*i.e.*, a weapon which will or is designed to or may readily be

23   converted to expel a projectile]." 21 U.S.C. § 921(a)(3)(B). According to Plaintiffs, a partially

24   complete AR-type receiver that is not machined or indexed and not sold with a jig or tool is still a

25   receiver within the meaning of § 921(a)(3)(B). Plaintiffs assert:

26                 Defendants concede that a receiver need not be finished or ready to
                   use in order to qualify as a "receiver" under the GCA. ATF has
27                 affirmatively argued – here and in other cases – that the term
                   "receiver" includes a partially complete receiver that is "designed to
28                 or may readily be converted to function as a . . . receiver."

United States District Court
Northern District of California

26

1    Opp'n at 21.

2         ATF's concession – *i.e.*, that a receiver includes a partially complete receiver that is

3    designed to or may readily be converted to function as a receiver – comes from ATF's own

4    regulation (as promulgated with the final rule):

> The terms "frame" and "receiver" shall include a **partially
> complete**, disassembled, or nonfunctional frame or **receiver**,
> including a frame or receiver parts kit, **that is designed to or may
> readily be** completed, assembled, restored, or otherwise **converted
> to function as a frame or receiver** . . . .  [But] [t]he terms shall not
> include a forging, casting, printing, extrusion, unmachined body, or
> similar article that has not yet reached a stage of manufacture where
> it is clearly identifiable as an unfinished component part of a
> weapon (e.g., unformed block of metal, liquid polymer, or other raw
> material).  When issuing a classification, the Director may consider
> any associated templates, jigs, molds, equipment, tools, instructions,
> guides, or marketing materials that are sold, distributed, or
> possessed with the item or kit, or otherwise made available by the
> seller or distributor of the item or kit to the purchaser or recipient of
> the item or kit.

13   27 C.F.R. § 478.12(c) (emphasis added).  Thus, Plaintiffs are not really arguing that ATF has

14   failed to act in accordance with the *GCA* but rather has failed to properly implement one of its

15   regulations.[11]

16   _____

17   [11] The Fifth Circuit has held that ATF's definition of "frame" or "receiver" as including partially
     complete frames or receivers is invalid on the basis that it is "an impermissible extension of the
18   statutory text [of the GCA] approved by Congress."  *Vanderstok v. Garland*, 86 F.4th 179, 189
     (5th Cir. 2023).  The Fifth Circuit reasoned as follows:

> In the GCA's definition of "firearm," the first subsection includes
> flexible language such as "designed to or may readily be converted
> to expel a projectile by the action of an explosive."  *See* 18 U.S.C. §
> 921(a)(3)(**A**).  But the subsection immediately thereafter [§
> 921(a)(3)(**B**)], which contains the term "frame or receiver," does not
> include such flexibility [*i.e.*, does not contain the language
> "designed to" or "may readily be converted"].  "[W]hen Congress
> includes particular language in one section of a statute but omits it in
> another section of the same Act, it is generally presumed that
> Congress acts intentionally and purposely in the disparate inclusion
> or exclusion."  *Collins v. Yellen*, 141 S. Ct. 1761, 1782, 210 L. Ed.
> 2d 432 (2021) (citation omitted). . . .

> There is also a clear logical flaw in ATF's proposal.  As written, the
> Final Rule states that the phrase "frame or receiver" includes things
> that are admittedly not yet frames or receivers but that can easily
> become frames or receivers – in other words: parts. [ ] As the district
> court put it, under the Final Rule, "ATF may properly regulate a
> component as a 'frame or receiver' even after ATF determines that

27

the component in question is *not* a frame or receiver." *VanDerStok*, 2023 U.S. Dist. LEXIS 115474 (emphasis in original).  Such a proposition defies logic: "a part cannot be both *not yet* a receiver and a receiver at the same time."

*Id.* at 189-90 (italics in original; bold added).

Respectfully, the analysis above is problematic for several reasons.  Although *Collins* states that a presumption may obtain from silence, case law also makes clear that any such presumption is simply a canon of construction that is not, on its own, necessarily dispositive.  *Cf. United States v. Vonn*, 535 U.S. 55, 65 (2002) ("[T]he canon that expressing one item of a commonly associated group or series excludes another left unmentioned is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives.").

Indeed, a contrary inference may be drawn: "because silence 'may signal permission rather than proscription,' the fact 'that Congress spoke in one place but remained silent in another . . . rarely if ever suffices for the direct answer" to the question of what Congress intended.  *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1260 (11th Cir. 2020); *see also Catawba Cnty. v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) (stating that, "[w]hen interpreting statutes that govern agency action, we have consistently recognized that a congressional mandate in one section and silence in another often 'suggests not a prohibition but simply a decision not to mandate any solution in the second context, i.e., to leave the question to agency discretion'"); *cf. Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 222 (2009) (Scalia, J.) (stating, in case under consideration, that "silence is meant to convey nothing more than a refusal to tie the agency's hands as to whether cost-benefit analysis should be used, and if so to what degree").  In assessing whether an agency has exceeded its statutory authority, a court must "'ascertain whether Congress had a specific intent on the precise question before [it],'" and, if the statute is ambiguous on the point, [the court] assume[s] that Congress delegated to the agency the authority to reasonably answer the question."  *Gateway Radiology Consultants*, 983 F.3d at 1256.  Hence, Congress's silence with respect to "frame" or "receiver" does not compel the conclusion that the definition of these terms is beyond interpretation by the ATF; it could support the inference that it affords ATP the authority to render and interpretation of the statute.

In respect to Congress's intent, courts should not presume that the legislature intended absurd results that might obtain upon a given interpretation of the law.  *See United States v. Thomsen*, 830 F.3d 1049, 1058 (9th Cir. 2016) ("Notwithstanding the importance of the text [of a statute], we must avoid a literal interpretation of the statute that produces an absurd result.") (internal quotation marks omitted).  Here, it makes no sense that something less than a fully functional receiver could never be a receiver regardless of the circumstances.  For example, if a receiver were partially complete because it was missing only one pinhole or dimple which could easily be drilled, it would make little sense to hew to the position that the partially complete receiver still is not a receiver for purposes of the GCA, as the Fifth Circuit's logic suggests.  This is particularly true given that the GCA was enacted to strengthen its predecessor statute (the Federal Firearms Act ("FFA")), not dilute it, as indicated by, *e.g.*, the fact that § 921(a)(3)(A) was revised to make the definition of firearm more inclusive.

The definition of the term "firearm" in paragraph (3) is a restatement and revision of the provisions of existing law (15 U.S.C. 901(3)) [i.e., the FFA].  The revised definition has been extended to include any weapon by whatsoever name known "which will," or "which may be readily converted to," expel a projectile or projectiles by the action of an explosive.  This represents a much needed clarification and strengthening of existing law designed to prevent circumvention

28

Some "courts have concluded that an agency's failure to comply with its own regulations is 'not in accordance with law'" for purposes of the APA. *Am. Stewards of Liberty v. DOI*, 370 F. Supp. 3d 711, 728 (W.D. Tex. 2019). Other courts have held that, when an agency fails to comply with its own regulations, it has acted arbitrarily and capriciously for purposes of the APA. *See Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"); *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct. The courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself."). For purposes of the instant action, precisely which standard technically applies is not significant; the analysis is largely the same.

     a.   <u>Designed</u>

In their papers, Defendants disagree that they are not adhering to their own final rule/regulation. Defendants contend:

> The disputed receiver blanks are not designed to "function as a frame or receiver." Rather, they are designed *to be converted into* a functional receiver through a complex set of machining operations. They are far from being *able* to function as a receiver because the

> of the purposes of the act. As under existing law, the definition also includes weapons "designed to" expel a projectile or projectiles by the action of an explosive, and firearm mufflers and firearm silencers.

111 Cong. Rec. 5520, 5527 (Mar. 22, 1965) (Sen. Dodd, introducing the bill). It is highly unlikely that Congress intended the perverse result that no matter how close to completion a partially complete receiver may be, it is categorically exempt from regulation under § 921(a)(3) of the GCA.

It is true that the GCA's predecessor statute "had specific language that authorized regulation of 'any part or parts of' a firearm," but that "Congress removed this language when it enacted the GCA, replacing 'any part or parts' with just 'the frame or receiver of any such weapon.'" *Vanderstok*, 86 F.4th at 191. However, the legislative history for the GCA reflects that the "parts" language was dropped because of impracticality. As Senator Dodd noted: "The present definition of this term [in the FFA] includes 'any part or parts' of a firearm. It has been impractical to treat *each small part* of a firearm as if it were a weapon [i.e., firearm]. The revised definition substitutes the words 'frame or receiver' for the words 'any part or parts.'" *Id.* That it was not practical to treat each small part of a firearm as a firearm does not mean there was an intent to regulate less.

29

fire control cavity is solid and unmachined.  *See* Sept. Open Letter at 3-4. . . .

. . . . [Plaintiffs] ignore[] the distinction between being designed to perform a function and being designed to be converted into something that will perform a function.  *See* [*United States v.*] *Gravel*, 645 F.3d [549,] 551 [(2d Cir. 2011)] ("designed" refers to what a product "was conceived of and designed for, and not to any modifications made afterwards").  Therefore, unserviceable or damaged receivers may, depending on the factual circumstances, be designed to function as a receiver under the Rule.  Defs.' MSJ at 10 n.5; [Final Rule], 87 Fed. Reg. at 24,685-86 & nn.99-100, 105.  But the disputed receiver blanks, which were designed to have a solid fire control cavity that cannot be used to house fire control components, plainly are not designed to function as a receiver in their present state.

Reply at 9-10 (emphasis added).

In response, Plaintiffs argue that Defendants have lost sight of the ordinary meaning of "design": "to create, fashion, execute, or construct according to a plan"; "to conceive and plan out in mind"; "to have as a purpose: INTEND"; or "to devise for a specific function or end." https://www.merriam-webster.com/dictionary/designed (last visited 2/23/2024); *see also United v. Thomas*, No. 17-194 (RDM), 2019 U.S. Dist. LEXIS 147264, at *12 (D.D.C. Aug. 29, 2019) (providing the same first definition for "design," as that term is used in § 921(a)(3)); *cf. United States v. Gravel*, 645 F.3d 549, 551 (2d Cir. 2011) (in considering "designed" as used in 26 U.S.C. § 5845(b), which regulates machineguns, finding a similar ordinary meaning for "design"; adding that "[t]he 'ordinary, contemporary, common meaning' of design must consider what was contemplated at the time the weapon was being conceived and devised").  According to Plaintiffs, under the ordinary meaning of "design," a partially complete receiver *is* designed to function as a receiver, and Defendants improperly conflate the "designed" prong of the regulation with the "may readily be converted" prong.   *See* Sur-Reply at 4 (arguing that "[t]he relevant question for the purposes of the 'designed to' prong is not, as Defendants suggest, whether the item can 'readily' be converted into a receiver . . . , but whether the item was manufactured *for the purpose of becoming* a receiver") (emphasis in original).

Plaintiffs' position is not unreasonable.  "Designed" and "may readily be converted" are distinct concepts. The problem for Plaintiffs, however, is that Defendants have articulated a position that is not unreasonable, one that does not conflate the two concepts – in essence, that

30

United States District Court
Northern District of California

"designed" evaluates what an item's *immediate* purpose is, and not what its purpose *may be* if later

converted. *Cf. United States v. Gravel*, 645 F.3d 549, 551-52 (2d Cir. 2011) ("find[ing] that the

word 'designed,' when applied to a manufactured object such as a firearm, refers to what the gun

was conceived and designed for, and not to any modifications made afterwards").[12]  Such an

interpretation makes particular sense given that the phrase used in the regulation (§ 478.12(c)) is

"designed . . . *to function*," and not, *e.g.*, "designed *to become*."  Defendants have also made a fair

argument that, under Plaintiffs' position, there is no real difference between the "designed" and

"may readily be converted" prongs of the regulation, which is contrary to the use of the disjunctive

"or" in the regulation.  Finally, under Plaintiffs' position, the regulation would have an internal

inconsistency: a partially complete receiver would always be a receiver (and therefore a firearm)

---

[12] *Gravel* was a criminal case.  The defendant had stolen a weapon that "originally was manufactured to fire automatically, but was later modified to shoot semi-automatically." *Gravel*, 645 F.3d at 550.  The modification "did not change the fundamental design of the weapon or . . . 'redesign' the weapon into something other than an automatic fire weapon." *Id.* at 552.  Rather, "[t]he evidence indicated that simply replacing the auto sear [which had been removed] would reenable the gun's automatic fire capabilities." *Id.*

On appeal, the issue was whether the district court properly applied a six-level enhancement based on its finding that the weapon was a "machinegun" as defined in 26 U.S.C. § 5845(b) (which is part of the National Firearms Act).  Under that statute, a machinegun is a weapon that "'is designed to shoot . . . automatically more than one shot.'" *Id.* at 550.

> Gravel [the defendant] argues that the M-16A1 was "re-designed" into a semi-automatic weapon, and that because Section 5845 uses the present tense "is designed," we may consider only the state of the weapon as it existed at the time of his crime.  The government argues that under the plain meaning of the statute, "designed" refers to what the weapon was originally designed to do, not to post-manufacture modifications.

*Id.*

The Second Circuit ultimately sided with the government:

> We find that the word "designed," when applied to a manufactured object such as a firearm, refers to what the gun was conceived and designed for, and not to any modifications made afterwards.  This is consistent with the statutory language further defining "machinegun" as a weapon readily restorable to automatic fire.  There would be no need to include a definition taking future modifications into account if the word "design" encompassed post-manufacture modifications.

*Id.* at 551-52.

31

under the "designed" prong which would then conflict with Example 4 – which, as noted above, provides that a partially complete receiver is not a receiver (and therefore a firearm) so long as it is not machined or indexed and is not sold with a jig or tools.  Presumably, ATF did not intend for there to be an internal inconsistency in its own regulation, and therefore, the regulation should be construed in a way to reconcile any potential internal inconsistency if it can reasonably be so construed.  *Cf. Momeni v. Chertoff*, 521 F.3d 1094, 1097 (9th Cir. 2008) ("Where an appellate court can construe two statutes so that they conflict, or so that they can be reconciled and both can be applied, it is obliged to reconcile them.").  Defendants' interpretation of "designed" – taking a narrower view compared to Plaintiffs' view – reconciles any potential inconsistency with Example 4.

Accordingly, the Court finds that Defendants did not fail to comply with their own regulations, and therefore they did not fail to act in accordance with the law, nor did they act arbitrarily and capriciously.  There is thus no APA violation here.  *See Davis v. Latschar*, 83 F. Supp. 2d 1, 5 (D.D.C. 1998) ("[P]rovided it does not violate the Constitution or a federal statute, an agency's interpretation of its own regulations 'will prevail unless it is "plainly erroneous or inconsistent" with the plain terms of the disputed regulations.'"); *see also Stinson v. United States*, 508 U.S. 36, 45 (1993).

> **b.**   <u>May Readily be Converted</u>

Plaintiffs argue that, under the final rule/regulation, a partially complete receiver must be deemed a receiver (regardless of what it is "designed" to do) if it "may readily be converted" to function as receiver.

This argument overlaps with that below – *i.e.*, as to how ATF has acted arbitrarily and capriciously in construing and applying the "readily be converted" test – and is therefore addressed below.

## C.   <u>Arbitrary and Capricious</u>

"[A]n agency's action can only survive arbitrary or capricious review where it has articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th

32

Cir. 2023) (internal quotation marks omitted).

> A decision is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise."

> *O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir. 1996) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 77 L. Ed. 2d 443, 103 S. Ct. 2856 (1983)). . . . "[R]eview under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *Id.* (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376, 104 L. Ed. 2d 377, 109 S. Ct. 1851 (1989)); *Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1160 (9th Cir. 1998) (citations omitted).

*Snoring Relief*, 210 F.3d at 1085.

In their papers, Plaintiffs have three main theories as to how ATF has acted arbitrarily and capriciously in failing to find that partially complete receivers without machining or indexing and not being sold with jigs or tools are not firearms:

(1) ATF has ignored the "GCA's [c]lear [s]tatutory [c]ommands." Opp'n at 23;

(2) ATF has ignored data demonstrating that such a partially complete receiver may readily be converted into a receiver, taking into account the definition of "readily" in 27 C.F.R. § 478.11 which includes multiple factors for consideration, including "[t]ime, i.e., how long it takes to finish the process," "[e]ase, i.e., how difficult it is to do so," "[e]xpertise, i.e., what knowledge and skills are required," etc.  27 C.F.R. § 478.11; and

(3) ATF has failed to sufficiently explain (a) why such a partially complete AR-15 type receiver with machining of *more* than 0.800 inch in the area near the fire control cavity (known as the takedown-pin lug clearance area) is a firearm but not one with machining of 0.800 inch or less, *see* Opp'n at 23; *see also* Opp'n at 30 (arguing that there must be data to support an agency's line drawing); Sur-Reply at 16-17 (arguing that line drawing must be consistent with the statute and relate to the

33

underlying regulatory problem), and (b) why such a partially complete receiver is not a receiver given that jigs and tools are so easy to obtain even if sold separately from the partially complete receiver. *See* Opp'n at 28 (noting that "[t]emplates and instructions are easy to locate online, sometimes for free, and jigs are both inexpensive and readily available for purchase (either from a different retailer or in a different transaction from the same retailer)").

1.     Theory No. 1: Ignoring GCA's Clear Statutory Commands

In their first theory, Plaintiffs argue that ATF acted arbitrarily and capriciously because it ignored the GCA's clear text by not deeming the partially complete receivers described in, *e.g.*, Example 4 firearms (*i.e.*, partially complete receivers with no machining or indexing and not sold with jigs or tools). Plaintiffs emphasize that ATF never even considered whether such partially complete receivers were designed to expel a projectile.

Plaintiffs' first theory is based on § 921(a)(3)*(A)* of the GCA. For the reasons discussed above, Plaintiffs' arguments based on § 921(a)(3)(A) fail because that subsection uses the word "weapon" and a partially complete receiver is not in and of itself a weapon but rather a part of a weapon.

2.     Theory No. 2: Ignoring Relevant Data

In their second theory, Plaintiffs criticize ATF on the basis that the challenged determinations (including Example 4, the September 2022 Open Letter, and the exemplary Classification Letter) were made without taking into account all relevant data, including the factors listed in 27 C.F.R. § 478.11 which defines "readily" as follows:

> A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:
>
> (1)     Time, i.e., how long it takes to finish the process;
> (2)     Ease, i.e., how difficult it is to do so;
> (3)     Expertise, i.e., what knowledge and skills are required;
> (4)     Equipment, i.e., what tools are required;
> (5)     Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;
> (6)     Expense, i.e., how much it costs;

34

(7)   Scope, i.e., the extent to which the subject of the process
       must be changed to finish it; and

(8)   Feasibility, i.e., whether the process would damage or
       destroy the subject of the process, or cause it to malfunction.

27 C.F.R. § 478.11.  Of particular note, ATF's determinations do not reflect how long it takes to convert the contested partially complete receivers into functional ones.  For example, the September 2022 Open Letter and the exemplary Classification Letter both focus on machining/indexing of the fire control cavity and do not make any mention of time.  Similarly, the final rule – though it does refer to the factor of time in some instances – never does so in discussing Example 4.  *See, e.g.*, Final Rule, 87 Fed. Reg. at 24,663 (discussing the definition of "readily" in § 478.11, of which one factor is time); *id.* at 24,699 (taking note that "[n]umerous commenters focused on the factor of 'time' under the proposed definition of 'readily,' arguing that it is not an adequate factor, without more specificity, by which to measure if a . . . partially completed frame or receiver may be readily convertible or assembled into a firearm"); *id.* at 24,700 (rejecting suggestion that "[the] factors should incorporate minimum time limits, percentages of completion, or levels of expertise, or otherwise create thresholds to determine when weapon or frame or receiver parts are 'readily' converted").  Plaintiffs contend with the assistance of available tools (which may be obtained from the open market), it can take just a few hours to convert a partially completed receiver into a fully functional one.[13]

In response, Defendants argue that "the machining operations necessary for [a receiver's] completion are highly relevant to [*e.g.*] the time and ease with which it can be rendered functional."  Reply at 16; *see also* Mot. at 13 (asserting that "ATF does consider the machining

---

[13] The Court notes that the parties do not appear to be disagree on this point.  *Compare* Yurgealitis Decl. ¶ 27 (testifying that the "conversion process can take one to three hours, depending on the available tools, the quality of the partially complete frame or receiver, the demarcations on the frame or receiver designed to guide swift conversion, and the mechanical aptitude of the individual completing the receiver"), *with* Hoffman Decl. ¶ 38 (testifying that it took him 4.5 hours to do his first conversion, although "the completed receiver build quality was substandard, with the fire control cavity not being cut to exact specifications"); Hoffman Decl. ¶ 27 (testifying that, prior to the September 2022 Open Letter, "FEOs in FTISB completed or attempted to complete numerous partially complete AR-type receivers with a fixture/jig" and "[t]hese builds averaged 1.5-3 hours to complete depending on the quality of the fixtures/jigs and the tools used and the experience of the FEO").  Though these declarations are not admitted for consideration for the reasons stated above, they are cited here simply to show the parties do not dispute this particular fact.  Ultimately, on remand, the time needed to convert and its implications will need to be considered by the agency.

United States District Court
Northern District of California

1   operations . . . but it considers [them] in order to *apply* the Rule's 'designed to or may readily be .

2   . . converted to function' test, not to *repudiate* it"; "the machining operations . . . are highly

3   relevant to most, if not all, of [the eight] factors" listed in § 478.11) (emphasis in original).  But

4   that machining operations are relevant to, *e.g.*, time does not establish that ATF considered the

5   actual time it takes to convert the kind of partially complete receiver at issue into a functional one,

6   including when jigs and tools are available.

7        The agency's failure to address time is particularly troubling given that time is clearly one

8   of the most important factors in assessing "readily."  It is the first factor identified in 27 C.F.R. §

9   478.11.  It is also a factor highlighted in case law addressing the similar issue of whether a weapon

10  should be considered a "machinegun" as defined in 26 U.S.C. § 5845(b) (which is part of the

11  NFA).  *See* 26 U.S.C. § 5845(b) (providing that "[t]he term 'machinegun' means any weapon

12  which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than

13  one shot, without manual reloading, by a single function of the trigger").  *See, e.g.*, *United States*

14  *v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 692 (9th Cir. 2006) (stating as follows: "A **two-**

15  **hour** restoration process using ordinary tools, including a stick weld, is within the ordinary

16  meaning of 'readily restored.'  As to the temporal component, two hours, while not an

17  insignificant amount of time, is still within a range that may properly be considered 'with fairly

18  quick efficiency,' 'without needless loss of time,' or 'reasonably fast.'  As to the means of

19  restoration, requiring the use of ordinary tools and a stick weld, even by a skilled worker, is

20  likewise within what may properly be considered 'with a fair degree of ease,' 'without much

21  difficulty,' or 'with facility.'") (emphasis added).

22       Moreover, any evaluation of time should take into account the object at issue.  For

23  instance, in *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416 (6th Cir.

24  2006), the Sixth Circuit addressed whether a weapon could be "readily restored" to shoot

25  automatically, in which case it would be deemed a "machinegun" for purposes of the National

26  Firearms Act.  The court noted that the phrase "readily restored" "must not be construed as an

27  abstract phrase, but rather its contours should be determined in the context of what it means to be

28  able to 'readily restore[]' a machinegun as opposed to some other object."  *Id.*  "The sort of object

United States District Court
Northern District of California

36

1  being restored, primarily its complexity, helps to determine whether a given amount of time,

2  money, expertise, and skill required to restore it is considered a 'ready' restoration" – *e.g.*, "a car

3  that could be restored in ten hours for $500 would likely be considered 'readily restored,' whereas

4  a skateboard that required the same inputs likely would not be considered 'readily restored.'" *Id.*

5  The record in the case at bar does not reflect that the complexity of the object at issue (an AR-15)

6  was actually considered by ATF in assessing how to factor time in connection with what "may

7  readily be converted."

8         To the extent Defendants argue that ATF did in fact consider factors such as time, that

9  position is based on the Hoffman Declaration – which Defendants admit the Court should not

10  consider if it does not consider the Yurgealitis Declaration submitted by Plaintiffs.  Moreover,

11  Plaintiffs make a fair argument that the Hoffman Declaration largely provides a post-hoc

12  explanation for ATF's determinations.[14]  *See, e.g.*, Hoffman Decl. ¶ 28 (testifying that, "[t]o help

13  implement the Final Rule, FTISB also developed a standard procedure to assist FEOs in

14  evaluating the tracked . . . factors under the 'readily' definition' – *i.e.*, it "developed a 'Readily'

15  Assembled Firearm Completion Form for this purpose"; the form has several fields including

16  "Time needed to complete build").

17         3.     Theory No. 3: Some Machining/Indexing and Jigs/Tools Sold Separately

18         In their third theory, Plaintiffs argue that ATF has acted arbitrarily and capriciously with

19  respect to partially complete receivers that are not machined or indexed and not sold with jigs or

20  tools by the seller or distributor of the receiver because ATF has failed to sufficiently explain:

21               (a) why such a partially complete AR-15 type receiver with machining of *more* than

22               0.800 inch in the area near the fire control cavity (known as the takedown-pin lug

23               clearance area) is a firearm but not one with machining of 0.800 inch or less, *see*

24               Opp'n at 23; *see also* Opp'n at 30 (arguing that there must be data to support an

---

[14] *See generally DOC v. New York*, 139 S. Ct. 2551, 2573 (2019) (noting that, "in order to permit meaningful judicial review, an agency must 'disclose the basis' of its action" and, "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record"); *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 690 (N.D. Cal. 2020) (stating that an "explanation . . . not publicly advanced by the agency at the time it reached its determination . . . constitutes an impermissible post hoc rationalization").

United States District Court
Northern District of California

1    agency's line drawing); Sur-Reply at 16-17 (arguing that line drawing must be

2    consistent with the statute and relate to the underlying regulatory problem), and

3    (b)  why such a partially complete receiver is not a receiver when  jigs and tools are

4         easy to obtain from the open market, even if sold separately from the partially

5         complete receiver.  *See* Opp'n at 28 (noting that "[t]emplates and instructions are

6         easy to locate online, sometimes for free, and jigs are both inexpensive and readily

7         available for purchase (either from a different retailer or in a different transaction

8         from the same retailer)").

9    Each sub-theory is addressed below.

10            a.    0.800-Inch Measurement

11   Plaintiffs' first subtheory lacks merit.  In their papers, Defendants address the 0.800-inch

12   measurement as follows.

> In an AR-15 variant weapon, the area known as the "fire control cavity" is critical because it "provides housing for the trigger mechanism and hammer."  ATF has determined that to be a "functional" receiver, an AR-type receiver must include a cavity large enough to house the relevant internal parts, including holes for certain of these parts.  Removing or indexing any material in this critical area, or completing or indexing any of these holes, is thus a crucial step in producing a functional receiver.

18   Reply at 17.  Defendants continue: "[B]ecause another cavity within the receiver – the takedown-

19   pin lug clearance area – merges with the fire control cavity in a functional AR-type receiver, it was

20   necessary for ATF to determine the point at which the former area ends and the fire control cavity

21   begins."  Reply at 17-18.  Drilling or milling greater than 0.800 inch "would breach the fire

22   control cavity."  Reply at 18.

23   The above explanation that Defendants give in their papers is consistent with the

24   explanation given in the September 2022 Open Letter:

> In an AR-15 variant weapon, the "fire control cavity is the critical area of the receiver because this area "provides housing for the trigger mechanism and hammer."  27 CFR 478.12(f)(1)(i).  To be a "functional" receiver, an AR-type receiver must include a cavity sufficient to house the relevant internal parts, including a hole for a selector and 2 pin holes (trigger pin and hammer pin) in precise locations.  Removing or indexing any material in this critical area, or

38

completing or indexing any of these holes, is therefore a crucial step in producing a functional receiver.

Thus, in order <u>not</u> to be considered "**readily**" completed to function, ATF has determined that a partially complete AR-type receiver must have no indexing or machining of any kind performed in the area of the trigger/hammer (fire control) cavity. <u>A partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity is not classified as a "**receiver**," or "**firearm**," if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit.</u>

[Photos omitted.]

Because the front of the takedown-pin lug clearance area merges with the back of the fire control cavity in a functional AR-type receiver, it was necessary for ATF to determine the point at which the takedown-pin lug clearance area stops, and the fire control cavity begins.  AFT has determined that drilling or milling a standard 0.800-inch takedown-pin area, measured from immediately forward of the front of the buffer retainer hole next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer.  Provided this length is not exceeded, the fire control cavity remains "*without critical interior areas having been indexed, machined, or formed*" as stated in 27 CFR 478.12(c), Example 4.

The following illustration demonstrates the fire control cavity of an AR-type receiver.



September 2022 Open Letter, ATF Supp. 201-02 (all emphasis in original).

Based on the above, ATF has given an explanation as to why it sees the fire control cavity as being critical – *i.e.*, because it houses the firing components.  *See also* Hoffman Decl. ¶ 22 ("In

United States District Court
Northern District of California

an AR-type firearm, the fire control cavity provides housing or a structure for the trigger mechanism and hammer.  The trigger initiates the firing cycle and releases the hammer.  Once released, the hammer strikes an explosive primer at the rear of the ammunition cartridge to ignite propellant powder and expel a projectile (bullet) through the barrel.").[15]  It has also explained why it came up with the 0.800-inch measurement – *i.e.*, to distinguish between the fire control cavity and the takedown-pin lug clearance area.  Machining beyond this measurement is implicitly condemned because it would constitute machining of the fire control cavity.  Thus, Plaintiffs' challenge comes down to two points: (1) it is not clear why a partially complete AR-15 type receiver that has a measurement of 0.800 inches or less cannot readily be converted into a functional receiver, *see* Sur-Reply at 14 , and (2) 0.800 inch is an arbitrary number.

With respect to (1), that essentially replicates the argument that Plaintiffs made in Theory No. 2 (discussed above in Part IV.C.2).  As for (2), some line drawing needed to be done and it does not appear that ATF picked the 0.800-inch number arbitrarily but rather based on the physical structure of an AR-15 type receiver.  Therefore, the ATF's interpretation is not arbitrary or capricious; it has a rational basis.

> b.   Jigs or Tools Not Sold with Partially Complete Receiver

Although Plaintiffs' first sub-theory is problematic, Plaintiffs' second sub-theory has merit.  Essentially, Plaintiffs contend that it makes no sense to say that a partially complete receiver that is not machined or indexed and is not sold with a jig or tools is not a firearm even where jigs and tools are easy to obtain (*i.e.*, can easily be purchased separately).  In response, Defendants do not dispute that jigs and tools may be purchased separately from sources other than the seller or distributor of the receiver with ease.  Indeed, Defendants contend that ATF *did* "consider that partially complete frames and receivers may be purchased separately from an assembly kit or from templates, jigs, and other similar equipment."  Mot. at 30.  But ATF's solution, Defendants explain, was to address that problem through the application of criminal law.

---

[15] Plaintiffs have expressly stated that they do not object to, *inter alia*, ¶ 22 of the Hoffman declaration since it "can assist the Court in understanding technical terms."  Sur-Reply at 8 n.4.

> The Rule makes clear that sellers or distributors may not undermine the Rule's requirements "by working with others or structuring transactions to avoid the appearance that they are not commercially manufacturing and distributing firearms." Sellers thus may not make an end run around the Rule's requirements by structuring sales transactions, for example, by shipping a partially complete receiver to a buyer in one transaction and then shipping the jigs, tools, or written materials allowing the partially complete receiver to be readily concerted into a functional receiver in a separate package or at a different time. Nor may sellers conspire with other sellers to evade the Rule's requirements by agreeing that they will separately sell to a buyer a partially complete frame and tools allowing for its ready conversion into a functional frame. ATF thus did consider that partially complete frames and receivers may be sold separately from kits, jigs, or similar items, but decided to address this problem through well-established criminal law: conspiracy, aiding and abetting, and structuring of transactions.

Mot. at 30 (quoting Final Rule, 87 Fed. Reg. at 24,713); *see also* Reply at 21 (asserting that, "[t]o the extent that Plaintiffs raise concerns about licensees evading the Rule through improper structuring of transactions or entities, those concerns may be ameliorated by the application of ordinary criminal principles like conspiracy and aiding and abetting liability to any unlawful conduct').

The first problem with Defendants' position is that ATF itself never clearly identified criminal law as the solution to the specific problem pinpointed by Plaintiffs. Nor did ATF ever explain why that was the appropriate solution. Defendants cite a D.C. Circuit case for the proposition that "[i]t does no violence to *Chenery* or *Kansas City* principles[16] for an agency to advance a legal argument in support of its administrative position which *bolsters* rather than duplicates the consistent position upon which its decision was made below." *America's Community Bankers v. FDIC*, 200 F.3d 822, 836 (D.C. Cir. 2000) (emphasis added). But the D.C. Circuit case is of little support because ATF's solution here was lacking in *any* explanation at the time it enacted the final rule – *i.e.*, this is not a situation where Defendants are now, in litigation,

---

[16] In *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), the Supreme Court held that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* at 87. In *City of Kansas City v. Department of Housing & Urban Development*, 923 F.2d 188 (D.C. Cir. 1991), the D.C. Circuit held: "In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy." *Id.* at 192.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    simply *expanding* on ATF's explanation that was given during the rulemaking below.

2           Furthermore, even if the Court were to consider the "solution" now framed by Defendants,

3    that solution is patently incomplete.  Even if criminal law could be used against, *e.g.*, a supplier

4    who sold a partially complete receiver and a jig/tools in two separate transactions to the same

5    consumer, that would *not* address the problem of a consumer buying a partially complete receiver

6    and a jig/tools from two different, nonconspiring suppliers – the situation most likely to be

7    encountered in the marketplace.

8           More fundamentally, criminal prohibitions and the existence of some deterrence against

9    circumventing the regulations are issues *separate from* whether a receiver blank can be "readily

10   converted" to a functioning receiver – the central point of the regulations implementing the GCA.

11   The regulation defining "readily convertible" does not list as a factor the role of criminal law

12   deterrence.  *See* Sur-Reply at 16; *cf. Snoring Relief*, 210 F.3d at 1085 (indicating that a decision is

13   arbitrary and capricious if the agency "'has relied on factors which Congress has not intended it to

14   consider'").  In short, whether criminal law may deter certain behavior is not material to whether a

15   partially complete receiver may be "readily converted" to a fully functioning one.  ATF's citation

16   to criminal law enforcement against some forms of circumvention does not address the basic

17   problem that renders this aspect of the ATF's regulation and rulings arbitrary and capricious – the

18   ATF his simply disregarded the ease by which tools/jigs are available (from whatever source)

19   which would render a receiver blank "readily convertible" to a completed receiver.

20          For similar reasons, the Court is troubled by several of ATF's post-hoc explanations as to

21   why it decided to rely on criminal law as the solution.  *See* Reply at 19 (asserting that, "[b]ased on

22   ATF's expertise in enforcing federal firearm laws, the agency drew this line where it did, because

23   of such factors as the difficulty of enforcing a rule of broader scope and the costs to manufacturers

24   of a broader rule").[17]  To be valid, any line drawing done by an agency must be consistent with the

25   _____

26   [17] Defendants maintain that these are not post-hoc explanations because the Final Rule references
     all or many of these concerns.  *See* Reply at 22.  *See, e.g.*, Final Rule, 87 Fed. Reg. at 24,697
27   ("Commenters opposed to inclusion of partially complete frames or receivers in the proposed
     definition of frame or receiver stated that the proposed rule would be difficult, if not impossible, to
28   enforce.  They opined that there is no purpose in trying to "ban 80%" receivers or regulate
     partially complete receivers because the rule is easily undercut by 3D-printing technology and the

                                                    42

statute/regulation at issue.  *Compare Natural Resources Defense Council, Inc. v. United States EPA*, 966 F.2d 1292, 1306 (9th Cir. 1992) (finding that EPA's decision not to regulate construction sites smaller than five acres was arbitrary when EPA provided no data to justify the five-acre threshold and admitted that unregulated sites could have significant impact on water quality), *with Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) (stating that "the FCC has provided a reasonable explanation for the line it has drawn, and demonstrated that line's relationship to the underlying regulatory problem addressed by the finder's preference program[;] [i]t is also a line that is consistent with the Commission's statutory obligation to 'manage the spectrum to be made available for use by the private land mobile services' in a manner that will 'improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users'").  *See also Mass. v. EPA*, 549 U.S. 497, 527, 532-33, 535 (2007) (acknowledging that "any agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities" and this "discretion as at its height when the agency decides not to bring an enforcement action"; but still finding agency's rationale for inaction problematic because it "rest[ed] on reasoning divorced from the statutory text" – "EPA must ground its reasons for action or inaction in the statute")[18]; *Prometheus Radio Proj. v. FCC*, 373 F.3d 372, 420 (3d Cir. 2004)

---

availability of online tutorials, which will only become more available and affordable for the public over time."); *id.* ("Manufacturers also raised concerns because they purchase partially machined raw materials or receiver shells without drilled fire control holes from domestic and foreign sources that are not current licensees.  The manufacturers were concerned that the proposed rule would subsequently require their suppliers to obtain an FFL license, apply the markings, and keep A&D records, which would be very costly and disruptive."); *id.* at 24,699 ("Commenters asserted that no one can predict what 'instructions, guides, templates, [and] jigs' the ATF Director will rely on in any given case.").

While at least some of these concerns were raised by commenters responding to the Proposed Rule, ATF did not expressly assert that these concerns were the basis for its line-drawing that Plaintiffs are now challenging (*e.g.*, to justify Example 4). And as noted *infra*, in any event, these consideration are not legally sanctioned by the GCA and do not fall within the ambit of the ATF regulation on "readily convertible."

[18] Defendants argue that *Massachusetts v. EPA* is distinguishable: "The case involved an agency's determination not to regulate at all despite a congressional command to regulate whenever the agency made certain findings.  Because Congress has not dictated that ATF regulate under certain prescribed circumstances, the case is inapposite."  Reply at 15 n.9.  But that argument is problematic because Congress has dictated that ATF regulate firearms, *see* 18 U.S.C. § 926 (providing that "[t]he Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter"), and Plaintiffs are asserting that certain

43

1   (stating that "[t]he deference with which we review the Commission's line-drawing decisions

2   extends only so far as the line-drawing is consistent with the evidence or is not 'patently

3   unreasonable'").

4         Likewise, the Court is troubled by ATF's argument that it is permissible for an agency to

5   undertake reform one step at a time.  While that may be true as a general matter, ATF cannot

6   properly be said to be engaged in "reform one step at a time" when it rules that partially complete

7   receivers not machined or indexed and not sold with jigs/tools are *not* firearms regardless of the

8   availability of such jigs/tools in the open – it has enacted a *categorical* bar.  This is not, *e.g.*, a

9   situation where ATF has chosen to first focus on regulation of a particular kind of firearm over

10  another (*i.e.*, made an enforcement decision).

11  D.    <u>Remedy</u>

12        For the reasons stated above, Plaintiffs have several meritorious arguments:

13        (1) ATF's determinations regarding partially complete receivers that are not machined

14             or indexed and not sold with jigs or tools (*e.g.*, in Example 4, the September 2022

15             Open Letter, and the exemplary Classification Letter) were made without taking

16             into account all relevant data, including the factors listed in 27 C.F.R. § 478.11

17             (which defines "readily" for purposes of "readily converted"); and

18        (2) ATF has failed to explain why it is not regulating such partially complete receivers

19             given that jigs and tools are easily obtainable.

20        The Court now turns to the issue of remedies.  The remedies sought by Plaintiffs are as

21  follows:

22            (1) declare one subsection of the Final Rule (Example 4) and related

23            agency actions to be unlawful and enjoin Defendants from enforcing
              them; (2) vacate one subsection of the Final Rule (Example 4) and

24            related agency actions; and (3) remand to ATF for further
              proceedings consistent with the Court's opinion.

25  Sur-Reply at 17; *see also* Pls.' Prop. Order (Docket No. 184-1).

26        Defendants argue that the Court should simply remand to the agency *without* any vacatur

27

28  _____

    partially complete receivers *are* firearms.

44

United States District Court
Northern District of California

1   of any part of the final rule/regulation.  They contend, for example, that "set aside" as used in the

2   APA simply means to disregard, not to vacate.  *See* 5 U.S.C. § 706(2) (providing that a court shall

3   "hold unlawful and set aside agency action, findings, and conclusions found to be – [*e.g.*]

4   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  They also

5   argue that, even if vacatur is permitted under the APA, *universal* vacatur is not a remedy that

6   should be awarded lightly because it comes with many of the same problems as a universal

7   injunction.  Again, Defendants suggest that there should simply be a remand to ATF without any

8   vacatur.[19]

9       The Ninth Circuit, however, has held that "vacatur is the presumptive remedy under the

10  APA, and [w]e order remand without vacatur only in limited circumstances.  Whether agency

11  action should be vacated depends on how serious the agency's errors are and the disruptive

12  consequences of an interim change that may itself be changed."  *350 Mont. v. Haaland*, 29 F.4th

13  1158, 1177 (9th Cir. 2022) (internal quotation marks omitted); *cf. Am. Pub. Gas Ass'n v. United*

14  *States DOE*, 72 F.4th 1324, 1342 (D.C. Cir. 2023) ("The decision to vacate depends on two

15  factors: the likelihood that deficiencies in an order can be redressed on remand, even if the agency

16  reaches the same result, and the disruptive consequences of vacatur.") (internal quotation marks

17  omitted).  Given this authority, the Court rejects Defendants' arguments.  It is questionable

18  whether the deficiencies identified by the Court can be redressed on remand, particularly given

19  that many of ATF's post-hoc explanations are problematic.  Furthermore, vacatur will not be

20  substantially disruptive given that the Court is, in effect, simply setting aside Example 4 and

21  adjudicating on the margins of the ATF's regulatory domain; the order leaves in place the core

22  guiding principle in § 478.12(c) that a partially complete receiver is still deemed a receiver if it is

23  designed to or may readily be converted to function as a receiver.  The vast corpus of ATF's

24

25  ───────────────

    [19] Many of Defendants' arguments are the same as points made by Justice Gorsuch in his
26  concurrence in *United States v. Texas*, 143 S. Ct. 1964, 1978-85 (2023) (Gorsuch, J., concurring).
    Justice Gorsuch did note, however, that there were "[t]houghtful arguments and scholarship . . . on
27  both side of the debate," and that he did not "mean to equate vacatur of agency action with
    universal injunctions . . . . But the questions here are serious ones.  And given the volume of
28  litigation under the APA, this Court will have to address them sooner or later.  Until then, we
    would greatly benefit from the considered views of our lower court colleagues."  *Id.*

United States District Court
Northern District of California

1  regulation of ghost guns and constituent parts remains untouched.

2  ### V.    CONCLUSION

3        For the foregoing reasons, the Court hereby grants in part and denies in part Defendants'

4  motion for summary judgment and grants in part and denies in part Plaintiffs' motion for summary

5  judgment.  The Court rejects Plaintiffs' challenge to ATF's use of the 0.800 inch measurement

6  with respect to the fire control cavity.  However, the Court agrees with Plaintiffs that ATF's

7  actions related to Example 4 are arbitrary in capricious in failing to take into account all eight

8  factors related to the "readily" assessment (in particular, time) and in failing to address the impact

9  of easy availability of, *e.g.*, jigs and tools from sources other than the seller or distributor of the

10  incomplete receiver.

11       The Court therefore: (1) declares one subsection of the final rule (Example 4) and related

12  agency actions to be unlawful and enjoins Defendants from enforcing them; (2) vacates one

13  subsection of the final rule (Example 4) and related agency actions; and (3) remands to ATF for

14  further proceedings consistent with the Court's opinion.

15       The Clerk of the Court is instructed to enter a final judgment in accordance with this order

16  and close the file in the case.

17       This order disposes of Docket Nos. 182 and 184.

18

19       **IT IS SO ORDERED**.

20

21  Dated: February 26, 2024

22

23  _____

24  EDWARD M. CHEN
    United States District Judge

25

26

27

28

46

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STATE OF CALIFORNIA, et al.,<br><br>              Plaintiffs,<br><br>      v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, et al.,<br><br>              Defendants. | Case No.  20-cv-06761-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 125 |

Plaintiffs are the State of California, the Giffords Law Center to Prevent Gun Violence ("GLC"), Bryan Muehlberger, and Frank Blackwell (collectively, "Plaintiffs").  They have filed suit against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); the Department of Justice ("DOJ"); and several federal employees, all in their official capacities (collectively, the "federal government" or "government").  According to Plaintiffs, Defendants have violated the Administrative Procedure Act ("APA") in at least two ways:

> (1) the ATF's determinations on "ghost guns" are not in accordance with the Gun Control Act which deems a firearm any weapon that is designed to be or may readily be converted into a firearm; and

> (2) the ATF's recently issued final rule on ghost guns (87 Fed. Reg. 24,652) is arbitrary and capricious because it "deems as firearms only those 80 percent receivers and frames sold in kits or alongside jig, templates, or similar aids, leaving 80 percent receivers and frames sold separately wholly unregulated."  FAC ¶ 150.

Currently pending before the Court is the federal government's motion to dismiss.  The government's main contention is that Plaintiffs do not have standing to assert their claims.  Having

United States District Court
Northern District of California

considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion to dismiss.  The Court also **DENIES** amici's request to dismiss or stay this suit.

## I.     FACTUAL & PROCEDURAL BACKGROUND

In the operative first amended complaint ("FAC"), Plaintiffs allege as follows.

The Gun Control Act ("GCA") imposes restrictions on the purchase and sale of firearms in the United States.  *See* FAC ¶ 1.  The statute defines "firearm," in relevant part, as follows: "(A) any weapon (including a starter gun) which will or is *designed to or may readily be converted to* expel a projectile by the action of an explosive; [or] (B) the *frame or receiver* of any such weapon."  18 U.S.C. § 921(a)(3) (emphasis added).  With respect to the definition in (B), the receiver (for a long gun) or a frame (for a handgun) is the part of the weapon that "houses the hammer, bolt, or breechblock, as well as the firing mechanism."[1]  FAC ¶ 3.  It is the "central piece" of a firearm, as reflected by the fact that the GCA expressly provides that a "'frame or receiver' *is* a 'firearm.'"  FAC ¶ 3 (emphasis in original).

Included among the GCA's restrictions on the purchase and sale of firearms are requirements that any firearm sold or imported in the United States "must have a unique serial number"; that "licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer"; that "licensed gun dealers [must] conduct criminal background checks on would-be gun purchasers"; and that certain categories of people are prohibited from purchasing firearms (*e.g.*, minors and individuals with disqualifying criminal convictions).  FAC ¶ 1.

"Ghost guns" are weapons that effectively evade the protections of the GCA.  *See* FAC ¶ 43 (alleging that ghost guns "are designed specifically to circumvent [the] common-sense

---

[1] Congress itself has never defined the terms "frame" and "receiver."  Thus, ATF has stepped in with regulations that define those terms.  The current definitions can be found in 27 C.F.R. § 478.12.  *See* 27 C.F.R. § 478.12(a)(1) (providing that a firearm frame is the part of a handgun that "provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt or similar primary energized component prior to initiation of the firing sequence"); *id.* § 478.12(a)(2) (providing that a firearm receiver is the part of a long gun that "provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent)").

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1   requirements in the GCA"); *see also* Opp'n at 1 (asserting that ghost guns "can be purchased

2   without a background check and without being serialized, rendering them untraceable to law

3   enforcement").  They are weapons that anyone can build at home to be fully operable firearms –

4   and "within minutes." FAC ¶ 2.  They are "'ghosts' because, lacking serial numbers, they are not

5   traceable by law enforcement when they are used in a crime." FAC ¶ 2.  According to Plaintiffs,

6   "Defendants have allowed ghost guns to proliferate because they have determined that the core

7   component of a ghost gun is not a 'firearm' under the GCA." FAC ¶ 3.

8         That core component is what the ghost gun industry calls an "80 percent" receiver/frame.

9   *See* Mot. at 4 (noting that federal law does not use the term "80 percent" receiver/frame, that the

10  term is a "marketing term[] used by some firms in the firearms industry to describe a wide variety

11  of partially complete frames and receivers," and that "ATF does not consider the terms useful in

12  determining whether any particular product qualifies as a firearm").  As suggested by the term "80

13  percent," an 80 percent receiver/frame is not a finished receiver/frame, but rather is a partially

14  complete one.  Although an 80 percent receiver/frame is only partially complete (*e.g.*, having "'a

15  solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or

16  hammer pins,'" FAC ¶ 44), it is both designed to and may readily be converted into a functional

17  firearm "with ease." FAC ¶ 3.  In fact, ghost gun manufacturers have developed tools that allow

18  80 percent receivers/frames to be converted into fully operable firearms "in as little as *15*

19  *minutes*." FAC ¶ 5 (emphasis in original).

20        Prior to 2006, ATF took the position that "many unfinished receivers and frames that are

21  identical to the 80 percent receivers and frames on the market today were 'firearms' under the

22  GCA." FAC ¶ 61.  ATF reached this conclusion based on a "temporal approach" – *i.e.*, the speed

23  and ease with which an unfinished receiver/frame could be turned into a fully functioning firearm.

24  *See* FAC ¶¶ 62-63.

25        However, in 2006, ATF changed course and adopted a "machining operations approach"–

26  *i.e.*, the agency "began to mechanically analyze which machining operations still needed to be

27  performed to determine whether a partially completed receiver or frame is a 'firearm' under the

28  GCA." FAC ¶ 64.  Applying this approach, "ATF concluded that 80 percent receivers with fire-

3

control cavity areas that are completely '**solid and un-machined**' do not qualify as firearms under the GCA."  FAC ¶ 64 (emphasis in original); *see also* FAC ¶ 83 (discussing ATF's Ghost Gun Guidance which states, *inter alia*, that a "'fire-control cavity area [that] is completely solid and un-machined [has] not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA'").

In 2020, Plaintiffs initiated the instant action challenging ATF's approach toward ghost guns.  As alleged in their original complaint, ATF had improperly decided that 80 percent receivers/frames were not "firearms" under the GCA even though they were "nearly finished," Compl. ¶ 4, and could "quickly and easily" be used to create a "fireable weapon," Compl. ¶ 6 – especially in light of tools that ghost gun manufacturers have developed, which "make it possible to convert 80 percent receivers and frames into fully operable firearms '**in under 15 minutes**.'" Compl. ¶ 10 (emphasis in original).  Subsequently, litigation in this case was put on hold because, in 2021, following several mass shootings, "the White House announced that it intended to 'issue a proposed rule to help stop the proliferation of "ghost guns."'" FAC ¶ 88.  In May 2021, ATF issued a proposed rule, and, in April 2022, the final rule.  *See* FAC ¶¶ 88-89.

In the final rule, "ATF stated that the goals of the Rule were to 'provide a more comprehensive definition of "frame" or "receiver" so that these terms more accurately reflect how most modern-day firearms are produced and function' and to 'reduce unserialized "ghost guns."'" FAC ¶ 89.  Under the final rule,

> [t]he terms "frame" and "receiver" shall include a *partially complete*, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver . . . .  [But] [t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material).  When issuing a classification, the Director *may* consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are *sold, distributed, or possessed with the item or kit*, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. § 478.12(c) (emphasis added).

United States District Court
Northern District of California

4

The final rule gives examples of what is and what is not a receiver/frame:

> Example 1 to paragraph (c) – Frame or receiver: A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed *with* a compatible jig or template *is* a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

> . . . .

> Example 4 to paragraph (c) – Not a receiver: A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is *not* sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is *not* a receiver.

*Id.* (emphasis added).

Plaintiffs acknowledge that the final rule "takes important steps to eliminate ghost gun-making 'kits' – meaning where 80 percent receivers or frames are sold together with other essential firearm parts, such as the magazine to store ammunition, and the jigs to assemble the firearm."[2] FAC ¶ 7.  However, Plaintiffs criticize the rule because it essentially "double[s] down on the 'machining operations' approach."  FAC ¶ 67.  Moreover, the rule "still permits the selling of . . . '80 percent' receivers and frames as *stand-alone* items."  FAC ¶ 7 (emphasis omitted and added).  In other words, even if a person cannot buy an 80 percent receiver/frame if it is sold *with* other essential firearm parts, nothing prevents a person from purchasing "all the items needed to create a firearm" so long as they purchase the 80 percent receiver/frame in a *separate* transaction from the other firearm parts.  FAC ¶ 7.  "When ghost gun manufacturers sought to enjoin the Final Rule in court [referring to two federal suits in Texas and one federal suit in North Dakota], [the federal government] confirmed what the text of the Rule suggests: that gun manufacturers can still sell un-machined 80 percent components so long as they do not bundle those components with jigs or tool kits in the same package."  FAC ¶ 92.  ATF took the same position in, *e.g.*, a slide-deck presentation, in a YouTube video, in a training aid for the Final Rule, and in an "Open

---

[2] A jig is a "device that guides the drilling and milling necessary to complete the receiver."  FAC ¶ 45.  With a jig, a person can "finish an 80 percent receiver 'in **under 30 minutes**' using basic household tools, such as [a] simple drill bit, file set, and a hand drill, to drill the remaining holes."  FAC ¶ 45 (emphasis in original).

United States District Court
Northern District of California

5

1   Letter" to federal firearms licensees issued in September 2022.  *See* FAC ¶¶ 99-102.

2     Plaintiffs assert that ATF's ghost gun determinations violate the law in two ways.

3      •  ATF's determination that 80 percent receivers/frames are not firearms "contravenes

4       the plain text of the GCA" because 80 percent receivers/frames "are '***designed to or***

5       ***may be readily converted***' into fully fireable weapons."  FAC ¶ 14 (emphasis in

6       original).

7      •  ATF's determination that "only 80 percent receivers and frames *sold with* jig kits,

8       templates, or similar items qualify as firearms under the GCA, while leaving the 80

9       percent receivers and frames themselves entirely unregulated," is arbitrary and

10      capricious.  FAC ¶ 15 (emphasis in original).

11    As indicated above, after the final rule issued, several ghost gun manufacturers filed

12  lawsuits in other federal district courts, challenging its validity in its entirety.  *See* Opp'n at 13

13  (taking note of two suits filed in Texas and one in North Dakota).  In one of the Texas cases, the

14  district court preliminary enjoined the final rule with respect to two ghost gun manufacturers.  *See*

15  Opp'n at 13-14 (noting that the court determined plaintiffs were "likely to succeed in showing that

16  the Final Rule exceeded ATF's statutory authority under the GCA").

17    In the currently pending motion to dismiss, Defendants largely challenge Plaintiffs'

18  standing to bring suit.  Plaintiffs' FAC contains allegations related to standing.  *See* FAC ¶ 111 *et*

19  *seq.*  The specific allegations related to each Plaintiff are addressed below.

20          **II.**    **<u>DISCUSSION</u>**

21  A.   <u>Standing</u>

22    Plaintiffs seek declaratory and injunctive relief with respect to the ATF final rule.

23  Defendants argue that Plaintiffs each lack standing to seek such relief, and therefore the Court

24  lacks subject matter jurisdiction over the case.

25    A party may move to dismiss for lack of subject matter jurisdiction, including lack of

26  standing, under Federal Rule of Civil Procedure 12(b)(1).  *See In re Apple iPhone Antitrust Litig.*,

27  846 F.3d 313, 319 (9th Cir. 2017).

28    Under Rule 12(b)(1), a defendant may challenge the plaintiff's

*United States District Court*
*Northern District of California*

6

jurisdictional allegations in one of two ways. A "facial" attack accepts the truth of the plaintiff's allegations but asserts that they "are insufficient on their face to invoke federal jurisdiction." The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction.

A "factual" attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings.

*Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

In the case at bar, Defendants have launched a facial challenge to Plaintiffs' standing. Thus, the Court must take all of Plaintiffs' well-pled allegations related to standing as true and make all reasonable inferences in their favor.

To have standing, plaintiffs must establish (1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision. . . . At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."

*Mecinas v. Hobbs*, 30 F.4th 890, 896-97 (9th Cir. 2022).

In a multi-plaintiff suit, only one plaintiff need have standing in order for the case to proceed. *Cf. Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."). Below the Court addresses each Plaintiff's standing to challenge the ATF final rule.

B.    California

California alleges that it has been and/or will be injured by the final rule because:

(1) ATF's actions and/or inactions – essentially leaving ghost guns unregulated – have led to a proliferation of ghost guns (what Plaintiffs refer to as a ghost gun "epidemic"), *see, e.g.*, FAC ¶ 135 (alleging that ATF's "stance on ghost guns . . . permit[s] the proliferation of untraceable firearms that can be purchased by prohibited and dangerous persons and without any background check");

(2) California, in particular, has been impacted by the epidemic of ghost guns as

7

reflected by the number of ghost guns that have been seized in the state, *see, e.g.*, FAC ¶ 112 (noting that, in 2015, the number of ghost gun seizures in the state was 26; by 2021, the number had jumped to 12,388); *cf.* FAC ¶ 115 (alleging that, in 2020, 65% of all ghost guns seized by ATF were seized in California); FAC ¶ 57 (alleging that, "[a]ccording to California law enforcement agencies, during 2020 and 2021, ghost guns 'accounted for 25 to 50 percent of firearms recovered at crime scenes'"); and

(3) as a result of the epidemic, California has had to spend time, money, and resources:

    (a) to solve or otherwise deal with ghost gun-related crimes, to deter ghost gun-related crimes, and to train on ghost-gun related crimes, *see* FAC ¶¶ 112, 114-15; and

    (b) to enact and implement legislation at the state level to close the "loophole" left by ATF.  *See* FAC ¶¶ 116-18 (discussing A.B. 857, 879, and 1621).[3]

    1.    <u>Increased Costs of Policing and Law Enforcement</u>

In its motion, the government argues first that California has failed to show an injury in fact with respect to (3)(a) above – *i.e.*, "increased costs of policing and law enforcement."  FAC ¶ 112.  The government's main contention is as follows:

    California nowhere links the unserialized firearms used in [ghost-

---

[3] As described in the opposition:

- A.B. 857 (passed in 2016) "requires self-assembled firearms to be stamped with unique serial numbers provided by the California Department of Justice, and also requires those possessing unserialized firearms to apply to the Department for serial numbers."  Opp'n at 16.

- A.B. 879 (passed in 2019 but subject to delayed implementation) "would have required sales of unfinished frames and receivers to be conducted through licensed dealers, subject to a California-only background check and sale record."  Opp'n at 16.

- A.B. 1621 (passed in 2022) "expand[s] the definition of 'firearm and precursor part' to include any precursor part that has reached a stage in manufacture where it may be readily converted into a firearm or is marketed or sold the public for use as the frame or receiver of a firearm."  Opp'n at 16.  It also "generally prohibits the sale or transfer of all firearm precursor parts that are not covered by the Final Rule, such as 80 percent frames and receivers."  Opp'n at 16.

> gun related] crimes to any specific ATF action challenged in this lawsuit.  In particular, California fails to allege that any of the unserialized firearms used in these crimes were assembled from the types of incomplete receiver blanks that ATF would determine not to be firearms under the Rule [*i.e.*, 80 percent frames/receivers sold standalone].

Mot. at 7.  According to the government, this problem means that California has failed to show not only an injury in fact but also traceability and redressability.[4]

    As an initial matter, the Court notes that the final rule was not issued until April 2022 and, thereafter, a period of time passed during which ATF's interpretation of the final rule was being clarified (*e.g.*, through its September 2022 Open Letter).  Thus, the fact that California has not yet pointed to a specific instance in which an 80 percent frame/receiver was sold standalone and then used in a crime is not dispositive.  Moreover, California fairly contends that its ability to point to a specific instance has been hampered by the very fact of the final rule.  In other words, the final rule leaves 80 percent receivers/frames when sold standalone unregulated, which means that they are not serialized, which is then an obstacle to California to tracking down their sale.  *See* Opp'n at 19 n.12 (arguing that Defendants' claim of "'speculation' is a direct result of ATF's failure to track the sale of 80 percent receivers and frames[;] Defendants should not be permitted to challenge standing based on their own unlawful determinations").

    But putting the above aside, the Court finds that California has sufficiently established standing to proceed with this litigation as all reasonable inferences must be made in Plaintiffs' favor at this juncture of the proceedings, and standing may be based on the likelihood of future injury.  "A plaintiff threatened with future injury has standing to sue if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McGee v. S-L Snacks*

---

[4] Although Defendants have challenged traceability on the above basis, they have not made any proximate cause-type argument that California's asserted injury is too many steps down the causal chain.  *Cf. City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1032-33, 1035 (9th Cir. 2021) (taking note of plaintiff-city's allegation that bank violated the Fair Housing Act "by engaging in mortgage-lending practices that discriminated against African-American and Latino borrowers" which then impacted the city because "the discriminatory loans to minority borrowers increased default and foreclosure rates and decreased property values, when [then] resulted in two economic harms: a decrease in property tax revenue and the simultaneous need for increased municipal expenditures to address public health and safety issues"; concluding that plaintiff-city failed to sufficiently plead proximate cause for its claim under the statute because "'[t]he general tendency . . . [is] not to go beyond the first step' of the causal chain").

United States District Court
Northern District of California

United States District Court
Northern District of California

*Nat'l*, 982 F.3d 700, 709 (9th Cir. 2020) (internal quotation marks omitted).  Here, when all reasonable inferences are made in California's favor – including the predictable effects of government action or inaction on third parties, *see Dep't of Commerce v. N.Y.*, 139 S. Ct. 2551 (2019)[5] – there is a "substantial risk" that California will be harmed by the final rule which leaves 80 percent receivers/frames sold standalone unregulated.  The Court finds California has sufficiently alleged such a substantial risk for several reasons.

First, it is predictable that 80 percent receivers/frames will be sold standalone.  Indeed, in the FAC, Plaintiffs allege that ghost gun manufacturers have already advised consumers to purchase such receivers/frames standalone to avoid regulation under the final rule – *i.e.*, buying the 80 percent receiver/frame separate from the other tools or components needed to build a functional weapon.  *See* FAC ¶ 15 & n.27 (taking note of advertising by one company that "consumers are free to purchase one 'Assemble for Thyself' kit to use on multiple, unserialized receivers they buy separately"); *see also* FAC ¶¶ 96-97.  Plaintiffs also take note that, "[i]n response to a YouTube video posted by a gun-rights lawyer describing the effects of the Final Rule, commenters recognized that so long as 80 percent components are sold separately from jigs

---

[5] In *Department of Commerce v. New York*, a challenge was made to a decision by the Secretary of Commerce to reinstate a question about citizenship on the 2020 census questionnaire.  The suit was brought by various plaintiffs, including state and local governments and nongovernmental organizations that worked with immigrant and minority communities.  The plaintiffs claimed a number of injuries as a result of the Secretary's decision: "diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources – *all of which turn on their expectation that reinstating a citizenship question will depress the census response rate* and lead to an inaccurate population count."  *Dep't of Commerce v. New York*, 139 S. Ct. at 2565 (emphasis added).

The federal government argued that "any harm to respondents is not fairly traceable to the Secretary's decision, because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census."  *Id.*  The federal government also argued that "[t]he chain of causation is made even more tenuous" because it was based on the third parties being "motivated by unfounded fears that the Federal Government itself will break the law by using noncitizens' answers against them for law enforcement purposes."  *Id* at 2565-66.  The Supreme Court rejected these arguments, explaining that, "in those circumstances, respondents have met their burden of showing that third parties will likely react in predictable ways to the citizenship question, even if they do so unlawfully and despite the requirement that the Government keep individual answers confidential."  *Id.* at 2566.  "Respondents' theory of standing . . . does not rest on mere speculation about the decisions of third parties; it relies instead on the *predictable effect of Government action on the decisions of third parties*."  *Id.* (emphasis added).

10

1   and tool kits, they can continue using ghost guns without being subjected to the serialization,

2   background check, or recordkeeping requirements of the GCA." FAC ¶ 98. From this, it can

3   reasonably be inferred that the number of ghost guns that will be sold standalone is not

4   insubstantial. Notably, the FAC alleges that, "[a]s of 2020, [California] was home to at least 18 of

5   the then-estimated 80 current online ghost gun retailers – the most of any state – and more than

6   double the number of retailers that existed in the State just six years before." FAC ¶ 111.

7       Second, it is predictable that at least some of the 80 percent receivers/frames sold

8   standalone will be used in crimes. The entire point of buying an 80 percent receiver/frame

9   standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law

10  enforcement to track sales. *See* FAC ¶ 40 (explaining that serialization "ensures that every firearm

11  – including those firearms recovered by law enforcement agencies at crime scenes – can be traced

12  back to its manufacturer or importer and first retail purchaser," and "[t]racing firearms helps link a

13  recovered firearm to crime suspects in a criminal investigation by helping law enforcement

14  officials track the movement of a firearm through the supply chain"). Although not every person

15  who procures an 80 percent receiver/frame standalone does so for purposes of committing a crime,

16  it is a reasonable inference that there will be some who do so. This may be reasonably inferred

17  from the substantial number of ghost gun seizures in the state in connection with crimes over the

18  years. *See* FAC ¶ 112 (alleging that, "from 2015 to 2021, California's annual ghost gun seizures

19  have increased from 26 to 12,388, representing a staggering 47,546% increase"); *see also* FAC ¶

20  57 (alleging that, "[a]ccording to California law enforcement agencies, during 2020 and 2021,

21  ghost guns 'accounted for 25 to 50 percent of firearms recovered at crime scenes'"); FAC ¶ 115

22  (alleging that, "in 2020, 65% of all ghost guns seized by ATF were seized in California").

23      In short, as the Court noted at the hearing, California's basic contention is that the final

24  rule contains a loophole/exception which enables people to avoid regulation. If that

25  loophole/exception is substantial, it is entirely predictable that crimes involving such guns will

26  occur and thereby injure the state. California has alleged that the size of the loophole/exception is

27  substantial: to wit, there is an easy way to avoid regulation by making a purchase of an 80 percent

28  receiver/frame standalone without, *e.g.*, an accompanying kit.

United States District Court
Northern District of California

11

In the reply brief, the government argues for the first time that California – and the other Plaintiffs – have interpreted the final rule incorrectly. The government points to an Open Letter that ATF recently issued in December 2022.[6] In the letter, ATF states as follows:

> Applying the regulatory text of Final Rule 2021-05F, partially complete Polymer80, Lone Wolf, and similar striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits, have reached a stage of manufacture where they "*may readily be completed, assembled, restored, or otherwise converted*" to a functional frame. This definition of "readily" applies to each and every classification of a partially complete frame or receiver under this Rule, whether sold alone or as part of a kit. Therefore, *even without* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials, these partially complete pistol frames are "**frames**" and also "**firearms**" as defined in the GCA and its implementing regulations, 18 U.S.C. § 921(a)(3)(B) and 27 CFR 478.12(a)(1), (c).

Reply, Ex. 1 (Dec. 2022 Open Letter at 1) (emphasis in original); *see also* Reply, Ex. 1 (Dec. 2022 Open Letter at 9) (stating that, "for these partially complete frames, such analysis [of whether the frame was sold with any associated templates, jigs, molds, etc.] was not necessary because they are, by themselves, 'frames' and 'firearms' as defined in the GCA"); *cf.* Reply, Ex. 1 (Dec. 2022 Open Letter at 3) (noting that the "analysis may include consideration of any associated templates, jigs, molds, [etc.] that are . . . sold . . . with the component part or kit" but indicating that this is just one factor and "the analysis must consider all factors that are relevant"). At the hearing, the government maintained that the Open Letter is consistent with the language of the final rule, which on its face simply states that,

> [w]hen issuing a classification, the Director *may* consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

27 C.F.R. § 478.12(c) (emphasis added).

California has not argued that judicial notice of the December 2022 Open Letter is

---

[6] The Open Letter was not issued until several months after Plaintiffs had filed their FAC challenging the final rule. It also was not issued until about a week after Plaintiffs' brief in opposition to the motion to dismiss was filed.

United States District Court
Northern District of California

improper.  Thus, the Court may consider whether the letter appreciably decreases the size of the asserted loophole/exception in the final rule.  The Court is not persuaded that the letter, on its face, does so.  First, the letter addresses specific 80 percent receivers/frames only (*i.e.*, certain products made by certain manufacturers), not all receivers/frames.  Second, the letter states that whether an 80 percent receiver/frame is sold standalone or as part of a kit or with other tools or components is still a factor to consider.  Third, the letter leaves unclear when and/or how much consideration is given to this factor – *e.g.*, when is this factor dispositive or at least significant?  Fourth, in spite of ATF's December 2022 Open Letter, its earlier Open Letter from September 2022 still stands.  There, the agency indicated that "80 percent AR-type receivers . . . are *not* firearms if they lack 'indexing or machining of any kind . . . in the area of the fire control cavity' and are '<u>not sold, distributed, or marketed with any associated templates, jigs, molds, [etc.], such as within a receiver parts kit</u>.'"  FAC ¶ 102 (emphasis in original); *see also* 27 C.F.R. § 478.12(c) (in Example 4, stating that the following is *not* a receiver: "A billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold distributed, or possessed with instructions, jigs, templates, [etc.] such that it may readily be completed is not a receiver").  In light of the September 2022 Open Letter, the size of the loophole/exception, even after the issuance of the December 2022 Open Letter, is ambiguous, and, at this juncture all reasonable inferences must be drawn to California's favor.

　　　　2.　　<u>Enactment and Implementation of State Legislation</u>

　　　　As noted above, California also claims as an injury increased costs related to its enactment and implementation of state legislation on ghost guns made necessary by the federal government's failure to fully implement the GCA.  In its motion to dismiss, the federal government argues that "[t]he expenses associated with California's decision itself to regulate a broader class of receiver blanks than the federal government and its 'accelerated efforts to implement' its legislation . . . cannot give rise to Article III standing" because "'[d]ecisions by . . . state legislations' to expend money from the public fisc or otherwise to enact new laws are 'self-inflicted,' and '[n]o State can be heard to complain about [such] damage.'"  Mot. at 7 (quoting *Penn. v. N.J.*, 426 U.S. 660, 664 (1976)).  The government's argument is not persuasive.

As California points out, the Supreme Court has stated that standing may be based on "reasonably incur[red] costs to mitigate or avoid" harm or a "'substantial risk'" of harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (stating that, "[i]n some instances, we have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm"); *see also Air Alliance Houston v. Envt'l Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018) (stating that "[m]onetary expenditures [made by the state] to mitigate and recover from harms that could have been prevented [*i.e.*, if the EPA did not decide to delay the effective date of a rule] are precisely the kind of 'pocketbook' injury that is incurred by the state itself"); *Cal. v. Ross*, 358 F. Supp. 3d 965, 1003, 1005 (N.D. Cal. 2018) (Seeborg, J.) (agreeing that state and local governments would suffer from inclusion of a citizenship question on the census questionnaire because they would have to "expend[] . . . funds for census outreach to mitigate the substantial risk of harm flowing from the citizenship question"; "[t]he California Plaintiffs' expenditures were reasonably incurred because they face a substantial risk of a differential undercount of their residents"). That is the gist of California's position here – *i.e.*, it has had to incur costs to regulate because ATF is not regulating, which has led to the proliferation of ghost guns.

The decision in *California v. Bureau of Land Management*, No. C18-cv-00521-HSG, 2020 U.S. Dist. LEXIS 53958 (N.D. Cal. Mar. 27, 2020) (hereinafter "*California v. BLM*"), is instructive. There, California challenged a final rule issued by the Bureau in 2017 that "repealed a previous rule [from 2015] regulating hydraulic fracturing operations on federal and tribal lands." *Id.* at *5 (explaining that hydraulic fracturing is a process used by oil and natural gas producers to increase production from wells). The government argued that any harms claimed by California were not traceable to the repeal of the 2015 rule – *i.e.*, any harms were general harms related to hydraulic fracturing that were not addressed by the 2015 rule and therefore could not be traced to the repeal of the 2015 rule. *See id.* at *11. The district court disagreed:

> California Plaintiffs allege that "the repeal of the [2015] Rule eliminates an additional layer of regulatory protection on federal lands in California that supplements and bolsters state hydraulic fracturing regulations . . . . As a result of the Repeal, responsibility for ensuring compliance with hydraulic fracturing regulations will

United States District Court
Northern District of California

14

fall entirely on California, placing additional burdens on State resources." Given that "California contains millions of acres of federal lands that are managed by [BLM] for energy production," . . . the burdens placed on California's resources to ensure state regulatory compliance on BLM lands increased due to the Repeal.

*Id.* at *12-13. The court added: "California Plaintiffs state an injury in fact[] since they will need to ensure state regulatory compliance to fill the regulatory gap that will be created if the 2015 Rule does not take effect." *Id.* at *14. The instant case is analogous to *California v. BLM*: although the case at bar does not involve the repeal of a federal rule, it focuses on a similar problem, *i.e.*, a lack of regulation by the federal government which causes an affirmative harm that the state must address.

The federal government's reliance on *Pennsylvania v. New Jersey*, 426 U.S. at 660, is misplaced. In that case, Pennsylvania sued New Jersey because New Jersey taxed the New Jersey-derived income of nonresidents (*i.e.*, income that nonresidents earned in New Jersey). *See id.* at 663. Pennsylvania claimed injury of its own because it allowed a tax credit to any of its residents for income taxes paid to other states, including New Jersey. *See id.* The Supreme Court held that this injury was "self-inflicted, resulting from decisions by [the] . . . state legislature[]." *Id.* at 664. The Supreme Court noted that nothing prevented Pennsylvania from withdrawing the tax credit that it gave for taxes paid to New Jersey. *See id.*

Based on *Pennsylvania v. New Jersey*, the federal government asserts that California's decision to enact and then implement its state legislation on ghost guns must also be considered self-inflicted injury. But as courts and treatises have pointed out, "[a]lthough 'standing has been denied because the injury seems *solely* attributable to the plaintiff,'" it is "'not defeated merely because the plaintiff has in some sense contributed to his own injury. Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000) (quoting Wright & Miller, 13 Fed. Prac. & Proc. § 3531.5 (2d ed.)[7]; *cf. Petro-Chem. Processing, Inc. v. E.P.A.*, 866 F.2d 433,

---

[7] The current Wright & Miller treatise notes that, although

[s]elf-inflicted injury may seem a suspicious basis for standing[,] [i]t is clear . . . that no rigid lines are drawn on this basis. A good

United States District Court
Northern District of California

438 (D.C. Cir. 1989) (considering whether the injury claimed "is 'so completely due to the [complainant's] own fault as to break the causal chain'"; here, "members . . . can avoid the threatened injury by choosing safer methods") (emphasis added).  In *Pennsylvania*, it was Pennsylvania's own tax law that caused it financial harm.  It did not suffer an affirmative harm imposed upon it by another sovereign's failure.  The harm, resulting from Pennsylvania's own law, was wholly avoidable, and thus was truly self-inflicted.  Not so in *Air Alliance Houston*, *California v. Ross*, or *California v. BLM*, cited above.  Nor is it so in this case.

Notably, in *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), the Ninth Circuit concluded that the state of California did have standing to bring suit because, even though one could have argued that the state contributed to its own injury, the state was not so solely at fault that it was proper to deem the injury self-inflicted.  In *California v. Azar*, several states challenged interim final rules ("IFRs") that exempted employers with religious and moral objections from a requirement that group health plans must cover contraceptive care without imposing cost sharing. The states claimed standing based on the following:

> the IFRs expanded the number of employers categorically exempt from the '[Affordable Care Act's] contraceptive coverage requirements, and [so] states will incur significant costs as a result of their residents' reduced access to contraceptive care. . . . [W]omen who lose coverage will seek contraceptive care through state-run programs or programs that the states are responsible for reimbursing.

*Id.* at 571.  The dissent argued this claimed injury was "self-inflicted because the states voluntarily chose to provide money for contraceptive care to its residents through state programs."  *Id.* at 573 (noting that the dissent cited *Pennsylvania v. New Jersey*).  But the Ninth Circuit rejected this

---

illustration is provided by *Havens Realty Corporation v. Coleman* [465 U.S. 363 (1982)].  Two plaintiffs were permitted standing to challenge racially discriminatory practices in apartment rentals.  One was a "tester," who sought information solely for the purpose of proving that false information was provided to black applicants; the other was an organization that claimed the defendants' practices forced it to greater efforts in combatting discrimination.  Neither plaintiff needed to become involved at all.  The voluntary choice to suffer the injury that conferred standing was sufficient.

Wright & Miller, 13A Fed. Prac. & Proc. & Proc. Juris. § 3531.5 (3d ed.).

16

contention:

> In *Pennsylvania* [*v. New Jersey*], the plaintiff states challenged other states' laws that increased taxes on nonresident income. The plaintiff states provided tax credits to their residents for taxes paid to other states. Accordingly, the defendant states' tax increases also increased the amount of tax credits provided by the plaintiff states, and the plaintiff states lost revenue. In denying leave to file bills of complaint invoking the Supreme Court's original jurisdiction, the Court held that the plaintiff states could *not* "demonstrate that the injury for which [they sought] redress was *directly* caused by the actions of another State" because the injuries to the plaintiff states' fiscs "were self-inflicted . . . and nothing prevents [them] from withdrawing [the] credit for taxes paid to [defendant states]."
>
>  . . . . [T]he injury here is not "self-inflicted" within the meaning of *Pennsylvania*.

*Id.* at 574 (emphasis added).

The Ninth Circuit went on to discuss another decision where the Supreme Court did find standing, namely, *Wyoming v. Oklahoma*, 502 U.S. 437 (1992). There, the state of Wyoming challenged an Oklahoma law that required Oklahoma power plants to use Oklahoma coal on the theory that the law reduced demand for Wyoming coal and thus inflicted a pocketbook injury on Wyoming through reduced tax revenues. *See id.* at 442 (noting that "Wyoming does not itself sell coal, [but] it does impose a severance tax upon the privilege of severing or extracting coal from land within its boundaries"). The Ninth Circuit explained in *California v. Azar* that

> [w]hat distinguishes [*Pennsylvania v. New Jersey* and *Wyoming v. Oklahoma*], and what caused the Supreme Court to reach different results, is that the plaintiff states' laws in Pennsylvania directly and explicitly tied the states' finances (revenue loss caused by tax credit) to another sovereign's laws (other states' taxes on nonresident income). Wyoming did not involve such state laws; the tax on Wyoming-mined coal was not so tethered to the legislative decisions of other sovereigns. The same is true of the contraceptive coverage laws of the plaintiff states here. Accordingly, we are not convinced that *Pennsylvania* controls in this case.

*Id.* As the Ninth Circuit explained, in *Pennsylvania v. New Jersey*, Pennsylvania made the choice to "tether" its tax laws to the laws of New Jersey, and Pennsylvania thus had the power to avoid injury by removing that tether – *i.e.*, it simply could withdraw the tax credit it gave for taxes paid to New Jersey. The instant case is different: although California was motivated to act because of ATF's actions/inactions, there is no similar tether between California and federal law; removing

17

1  California's legislation on ghost guns would not resolve the problem for the state.[8]

2  In *California v. Azar*, the Ninth Circuit also pointed out that "[c]ourts regularly entertain

3  actions brought by states and municipalities that face economic injury, *even though those*

4  *governmental entities theoretically could avoid the injury by enacting new legislation*." *Id.* at 574

5  (emphasis added). Thus, under *California v. Azar*, here, California cannot be blamed for

6  "avoiding" injury by enacting legislation to fill the regulatory gap left by the ATF. As noted

7  above, if California did *not* enact legislation, it would face injury resulting from that regulatory

8  gap which has led to the proliferation of ghost guns. *See Tex. v. U.S.*, 809 F.3d 134, 158 (5th Cir.

9  2015) (taking note that, in *Wyoming v. Oklahoma*, Wyoming "sought to tax the extraction of coal

10  and had *no way to avoid* being affected by other states' laws that reduced demand for that coal";

11  thus, it had standing) (emphasis added). This is not a case where California has self-inflicted its

12  own wound.

13  Accordingly, the Court concludes that California has made out a plausible showing of

14  standing, and this is so whether the government has made challenges to standing based on injury

15  in fact, traceability, or redressability.[9] And because the Court finds standing in California's favor,

16  that is enough for this case to proceed. *Cf. Leonard*, 12 F.3d at 888 (noting that, "once the court

17  determines that one of the plaintiffs has standing, it need not decide the standing of the others.").

18  However, out of an abundance of caution, the Court addresses the standing of both the

19  organizational plaintiff GLC as well as that of the individual plaintiffs.

20  C.  GLC

21  GLC is a nonprofit organization. Its "core mission is to save lives from gun violence by

22  shifting culture, changing policies, and challenging injustice." FAC ¶ 135; *see also* FAC ¶ 20

---

[8] Nothing suggests that the Ninth Circuit meant that any time a state were to take action in response to federal government action, that would be "self-inflicted" injury.

[9] Because California has standing in its own right, the Court need not address the government's argument that "a state 'does not have standing as *parens patriae* to bring an action against the Federal Government.'" Mot. at 7 (quoting *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011)); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-01 (1982) (stating that, "if [a] State is only a nominal party without a real interest of its own[,] then it will not have standing under the *parens patriae* doctrine"; but adding that a state could have standing based on a quasi-sovereign interest).

United States District Court
Northern District of California

1 (alleging that GLC is "dedicated to finding sensible solutions that will prevent further gun

2 violence"). GLC's "core policy platform" is "supporting background check and licensing laws at

3 the federal and state level." FAC ¶ 135.

4     An organization such as GLC may assert standing in its own right (*i.e.*, instead of on behalf

5 of its members). As the Ninth Circuit has noted, the parameters of this kind of organizational

6 standing were addressed in the Supreme Court's decision *Havens Realty Corp. v. Coleman*, 455

7 U.S. 363 (1982).

> There, a fair housing organization alleged in its complaint that it
> "ha[d] been frustrated by defendants' racial steering practices in its
> efforts to assist equal access to housing" and that the organization
> had needed "to devote significant resources to identify and
> counteract" those practices. The Supreme Court held that those
> allegations were sufficient to establish standing at the motion to
> dismiss stage, explaining that "[s]uch concrete and demonstrable
> injury to the organization's activities –with the consequent drain on
> the organization's resources –constitute[d] far more than simply a
> setback to the organization's abstract social interests."

14 *Rodriguez v. City of San Jose*, 930 F.3d 1123, 1134 (9th Cir. 2019) (quoting *Havens*).

15     Thus, under *Havens*, "an organization may establish 'injury in fact [for purposes of

16 standing] if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its

17 resources to combat the particular [injurious behavior] in question.'" *Id.* Notably, "a diversion-

18 of-resources injury is sufficient to establish organizational standing at the pleading stage, even

19 when it is 'broadly alleged.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040 (9th

20 Cir. 2015) (quoting *Havens*, 455 U.S. at 379).

21     In the instant case, GLC alleges that it has been and/or will be injured by the final rule

22 (which effectively leaves ghost guns unregulated) because (1) the rule frustrates its "core mission

23 [of] sav[ing] lives from gun violence," FAC ¶ 135, and (2) the rule has forced the organization to

24 divert its resources to focus on ghost guns. Regarding the latter, GLC alleges that it has had to

> expend a substantial portion of its substantial human capital and
> resources to educate the public and combat the violence ghost guns
> cause. Addressing ghost guns and the violence they facilitate is
> currently among the organization's top policy and legislative
> priorities: in recent years, [GLC] has contributed technical
> assistance to or monitored and analyzed over 100 state and federal
> bills pertaining to ghost guns. [GLC] has also launched a series of

> specific ghost gun initiatives, including drafting proposed legislation [on ghost guns], publishing white papers [on ghost guns]; and helping produce videos and other educational materials for the public [related to ghost guns].

FAC ¶ 135.  Furthermore, GLC has provided "policy expertise and technical assistance in support of violence intervention programs in communities disproportionately impacted by . . . ghost gun violence" and provided "direct support services to victims of gun violence."  FAC ¶ 137 (also referring to "increased expenditure of human and financial capital and resources by [GLC] toward work supporting violence intervention programs and violence reduction work by community-based organizations").  In addition, GLC has engaged in "legal action, [either] as co-counsel or an amicus in lawsuits" related to ghost guns.  *See* FAC ¶ 136 (identifying suits in San Francisco Superior Court and the Southern District of New York).  In San Francisco Superior Court, GLC joined with the California Attorney General and the San Francisco District Attorney to file suit against ghost gun retailers because ghost guns are an "urgent priority" in the state, with ghost guns "rang[ing] from 25 5o 50% of all crime guns recovered" in the state.  FAC ¶ 136.

GLC's time, energy, and resources spent on ghost guns has taken away from

> every other firearm policy that [GLC] advocates for.  This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level.  Background check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF's choice to create a loophole by which buyers can evade all otherwise applicable firearm sales regulations.  This loophole has forced [GLC] to redouble its violence prevention efforts and direct even more resources into addressing gun violence even in states with strong firearm laws, like the organization's home state of California.

FAC ¶ 136.  In sum, ATF's actions have forced GLC to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence.

According to the government, GLC has not adequately pled an injury in fact for several reasons: (1) because GLC has articulated only a setback to abstract social interests (saving lives from gun violence); (2) because GLC "is in the business of lobbying, policymaking, and carrying out legal activities related to gun safety [and] [a]n organization cannot establish standing based on a diversion of resources theory when it is 'merely going about its business as usual'"; and (3) because GLC has essentially manufactured its injury "by disagreeing with an interpretation of

federal law and then 'choosing to spend money' on efforts to change that interpretation."  Mot. at

6.  None of these arguments is persuasive.

Regarding (1), GLC has simply identified savings lives as its mission and asserted that the

final rule frustrates that mission.  GLC has not claimed injury based simply on frustration of

mission alone; rather it claims a diversion of resources, *see* FAC ¶¶ 135-37, consistent with

*Havens*.  *See Havens*, 455 U.S. at 379 ("If, as broadly alleged, [defendants' racially

discriminatory] steering practices have perceptibly impaired [plaintiff-organization's] ability to

provide counseling and referral services for low- and moderate-income home-seekers, there can be

no question that the organization has suffered injury in fact.  Such concrete and demonstrable

injury to the organization's activities – with the consequent drain on the organization's resources –

constitutes far more than simply a setback to the organization's abstract social interests."); *see also*

Wright & Miller, 13A Fed. Prac. & Proc. Juris. § 3531.9.5 (3d ed.) (noting that "[i]njury to an

organization's efforts to help others or address social problems has supported standing in a

number of cases since the *Havens Realty* case[;] [t]he most secure foundation for standing seems

to be found in showings that the organization has devoted specific effort and expense to combat

the challenged activity").

On (2), just because GLC is in the business of gun safety does not mean that any resources

spent on gun safety means it is going about its "business as usual."  An organizational plaintiff

simply must show that it has redirected resources to "combat the *specific challenged conduct*."

*Rodriguez*, 930 F.3d at 1134 (emphasis added).  For example, as the Ninth Circuit has explained:

> in *East Bay Sanctuary Covenant v. Trump,* 909 F.3d 1219 (9th Cir.
> 2018), *as amended by* 932 F.3d 742, 2018 U.S. App. LEXIS 37150,
> 2018 WL 8807133 (9th Cir. December 7, 2018), the plaintiff
> organizations created "education and outreach initiatives regarding
> the [challenged] rule."  *Id.* at 1242.  In *National Council of La Raza
> v. Cegavske,* 800 F.3d 1032 (9th Cir. 2015), to counteract alleged
> voter registration violations, civil rights groups "expend[ed]
> additional resources" that "they would have spent on some other
> aspect of their organizational purpose."  *Id.* at 1039.  In these cases,
> the plaintiffs were not "simply going about their 'business as
> usual,'" *id.* at 1040-41, but had altered their resource allocation *to
> combat the challenged practices*, *see also Valle del Sol Inc. v.
> Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (finding
> organizational standing where the plaintiffs "had to divert resources
> to educational programs to address its members' and volunteers'

United States District Court
Northern District of California

21

> concerns about the [challenged] law's effect"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (finding organizational standing where the plaintiff, in response to the defendant's challenged practices, "started new education and outreach campaigns targeted at discriminatory roommate advertising"); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943-44 (9th Cir. 2011) (finding organizational standing where resources directed toward "assisting day laborers during their arrests and meeting with workers about the status of the [challenged] ordinance would have otherwise been expended toward [the advocacy group's] core organizing activities"); *Smith*, 358 F.3d at 1105 (finding organizational standing where complaint was dismissed without leave to amend and plaintiff alleged it "divert[ed] its scarce resources from other efforts" so it could "monitor the [subject] violations and educate the public regarding the discrimination"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (finding organizational standing where plaintiff alleged it had expended thousands of dollars to "redress[] the impact" of defendant's discrimination and, as a result, was unable "to undertake other efforts to end unlawful housing practices"); *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (finding organizational standing where plaintiffs "expend[ed] resources in representing clients they otherwise would spend in other ways").

*Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1154-55 (9th Cir. 2019) (emphasis added).

The fact that a plaintiff has previously engaged in a particular kind of activity does not mean that the plaintiff is going about its "business as usual" if it engages in the same kind of activity *in response to the defendant's conduct*, so long as the uptick in that activity causes a diversion of resources away from the organization's affairs, *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1040-41 (9th Cir. 2015) (noting that "[r]esources Plaintiffs put toward registering someone who would likely have been registered by the State, had it complied with the [National Voter Registration Act], are resources they would have spent on some other aspect of their organizational purpose – such as registering voters the NVRA's provisions do not reach, increasing their voter education efforts, or any other activity that advances their goals[;] . . . Plaintiffs have not alleged that they are simply going about their 'business as usual,' unaffected by the State's conduct"); *Sabra v. Maricopa Cty. Cmty. Coll. Dist.*, 44 F.4th 867, 878-80 (9th Cir. 2022) (rejecting district court's conclusion that nonprofit organization "'committed to advocacy and protecting the civil rights of American Muslims'" lacked standing to challenge a module on

22

Islamic terrorism taught in a college course on the basis that it failed to show "how its remedial actions – developing a public-awareness campaign to combat Islamophobia – fell outside 'the realm of [its] normal advocacy'"; organization alleged that, "in response to [the professor's] allegedly harmful depiction of Islam, it went out of its way to develop a public-awareness campaign rebutting the information in [the] course," divert[ing] [its] resources' by contracting with a religious scholar who assisted in creating materials for the campaign"); *cf. Fair Hous. Council v. Roommate.com, LLC*, 666 F.3d 1216, 129 (9th Cir. 2012) (finding that plaintiff-Fair Housing Councils had standing to sue defendant, which ran a website helping roommates find each other and used a questionnaire requiring disclosure of sex, sexual orientation, and familial status to match people based on those characteristics; in response to defendant's conduct, Fair Housing Councils "started new education and outreach campaigns targeted at discriminatory roommate advertising"). *Compare Am. Diabetes*, 938 F.3d at 1155 (noting that "the only resource the Association claims it diverted as a result of the New Policy [being challenged] is the time one of its two staff attorneys took to handle a single intake call"; this was just business as usual because Association's staff attorneys "dedicate a portion of their time to taking calls, and one [person] used that service" – there was no showing that, "as a result of the New Policy, the Association had altered or intended to alter its resource allocation to allow its attorneys to take a higher volume of calls or separately address the New Policy").

In the case at bar, GLC has sufficiently alleged that it has altered its resource allocation. Specifically, it has alleged that "ATF's actions on ghost guns [*i.e.*, not regulating them] have required [GLC] to expend more resources and staff time because ATF's regulatory approach undermines every other firearm policy that [GLC] advocates for. This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level," for all firearms in general. FAC ¶ 136 (adding that "[b]ackground check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF"). GLC has shifted resources to activity related to ghost guns in particular and away from activity related to other firearms.

Finally, the government's argument in (3) has little to no merit. An organizational plaintiff

23

United States District Court
Northern District of California

1   "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money

2   fixing a problem that otherwise would not affect the organization at all.  It must instead show that

3   it would have suffered some other injury if it had not diverted resources to counteracting the

4   problem."  *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1088

5   (9th Cir. 2010).  But the instant case does not present this concern.  GLC has not simply

6   manufactured an injury by incurring litigation costs (*i.e.*, it has actually diverted resources to

7   counteract the loophole/exception in the ATF regulation), nor has it been spending money

8   addressing a problem that would not affect it at all.

9   D.      Individual Plaintiffs

10         The final plaintiffs in the pending action are two individuals: Mr. Muehlberger and Mr.

11  Blackwell.  Mr. Muehlberger lives in Santa Clarita, California, and works in Santa Monica,

12  California, both located in Los Angeles County.  *See* FAC ¶¶ 126, 128.  Mr. Blackwell also lives

13  in Santa Clarita.  The FAC does not specify the city where Mr. Blackwell works but does state that

14  it is also located in Los Angeles County.  *See* FAC ¶ 131.

15         In 2019, Mr. Muehlberger's teenage daughter and Mr. Blackwell's teenage son were killed

16  in a shooting at Saugus High School.  The shooter was a classmate who used a ghost gun that "law

17  enforcement officials believe he obtained from his father, who was legally prohibited from owning

18  and possessing firearms."  FAC ¶ 126.  The high school is located in Los Angeles County.  The

19  Court takes judicial notice of the fact that the school is located in Santa Clarita specifically.

20         Mr. Muehlberger and Mr. Blackwell assert that they have suffered and/or will suffer injury

21  as a result of the final rule because they "live in acute fear of ghost gun violence."  FAC ¶ 127; *see*

22  *also* FAC ¶ 132.  They worry not only for their own lives but also for the lives of their other

23  children, one of whom (a child of Mr. Blackwell's) currently attends Saugus High School.  *See*

24  FAC ¶¶ 129, 133.  Mr. Muehlberger and Mr. Blackwell maintain that their fear is substantiated

25  because their children were killed and because they live and work in Los Angeles County which

26              has a significant and growing rate of ghost gun possession and
                violence.  In 2021, the Los Angeles Police Department announced
27              that ghost guns "accounted for 33 percent of all guns recovered by
                the department" and that "the number of ghost guns seized by the
28              department increased 400 percent since 2017 and more than doubled

24

from 2020 to 2021 alone."

FAC ¶ 127; *see also* FAC ¶ 114 (alleging that, "[i]n January 2020, the ATF special agent in charge of the Los Angeles Field Division stated that 41% of the Los Angeles Field Division's cases have involved ghost guns"); FAC ¶ 115 (alleging that, in the first half of 2021, "the Los Angeles Police Department reported a nearly 300% increase in ghost gun seizures as compared to the same period in 2020"). Mr. Muehlberger and Mr. Blackwell underscore that they have regular therapy to assist in processing their ongoing fear and trauma. *See* FAC ¶¶ 129, 133.

In the motion to dismiss, the federal government argues that the individual plaintiffs lack standing because "[a] plaintiff threatened with future injury has standing to sue [only] if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *McGee*, 982 F.3d at 709 (internal quotation marks omitted). According to the government, the FAC "lacks any specific allegation that [the individual plaintiffs] are 'realistically threatened' by an actual likelihood they – or their surviving family members – will be the victims of a crime committed with an unserialized firearm made from a receiver blank that would not be classified as a firearm under the [Final] Rule." Mot. at 10.

As an initial matter, the Court takes note that, per the allegations in the FAC, Mr. Muehlberger and Mr. Blackwell are *currently* experiencing fear – *i.e.*, that there is a present injury, not a future injury. That being said, one cannot claim a current or ongoing injury such as fear based on future events that are implausible. *See Clapper*, 568 U.S. at 416 (concluding that domestic entities lacked standing to challenge a statute that allowed the government to intercept communications between the entities and foreigners: although entities claimed they had a current fear of surveillance which led them to take measures to protect the confidentiality of their communications, the harm they sought to avoid was "not certainly impending"). The fears must be reasonably founded. *See Coddington v. Crow*, Nos. 22-6100, 22-6112, 2022 U.S. App. LEXIS 28996, at *23 (10th Cir. Oct. 19, 2022) (stating that, "if current emotional distress based on fear of future harm is enough for injury-in-fact, we believe that such a fear would need to be reasonably founded"). In *Clapper*, the Supreme Court noted that the plaintiffs "present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental

25

1    actions." *Clapper*, 568 U.S. at 420.

2          In their papers, the individual plaintiffs do not really dispute the above legal standard. *See*

3    Opp'n at 24-25 (arguing that "[c]ourts routinely find that an increased risk of future injury is

4    cognizable"). Instead, they suggest that, at the very least, there is a question of fact as to whether

5    their fear is reasonably founded. *Cf. Cent. Delta Water Agency v. United States*, 306 F.3d 938,

6    948 (9th Cir. 2002) (where plaintiffs claimed future injury, stating that "[p]laintiffs have at the

7    very least raised a material question of fact with respect to the issue whether they suffer a

8    substantial risk of harm as a result of the Bureau's policies").

9          Although it is reasonable to infer that 80 percent receivers/frames will be sold standalone,

10   *i.e.*, to exploit the loophole/exception in the ATF regulations (as the Court addressed in the section

11   on California's standing), the Court finds that Mr. Muehlberger and Mr. Blackwell have not made

12   out a plausible case for standing as individuals. First, their position is dependent on 80 percent

13   receivers/frames being sold standalone in Los Angeles County; however, they have failed to

14   explain why it is fair to consider the entirety of the County when they both live in Santa Clarita

15   and Mr. Muehlberger works in Santa Monica. *See* https://hr.lacounty.gov/about-the-county/ (last

16   visited 2/7/2023) (stating that Los Angeles County covers 4,084 square miles);

17   https://www.census.gov/quickfacts/fact/table/losangelescountycalifornia,CA/PST045221 (last

18   visited 2/7/2023) (estimating that, in 2021, Los Angeles County had a population of more than 9.8

19   million).[10] To be sure, there appears to be (as alleged) some ghost gun violence in both cities, *see*

20   *also* FAC ¶ 128 (alleging that, in 2013, a person used a ghost gun to kill five people in Santa

21   Monica), but Mr. Muehlberger and Mr. Blackwell have not shown that there is an actual or likely

22   ghost gun epidemic in either city based on 80 percent frames/receivers being sold standalone.

23         Second, even if the Court were to consider Los Angeles County more broadly, Mr.

24   Muehlberger and Mr. Blackwell would fare no better. As the federal government has argued, the

25   individual Plaintiffs cannot predicate standing on there being a general ghost gun problem in Los

26   Angeles County. Rather, they must plausibly show that crimes have occurred or will occur based

27

28   ───────────────
     [10] The Court takes judicial notice of the size and population of Los Angeles County.

                                          26

United States District Court
Northern District of California

United States District Court
Northern District of California

1    on 80 percent receivers/frames being sold standalone in the County and to such an extent that it is

2    reasonable for them to fear violence because of those sales.  The allegations in the FAC are not

3    sufficient.  Notably, the cases on which Mr. Muehlberger and Mr. Blackwell rely in support of

4    their position are distinguishable because they involved a "broader" problem.  For example, in

5    *Powell v. Illinois*, No. 18 CV 6675, 2019 U.S. Dist. LEXIS 168209 (N.D. Ill. Sep. 30, 2019), the

6    problem was violence based on guns generally.  *See id.* at *2, 18-20 (where mental injuries to

7    children were alleged as a result of  "the threat of continuing exposure to incidents of gun violence

8    in the five primarily African-American Chicago neighborhoods in which it is most concentrated,"

9    finding that the complaint "contain[ed] ample statistical evidence that gun violence in Chicago is

10   concentrated in . . . predominately African-American neighborhoods").  Similarly, in *Brady*

11   *Campaign to Prevent Gun Violence United with the Million Mom March v. Ashcroft*, 339 F. Supp.

12   2d 68. 75-76 (D.D.C. 2004), the problem was violence based on semiautomatic weapons generally

13   (and not a subset of such weapons).  *See id.* at 75-76 (finding that organization had satisfied the

14   injury-in-fact requirement because, as alleged in the complaint, "specific members of the Brady

15   Campaign live in neighborhoods where violent crimes involving SAWs occur at higher than

16   average rates; and the challenged ATF policy increases the risk that criminals in those

17   neighborhoods will be able to obtain SAWs [semiautomatic weapons], thus increasing the risk of

18   violent SAW related crimes involving Brady Campaign members").  Here, the claim is based on

19   the incremental addition of ghost guns on the streets resulting from the limited reach of the new

20   regulation.

21        The Court's conclusion here is not inconsistent with its conclusion that the state of

22   California has sufficiently pled standing.  For California, the asserted injury is aggregative based

23   on the state's position.  Even a relatively few instances of a standalone 80 percent receiver/frame

24   (made available as a result of the challenged regulation) being used in a crime may impose costs

25   on the state which provides a basis for the state's standing.  As noted above, the state will suffer an

26   injury as a result if any nonserialized weapon makes it more difficult for California to trace the

27   weapon.  For Mr. Muehlberger and Mr. Blackwell, a chance of a particular instance of a

28   standalone 80 percent receiver/frame (attributable to the challenged regulation) being used in a

27

1    crime against these individuals is not a sufficient basis to support standing; their fear – which

2    affects Mr. Muehlberger and Mr. Blackwell individually – must be reasonably founded.  To be

3    clear, the Court is not finding here that there is no general ghost gun violence problem in Los

4    Angeles County.  However, the allegations in the FAC do not plausibly demonstrate that Mr.

5    Muehlberger and Mr. Blackwell, as individuals, have sufficiently alleged a reasonable fear of

6    violence based on 80 percent receivers/frames being sold standalone in the County.

7         Accordingly, the Court dismisses Mr. Muehlberger and Mr. Blackwell from this suit based

8    on lack of standing.  Its ruling here does not preclude either individual from participating in the

9    suit in an amicus capacity.

10   E.    Ripeness

11        For the reasons stated above, the Court concludes that the state of California and GLC

12   have adequately alleged standing.  The government contends that, even if this is true, a part of the

13   case should still be dismissed.  Specifically, the government argues that the state/GLC's

14   "alternative" claim for relief should be dismissed.  The alternative claim is that, should the final

15   rule be "vacated, altered, or amended at any point," FAC ¶¶ 144, 153, then (1) ATF's prior ghost

16   gun determinations will essentially be reactivated (to "fill [the] void," Opp'n at 29), and (2) those

17   prior determinations likewise "disregard the GCA," FAC ¶ 144, and are "arbitrary and

18   capricious."  FAC ¶ 154.  In other words, California/GLC's alternative claim is their original

19   lawsuit.  According to Defendants, this alternative claim warrants dismissal because it is not ripe;

20   there is no indication that the final rule will be vacated, altered, or amended at any point.[11]

21        Plaintiffs' response is that they have included this alternative claim because there is

22   litigation pending in other districts (two federal suits in Texas and one federal suit in North

23   Dakota[12]) primarily brought by ghost gun manufacturers and "seeking to enjoin the Final Rule in

_____

[11] In their reply, Defendants also suggest that prior determinations would not automatically be
reactivated to fill the void.  *See* Reply at 9 ("Plaintiffs cite no authority for the contention that such
guidance and classifications would automatically be reinstated . . . .").  However, it is a fair
inference that such prior determinations would essentially be reinstated.

[12] *See VanDerStok v. Garland*, No. 4:22-cv-00691-O (N.D. Tex.); *Morehouse Enters., LLC v. Bur.
of Alcohol, Tobacco, Firearms & Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D.); *Div. 80 v.
Garland*, No. 3:22-cv-00148 (S.D. Tex.).

28

United States District Court
Northern District of California

1    its entirety." Opp'n at 27. According to Plaintiffs, the alternative claim is ripe because "there is a

2    sufficient likelihood that the Final Rule will be vacated." Opp'n at 27; *see also* Opp'n at 28

3    (emphasizing that "a 'factual contingency' does not automatically render [a] claim unripe").

4    Plaintiffs underscore that, in one of the Texas cases (*VanDerStok*), the district court has already

5    issued preliminary injunctions enjoining enforcement of the final rule "against two different ghost

6    gun manufacturers. The court did so after concluding that the ghost gun manufacturers

7    demonstrated a 'substantial likelihood of success' on their claims that provisions of the Final Rule

8    exceed ATF's statutory authority." Opp'n at 29; *see also VanDerStok v. Garland*, No. 4:22-cv-

9    00691-O, 2022 U.S. Dist. LEXIS 159459, at *11, 14 (N.D. Tex. Sept. 2, 2022) (concluding that

10   plaintiffs were likely to succeed on both of their arguments – to wit, (1) "the Final Rule expands

11   ATF's authority over parts that may be 'readily converted' into frames or receivers when Congress

12   limited ATF's authority to 'frames or receivers' as such," and (2) "the Final Rule unlawfully treats

13   weapon parts kits as firearms"; noting, *e.g.*, that something "which *may become* a receiver is not

14   itself a receiver," and "Congress could have included firearm parts that 'may readily be converted'

15   to frames or receivers, as it did with 'weapons' that 'may readily be converted' to fire a

16   projectile," but did not) (emphasis in original); *VanDerStok v. Blackhawk Mfg. Grp. Inc.*, No.

17   4:22-00691-O, 2022 U.S. Dist. LEXIS 200315, at *-9 (N.D. Tex. Nov. 3, 2022) (making the same

18   likelihood-of-success analysis for different plaintiff).

19        Although Plaintiffs' position is not entirely meritless, it is difficult to say that the

20   alternative claim is ripe since a preliminary injunction is simply a preliminary assessment – and it

21   appears that the preliminary injunction rulings are on appeal. *See* Amicus Br. at 6 (referring to

22   Case No. 22-11071 before the Fifth Circuit for which the opening brief was due on 12/20/2022;

23   also referring to Case No. 22-11086 before the Fifth Circuit for which the opening brief was due

24   on 1/3/2023). Furthermore, as a practical matter, it is not clear that California or GLC would

25   suffer any injury if the Court were not to permit the claim at this time. To be clear, the Court is

26   not barring California/GLC from asking for leave to amend should things become more concrete

27   in nature, but, at this point at least, the contingent nature of the outcome and effect of the other

28   suits presents a problematic ripeness problem. The Court thus dismisses the "alternative" claim

*United States District Court*
*Northern District of California*

29

1    for relief without prejudice.

2    F.    Amicus Brief

3        Finally, the Court takes note that an amicus brief has been filed by some of the

4    individuals/entities who previously moved to intervene (hereinafter the "Blackhawk Applicants").

5    The Blackhawk Applicants argue that the FAC should be dismissed because "it concerns an

6    entirely distinct agency action and the basis for Plaintiffs' original lawsuit is moot."  Amicus Br.

7    at 1.  Alternatively, the Blackhawk Applicants ask the Court to stay this pending the outcome of

8    the Texas and North Dakota actions that challenge the final rule in its entirety.

9        Neither of the arguments is persuasive.

10       As to the first argument, the Blackhawk Applicants ignore the fact that the Court already

11   allowed Plaintiffs to file an amended complaint.  To the extent they ask the Court to reconsider,

12   their argument still lacks merit.  The Blackwell Applicants contend that the amended pleading is

13   governed by Federal Rule of Civil Procedure 15(d).  Rule 15(d) governs supplemental pleadings.

14   It provides that, "[o]n motion and reasonable notice, the court may, on just terms, permit a party to

15   serve a supplemental pleading setting out any transaction, occurrence, or event that happened after

16   the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).

17       Rule 15(d) is implicated even though a fair amount of time has transpired since this case

18   was filed.  The Blackhawk Applicants argue that, "'[w]hile leave to permit supplemental pleading

19   is 'favored,' it cannot be used to introduce a 'separate, distinct and new cause of action.'"  Amicus

20   Br. at 3 (quoting *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997)).  But

21   the Blackhawk Applicants have glossed over the facts underlying *Planned Parenthood*.  There, the

22   plaintiffs filed their original action in 1989, challenging the constitutionality of a state's parental

23   consent abortion law.  The plaintiffs prevailed, and a final judgment was entered in their favor.

24   The district court did not retain jurisdiction after entering its final order declaring the statute

25   unconstitutional, and the judgment was not appealed.  Several years later, in 1996, a new parental

26   consent abortion statute was enacted.  Before the effective date of the new statute, the plaintiffs

27   filed a motion for leave to file a supplemental complaint to their original action filed back in 1989.

28   *See id.* at 401-02.

United States District Court
Northern District of California

30

It was in this context that the Ninth Circuit stated as follows:

> The supplemental complaint filed by plaintiffs involved a new and distinct action that should have been the subject of a separate suit. Although both the original suit and the supplemental complaint sought to challenge Arizona's parental consent law, the supplemental complaint challenged a different statute than the one that had been successfully challenged in the original suit. Additionally, a final judgment had been rendered in the original action four years prior to plaintiffs' request to supplement their complaint. That judgment was not appealed and in no way would be affected by plaintiffs' supplemental complaint. Nor did the district court retain jurisdiction after entering that order.

> We also note that permitting the plaintiffs to supplement their complaint did not serve to promote judicial efficiency, the goal of Rule 15(d). To determine if efficiency might be achieved, courts assess "whether the entire controversy between the parties could be settled in one action . . . ." In the case at hand there would necessarily be two actions since the original suit had been settled for some time. There were also no "technical obstacles" to plaintiffs bringing a new, separate action to challenge § 36-2152 as amended.

*Id.* at 402. And notably, in a subsequent decision, the Ninth Circuit cited *Planned Parenthood* for the following proposition: "[a] supplemental pleading cannot be used to introduce a 'separate, distinct and new cause of action' where the original action between the parties has reached a final resolution and the district court does not retain jurisdiction." *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 n.11 (9th Cir. 1997), *overruled in part on other grounds by Shalabi v. City of Fontana*, 11 Cal. 5th 842 (2021).

The posture of the case at bar is clearly different from that in *Planned Parenthood*. Here, there was no conclusion to the proceedings initiated by the original complaint. Rather, the matter was stayed pending modification of the regulations in question. *Planned Parenthood*, therefore, does not dictate how the Court should proceed in the case at bar.

Furthermore, judicial economy would not be furthered by denying Plaintiffs an opportunity to supplement their pleading and requiring them to file a new action. *See also Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988) (noting that Rule 15(d) "'is a useful device, enabling a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted[;] [s]o useful they are and of such service in the efficient administration of justice that they ought to be allowed as of

course, unless some particular reason for disallowing them appears'"); *see also* 6A Wright &

Miller, Fed. Prac. & Proc. § 1506 (3d ed.) (noting that "[o]ne of the basic policies of the rules . . .

is that a party should be given every opportunity to join in one lawsuit all grievances against

another party regardless of when they arose"; adding that "the usual effect of denying leave to file

a supplemental pleading because it states a new 'cause of action' is to force plaintiff to institute

another action and move for consolidation under Rule 42(a) in order to litigate both claims in the

same suit, a wasteful and inefficient result"). The Court thus exercises its "broad discretion" to

allow Plaintiffs' supplemental pleading. *Keith*, 858 F.2d at 473.

As for the Blackhawk Applicants' second argument, in which they request a stay of

proceedings, it is also predicated Rule 15(d), which, as noted by the Ninth Circuit, has the goal of

"promot[ing] judicial efficiency." *Planned Parenthood*, 130 F.3d at 402.

Notably, the Blackhawk Applicants have invoked only Rule 15(d) as a basis for a stay.

They have not, *e.g.*, asked for a stay under the first-to-file rule. *See Alltrade, Inc. v. Uniweld*

*Prods.*, 946 F.2d 622, 623 (9th Cir. 1991) (stating that the first-to-file rule "allows a district court

to transfer, stay, or dismiss an action when a similar complaint has already been filed in another

federal court"); *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir.

2015) (noting that, for the first-to-file doctrine, three factors are considered: (1) the chronology of

the actions; (2) similarity of the parties; and (3) similarity of the issues). Nor have they asserted

that the Court should stay pursuant to its inherent authority and *Landis v. North American Co.*, 299

U.S. 248, (1936). *See Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005) (noting that,

for a *Landis* stay, a court should consider "the possible damage which may result from the

granting of a stay, the hardship or inequity which a party may suffer in being required to go

forward, and the orderly course of justice measured in terms of the simplifying or complicating of

issues, poof, and questions of law which could be expected to result from a stay").

Just as judicial efficiency is not furthered by a dismissal, judicial efficiency is not furthered

by a stay. This case has been ongoing since 2020. It began with a challenge to the ATF's ghost

gun policy and continues to be a challenge to the ATF's ghost gun policy (even if that challenge

has now narrowed). Furthermore, Plaintiffs have been diligent in litigating the case: agreeing to a

United States District Court
Northern District of California

32

1  stay when it was clear that the ATF was coming up with a new rule and then evaluating ATF's

2  interpretation of the final rule after its issuance before proceeding with the FAC. Indeed, with

3  respect to judicial efficiency, the Blackhawk Applicants and/or others similarly situated could

4  have filed a challenge to the final rule in this case where the matter was already pending and the

5  competing claims could have been coordinated, but they chose not to do so. The Court further

6  notes that, as discussed below, it shall move forward with the intervention motions; if those

7  motions are granted, then the Blackhawk Applicants cannot argue that their viewpoints will not be

8  considered in and coordinated within this litigation.

9  ### III.   **CONCLUSION**

10  For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part the federal

11  government's motion to dismiss. The motion to dismiss for lack of standing is denied as to

12  California and GLC, but granted as to Mr. Muehlberger and Mr. Blackwell. The motion to

13  dismiss the "alternative" claim for relief is granted, but California and/or GLC are not barred from

14  raising the claim in the future should circumstances change.

15  Finally, the Court sets an expedited briefing schedule on the intervention motions as

16  follows. The parties seeking intervention shall file a supplemental brief in support of their motion

17  on February 23, 2023. The Court notes that, although there are two sets of proposed intervenors, a

18  joint brief is strongly preferred since their positions are aligned. By March 9, 2023, any

19  opposition to intervention, whether from Plaintiffs or the federal government, shall be filed. Each

20  supplemental brief shall be no longer than ten (10) pages.

21  This order disposes of Docket No. 125.

22  **IT IS SO ORDERED**.

23

24  Dated: February 9, 2023

25

26  _____

27  EDWARD M. CHEN
   United States District Judge

28

33

GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
sedelman@gibsondunn.com
2029 Century Park East
Los Angeles, CA  90067-3026
Telephone: (310) 552-8500

LEE R. CRAIN, *pro hac vice*
ERICA PAYNE, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY  10166-0193
Telephone: (212) 351-4000

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000

*Attorneys for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to
Prevent Gun Violence*

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, SBN 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Ave,
Suite 11000
San Francisco, CA 94102-7004
Telephone:  (415) 510-3807

*Attorneys for Plaintiff State of California, by
and through Attorney General Rob Bonta*

[*Additional Counsel Listed on Next Page*]

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| STATE OF CALIFORNIA, BRYAN MUEHLBERGER, FRANK BLACKWELL, GIFFORDS LAW CENTER to PREVENT GUN VIOLENCE, <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, STEVEN DETTELBACH, in his official capacity, DANIEL HOFFMAN, in his official capacity, DEPARTMENT OF JUSTICE, MERRICK GARLAND, in his official capacity, <br><br> Defendants. | CIVIL CASE NO.:  3:20-CV-06761-EMC <br><br> **SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> HON. EDWARD M. CHEN |

1   Additional Counsel

2   GIFFORDS LAW CENTER TO
3   PREVENT GUN VIOLENCE
    DAVID M. PUCINO, *pro hac vice*
4   244 Madison Ave Ste 147
    New York, NY 10016
5   Telephone: (917) 524-7816

6   *Attorney for Plaintiffs Bryan Muehlberger,*
7   *Frank Blackwell, and Giffords Law Center to*
    *Prevent Gun Violence*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to the Court's directive at the status conference held on August 29, 2023, Plaintiffs State of California and Giffords Law Center to Prevent Gun Violence submit this Supplemental Complaint, along with the exhibits attached thereto, against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); Steven Dettelbach, in his official capacity as Director of ATF; Daniel Hoffman, in his official capacity as Chief of the Firearms Technology Industry Services Branch of ATF; the United States Department of Justice ("DOJ"); and Merrick Garland, in his official capacity as Attorney General of the United States, as follows:

## INTRODUCTION

1. Since 1968, the Gun Control Act ("GCA") has imposed important, common-sense gun safety restrictions on the purchase and sale of firearms in the United States.[1] These include, among other requirements, that any firearm sold or imported in the United States must have a unique serial number, and that licensed gun dealers must maintain identifying records, including the serial numbers of guns they sell and the identity of the buyer. These requirements allow law enforcement to trace guns recovered at crime scenes to their first retail purchaser. The GCA also requires licensed gun dealers to conduct criminal background checks on would-be gun purchasers, ensuring that weapons do not fall into the wrong hands. Federal law prohibits numerous categories of people from purchasing guns, including minors and individuals with disqualifying criminal convictions, people with records of domestic violence, those suffering from serious mental illness, or individuals who are addicted to drugs. These restrictions have been hallmarks of federal firearms regulation for decades. By preventing those who pose the greatest threat of violence from purchasing firearms, these laws have protected an incalculable number of Americans from harm.

2. But the protections of the GCA have been threatened by the rapid proliferation of so-called "ghost guns."[2] Ghost guns are, in effect, lethal do-it-yourself ("DIY") projects that allow anyone at home to build a fully operable firearm *within minutes*. The resulting DIY weapons are "ghosts" because, lacking serial numbers, they are not traceable by law enforcement when they are used in a

---

[1] *See generally* Gun Control Act of 1968, Pub. L. No. 90-618 (1968); Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

[2] Ghost guns are also sometimes referred to as privately made firearms or "PMFs."

2
SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

crime.  These ghost guns are readily accessible because of ATF's erroneous determination that the critical components of these firearms are excluded from the ambit of the GCA.  Because of ATF's recent rulemaking and other final agency actions, ghost guns can be purchased without a background check by people who are prohibited from possessing firearms; the firearms do not have serial numbers; and gun dealers are not required to maintain any records of their sales or the identity of their purchasers.  Anyone can buy them, and no one can trace them.  As a result, ghost guns have become the weapon of choice for illegal gun traffickers and those—like organized criminal gangs and mass murderers—who seek to bear arms not for lawful means, but rather to engage in criminal activity and acts of violence.

3.    Defendants have allowed ghost guns to proliferate because they have determined that the core component of a ghost gun is not a "firearm" under the GCA.  That core component is a product that the ghost gun industry calls "80 percent" "receivers" for long guns or "frames" for handguns.  A receiver or frame is the central piece of any firearm—the part of the firearm that houses the hammer, bolt, or breechblock, as well as the firing mechanism;[3] it is so central that the GCA expressly provides that a "frame or receiver" *is* a "firearm" for purposes of the GCA's regulatory regime.  18 U.S.C. § 921(a)(3).  The GCA also provides that "firearms" include not only fully functional weapons, but also receivers and frames of such weapons that are "***designed to or may readily be converted***" into functional weapons.  *Id*.  (emphasis added).  In reality, "80 percent" or "unfinished" receivers and frames are nearly finished firearms—products that require mere minutes to go from "unfinished" to ready-to-fire.  They are therefore both "designed to" *and* "may readily be converted" into functional firearms with ease.  For that reason, the monikers "80 percent" or "unfinished" are arbitrary terms that

---

[3]  27 C.F.R. § 478.12 (defining "frame" as "the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure" and "receiver" as "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or aa structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.").

3

do not accurately reflect the limited amount of work remaining to convert a frame or receiver into an operable weapon.



**Image 1:  80 Percent Frame Compared to Finished Frame**

4.      80 percent receivers and frames are pieces of metal or composite plastic created for the sole and express purpose of allowing people to create a fireable weapon quickly and easily.  To the lay eye, 80 percent receivers and frames are in all material respects ***indistinguishable*** from ready-to-fire receivers and frames, as shown in Image 1 above, in which the top images are 80 percent frames while the bottom images are the substantially similar finished frames.

5.      Ghost gun manufacturers have also developed tools that make it easier than ever to convert 80 percent receivers and frames into fully operable firearms in as little as ***15 minutes***.[4]  These tools include jig kits (a collection of tools, measurements, and physical guides designed to quickly make unfinished or 80 percent receivers functional), milling machines (a pre-programmed "mill" that automatically turns 80 percent receivers into functioning weapons) and even free, easy to use printable

---

[4]  *80 Percent Lower Jig*, GUN BUILDERS DEPOT, https:*//www.gunbuilders.com/80-lower-jig/* (last visited Oct. 12, 2022); *see Glock 80% Compact Polymer Pistol Frame Kit*, FANDWGUNS.GUNSAMERICA.COM, http://fandwguns.gunsamerica.com/ItemDetails/762360860/Glock-80-Compact-Polymer-Pistol-Frame-Kit.htm (last visited Oct. 18, 2022).

blueprints for building ghost guns.[5]  Even without these products however, anyone with internet access can easily find detailed instructions for completing their frame or receiver with common household tools.  The fact that 80 percent receivers and frames are so easy to assemble into ghost guns and are sold without background checks or recordkeeping is the very reason these DIY products have dangerously proliferated.  As one seller advertised, 80 percent receivers "allow gun owners to build their own firearms without having to go through a licensed dealer."[6]

6.      Yet Defendants have determined that 80 percent receivers and frames are not "firearms" under the GCA, and that therefore the statutory requirements and prohibitions of the GCA do not apply to these products.  Consequently, with nothing more than an internet connection and a credit card— and without needing to validate as to whether a purchaser is alive or dead, real or fake—anyone including minors and people with serious, violent criminal records can purchase an 80 percent receiver and convert it into a fireable weapon, often within mere minutes.

7.      Plaintiffs originally filed this action over two years ago, in September 2020, to challenge Defendants' prior agency actions regarding ghost guns as arbitrary and capricious and in defiance of the plain meaning of the GCA.  In April 2022, the administration issued new rulemaking that seemed intended to combat the proliferation of ghost guns.  But ATF's new rule, which took effect in August 2022, is contrary to the text of the GCA in one critical aspect.[7]  *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479) (hereinafter, the "Final Rule").  Though the Final Rule takes important steps to eliminate ghost gun-making "kits"—meaning where 80 percent receivers or frames are sold together with other essential firearm parts, such as the magazine to store ammunition, and the jigs to assemble the firearm—the Rule ***still permits*** the selling of unserialized "80 percent" receivers and frames as stand-alone items without any background checks or serialization.  For example, Juggernaut Tactical sells

---

[5]  Keegan Hamilton, *A Simple Plastic Tool Is Undermining New Ghost Gun Rule*s, VICE (Sept. 12, 2022), https://www.vice.com/en/article/epzb3a/ghost-gun-jig-tool.

[6]  *Why Our 80 Lower Jig Tools?*, 5D Tactical, https://www.5dtactical.com/categories/80-lower-jig-tools/ (last visited Oct. 19, 2022).

[7]  Anjeanette Damon, *Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (Aug. 24, 2022), https://www.propublica.org/article/nevada-ghost-guns-polymer80-firearms-laws.

both 80 percent lower receivers *and* jigs and tool kits on their website.  These items are sold completely unregulated—as long as a buyer purchases each in a separate transaction.  The company even specifically instructs its customers to purchase all the items needed to create a firearm from an 80 percent receiver or frame in separate transactions, as an easy workaround to the Final Rule.[8]

8.    The Final Rule's exclusion of stand-alone 80 percent receivers and frames is contrary to the plain text of the GCA and arbitrarily and capriciously ignores the widely acknowledged truth that 80 percent receivers and frames "*may readily be*" converted into operable firearms quickly and easily, using basic household tools, even when sold without supporting kits or jigs.  18 U.S.C. § 921(a)(3).  The Rule also ignores that these 80 percent receivers and frames are also "*designed to*" be converted into operable firearms, as there is no consumer market for 80 percent receivers and frames other than to convert them into operable firearms.[9]  *Id.*

9.    Indeed, ghost gun manufacturers and sellers have quickly recognized the narrow scope of the Final Rule, declaring:  "there is really very little practical effect" of "the New ATF 'Ghost Gun' Kit Ban"[10] and "this rule will not stop anyone who really wants to make a gun from building their own."[11]  And the federal government has not disputed this interpretation in litigation defending the Final Rule, confirming that it is "not going to be a problem" for ghost gun manufactures to continue to "sell[] receiver blanks . . . without a [] license."[12]

10.    In the meantime, there continue to be record numbers of ghost guns sold, possessed by prohibited purchasers, and used in crimes.  Since this lawsuit began in September 2020, the gun market

---

[8]  *See infra* ¶ 97.

[9]  *See, e.g., What Are the Benefits of Building Your Own AR? – Quick Assembly*, 5D TACTICAL, https://www.5dtactical.com/#tab-assembly (last visited Oct. 15, 2022) ("Our equipment provides the capability to swiftly complete an 80% lower receiver, with unparalleled precision. The Router Jig Pro can be assembled fast and ready to be used in just a few minutes. Once you're familiar with the user-friendly process, you can finish an 80 lower receiver and begin installing the lower parts kit in as little as 30 minutes!"); *see also supra* note 4 (noting that an 80 percent lower frame can be made into a fully functional firearm in as little as "15 minutes").

[10]  The Reload, *The Early Impacts of the New ATF 'Ghost Gun' Kit Ban*, YOUTUBE (Sept. 2, 2022), https://www.youtube.com/watch/PU9fJjNI9Go/.

[11]  *ATF Final Rule 2021R-05F (aka 80% Receiver Rule) Explained*, THEFIREARMBLOG.COM (Aug. 26, 2022), https://www.thefirearmblog.com/blog/2022/08/26/atf-2021r-05f-80-receiver-rule/.

[12]  *See* Ex. 1, Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 16:2–5, *Div. 80 v. Garland*, No. 3-22-CV-00148 (S.D. Tex. Aug. 9, 2022).

has expanded exponentially, and, on information and belief, the ghost gun market has similarly expanded.  According to the FBI, while an average of 13 million guns were sold legally in the U.S. each year between 2010 and 2019, that number increased to about 20 million annual gun sales in both 2020 and 2021.[13]  Although purchases of ghost guns are, by definition, not required to be recorded or disclosed, ghost gun retailers widely reported substantially increased demand.  Indeed, ghost gun manufacturers have experienced backlogs and shipping delays due to increased demand since the beginning of the COVID-19 pandemic in early 2020.[14]

11.   Given Defendants' failure to regulate 80 percent receivers and frames, ghost guns have flooded the country.  In recent years, a record number of ghost guns were recovered in California as well as in numerous other states.  In May 2020, for instance, *60 Minutes* reported that "at least 38 states and Washington D.C. have seen criminal cases involving ghost guns" and that ghost guns were used in "at least four mass shootings, violent police shootouts . . . and cases involving terrorism and white supremacists."[15]  One widely publicized ghost gun mass shooting occurred at Saugus High School on November 14, 2019.  On that day, a 16-year-old high school student wielding a ghost gun wounded three classmates and killed two others—15-year-old Gracie Anne Muehlberger, daughter of Plaintiff Bryan Muehlberger, and 14-year-old Dominic Blackwell, son of Plaintiff Frank Blackwell.[16]  The Saugus shooting has unfortunately not been the last ghost gun school shooting.  On November 29, 2021, a 15-year-old student shot and wounded a 16-year-old classmate with a ghost gun at Cesar

---

[13]  *One in Five American Households Purchased a Gun During the Pandemic*, UNIVERSITY OF CHICAGO: NORC (March 24, 2022), https://www.norc.org/NewsEventsPublications/PressReleases/Pages/one-in-five-american-households-purchased-a-gun-during-the-pandemic.aspx.

[14]  *Letter from Jerrold Nadler, Chairman, U.S. House Judiciary Committee, to Regina Lombardo, Acting Director*, ATF (Apr. 23, 2020), https://judiciary.house.gov/uploadedfiles/2020-04-23_letter_to_the_atf_re_ghost_guns.pdf?utmcampaign=2714-519 ( "[A]t least 16 companies that sell ghost gun kits have reported order backlogs and shipping delays due to overwhelming demand" during the COVID-19 pandemic.); *see also* Tess Owen, *People Are Panic-Buying Untraceable 'Ghost Guns' Online in the Coronavirus Pandemic*, VICE (Mar. 27 2020), https://www.vice.com/en_us/article/g5x9q3/people-are-panic-buying-untraceable-ghost-guns-online-in-the-coronavirus-pandemic.

[15]  Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms That Skirt Most Federal Gun Laws and Are Virtually Untraceable*, CBS NEWS (May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

[16]  *15-Year Old Gracie Anne Muehlberger, 14-Year-Old Dominic Blackwell ID'd as Saugus High School Shooting Victims*, CBS L.A. (Nov. 15, 2019), https://losangeles.cbslocal.com/2019/11/15/gracie-anne-muehlbergerdominic-blackwell-saugus-high-school-shooting-victims/.

7

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

Chavez High School in Phoenix, Arizona.[17]  On January 21, 2022, a 17-year-old student in Rockville, Maryland used a ghost gun to shoot and critically wound a classmate.[18]  On February 25, 2022, a 14-year-old student in New Mexico shot and killed his classmate during a fight over the ghost gun itself.[19]  And on March 4, 2022, an 18-year-old student used a ghost gun to wound two teachers at a high school in Kansas.[20]

12.    Defendants are keenly aware of the damage the ghost gun epidemic is inflicting—even noting in the Final Rule the "substantial increase" in ghost gun recoveries nationwide over the last several years.[21]  Just weeks ago, in fact, the Department of Justice acknowledged its "serious concerns about the proliferation of untraceable firearms easily assembled from firearm parts kits and unfinished frames and receivers."[22]  And President Biden "lamented the proliferation of these firearms, as they can be purchased in parts, are assembled at home with no serial number, can't be traced, and they're as deadly as any other weapon out there."[23]  Thomas Chittum, ATF's former Assistant Director of Field Operations, recently admitted that it is "challenging [for ATF] to keep [ghost guns] outta the hands of people who are not allowed to possess firearms," and that the number of crimes committed with ghost guns is "increasing significantly and rapidly."[24]  Current ATF Director Steven Dettelbach recently put a finer point on it, reiterating that ghost guns "hurt people like regular guns," but are "impossible to trace."[25]  ATF also states on its website that when ghost guns without serial numbers "are found at []

---

[17]  Ivan Pereira, *'Ghost Guns' Showing Up in School Shootings, Experts Fear Trend Will Get Worse*, ABC NEWS (Mar. 17, 2022), https://abcnews.go.com/US/ghost-guns-showing-school-shootings-experts-fear-trend/story?id=83346844.

[18]  *Id.*

[19]  *Id.*

[20]  *Id.*

[21]  87 Fed. Reg. 24,656 (explaining that from 2016 to 2021, "approximately 45,240 suspected [ghost guns]" were reported to have been recovered by law enforcement agencies; 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021).

[22]  Statement of Interest of the United States of America, *City of New York v. Arm or Ally, LLC*, No. 22-cv-5525, (S.D.N.Y. July 22, 2022), ECF No. 64 at 2.

[23]  *Id.* (cleaned up).

[24]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

[25]  Andy Sheehan, *ATF Director Says Agency Will Use All Its Tools to Stop Gun Violence*, CBS NEWS (Sept. 26, 2022), https://www.cbsnews.com/pittsburgh/news/atf-director-steven-dettelbach-stopping-gun-violence/.

crime scene[s], it is usually not possible to trace th[ose] firearm[s] or determine [their] history, which hinders crime gun investigations and jeopardizes public safety."[26]   Despite these obvious and predictable consequences, ATF has failed to properly apply the plain text of the GCA to slow or stop the proliferation of the 80 percent frames and receivers fueling the ghost gun epidemic.

13.    Plaintiffs therefore bring this action to require ATF to faithfully interpret and enforce the dictates of the GCA.  ATF's determinations that 80 percent receivers are *not* firearms are both contrary to law and arbitrary and capricious.

14.    *First*, ATF's determinations, codified in the Final Rule, classification letters, and other determinations, that 80 percent or unfinished receivers and frames—which can be converted into firearms in as little as 15 minutes—are *not* firearms contravenes the plain text of the GCA.  Because 80 percent receivers are **"*designed to or may be readily converted*"** into fully fireable weapons, they ***are*** firearms under the GCA.  To be sold legally, then, these products must be serialized, and their purchasers must undergo background checks.

15.    *Second*, the Final Rule and ATF's other determinations that 80 percent receivers and frames are not firearms are arbitrary and capricious.  ATF's Final Rule has arbitrarily determined that only 80 percent receivers and frames *sold with* jig kits, templates, or similar items qualify as firearms under the GCA, while leaving the 80 percent receivers and frames themselves entirely unregulated.  The industry is already taking advantage of this arbitrariness, advising consumers how they can easily develop their own "kits" even if purchasers are now required to order more than one product in separate transactions.[27]

16.    And ATF's actions purporting to implement the Final Rule, including "Open Letters" and classification letters, have arbitrarily concluded that certain 80 percent receivers and frames are not "firearms," even though they fall within the statutory definition.  The Final Rule and these particular implementing classifications and determinations thus fail to consider important aspects of the problem,

---

[26]  *Can Functioning Firearms Made From Receiver Blanks Be Traced?*, ATF, https://www.atf.gov/firearms/qa/can-functioning-firearms-made-receiver-blanks-be-traced (last updated Feb. 6, 2020).

[27]  *See* Ex. 2 (Polymer80 webpage advertising "Product Changes in Accordance with ATF Final Rule") (noting that consumers are free to purchase one "Assemble for Thyself" kit to use on multiple, unserialized receivers they buy separately).  *See also AR-15 80% Lower Adjustable Universal Jig Kit*, Juggernaut Tactical, https://jtactical.com/products/9 (last visited Oct. 15, 2022) ("Note: Due to ATF final rule 2021R-05F . . . you cannot order an 80% Lower and jig-related products at the same time. If you have both in your cart, you will not be able to complete the checkout process.").

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC
**ER-092**

such as the deadly consequences of allowing manufacturers to sell untraceable weapons to prohibited possessors.

17.     The ghost gun epidemic is real.  This Court should declare that 80 percent receivers and frames are firearms that must be regulated under the GCA, and that ATF's decision to permit the unregulated sale of "80 percent" and "unfinished" receivers and frames that are *not* within kits is arbitrary and capricious.

## PARTIES

18.     Plaintiff State of California, represented by and through its Attorney General, is a sovereign state of the United States of America.

19.     Plaintiff Bryan Muehlberger resides in Santa Clarita, California.  His daughter, 15-year-old Gracie Anne Muehlberger, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Muehlberger's daughter and her fellow students—killing Gracie and Dominic Blackwell, and injuring three others.

20.     Plaintiff Frank Blackwell resides in Santa Clarita, California.  His son, 14-year-old Dominic Blackwell, was tragically murdered in the November 2019 Saugus High School Shooting in Santa Clarita, California, when a 16-year-old high school student used an untraceable ghost gun and opened fire on Mr. Blackwell's son Dominic and his fellow student Gracie Anne Muehlberger, and injured three others.  Mr. Blackwell has filed this action in his personal capacity only.

21.     Plaintiff Giffords Law Center is a nonprofit unincorporated association operating under section 501(c)(3) of the Internal Revenue Code.  Based in San Francisco, California, Giffords Law Center also operates offices in New York and Washington, D.C.  Giffords Law Center is one of the nation's leading legal and policy organizations dedicated to finding sensible solutions that will prevent further gun violence.

22.     Defendant ATF is an administrative agency within the DOJ responsible for protecting communities from violence, violent criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, acts of terrorism, and the illegal diversion of alcohol and tobacco products.  ATF is headquartered in Washington, D.C.

23.     Defendant Steven Dettelbach is the Director of ATF.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Director Dettelbach has responsibility for oversight of the activities of ATF.

24.     Defendant Daniel Hoffman is the Chief of the Firearms Technology Industry Services Branch of ATF.  His official address is in Martinsburg, West Virginia.  He is being sued in his official capacity.  In that capacity, he is responsible for classifying firearms and ammunition under federal rules and regulations.

25.     Defendant DOJ is an executive agency within the federal government of the United States.

26.     Defendant Merrick Garland is the Attorney General of the United States.  His official address is in Washington, D.C.  He is being sued in his official capacity.  In that capacity, Attorney General Garland has the authority to prescribe rules and regulations for carrying out the provisions of the Gun Control Act. 18 U.S.C. § 926(a).  The Attorney General delegated the responsibility to investigate, administer, and enforce the provisions of the Gun Control Act to ATF.  28 C.F.R. § 0.130(a)(1).

## JURISDICTION AND VENUE

27.     Plaintiffs bring this action under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' causes of action arise under the laws of the United States.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff State of California, and Giffords Law Center reside in this District, and a substantial portion of the events giving rise to this case occurred in this District.  Defendant ATF also maintains numerous Field Offices in this District.

## STATUTORY BACKGROUND:  THE GUN CONTROL ACT OF 1968

29.     The GCA has been the foundation of federal firearms law for more than half a century.  Its genesis began with the assassination of President John F. Kennedy, who was shot and killed with a mail-order rifle Lee Harvey Oswald purchased for $19.95 in response to a magazine advertisement.  Shortly after President Kennedy's death, Senator Thomas Dodd of Connecticut introduced legislation restricting mail-order sales of shotguns and rifles.  That legislation garnered bipartisan support and was

endorsed by the National Rifle Association.  But the bill ultimately died in committee.  The debate continued, however, gaining even greater urgency in 1968 after the assassinations of Martin Luther King Jr. and Robert F. Kennedy.

30.     Following these jolting national tragedies, on October 22, 1968, President Lyndon B. Johnson signed into law the GCA, landmark legislation that asserted significant federal control over the firearms industry and those who were legally permitted to possess guns.  Gun Control Act of 1968, Pub. L. No. 90-618 (1968).  The GCA's major provisions include: (i) a ban on sales of guns to, *inter alia*, people convicted of felonies, people addicted to drugs, minors, and individuals with serious mental illnesses;[28] (ii) a requirement that all firearms dealers obtain a federal firearms license; (iii) a prohibition on the importation of firearms "with no sporting purpose"; and (iv) a mandate that all firearms be serialized.  18 U.S.C. §§ 921 *et seq.*

31.     The GCA has been amended multiple times to expand federal regulation of firearms.  In 1993, for instance, following another national tragedy—the attempted assassination of President Ronald Reagan, which left his Press Secretary James Brady permanently disabled—President William J. Clinton signed the Brady Handgun Violence Prevention Act, which required that federal background checks be conducted on *all* sales of guns by licensed dealers.  Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).  Federal law was amended further in 1994 with the passage of the Violence Against Women Act, which prohibited gun possession by individuals subject to certain domestic violence restraining orders, and again in 1996 to prohibit those convicted of particular domestic abuse crimes from possessing a firearm.  18 U.S.C. §§ 922(g)(8), (g)(9).

32.     The GCA regulates the possession and purchase of "firearms."  Under the GCA, "firearm" is broadly defined to include not only fully functional weapons that "expel [] projectile[s] by the action of an explosive," but also items that are "designed to or may readily be converted" into fully functional weapons, and the "receiver" or "frame" of such weapons.  18 U.S.C. § 921(a)(3).  A firearm frame is the part of a handgun that houses "the hammer, striker, bolt or similar component prior to

---

[28]  Specifically, federal law restricts people from accessing firearms if they have been committed to any mental institution or adjudicated as a mental defective, *see* 18 U.S.C. § 922(d)(4), which means they have been found by a court, board, commission, or other lawful authority to be a danger to self or others, or to lack the mental capacity to contract or manage their own affairs, as a result of their mental condition or illness, *see* 27 C.F.R. § 478.11(a).

initiation of the firing sequence." *See* 27 C.F.R. § 478(a)(1).  And a firearm receiver is the part of a rifle or shotgun or projectile weapon other than a handgun that houses "the primary component designed to block or seal the breech prior to initiation of the firing sequence (*i.e.*, bolt, breechblock, or equivalent)." *Id*. at § 478.12(a)(2).  The parts of a handgun and rifle are depicted in Images 2 and 3 below.

33.    Because receivers and frames are defined as "firearms" in the GCA, these parts must also carry serial numbers.  18 U.S.C. § 923(i).  Sellers and manufacturers of receivers and frames must obtain a federal firearms license, and individuals who purchase receivers and frames from gun dealers are subject to federal background checks.  18 U.S.C. §§ 923(a), 922(t).



**Image 2:  Semiautomatic-Pistol**[29]

---

[29]  *Firearms Parts and Components,* UNODC (Feb. 2019), https://www.unodc.org/e4j/en/firearms/module-2/key-issues/firearms-parts-and-components.html.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC



**Image 3:  AR-15 Rifle[30]**

### BACKGROUND ON ATF AND ITS ROLE IN REGULATING FIREARMS

34.     ATF was established as an independent agency in 1972 to regulate firearms, among other things.[31]  According to the agency's website, ATF "recognizes the role that firearms play in violent crimes" and uses federal firearm legislation like the GCA "to target, investigate and recommend prosecution of [criminal] offenders to reduce the level of violent crime and to enhance public safety."[32]

35.     ATF, like any other agency, takes a wide variety of agency action, including standard notice-and-comment rulemaking and issuing guidance.  It also issues "Classification Letters" with regard to specific products it regulates, like firearms and explosives.  In these letters, ATF responds to questions that manufacturers, distributors, and others submit to ATF to adjudicate, such as whether the product they are proposing to sell is subject to the GCA's requirements, including background checks and serialization.  According to the ATF Handbook, ATF encourages firearms manufacturers to "seek an ATF classification of its product prior to manufacture" in order to "avoid an unintended classification and violations of the law."  *See* Ex. 3, *Do You Know How ATF Would Classify Your Product?*, *in* ATF NATIONAL FIREARM ACTS HANDBOOK, § 7.2.4 (Apr. 2009), https://www.atf.gov/firearms/docs/guide/atf-national-firearms-act-handbook-atf-p-53208/download.  The ATF Handbook

---

[30]  *Simple AR-15 Diagram*, 3D WAREHOUSE, https://3dwarehouse.sketchup.com/model/1a2d3089-04fc-47a0-af95-fd3ff78ab966/Simple-AR15-Diagram (last visited Oct. 18, 2022).

[31]  Prior to the establishment of ATF, Congress had delegated the enforcement of the GCA to the Alcohol and Tobacco Division of the Internal Revenue Service.  When first formed, ATF was part of the United States Department of the Treasury, but following the 9/11 terrorist attacks, the Homeland Security Act of 2002 transferred ATF to the DOJ.

[32]  *Firearms*, ATF, https://www.atf.gov/firearms (last visited Oct. 18, 2022).

14

further explains that such Classification Letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws." *Id.* at § 7.2.4.1.  ATF also issues broad-ranging industry guidance in the form of questions and answers ("Q&As"), which are published on ATF's official website—guidance that on information and belief market participants refer to and/or rely on in designing, marketing, and distributing the 80 percent frames and receivers used to build ghost guns.

36.    As a law enforcement agency within the DOJ, ATF also investigates violent crimes.  In that role, ATF relies significantly upon the GCA's requirement that firearms be adorned with unique, traceable serial numbers.  GCA's serialization requirement requires firearm manufacturers or importers to affix weapons with unique serial numbers and other marks that identify the manufacturer or importer, as well as the make, model, and caliber of the firearm.  Using this information, ATF's National Tracing Center can trace a firearm recovered at a crime scene from the manufacturer or importer through the distribution chain to the first retail purchaser.

37.    Tracing provides critical information necessary to investigate and solve crimes.  ATF processes hundreds of thousands of crime gun trace requests each year from domestic and international law enforcement agencies.[33]  Because there is no comprehensive electronic federal database of gun purchases, ATF relies on the records held by each dealer to connect a recovered firearm to its first retail buyer.  As depicted in Image 4 below, when firearms contain serial numbers, ATF can generally determine the original Federal Firearms Licensee who sold the weapon.  From that entity, using the records it is required to keep under the GCA, ATF is able to learn the name of the person who originally purchased the weapon.  Identifying that initial purchaser is critical to law enforcement's ability to investigate and solve crimes committed with the recovered firearm.

---

[33]  *ATF By the Numbers*, ATF (June 14, 2018), https://www.atf.gov/resource-center/infographics/atf-numbers.



**Image 4:  How ATF Traces Firearms[34]**

38.     In addition to its critical role in the investigation of criminal activity, tracing also acts as a powerful deterrent—discouraging straw purchases or trafficking of firearms through secondary sales to prohibited persons.

39.     But tracing is effective *only if* law enforcement officials can trace a firearm based on its serial number.  And ATF and its leaders have not required manufacturers and sellers of 80 percent frames and receivers to affix serial numbers to their products, so they do not in fact feature them.  As a result, firearms dealers are not required to keep records of their sales of ghost gun frames and receivers.  Thus, ATF and law enforcement are completely obstructed in their attempts to trace a ghost gun to its original source, and prohibited purchasers are more likely to purchase a ghost gun because they know that there are no records that would allow the purchase to be traced back to them.

---

[34] *How ATF Traces Firearms*, ATF (Aug. 17, 2018), https://www.atf.gov/resource-center/infographics/how-atf-traces-firearms.

# FACTUAL BACKGROUND

**A.    Ghost Guns Are Designed to Circumvent Federal Firearms Requirements, Resulting in an Overwhelming Threat to Public Safety.**

40.    Before a licensed gun dealer sells any firearm in the United States, a buyer must pass a background check to confirm that they are authorized to possess a firearm—namely, that they are not a minor, not disqualified because of a criminal conviction or domestic violence restraining order, and not otherwise prohibited from gun possession.  18 U.S.C. § 922(t).

41.    Licensed manufacturers or importers must also legibly identify each firearm with a unique serial number.  27 C.F.R. § 478.92.  Specifically, the GCA requires that manufacturers and importers engrave, cast, stamp, or otherwise conspicuously place on the frame or receiver of each firearm an individual serial number and other identifying information, such as the model of the firearm, its caliber or gauge, and the manufacturer's name or the name of the foreign manufacturer. 27 C.F.R. § 478.92(a)(1)(i)-(ii).  This serialization process ensures that every firearm—including those firearms recovered by law enforcement agencies at crime scenes—can be traced back to its manufacturer or importer and first retail purchaser.  Tracing firearms helps link a recovered firearm to crime suspects in a criminal investigation by helping law enforcement officials track the movement of a firearm through the supply chain.

42.    Assault weapons, such as AR-15 rifles, were once placed under even stricter regulations under federal law, and remain subject to heightened regulation in many states.  Generally, assault weapons are a class of semiautomatic firearms that share characteristics with military firearms specifically designed to kill humans quickly and efficiently.  Wounds caused by assault rifles like AR-15s are more lethal than wounds caused by handguns because the bullets they fire travel at a higher velocity and impart a correspondingly higher level of energy when passing through a body.  And when paired with large magazines full of ammunition, assault weapons can kill a large number of people extremely quickly.  Because assault weapons are extremely dangerous and designed to kill, certain "semiautomatic assault weapons" were banned at the federal level between 1994 and 2004.  While that law lapsed and there is currently no federal law prohibiting these lethal, military grade weapons,

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

seven states—including California—prohibit the purchase, sale and/or possession of assault weapons. California, for example, has banned over 75 assault weapon types, models, and series by name.

43.     Serialization requirements apply not only to complete, fully functional firearms, but also to "[a] firearm frame or receiver that is not a component part of a complete weapon at the time it is sold." 27 C.F.R. § 478.92(a)(2).  The ATF website provides sample images of frames and receivers, along with the explanation that "A Frame or Receiver constitutes a FIREARM."



**Image 5:  ATF's Diagram of a Sample Frame and Receiver, Noting that Each Constitutes a Firearm[35]**

44.     Ghost guns are designed specifically to circumvent these common-sense requirements in the GCA.  The 80 percent components used to build ghost guns are designed as, and may readily be converted into, lethal firearms.  Today, they can be purchased by anyone with an internet connection and a credit card or other form of online payment (as well as at gun shows and from brick-and-mortar gun stores)—including people convicted of felonies or domestic violence, people addicted to drugs, minors, and individuals with serious mental illnesses, despite the fact that all of them are prohibited by federal law from purchasing and possessing firearms.  As a result of ATF's decisions, no background check is required to buy 80 percent receivers and frames, no records of the buyers' identities must be kept, and no 80 percent receiver or frame has to carry federal serial numbers or other markings that clearly identify the product's manufacturer, importer, make, model, or caliber. Thus, while a person cannot purchase an assembled gun at a gun store without passing a background check to ensure that he is not a prohibited person under the GCA, a prohibited person can purchase an

---

[35] *Firearms - Guides - Importation & Verification of Firearms, Ammunition - Gun Control Act Definitions – Firearm*, ATF, https://www.atf.gov/firearms/firearms-guides-importation-verification-firearms-ammunition-gun-control-act-definitions (last visited Oct. 18, 2022).

80 percent frame or receiver from the very same gun store without any background check or any questions asked.  With an 80 percent receiver or frame in hand, that prohibited person can then purchase all ancillary products needed to complete the firearm (like jigs and templates), either in a different contemporaneous transaction or from a different seller, and quickly and easily assemble a firearm functionally indistinguishable from the firearm he would have been be barred from buying after a background check.

45.    As illustrated in Images 6, 7, and 8 below, which ATF itself provides, the sole difference between an 80 percent receiver and a finished receiver is hardly noticeable:  an 80 percent receiver, shown in Images 6 and 7, "has a solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or hammer pins."  ATF has concluded that the receiver does not meet the GCA definition of a "firearm."[36]

 

**Images 6 and 7:  80% Receiver – *Not* a Firearm**

---

[36]  *Are "80%" Or "Unfinished" Receivers Illegal*, ATF (Apr. 6, 2020), https://www.atf.gov/firearms/qa/are-%E2%80%9C80%E2%80%9D-or-%E2%80%9Cunfinished%E2%80%9D-receivers-illegal.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

The second receiver, shown in Image 8, "has a partially machined fire-control cavity and ATF has concluded that it **does** meet the GCA definition of a firearm."[37]



**Image 8:  Finished Receiver – *Is* a Firearm**

46.     As a result of these minor differences, 80 percent receivers can easily be turned into lethal assault weapons.  Using a jig—a device that guides the drilling and milling necessary to complete the receiver—a buyer can finish an 80 percent receiver "in **under 30 minutes**" using basic household tools, such as simple drill bit, file set, and a hand drill, to drill the remaining holes.[38]  As noted, one seller even boasted that using its jig could help complete an 80 percent frame or receiver in as little **as 15 minutes**.[39]  Of course, the same is true whether the jig is purchased in the same transaction as the 80 percent receiver (which would fall within the ambit of the Final Rule) or sold in a separate transaction as the purchase of the 80 percent receiver (which falls outside the Rule's ambit).

47.     Similarly, 80 percent frames, depicted in Image 9 below,[40] closely resemble finished frames, depicted in Image 10 below.[41]  To complete an 80 percent frame, the buyer need only make

---

[37]   *Id.*

[38]   *Easy Jig Gen 3 Multi-Platform – AR-15, AR-9 and .308 80% Lower Ji*g, 80 PERCENT ARMS, https://www.80percentarms.com/products/easy-jig-gen-3-multi-platform-ar-15-ar-9-and-308-80-lower-jig// (last visited Oct. 11, 2022).

[39]   *See supra* note 4.

[40]   *Fusion Pro Line 80% 1911 Government Frame*, FUSION FIREARMS, https://fusionfirearms.com/fusion-pro-line-80-1911-government-frame-checkered-stainless (last visited Oct. 10, 2022) (stating that the operations left to be completed are "[c]utting of the slide rails," "[c]utting of the barrel seat," "[d]rilling of the hammer pin hole," and "[d]rilling of the sear pin hole").

[41]   *1911 Frame, C-Class – Government Size*, FUSION FIREARMS, https://fusionfirearms.com/1911-frame-c-class-government-size (last visited Oct. 10, 2022).

20
SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-103**

simple cuts and drills into the frame,[42] which is a quick and easy process, especially when a jig kit is used.  Even without a jig kit, common household tools—such as a simple drill bit, file set, and a hand drill, each of which can be inexpensively obtained from any hardware store—can be used to complete the firearm.

    

**Image 9:  80% Frame**          **Image 10:  Finished Frame**

If the buyer wants to avoid drilling altogether, pre-programmed milling machines, called computer numerical controlled ("CNC") machines, can finish 80 percent receivers and frames at the press of a button.[43]  To use a CNC machine, a buyer with no technical expertise needs only a generic computer and an 80 percent receiver or frame—which the machine's seller can ship, alone or in bulk, along with the machine itself.  CNC machines, which can cost $2,500, have been used to mass produce ghost guns.[44]  For example, in 2020, a resident of Washington State who had eight prior felony convictions and had been recently released from prison after serving time on a gun charge, was found with an arsenal of ghost guns, a drill press, and a CNC machine.[45]  The arsenal included 17 pistols, 24 rifles,

---

[42] *80 Lower Jig*, GUN BUILDERS DEPOT, https://www.gunbuilders.com/80-lower-jig/ (last visited Oct. 12, 2022) ("We offer 80% jigs that require little to no machining experience and only require basic tools—a hand drill or drill press, a small vise, and other hand tools—to successfully cut and drill your new firearm").

[43] Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 11. *See, e.g.*, *Ghost Gunner 3 Deposit*, Ghost Gunner, https://ghostgunner.net/product/ghost-gunner-3-deposit/ (last visited Oct. 10, 2022) ("Ghost Gunner 3 is a general purpose CNC mill that gives you the ability to finish 80% receivers and frames with ease, in the comfort of your own home.").

[44] *See e.g.*, *Ghost Gunner 3 Deposit*, *supra* note 43.

[45] *See Edmonds Felon Accused of Having 'Ghost Gun' Arsenal in Home,* HERALD NET (Mar. 1, 2020), https://www.heraldnet.com/news/supervised-edmonds-felon-accused-of-having-ghost-gun-arsenal/.

ten silencers, 20 unfinished lower receivers, and 300 pounds of ammunition.[46]  And just this month, the New York Police Department arrested a Manhattan resident with a prior felony conviction preventing him from possessing firearms for using a CNC machine to finish and sell dozens of ghost guns.[47]  Between October 2016 and May 2022, the man bought at least 55 ghost gun parts worth more than $7,000.[48]  Two of the firearms found in his apartment were not locked or safely stored and were easily accessible to the two toddlers living in the apartment.[49]  To state the obvious, the dangers associated with these arsenals are not diminished by the fact that the drill press or CNC machine was purchased in a separate transaction than the 80 percent receivers and frames.

48.     After the receiver or frame is finished, the buyer can easily complete the building process by using an assembly kit, which contains every part needed to make a fully functioning firearm, and is often sold by the same firms selling 80 percent receivers and frames.  As one seller explained, "AR-15 kits . . . come with all the standard parts of an AR-15 . . . . [and] ***is essentially a complete [AR-15] that needs to be assembled*** . . . [so] building time doesn't take too long.  ***Within an hour or two, you should be breaking it in at the range***."[50]  In other words, within "an hour or two," an individual intent on harming others could use an 80 percent receiver to build a highly lethal, dangerous assault weapon capable of killing a large number of human beings quickly and efficiently.

---

[46]  *Id.*

[47]  Jonathan Dienst, *Cache of Ghost Guns Found in Ex-Con's Lower East Side Apartment: DA*, NBC N.Y. (Oct. 12, 2022), https://www.nbcnewyork.com/news/local/crime-and-courts/cache-of-ghost-guns-found-in-ex-cons-lower-east-side-apartment-da/3903381/.

[48]  *Id.*

[49]  *Id.*

[50]  *Why is Purchasing an AR-15 Kit is Great for Beginners?*, THUNDER TACTICAL (May 10, 2019), https://web.archive.org/web/20200923221047/https://thundertactical.com/ar-15-kits-great-for-beginners/ (emphases added).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC



**Image 11:  AR-15 Assembly Kit[51]**

49.     Regardless of the method used to assemble the ghost gun, these unserialized weapons are hugely popular, affordable, and widely available online.  Currently, there are at least 80 online retailers of ghost guns—68 percent of which entered the ghost gun market after 2014—that sell all of the parts necessary to build a ghost gun.  That number is likely even larger than reported, because dealers are not required to obtain an ATF license to sell their products.

50.     Advertisements for ghost guns often highlight that 80 percent receivers and frames are unregistered and can be purchased without a background check.  One seller, for example, touts that "ATF does NOT recognize an 80% complete lower as a firearm, and therefore an unfinished receiver is not subject to the same regulations as any other complete firearm . . . [t]his means no RED TAPE including:  NO Registering . . . NO FFL Required . . . NO Transfer fees."[52]  The same seller provides a basic guide to completing an 80% receiver and, as Image 12 demonstrates, makes a point of noting the ease with which anyone can turn an 80% receiver into a fully functioning firearm.[53]

---

[51]   Complete 16 .223/5.56/300BLK AR-15 80% Build Kit, 80 PERCENT ARMS, https://www.80percentarms.com/products/complete-16-223-5-56-300blk-ar-15-80-build-kit/ (last visited October 18, 2022).

[52]   *80% Lowers*, 80 PERCENT ARMS, https://www.80percentarms.com/80-lowers/ (last visited Oct. 11, 2022).

[53]   *Id*.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**IS IT HARD TO COMPLETE AN 80% LOWER?**

Completing an 80% lower doesn't require experience at all! 80% lowers are finished with equipment such as a standard drill and router. So, all you need is a little patience and care. With enough practice, they can be made in less than two hours. For more information on machining your 80% lower, consult our complete guide.

**Image 12:  80 Percent Arms Advertisement[54]**

51.      Because 80 percent receivers and frames can be obtained by individuals who are otherwise prohibited from purchasing firearms, and cannot be traced by law enforcement, it is unsurprising that ghost guns have become a weapon of choice for criminal organizations, gangs or groups engaging in violence, and other individuals who are intent on doing harm.  For example:

   a.   In 2013, a Southern California man, who failed a background check because of his mental instability that caused a run-in with the police, could not legally purchase a gun built an assault rifle from a ghost gun kit that he bought online.  He then used the ghost gun to kill five people during a rampage in Santa Monica.[55]

   b.   In 2017, a Northern California man that prosecutors described as a "deranged, paranoid killer," who was prohibited from owning a gun and under prosecution for multiple crimes, was nevertheless able to kill five people and injure at least ten with two assault-style rifles he assembled from unregulated ghost gun parts he ordered online.[56]

   c.   In 2020, 18 individuals in Los Angeles, California with links to a drug ring that also sold ghost guns were arrested, after law enforcement officers seized 28 pounds of methamphetamine, a quarter-pound of cocaine, crack cocaine, and 16 firearms, including several ghost guns.[57]

---

[54]  *Id.*

[55]  Robert Cavnar, *Santa Monica Shooter Built His Gun From Parts He Bought Online*, HUFFINGTON POST (June 15, 2013), https://www.huffingtonpost.com/robert-l-cavnar/santa-monica-shooter-buil_b_3447220.html (last visited Sept. 28, 2020).

[56]  Ray Sanchez et al., *Gunman in Northern Rampage Was Not Supposed to Have Guns*, CNN (Nov. 15, 2017), https://www.cnn.com/2017/11/15/us/california-tehama-county-shootings/index.html; *see also* Andrew Blankstein & Corky Siemaszko, *California Mass Shooter Made His Own Rifles*, NBC NEWS (Nov. 16, 2017), https://www.nbcnews.com/news/us-news/california-mass-shooter-made-his-own-killing-machines-n821516.

[57]  Richard Winton, *FBI Arrests Drug Ring that Also Sold 'Ghost Gun' AR-15s*, L.A. TIMES (Sept. 15, 2020), https://www.latimes.com/california/story/2020-09-15/fbi-arrests-drug-ring-that-also-sold-ghost-gun-ar-15s.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

52.     Far right extremists have been using ghost guns to target communities of color.  In 2020, the FBI seized ghost guns and arrested alleged white supremacists planning to start a race war at a Richmond, Virginia gun rights rally,[58] and a man linked to the right-wing "boogaloo" movement allegedly used a ghost gun to murder two law enforcement officers in California.[59]

53.     Other high-profile violent crimes allegedly committed with ghost guns include:

a.   In Stockton, California, in 2014, perpetrators of a bank robbery used at least one ghost gun in the crime.[60]

b.   In Walnut Creek, California, in 2015, a former Stanford student fatally shot his ex-girlfriend and then himself using guns he had assembled from parts he had ordered online.[61]

c.   In Fresno, California, in 2017, investigators discovered that a criminal organization suspected of trafficking young women, firearms, and narcotics possessed a cache of ghost guns.[62]

d.   In Washington, D.C., in the summer of 2018, a 25-year-old man was killed with a ghost gun during a shootout.[63]

e.   In Santa Barbara, California, in 2019, a suspected cocaine dealer was found in possession of a ghost gun.[64]

---

[58]  Alain Stephens, *They Planned to Start a Race War. DIY Gun Kits Allowed Them to Build an Arsenal*, THE TRACE (Jan. 23, 2020), https://www.thetrace.org/2020/01/white-supremacists-the-base-fbi-virginia-diy-ghost-gun/.

[59]  Cheri Mossburg, *A Man Allegedly Linked to the Boogaloo Movement Accused of Going to a BLM Protest with a Homemade Machine Gun to Kill Cops*, CNN (June 16, 2020), https://www.cnn.com/2020/06/16/us/steven-carrillo-california-officers-deaths-suspect-boogaloos/index.html.

[60]  Joe Goldeen, *Another Arrest, Reward in Bank of the West Heist*, RECORD NET (Sept. 16, 2014), https://web.archive.org/web/20190411004805/https://www.recordnet.com/article/20140916/NEWS/140919728.

[61]  Rick Hurd, *Former Stanford Student Built the Gun He Used to Kill Ex-girlfriend, Himself*, MERCURY NEWS (Aug. 4, 2015), https://www.mercurynews.com/2015/08/04/former-stanford-student-built-the-gun-he-used-to-kill-ex-girlfriend-himself/.

[62]  Sontaya Rose, *Fresno Police Gang Crackdown Busts Prostitution Ring, Dozens Arrested*, ABC30 ACTION NEWS (Sept. 8, 2017), https://abc30.com/fresno-police-bulldog-gang-jerry-dyer-bust/2393264/.

[63]  Peter Hermann & Tom Jackman, *District Seeks to Ban 'Ghost Gun' Kits as Seizures of Homemade Weapons Soar*, WASH. POST (Feb. 27, 2020), https://www.washingtonpost.com/local/public-safety/district-seeks-to-ban-ghost-gun-kits-as-seizures-of-homemade-weapons-soar/2020/02/27/d12be0da-5416-11ea-9e47-59804be1dcfb_story.html.

[64]  Indy Staff, *Suspected Cocaine Dealer Arrested with a 'Ghost Gun*,' SANTA BARBARA INDEPENDENT (May 17, 2019), https://www.independent.com/2019/05/17/suspected-cocaine-dealer-arrested-with-a-ghost-gun/.

25
SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

f.  In Longmont, Colorado, in 2019, police recovered ghost guns in connection with a drug trafficking investigation.[65]

g.  In Evesham, New Jersey, in 2019, a man wanted for violation of federal probation was found to be in possession of three ghost guns, as well as large quantities of cocaine and methamphetamine.[66]

h.  In Washington, D.C., in December 2019, a man, who was previously convicted of illegally possessing an unregistered handgun two years prior, shot at two reserve police officers using a ghost gun.[67]

i.  In San Francisco, California, in September 2020, a man who was previously convicted of a felony was arrested and found to be in possession of a ghost gun, ammunition, and significant quantities of methamphetamine and fentanyl.[68]

j.  In Fultonville, New York, in 2020, a man manufactured and sold or transferred 19 fully assembled ghost guns, including short-barreled rifles and guns modified to be capable of fully automatic fire.[69]

k.  In Fresno, California, in June 2021, federal agents searched the home of a man accused of dealing fentanyl and uncovered 13 firearms, including a ghost gun modified with an "auto sear" to be capable of fully automatic fire.[70]

---

[65]  Kelsey Hammon, *More Arrested Monday in Alleged Connection with Drug-Trafficking Operation*, TIMES-CALL (July 12, 2019), https://www.timescall.com/2019/07/10/more-arrested-monday-in-alleged-connection-with-drug-trafficking-operation/.

[66]  Erin Vogt, '*Armed & Dangerous' Duo Found with Coke, Meth and Kids - Cops*, N.J. 101.5 (Aug. 6, 2019), https://nj1015.com/armed-dangerous-duo-found-with-coke-meth-and-kids-cops/.

[67]  Peter Hermann, *Officers Who Were Fired on 'Could See the Muzzle Flashes,' Police Say*, WASH. POST (Dec. 13, 2019), https://www.washingtonpost.com/local/public-safety/officers-who-were-fired-on-could-see-the-muzzle-flashes-police-say/2019/12/13/72d645e2-1dcb-11ea-b4c1-fd0d91b60d9e_story.html.

[68]  Press Release, U.S. Attorney's Office for the Northern District of California, *San Francisco Resident Sentenced to Six Years in Prison for Possession of Guns, Ammunition, and Drugs* (Sept. 20, 2022), https://www.justice.gov/usao-ndca/pr/san-francisco-resident-sentenced-six-years-prison-possession-guns-ammunition-and-drugs.

[69]  Press Release, U.S. Attorney's Office for the Northern District of New York, *Montgomery County Man Sentenced to 30 Months for Unlawfully Selling "Ghost Guns"* (Sept. 2, 2021), https://www.justice.gov/usao-ndny/pr/montgomery-county-man-sentenced-30-months-unlawfully-selling-ghost-guns.

[70]  Press Release, U.S. Attorney's Office for the Eastern District of California, *Federal Drug and Gun Charges Brought Against Fresno Man Accused of Dealing Fentanyl* (July 15, 2021), https://www.justice.gov/usao-edca/pr/federal-drug-and-gun-charges-brought-against-fresno-man-accused-dealing-fentanyl.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

l.   In New York City, in July 2022, a Connecticut man with a prior felony conviction was charged with trafficking firearms.  The man allegedly sold a number of ghost guns from 2019 to 2022 including to members of the Bloods street gang.[71]

---

[71] Press Release, U.S. Attorney's Office for the Southern District of New York, *Connecticut Man Charged in Manhattan for Trafficking "Ghost" Guns* (July 21, 2022), https://www.justice.gov/usao-sdny/pr/connecticut-man-charged-manhattan-trafficking-ghost-guns.



**Image 13:  AR-15-Style Ghost Gun Custom-Made for the Bloods Street Gang**[72]

    m.  In San Diego, California, in April 2021, a man equipped with a ghost gun killed one person and seriously injured four others in what appeared to be a random shooting spree.[73]

    n.  In McAllen, Texas, in May 2021, a 73-year-old man manufactured 11 fully automatic ghost guns intending to sell them to members of a Mexican drug cartel.[74]

    o.  In Salem, Oregon, in March 2022, an ATF raid exposed a massive ghost gun manufacturing operation.  Federal agents recovered 63 ghost guns, including rifles, pistols, and shotguns, high-capacity magazines, and a variety of other components and manufacturing equipment, in addition to hundreds of "counterfeit blue M30 oxycontin pills" laced with fentanyl and heroin.[75]

---

[72]  *Id*.

[73]  Clara Benitez, '*Ghost Gun' Used in Gaslamp Shooting*, FOX 5 NEWS (Apr. 24, 2021), https://fox5sandiego.com/news/local-news/ghost-gun-used-in-gaslamp-shooting/.

[74]  Press Release, U.S. Attorney's Office for the Southern District of Texas, *Septuagenarian Charged with Manufacturing "Ghost Guns"* (June 15, 2021), https://www.justice.gov/usao-sdtx/pr/septuagenarian-charged-manufacturing-ghost-guns.

[75]  Maxine Bernstein, *'Massive' Ghost Gun Manufacturing Operation Found in Oregon Raid, Feds Say*, OREGONIAN (Mar. 18, 2022), https://www.oregonlive.com/crime/2022/03/salem-man-accused-of-selling-homemade-ghost-guns-and-trafficking-fentanyl-in-exchange-for-guns-feds-say.html.

p.  In Las Vegas, Nevada, in September 2022, two men engaged in a violent crime spree over multiple weeks, using a ghost gun to shoot four people across at least five crime scenes.[76]

54.  Similarly, reports indicate that ghost guns have increasingly been purchased and/or used by individuals who are prohibited from owning firearms under the GCA, including:

a.  In Temple City, California, in 2018, a man who was banned from owning a gun was found with 28 firearms—11 of which were untraceable ghost guns—and 65,000 rounds of ammunition.[77]

b.  In Plattsburgh, New York, in 2018, a man with a prior felony conviction brandished, during an argument, an unserialized Glock ghost gun that he purchased partially completed and finished himself.[78]

c.  In Upper Darby, Pennsylvania, in 2018, a teenage exchange student bought parts online and built a ghost gun he planned to use to commit a school shooting.[79]

d.  In Syracuse, New York, in 2019, a man with a prior felony conviction used a ghost gun to shoot his six-year-old nephew in the back.[80]

e.  In Evansville, Indiana, in 2019, a 17-year-old teenager bought parts online to create a handmade ghost gun.[81]

---

[76]  David Charns, *2 Accused of Shooting 4 Across Las Vegas in Violent Crime Spree with Ghost Gun*, 8NEWSNOW (Sept. 29, 2022), https://www.8newsnow.com/crime/2-accused-of-shooting-4-across-las-vegas-in-violent-crime-spree-with-ghost-gun/.

[77]  Josh Haskell, *Temple City Father, Adult Daughter Found with Stockpile of Illegal Weapons, Ammunition*, KABC-TV L.A. (Feb. 21, 2018), https://abc7.com/temple-city-weapons-cache-father-daughter-guns-found-charged/3120273/.

[78]  Bob Bennett, *Police: Convicted Felon Revealed Gun During Argument*, PRESS-REPUBLICAN (Apr. 16, 2018), https://www.pressrepublican.com/news/local_news/police-convicted-felon-revealed-gun-during-argument/article_690748e1-3549-5324-acef-42eb7cc2f82e.html/.

[79]  Chad Pradelli, *Police: Exchange Student Built Gun from Parts Bought Online*, 6ABC ACTION NEWS (Apr. 2, 2018), https://6abc.com/police-exchange-student-built-gun-from-parts-bought-online/3292963/.

[80]  Douglass Dowty, *DA: Syracuse Man Shot 6-Year-Old Nephew with Untraceable 'Ghost Gun'*, SYRACUSE.COM (Jan. 6, 2020), https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html/.

[81]  Philip Joens, *Indiana Teen Built 'Ghost Gun' from Online Parts*, COLUMBIA DAILY TRIBUNE (May 25, 2019), https://www.columbiatribune.com/news/20190525/indiana-teen-built-ghost-gun-from-online-parts/.

f.  In New Orleans, Louisiana, in June 2021, a man with a prior felony pled guilty to being a felon in possession after he attempted to pass through airport security while carrying a Polymer80 ghost gun and two 30-round magazines.[82]

g.  In Albany, New York, in August 2021, a man with a prior felony was sentenced to thirty months after being convicted of unlawfully possessing ghost guns.[83]  Despite his prior felony, the man had over 38 firearms, an "auto sear," multiple silencers, two completed ghost rifles, and 15 unserialized finished receivers and frames.[84]

h.  In Sacramento, California, in March 2022, a man prohibited from owning a firearm used an AR-15-style ghost gun to murder his three daughters and their court-mandated chaperone in a church.[85]

55.  Ghost guns are also increasingly used by illegal gun-trafficking rings.  In 2015, for example, the New York State Attorney General announced a 32-count indictment of two defendants charged with illegally trafficking at least a dozen untraceable ghost guns, including AR-15s.[86]  The two defendants were convicted of illegally trafficking ghost guns, and were sentenced to nine and eleven years in prison, respectively.[87]  And in June 2019, the New Jersey Attorney General announced the indictment of nine men allegedly part of a criminal network that was illegally trafficking

---

[82]  Press Release, U.S. Attorney's Office for the Eastern District of Louisiana, *LaPlace Man Pleads Guilty to Being Felon in Possession of Ammunition* (June 25, 2021), https://www.justice.gov/usao-edla/pr/laplace-man-pleads-guilty-being-felon-possession-ammunition/.

[83]  Press Release, U.S. Attorney's Office for the Northern District of New York, *Rensselaer County Felon Sentenced to 30 Months on Firearms Convictions* (Aug. 10, 2021), https://www.justice.gov/usao-ndny/pr/rensselaer-county-felon-sentenced-30-months-firearms-convictions.

[84]  *Id.*

[85]  *Man Used 'Ghost Gun' to Kill 3 Daughters in Church*, ABC10 (Mar. 6, 2022), https://www.abc10.com/article/news/local/sacramento/david-mora-church-shooting-gun/103-36f31f43-9c24-4b39-b9cf-0097910ae817.

[86]  Press Release, N.Y. State Attorney General's Office, *A.G. Schneiderman Announces Thirty-Two Count Indictment Of Two Defendants Charged With Illegally Trafficking Untraceable 'Ghost Guns'* (Sept. 21, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-thirty-two-count-indictment-two-defendants-charged.

[87]  Press Release, N.Y. State Attorney General's Office, *A.G. Schneiderman Announces 11 Year Jail Sentence Of Defendant Convicted For Illegally Trafficking Untraceable "Ghost Guns"* (Apr. 28, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-11-year-jail-sentence-defendant-convicted-illegally.

untraceable ghost guns, including assault rifles, assembled from kits purchased online.[88]  In July 2020, one of these men was sentenced to 14 years in prison for his role in the trafficking ring.[89]  Similarly, in August 2021, a federal jury indicted four men for their part in a California drug and gun-trafficking ring.[90]  Before their arrest, the men sold confidential informants a variety of drugs and ghost guns including an AR-15-style rifle, a shotgun, and handguns.[91]  In June 2022, a joint state and federal investigation took down a Philadelphia-area ghost gun and drug trafficking ring that, while operative, was a one-stop shop for methamphetamine and fully automatic and fully untraceable ghost guns.[92]  Law enforcement officials believe more arrests may be coming as they ascertain the full extent of this trafficking ring.[93]

56.    The increasing production and availability of ghost guns built with 80 percent components has led to a commensurate rise in violence attributable to unregistered, untraceable ghost guns.  Law enforcement agencies connected at least 2,513 ghost guns to criminal activity between 2010 and April 2020.  *See* Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 17.  Of that number, more than half—1,300 ghost guns—were used or sold by criminal enterprises to facilitate crimes including gun trafficking, robbery, drug trafficking, terrorism, and murder.  *Id.*  Ghost guns were linked to criminal cases in at least 38 states between late 2018 and May 2020.  *See* Ex. 5, Bill Whitaker, *Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable*, CBS NEWS 60 MINUTES

---

[88]  Press Release, N.J. Attorney General's Office, Indictment in "Operation Stone Wall" Charges Nine Alleged Members of Ring that Trafficked Untraceable "Ghost Gun" Assault Rifles & Cocaine (June 5, 2019), https://www.nj.gov/oag/newsreleases19/pr20190605a.html.

[89]  Julie Shaw, *Camden County Man Has Been Sentenced to 14 Years in Prison for His Role in "Ghost Guns" Trafficking Ring, Ag Says*, PHILA. INQUIRER (July 10, 2020), https://www.inquirer.com/news/new-jersey-attorney-general-operation-stone-wall-ghost-guns-christopher-stoner-sentence-20200710.html.

[90]  Press Release, U.S. Attorney's Office for the Eastern District of California, *Three South Lake Tahoe Residents Charged with Drug Trafficking and Texas Man Charged with Trafficking Firearms* (Aug. 23, 2021), https://www.justice.gov/usao-edca/pr/three-south-lake-tahoe-residents-charged-drug-trafficking-and-texas-man-charged.

[91]  *Id.*

[92]  *'Ghost Guns' Trafficking Ring Taken Down in Bucks County*, MYCHESCO (June 12, 2022), https://www.mychesco.com/a/news/regional/ghost-guns-trafficking-ring-taken-down-in-bucks-county/.

[93]  *Id.*

31
SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE
NO. 3:20-CV-06761-EMC

(May 10, 2020), https://www.cbsnews.com/news/ghost-guns-untraceable-weapons-criminal-cases-60-minutes-2020-05-10/.

57.     The number of ghost guns recovered in connection with criminal activity is growing each year.  In 2017, the District of Columbia recovered only three ghost guns.[94]  But by 2019, law enforcement recovered 116 ghost guns in one year, before recovering another 106 ghost guns in just the first five months of 2020.[95]  According to information from the District of Columbia's Department of Forensic Sciences, of the 250 ghost guns recovered in Washington D.C. between 2017 and May 29, 2020, at least 208, or 83.2%, were manufactured by a single company, Polymer80.[96]

58.     According to California law enforcement agencies, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of firearms recovered at crime scenes."[97]  The "vast majority" of these weapons were wielded by individuals prohibited from owning a firearm.[98]  In Los Angeles, the number of ghost guns recovered increased by 144% from 2015 to 2019.[99]  In San Francisco, no ghost guns were recovered in 2015, but beginning in 2016, ghost gun recoveries began to sharply rise—increasing by 1517% from 2016 to 2019.[100]

59.     This is a national problem.  In its 2022 Final Rule, ATF noted that there has been a "substantial increase" in ghost gun or privately made firearm ("PMF") recoveries nationwide over the last several years.  87 Fed. Reg. 24,656.  From 2016 to 2021, "approximately 45,240 suspected PMFs" were reported to have been recovered by law enforcement agencies; 1,758 in 2016, 2,552 in 2017, 3,960 in 2018, 7,517 in 2019, 10,109 in 2020, and 19,344 in 2021.  *Id.*

60.     These statistics—as indicative of exponential growth as they are—likely grossly underreport the massive scale of the problem because they rely on instances where ghost guns are

---

[94] *AG Racine Sues Gun Manufacturer Polymer80 for Illegally Advertising and Selling Untraceable Firearms to District Consumers*, OFFICE OF THE ATT'Y GENERAL OF D.C. (June 24, 2020), https://oag.dc.gov/release/ag-racine-sues-gun-manufacturer-polymer80

[95] *Id.*

[96] *Id.*

[97] Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic of Violence*, N.Y. TIMES (Jan. 26, 2022), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

[98] *Id.*

[99] Data released to Giffords Law Center following FOIA request.

[100] *Id.*

32

recovered by law enforcement.  Countless shootings and other acts of violence using ghost guns are never reported as ghost gun violence because no firearm was recovered, and ammunition from the scene of the crime cannot reveal that it was fired from a ghost gun, as opposed to a traditional, serialized weapon, since the ways that serialized and unserialized guns fire ammunition—and function in every other way—are indistinguishable.

61.     The sale of ghost guns in the United States presents an overwhelming threat to communities and people who may become victims of violence.  Unregulated, ghost guns can be purchased by people with lengthy criminal records or serious mental illnesses, and other prospective shooters intent on doing harm.  These ghost guns open the floodgates for such prohibited persons to obtain and use a range of firearms—from small hand-held pistols to high-powered AR-15 military-style assault weapons—in gun crimes, targeted acts of violence, and indiscriminate public mayhem. After these terrible crimes are committed and ghost guns are recovered, the inability to trace the ghost gun back to a particular buyer and seller prevents law enforcement from fully investigating the crime, allowing reckless sellers and illegal traffickers to operate with near impunity.  Victims of crimes committed with ghost guns are often left without answers, and ghost gun trafficking remains undetected.  Yet, year after year, the number of ghost guns continues to grow—including a surge of sales during the COVID-19 pandemic.  This threat to public safety can be stopped, if only ATF—the federal agency delegated the authority to regulate firearms—reasonably applies the GCA's plain text and regulates ghost guns in the way that it regulates all other guns.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**B.      ATF at First Properly Concludes that Ghost Guns Fall Under the GCA, but Then Inexplicably Reverses Its Position.**

62.      Beginning in the early 1980s and into the twenty-first century, ATF took the position in its Classification Letters that many unfinished receivers and frames that are identical to the 80 percent receivers and frames on the market today were "firearms" under the GCA, meaning that buyers of these unfinished frames and receivers were required to undergo background checks to determine whether they were legally entitled to own a firearm.

63.      The agency's conclusion, during this period, was based on an approach that analyzed how quickly and easily an unfinished receiver or frame could be turned into a fully functional firearm— that is, whether it could "readily be converted" to function as the firearm it was specifically designed to be.  Using this "temporal" approach, ATF found that 80 percent receivers that required some machining but could be finished in under 75 minutes or in a "minimal amount of time" qualified as "firearms."  *See, e.g.*:

- Ex. 6, Letter from Edward M. Owen, Jr., Chief, Firearms Technology Branch, ATF, to Henry A. Roehrich, SGW Incorporated (May 3, 1983) (classifying as a firearm a partially completed receiver that could be completed with additional milling that took roughly "**75 minutes**") (emphasis added).

- Ex. 7, Letter from Curtis H.A. Bartlett, Chief, Firearms Technology Branch, ATF, to Lane Browne, Mega Machine Shop, Inc. (Dec. 27, 2002) (classifying as a firearm each of the four "AR-15 type lower receiver samples" submitted for examination despite the fact that one of the samples had a "solid interior" because it could be finished in "**approximately 75 minutes**") (emphasis added).

- Ex. 8, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF, to Robert Serva, Dan Wesson Firearms (Aug. 19, 2004) (classifying as a firearm a "1911-type semiautomatic pistol frame" because the frame "can be completed **in a minimal amount of time** by a competent individual having the necessary equipment") (emphasis added).

64.      ATF's temporal analysis was also consistent with the GCA, which provides that "firearms" include not only fully functional weapons, but also receivers and frames of such weapons that are "*designed to or may readily be converted*" into functioning ones.  18 U.S.C. § 921(a)(3) (emphasis added).  The speed and ease with which an 80 percent receiver or frame can be turned into a functioning firearm speaks directly to whether or not that item was "designed to" be a functional weapon, and whether it "may readily be converted" into a functional weapon.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

65.     But around 2006, ATF began changing course, without providing any justification for the switch.  ATF stopped considering whether an unfinished frame or receiver is "designed to or may readily be converted" into a functioning firearm under the GCA.  Instead, ATF began to mechanically analyze which machining operations still needed to be performed to determine whether a partially completed receiver or frame is a "firearm" under the GCA.  Under this approach, ATF concluded that 80 percent receivers with fire-control cavity areas that are completely *"solid and un-machined"* do not qualify as firearms under the GCA.  Ex. 9, Letter from Sterling Nixon, Chief, Firearms Technology Branch, ATF to Justin Halford (Apr. 24, 2006) (classifying an "AR-15 pattern receiver" as a "firearm" because the sample did not have a solid "trigger/hammer area").  In recent years, ATF has analyzed 80 percent frames and receivers under the "machining operations" approach, with no mention of the ease or time it would take to convert the product into a functioning firearm.  *See, e.g.*:

- Ex. 10, Letter from John R. Spencer, Chief, Firearms Technology Branch, ATF, to Alan Aronstein, Hi-Standard Manufacturing Company (Sept. 28, 2012) (classifying as not "firearms" a "1911-type receiver blank" and "target-pistol type receiver blank" after analyzing which "**machining operations**" had been "partially or fully completed") (emphasis added).

- Ex. 11, Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013) (classifying as "not . . . a 'firearm'" a "partially completed AR-type receiver" because certain "**machining operations**" including "[m]illing out of fire-control cavity" were not yet performed) (emphasis added).

- Ex. 12, Letter from Earl Griffith, Chief, Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014) (classifying as "not a 'firearm'" an "AR-10 type receiver blank" because it "is completely **solid and un-machined** in the fire-control recess area") (emphasis added).

66.     ATF further memorialized the mechanical "machining operations" approach in a formal ruling (Ruling 2015-1, issued on January 2, 2015) regarding the manufacture and sale of ghost guns. *See* Ex. 13, ATF, RULING 2015-1 (Jan. 2, 2015).  ATF explained that Ruling 2015-1 was issued in response to "inquiries from the public asking whether Federal Firearms Licensees (FFL), or unlicensed machine shops, may engage in the business of completing, or assisting in the completion of, the manufacture of firearm frames or receivers *for unlicensed individuals* without being licensed as a manufacturer of firearms."  *Id.* at 1  (emphasis added).  In other words, ATF was asked to clarify

whether sellers or gunsmiths could convert 80 percent frames or receivers into fully functioning firearms for buyers.

67.     In its Ruling, ATF clarified the obligations by again focusing on the "machining operations" performed on the 80 percent receivers.  Specifically, Ruling 2015-1 explains that "when a person *performs machining or other manufacturing process* on [an unfinished frame or receiver] to make a firearm 'frame or receiver' . . . that person has performed a manufacturing operation."  *Id*. at 3 (emphasis added).  Similarly, when any person "make[s] available its machinery . . . to individuals who bring in raw materials, blanks, unfinished frames or receivers . . . for the purpose of creating operable firearms," that person is also "engaged in the business" of manufacturing firearms.  *Id*. at 5.  In both situations, where "machining" occurs, the seller "must be licensed as a manufacturer under the Gun Control Act of 1968 (GCA); identify (mark) any such firearm; and maintain required manufacturer's records."  *Id*. at 1.

68.     In explaining the purported reasoning behind the Ruling, ATF stated that allowing a seller or gunsmith to perform "manufacturing processes on a frame or receiver" would result in firearms being "manufactured without any markings or serialization" which would "run[] contrary to a major purpose of the GCA [by] eliminat[ing] the ability of law enforcement to trace firearms used in a crime, or stolen or lost firearms."  *Id*. at 5.  But the machining test permits consumers to acquire partially complete receivers and frames without serial numbers, and use tools (in some cases, common household tools) to quickly and easily turn them into usable firearms.  The result of ATF's mechanical "machining operations" test is the proliferation of unserialized, untraceable weapons, and ATF has doubled down on the "machining operations" approach in its explanation of the Final Rule.[101]

69.     Through its continued use of the mechanical "machining operations" approach, ATF has issued a series of Classification Letters to Polymer80, beginning in 2015, that have gravely endangered the lives of Americans and severely inhibited law enforcement's ability to fight crime.

---

[101]  ATF clarified in the Final Rule that "ATF has maintained and continues to maintain that a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain *machining operations* (e.g., milling out the fire control cavity of an AR-15 billet or blank, or indexing for that operation) because it may not readily be completed to house or hold the applicable fire control components."  87 Fed. Reg. 24,668 (emphasis added).

36
SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-119**

1. **ATF's Classification Letters Regarding Polymer80 Have Permitted and Encouraged the Proliferation of Ghost Guns.**

    a.    **ATF's Ghost Gun Classification Letters Issued to Polymer80.**

70.    Polymer80 is a leading ghost gun component manufacturer that markets and sells 80 percent receivers and frames and other ghost gun components to individuals online and via firearms dealers. Between 2015 and 2017, ATF issued a series of Classification Letters to Polymer80, analyzing Polymer80's products under the mechanical "machining" approach. Exs. 14, 15, 16. *First*, in early 2015, ATF issued a Classification Letter that classified Polymer80's AR-15-type receiver as "NOT a firearm receiver, or a firearm" (the "February 2015 Polymer80 Letter"). *See* Ex. 14, Letter from Michael R. Curtis, Acting Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis, Davis & Associates. ATF reasoned that because the receiver had a "**solid fire control cavity area**, and was cast in a homogenous manner" using "a single shot of molten material," it was not a firearm. *Id*. at 2 (emphasis added).

71.    ATF's February 2015 Polymer80 Letter did not deny that Polymer80's proposed product was designed to and may be readily converted into a fully functional weapon. Nor did the letter consider how quickly a DIY gunsmith could convert the product into a functional firearm using standard household tools, such as a simple drill bit, file set, and a hand drill, or a CNC machine. Notably, at least one retailer of the Polymer80 receiver advertised that the specific AR-15 type firearm at issue in the February 2015 Polymer80 Letter was "a fully automated system" that required "NO expensive jig kits and parts."[102] A 2018 product review of the receiver states, "Great product for first time build . . . [e]asy to cut."[103] Another review from 2016 states, "Easy milling process, and very durable. Have had zero issues with this product."[104]

72.    In November 2015, ATF issued a second Classification Letter to Polymer80 (the "November 2015 Polymer80 Letter"), this time regarding two separate 80 percent components: first, an 80 percent receiver for an AR-10 assault rifle which Polymer80 identified as a "WARRHOGG

---

[102]  *See Polymer80 G150 Phoenix2 80% Receiver Lower Receiver Kit AR-15 Polymer*, MIDWAY USA, https://www.midwayusa.com/product/1092916295905 (last visited Oct. 18, 2022). As of October 19, 2022, the product has been discontinued.

[103]  *Id.* (Review by Six_shooter).

[104]  *Id.* (Review by Brian).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-120**

BLANK" and, second, a Glock-type "CG" or "CG9" Blank handgun frame. *See* Ex. 15, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF, to Jason Davis, Davis & Associates (Nov. 2, 2015). ATF concluded that both items were not firearms under the GCA because certain "machining operations" or "design features" were "not yet present or completed" on the items. *Id*. at 3-4. In particular, ATF's Classification Letter pointed out that the AR-10 receiver lacked (1) complete removal of material from the fire-control cavity area, (2) machining or indexing of selector-lever hole, (3) machining or indexing of trigger slot, (4) machining or indexing of trigger-pin hole, or (5) machining or indexing of hammer-pin hole. *Id*. at 3. ATF's letter noted that the GC9 Blank lacked a (1) machined or indexed trigger-pin hole, (2) machined or indexed locking block-pin hole, (3) front or rear frame rails, or a (4) machined or formed barrel seat. *Id*. at 4.

73.    ATF's November 2015 Polymer80 Letter did not deny that Polymer80's proposed products were designed to function as and could be readily converted into fully functional weapons. Nor did the letter consider how quickly a DIY gunsmith could convert the products into functional firearms. According to a 2016 review of the AR-10 type receiver at issue in the 2015 Polymer80 Letter on an online retailer's website, "This was easy . . . *I was done in about an hour and another hour to install the* [remaining parts]. Really is that easy."[105]

74.    On January 18, 2017, ATF issued a third Classification Letter to Polymer80 (the "2017 Polymer80 Letter"), regarding its Glock-type "PF940C Blank," ruling that it was "not sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a 'firearm' as defined in the GCA." *See* Ex. 16, Letter from Michael R. Curtis, Chief, Firearms Technology Industry Services Branch, ATF to Jason Davis, Davis & Associates (Jan. 18, 2017), at 3. The letter explained that the item was not "sufficiently complete" because the following "machining operations or design features were <u>not</u> yet present or completed":  (1) trigger-pin hole machined or indexed, (2) trigger mechanism housing pin machined or indexed, (3) locking block-pin hole machined or indexed, (4) devoid of front or rear frame rails, (5) barrel seat machined or formed, and (6) incapable of accepting Glock locking-block. *Id*. at 2.

---

[105]  *See Polymer80 Warrhogg 80% Receiver Kit LR-308 Polymer*, MIDWAY USA, https://www.midwayusa.com/product/1092916305283 (last visited Oct. 19, 2022) (Review by Bill the plumber) (emphasis added). As of October 19, 2022, the product has been discontinued.

75.     ATF's 2017 Polymer80 Letter did not deny that Polymer80's proposed product was designed to function as and could be readily converted into a fully functional weapon.  Nor did the letter consider how quickly a DIY gunsmith could convert the product into a functional firearm.  Notably, at least one retailer of the Glock-type receiver at issue in ATF's 2017 Polymer80 Letter stated in its marketing for the 80 percent receiver that "***It's amazing to think in just 10-15 minutes you can have a fully functioning Glock that you made at home.***"[106]

76.     The Classification Letters ATF issued to Polymer80 are just a few of the Classification Letters that ATF has issued to manufacturers of 80 percent receivers and frames.  Indeed, a number of other manufacturers of 80 percent receivers and frames—including KE Arms,[107] 80 Percent Arms,[108] Palmetto State Defense,[109] and TPM Arms[110]—have similarly received Classification Letters that permitted those manufacturers to sell ghost guns outside the strictures of the GCA.  Individually and even more so collectively, these pre-Final Rule Classification Letters resulted in exponential explosion of the size of the ghost gun market, which accelerated during the COVID-19 pandemic, when demand for ghost guns surged.[111]

77.     As a result of these Classification Letters,[112] Polymer80 has become a prominent manufacturer of 80 percent receivers and frames and other ghost gun parts.  It has been advertising, offering, and selling firearms on its website, www.Polymer80.com, and through a network of firearms dealers that consumers can access through the company's website.  Moreover, ATF's pre-Final Rule

---

[106]  *See Glock 80% Compact Polymer Pistol Frame Kit*, FANDWGUNS, http://fandwguns.gunsamerica.com/ItemDetails/762360860/Glock-80-Compact-Polymer-Pistol-Frame-Kit.htm (last visited Oct. 18, 2022) (emphasis added).

[107]  *See* KE ARMS, http://www.kearms.com/ (last visited Oct. 18, 2022); Ex. 11 Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Doug Hughes, Kenney Enterprises, Inc. (May 17, 2013), at 2.

[108]  *See* 80 PERCENT ARMS, https://www.80percentarms.com/ (last visited Oct. 18, 2022); Ex. 17, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Tilden Smith, 80 Percent Arms (July 15, 2013), at 2.

[109]  *See* PALMETTO STATE DEFENSE, https://www.psdmfg.com/ (last visited Oct. 18, 2022); Ex. 12, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF, to Bradley Reece, Palmetto State Defense, LLC (May 25, 2014), at 2.

[110]  *See* TPM ARMS, https://tpmarms.com/ (last visited Oct. 18, 2022); Ex. 18, Letter from Earl Griffith, Chief of Firearms Technology Branch, ATF to David Trease, President, TPM Arms, LLC (Nov. 22, 2013), at 3.

[111]  *See supra* note 13.

[112]  [Footnote withdrawn]

Classification Letters to Polymer80 became a linchpin for the industry.   Indeed, individuals and businesses alike have relied on ATF's Classification Letters, such as the Polymer80 Classification Letters, when purchasing, selling, and/or designing 80 percent lower receivers and frames in the United States.[113]

### b. Polymer80 Is a Major Contributor to the Ghost Gun Epidemic.

78.   Polymer80 contributes significantly to ghost gun violence nationwide.   On information and belief, Polymer80's products constitute an outsized percentage of the ghost guns sold nationwide. Indeed, almost 90% of the ghost guns recovered by the Los Angeles Police Department last year were Polymer80's products.[114]   The New York Police Department also reported that 90% of recovered ghost guns are made with parts from Polymer90.[115]   Similarly, since 2017, Polymer80's products constitute over 83% of the ghost guns recovered by law enforcement officers in the District of Columbia.[116]   On information and belief, Polymer80 ghost guns have become so ubiquitous that law enforcement in some jurisdictions colloquially refer to all DIY handguns they recover as "Polys," even if a recovered gun was assembled with parts bought from a different seller.

79.   On information and belief, Polymer80 customers and other ghost gun consumers can purchase large quantities of ghost guns and resell them for a profit.   For example, a five-time convicted felon from Easthampton, Massachusetts pled guilty to building AR-15 rifles from parts bought online and then sold in New Hampshire, making a $300 profit on each military-style rifle.[117]   Another

---

[113]   *See, e.g.*, Complaint at ¶ 41, *Cal. Rifle & Pistol Ass'n v. ATF*, No. 1:14-cv-01211 (E.D. Cal. July 21, 2014), where the California Rifle & Pistol Association (an organization comprised of individuals and businesses who, among other things, own, manufacture, and/or sell 80 percent receivers), stated that it has "reli[ed] . . . on the ATF's prior opinions, interpretations, and **letter rulings** regarding what constitutes a 'firearm' 'frame' or 'receiver.'" (emphasis added).

[114]   Joshua Eaton, *Polymer80's Name Has Become Synonymous with 'Ghost Guns.' Now It's in the Crosshairs*, NBC NEWS (Mar. 27, 2022), https://www.nbcnews.com/news/us-news/polymer80-ghost-guns-kits-crime-rcna20864.

[115]   Ali Bauman, *New York City Hall Targets Manufacturer Polymer80 in Fight against Ghost Guns*, CBS NEWS (May 11, 2022), https://www.cbsnews.com/newyork/news/polymer80-ghost-guns-new-york-city/.

[116]   *See* Complaint at ¶ 1, *District of Columbia v. Polymer80, Inc.*, Case No. 2020-CA-002878-B (D.C. Super. June 24, 2020) (available at https://oag.dc.gov/sites/default/files/2020-06/Polymer80-Complaint.pdf (last visited Oct. 18, 2022)).

[117]   Dan Crowley, *Easthampton Man Pleads Guilty to Illegal Possession of Firearms He Assembled, Intended to Sell*, DAILY HAMPSHIRE GAZETTE (Aug. 13, 2016) https://www.gazettenet.com/Easthampton-man-pleads-guilty-in-NH-federal-court-to-illegal-possession-of-a-firearm-as-a-convicted-felon-4061253 (last visited Sept. 16, 2020).

convicted felon, in Salem, Massachusetts, sold completed firearms for three times what he spent to purchase the parts, spending only 30 minutes to build each gun.[118]

80.     Polymer80 advertises and sells a variety of weapons on its website that can be made into fully operational firearms with minimal effort—including AR-15 rifles and multiple types of handguns.  And until recently, Polymer80 sold 80 percent receivers in "Buy, Build, Shoot" kits, which contained "all the necessary components" to turn the 80 percent frames into fully functional firearms.[119]  The handgun kits contained 80 percent frames as well as a "complete slide assembly, complete frame parts kit, 10 round magazine and a pistol case."[120]  Many "buy, build, shoot" kits sold out during the first half of 2020, as manufacturers experienced rapidly increased ghost gun sales during the COVID-19 pandemic.[121]

81.     Like other ghost gun retailers, Polymer80 has permitted bulk purchases of its products and kits without restriction—including without any proof of identification, age, or eligibility to possess firearms as would be confirmed by undergoing a background check.  Polymer80 has made no effort to confirm that its customers are even alive—claiming it sells firearms to a "growing market of individuals who 'value their Fourth Amendment rights' to privacy."[122]  In spring 2020, in fact, Plaintiff Bryan Muehlberger was able to order a ghost gun from Polymer80 in his deceased daughter's name, only four months after Gracie Anne Muehlberger was murdered in the Saugus High School ghost gun shooting.  Despite the fact that the name he provided as the purchaser—Gracie's—did not match the name on the credit card used—Mr. Muehlberger's own—in mere minutes, he purchased a ghost gun kit on Polymer80.com for $650.  Even if Gracie Anne Muehlberger were still alive, she would have been

---

[118]   Complaint, *United States v. Echeverria, et al.*, 19-MJ-06527, 11–12 (D. Mass. Oct. 28, 2019); *see also supra* Ex. 4, EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020), at 11.

[119]   *P80® Buy Build Shoot™ kit PF940v2™ - 10 Round Magazine*, POLYMER 80 (Aug. 12, 2020), https://web.archive.org/web/20200811213619/https://www.polymer80.com/pistol-frames/buy-build-shoot-kits/p80-bbs-kit-pf940v2-2343 (last visited Oct. 18, 2022).

[120]   *Id.*

[121]   *See* Letter from Jerrold Nadler, Chairman, U.S. House Judiciary Committee, to Regina Lombardo, Acting Director, *supra* note 14.

[122]   Anjeanette Damon, *Why Outlawing Ghost Guns Didn't Stop America's Largest Maker of Ghost Gun Parts*, PROPUBLICA (Aug. 24, 2022), https://www.propublica.org/article/nevada-ghost-guns-polymer80-firearms-laws.

41

underage and prohibited from purchasing a firearm under the GCA. Polymer80's other "80 percent" and "unfinished" products are equally accessible.

82. In December 2020, ATF executed a search warrant at Polymer80's headquarters. The search warrant relied in part on the allegations described above from Plaintiffs' original Complaint concerning Plaintiff Bryan Muehlberger's purchase of a Polymer80 ghost gun kit in his daughter's name.[123] In addition to that example, the search warrant identified at least seven other instances where Polymer80 shipped its products "to individuals within the United States who are prohibited from receiving or possessing firearms."[124] The search warrant also described Polymer80's social media marketing techniques—including marketing their products specifically to individuals who might not pass a background check.[125] Specifically, the search warrant pointed to an April 17, 2020 Instagram post where an individual featured in a video posted by Polymer80 explains that with Polymer80's products, "you don't have to worry about a background check."[126] An account with the name "@ellipsis415" responded to the video, remarking that it was strange to market products to people who would not pass a background check. In response, Polymer80 expressed that any background check is an "infringement."[127]

**2.  ATF Provides Public Guidance Related to Ghost Guns.**

83. Also in 2015, ATF decided to explain its official agency position regarding ghost guns on a subsection of the Questions and Answers section of its website, entitled "Receiver Blanks" (hereinafter, the "Ghost Gun Guidance").[128] In or around June or September of 2015, the Ghost Gun

---

[123] Polymer80 Search Warrant Affidavit at ¶ 87(h), available at https://s.wsj.net/public/resources/documents/ghostraid-121420-warrant.pdf (last visited Oct. 5, 2022) (explaining that "a Buy Build Shoot Kit was shipped by POLYMER80 in May 2020 to "Gracie Muehlberger;" at an address in Santa Clarita, CA" and that Gracie "was a 15 year old girl who was killed in the shooting at Saugus High School on November 14, 2019 by a minor who was using a ghost gun.").

[124] *Id.* at ¶¶ 87(a)-(g).

[125] *Id.* at ¶¶ 89-90.

[126] *Id.* at ¶ 89.

[127] *Id.*

[128] The Ghost Gun Guidance page is still live on ATF's website. *See Receiver Blanks*, ATF, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 14, 2022).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

Guidance was posted as a subsection on ATF's Question and Answers page.[129]  *See* Ex. 19, pages from Archive.org showing the first archived version of the Ghost Gun Guidance page in September 2015. The Ghost Gun Guidance page states that it contains "answers to some common questions specific to receivers known as 80% receivers or unfinished receivers" and contains eight links to questions and answers.  The questions and answers do not appear to have been materially changed since their initial debut on the website, nor have they changed after the Final Rule was made effective.  The same eight questions and answers remain on the site today, each containing a note of the date that the answer was "last reviewed."  The eight answers have last been reviewed by ATF between February 6, 2020 and June 24, 2020.  *See* Ex. 20, *Receiver Blanks,* ATF, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 10, 2022).

84.  The Ghost Gun Guidance contains legally determinative information regarding when ATF considers a receiver to have become a "firearm" for purposes of the GCA.  For example, one of the listed questions asks: "Are '80%' or 'unfinished receivers' illegal?"  ATF's answer states:

> Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA).  ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of manufacture" which would result in the classification of a firearm according to the GCA.

*See* Ex. 20. The same response then includes three photos as "examples" of a finished receiver that meets the definition of a firearm and unfinished receivers that ATF has said do not.  *See* Images 6-8, *supra* Section A.

85.  A further question asks: "Can functioning firearms made from receiver blanks be traced?"  ATF responds that "it is usually not possible to trace the firearm or determine its history" when it was made from an 80 percent receiver.  ATF then acknowledges that the inability to trace these firearms "hinders crime gun investigations and jeopardizes public safety."

---

[129]  According to a website that catalogs webpage archives, the WayBackMachine (Archive.org), the earliest known Ghost Gun Guidance page was captured in September 2015.  *See* Ex. 19, Pages from Archive.org showing the first archived version of the Ghost Gun Guidance page in September 2015.  The screen capture contains the date that the website section was "last reviewed" by ATF and states it was last reviewed in June 2015.  (Note that this was the first time that the "automated crawlers" became aware of the site and archived it, although the page may have been published some time earlier before detected by the archiving system).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

86.     Similarly, another question reads: "Have firearms made from unmarked receiver blanks been recovered after being used in a crime?"  In response, ATF again acknowledges that these untraceable ghost guns continue to be "recovered after shooting incidents, from gang members, and from prohibited people after they have been used to commit crimes."

87.     This Ghost Gun Guidance constitutes final agency action.  Until recently, the Ghost Gun Guidance had presented ATF's definitive guidance to the industry and the public regarding 80 percent receivers, and was the primary authority that the public and manufacturers could rely on to understand ATF's position on the legality of 80 percent receivers.

88.     Moreover, ATF's Ghost Gun Guidance reflects actual agency policy, consistent with the Polymer80 Classification Letters, that "bind[s] private parties without undergoing the rulemaking process."[130]  ATF's determination regarding 80 percent receivers, as described on its Q&A page, has directly resulted in a massive proliferation in both 80 percent receivers *and* in gun violence perpetrated with ghost guns, as described herein.  Ghost gun manufacturers and dealers have cited the Ghost Gun Guidance as authority on their websites—for example, a dealer called "80% Lowers" quoted the Ghost Gun Guidance on its website, arguing that "80% lowers are not considered firearms" because ghost guns are "not capable of meeting the definition of a firearm under federal law."[131]

---

[130]  *See* Memorandum from Att'y Gen. Jefferson B. Sessions III to ATF (Nov. 16, 2017), at 1, https://www.justice.gov/opa/press-release/file/1012271/download (explaining that agencies may no longer "issue guidance documents" that "bind private parties without undergoing the rulemaking process").

[131]  *Are 80% Lowers Legal*, 80% LOWERS (June 11, 2020), https://web.archive.org/web/20220117095107/https://www.80-lower.com/80-lower-blog/are-80-lowers-legal/ (last visited Sept. 28, 2020) (note that the website has been saved by the WayBackMachine and is an archived version).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**Image 14:  80% Lowers' Guidance on the Legality of Ghost Guns, Quoting ATF's Ghost Gun Guidance**

**C.    ATF Issues the Final Rule but Carves Out Exceptions that Swallow the Rule.**

89.    In 2021, after devastating mass shootings in Boulder, Colorado and Atlanta, Georgia, and amid increasing calls for actions to address gun violence across the United States, the White House announced that it intended to "issue a proposed rule to help stop the proliferation of 'ghost guns.'"[132] That proposed rule was published on May 21, 2021.[133]

90.    Eleven months later, on April 11, 2022, ATF issued its Final Rule, which was titled "Definition of 'Frame or Receiver' and Identification of Firearms."  ATF stated that the goals of the Rule were to "provide a more comprehensive definition of 'frame' or 'receiver' so that these terms more accurately reflect how most modern-day firearms are produced and function," 87 Fed. Reg.

---

[132] *FACT SHEET: Biden-Harris Administration Announces Initial Actions To Address The Gun Violence Public Health Epidemic*, WHITE HOUSE (Apr. 7, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/07/fact-sheet-biden-harris-administration-announces-initial-actions-to-address-the-gun-violence-public-health-epidemic/.

[133] *See* Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021).

24,661, and to "reduce unserialized 'ghost guns.'"[134]  Under the Final Rule, the term "frame" means "the part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence."  27 C.F.R. 478.12(a)(1).  And a "receiver" means the "part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence."  *Id*. at (a)(2).  Additionally, the Final Rule purports to address 80 percent component frames and receivers by stating that the definition of "frame" or "receiver" includes a partially complete frame or receiver, *including a parts kit*, "that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver."  *See* 27 C.F.R. § 478.12(c).

91.     But the Final Rule also reiterates portions of ATF's legally flawed pre-Rule interpretation of the GCA.  While the Final Rule provides that un-machined 80 percent frames and receivers **sold with** a jig, parts kit, and template are firearms subject to the serialization and background check requirements of the GCA,[135] in the next breath, it states that 80 percent receivers and frames are **not firearms** under the GCA if they are sold **without** a template, jig, or other items and materials.[136] So long as a customer buys an 80 percent frame or receiver in a separate transaction from the jig and tool kit and the manufacturer's instructions are separately provided, a customer (or prohibited person under the GCA) can purchase the 80 percent receiver without complying with the GCA's serialization, background check, and recordkeeping requirements.

92.     That result severely undermines the effectiveness of the GCA.  It is also wrong as a matter of law.  Even without a kit, an 80 percent receiver sold alone *can be* "readily converted" into a firearm.  Indeed, that is its sole purpose.  Until ATF begins classifying all 80 percent frames and

---

[134] *FINAL RULE 2021R-05F-Definition of "Frame or Receiver" And Identification Of Firearms*, ATF, https://www.atf.gov/firearms/docs/guide/overview-final-rule-2021r-05f-definition-%E2%80%9Cframe-or-receiver%E2%80%9D-and-identification/download (last visited Oct. 4, 2022).

[135] *See* 27 C.F.R. § 478.12(c) Example 1 to Paragraph (c) (deeming the following a firearm:  "A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver.").

[136] *Id*. at Example 4 to Paragraph (c) (deeming *not* a firearm:  "A billet or blank of an AR–15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver").

receivers as firearms, it will continue to defy the GCA's plain language and leave mile-wide loopholes in the GCA's regulatory regime, resulting in a Final Rule that is arbitrary and capricious.

93.     When ghost gun manufacturers sought to enjoin the Final Rule in court, Defendants confirmed what the text of the Rule suggests:  that gun manufacturers can still sell un-machined 80 percent components so long as they do not bundle those components with jigs or tool kits in the same package.  To date, ghost gun manufacturers have brought at least three lawsuits against the Final Rule. In each, ATF has taken the position that ghost gun manufacturers would suffer no harm as a result of the Final Rule because they can still sell 80 percent frames and receivers without serialization, background check, and reporting requirements—just as they could prior to the Final Rule—so long as jigs and tool kits are sold separately.

94.     For example, on May 9, 2022, Division 80, a ghost gun manufacturer, brought suit in the Southern District of Texas seeking a nationwide preliminary injunction to suspend the Final Rule. *See Div. 80 v. Garland*, No. 3:22-cv-00148 (S.D. Tex. May. 9, 2022).  At oral argument on the motion for preliminary injunction, ATF confirmed that it was not "going to be a problem" under the Final Rule for ghost gun manufactures to "sell[] receiver blanks . . . without a [] license."  *See* Ex. 1, Transcript of Hearing on Plaintiff's Motion for Preliminary Injunction at 16:2-5, *Div. 80*, No. 3-22-CV-00148 (S.D. Tex. Aug. 9, 2022), ECF No. 68.  ATF even clarified that selling both jigs and 80 percent frames and receivers, so long as they are purchased in different transactions, does not violate the Final Rule.  *See id.* at 30:17-24; 31:13-16.

95.     In two other cases, ATF took similar positions, acknowledging that the Final Rule does not have the sweeping effect promised.  On July 5, 2022, ghost gun manufacturers, some state attorneys general, and ghost gun consumers filed suit in the District of North Dakota seeking to enjoin the Final Rule from taking effect as scheduled.  *See Morehouse Enters., LLC v. Bureau of Alcohol*, *Tobacco*, *Firearms, and Explosives*, No. 3:22-cv-00116-PDW-ARS (D.N.D. July 5, 2022).  In their opposition to the plaintiffs' motion for preliminary injunction, Defendants argued that ATF was not "regulating the individual tools, jigs, templates, or instructions sold with firearm parts kits" and that, "for the most part[,] ATF does not regulate individual firearm parts."  *See* Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary and/or Permanent Injunction, *Morehouse Enters.*, No. 3:22-cv-

00116-PDW-ARS (D.N.D. Aug. 23, 2022), ECF No. 43.  Similarly, in *VanDerStok v. Garland*, ghost gun consumers joined by a ghost gun manufacturer and a nonprofit organization brought suit in the Northern District of Texas seeking to enjoin the Final Rule.  *VanDerStok, et al. v. Garland, et al.*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 11, 2022).  In opposing injunctive relief, Defendants confirmed that it "remains true that 'partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations'" and that the "only relevant policy change concerns ATF's consideration of jigs, templates, instructions, equipment, or tools that are sold alongside a partially-complete frame or receiver to determine whether that clearly-identifiable component has reached the 'critical stage of manufacture.'"  *See* Defendants' Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction, *VanDerStok*, No. 4:22-cv-00691-O (N.D. Tex. Aug. 29, 2022), ECF No. 41 (citing 87 Fed. Reg. 24,668).  In other words, ATF has determined that the one-stop-shop purchase of single-transaction *kits* are firearms that are subject to the GCA, but that unmachined 80 percent frames and receivers bought separately *are not*, no matter how easy it is to convert these parts into a fully fireable weapon.

96.     As a result, the ghost gun industry now recognizes the obvious:  the Final Rule contains a massive loophole.  Ghost gun manufactures, like Polymer80 and 80 Percent Arms, continue to sell 80 percent frames at will, and such products remain unregulated; they are still sold without background checks, serial numbers and recordkeeping.[137]

97.     Polymer80, for example, continues to sell unfinished receivers and frames.  *See P80 80% Pistol Blanks*, POLYMER80, https://www.polymer80.com/pistols/pistolblanks (last visited Oct. 18, 2022), attached as Ex. 21 ("P80 80% Pistol Blanks"); *AR Receiver Blanks*, POLYMER80, https://www.polymer80.com/arreceivers (last visited Oct. 18, 2022), attached as Ex. 22 ("P80 AR Receiver Blanks").  Polymer80 has issued a press release noting that its unserialized 80 percent products are in full compliance with the Final Rule.  Ex. 2, Polymer80 Product Changes in Accordance with ATF Final Rule.  Moreover, while Polymer80 says that its "kits" that include receivers/frames

---

[137]  Ex. 2, Polymer80 Product Changes in Accordance with ATF Final Rule; *see also ATF Final Ruling 2021R-05F | Complete Breakdown*, 80 PERCENT ARMS (Aug. 25, 2022), https://www.80percentarms.com/blog/atf-final-ruling-2021r05f-complete-breakdown/ ("Lowers are still shipping: you can keep placing new orders for lower receivers.").

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC
**ER-131**

plus jigs and other tools will be serialized, it will continue to sell "their complete line of pistols," other "parts and accessories," **and** "their AFT 'Assemble for Thyself' kit, which includes all the necessary components to build a complete firearm, no drilling required." *Id.* Consumers are free to purchase one "Assemble for Thyself" kit to use on multiple, unserialized receivers they buy separately.

98.     Similarly, Juggernaut Tactical still stocks both 80 percent lower receivers as well as jigs and tool kits on its website and sells them free and clear of the regulations that govern firearm transactions—so long as a buyer purchases each in a separate transaction. Juggernaut Tactical's policy is reflected in a warning at the bottom of its webpage stating that a receiver and jig cannot be purchased in the same transaction:



**Image 15: Juggernaut Tactical's Universal Jig Kit for Sale (emphasis added)**

99.     Ghost gun customers and commentators also quickly recognized the narrow scope of the Final Rule. In response to a YouTube video posted by a gun-rights lawyer describing the effects of the Final Rule, commenters recognized that so long as 80 percent components are sold separately from jigs and tool kits, they can continue using ghost guns without being subjected to the serialization, background check, or recordkeeping requirements of the GCA.[138]  For these commenters, the Final Rule is little more than a minor inconvenience:

---

[138] *What The ATF's New Rules On Unfinished Frames And Receivers Really Means To You...*, YOUTUBE (Aug. 31, 2022), https://www.youtube.com/watch?v=XCZPSmx4hzw.



**Image 16:  YouTube Comments Identifying Flaws in the Final Rule**

100.    ATF confirmed the Final Rule's limited scope in a new section of its website dedicated to providing guidance documents and examples of firearm frames and receivers.[139]   In a slide-deck detailing the effect of the Final Rule, ATF observed that un-machined 80 percent receivers not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools are *not* firearm receivers under the GCA.[140]

---

[139] *Definition Of "Frame Or Receiver" And Identification Of Firearms*, ATF (Oct. 17, 2022), https://www.atf.gov/rules-and-regulations/definition-frame-or-receiver.

[140] *FINAL RULE 2021R-05F-Definition Of "Frame Or Receiver" And Identification Of Firearms*, ATF, https://www.atf.gov/firearms/docs/guide/overview-final-rule-2021r-05f-definition-%E2%80%9Cframe-or-receiver%E2%80%9D-and-identification/download (last visited Oct. 4, 2022).





**Image 17: ATF Slides Explaining that, Under the Final Rule, Un-Machined 80 Percent Frames and Receivers Are Not Firearms Unless Sold in the Same Transaction as a Jig, Template, or Tool Kit**

101. Similarly, in an August, 26, 2022 YouTube video produced by ATF presenting those same slides, it confusingly stated that "not all items previously marketed as 80 percent firearms or 80 percent kits will be regulated under the final rule."[141] Again, ATF confirmed that an un-machined receiver billet or blank "not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools that make it readily [] completed, is not a receiver."[142]

---

[141] FINAL RULE 2021R-05F-Definition Of "Frame Or Receiver" And Identification Of Firearms, YOUTUBE, at 9:33 (Aug. 26, 2022), https://www.youtube.com/watch?v=q7XWhcx_Q3A.

[142] *Id*.

102.     In a "training aid" intended to clarify the definition of a "frame" or "receiver" under the Final Rule, ATF took the same position.  In response to the question "Which "80 [percent] receiver" kits are regulated under the final rule?," ATF answered that an 80 percent receiver kit did not include an "unmachined body."[143]   Only when "sold, distributed, or possessed with a compatible jig or template" will such 80 percent components be considered firearms.[144]

103.     On September 27, 2022, ATF issued an "Open Letter" "to all federal firearms licensees," for the purpose of "further assist[ing] the firearms industry and the public in understanding whether a 'partially complete, disassembled, or nonfunctional' receiver of an AR-15/M-16 variant weapon" is a "frame or receiver" or "firearm" under the Final Rule.  Ex. 23, ATF, *Open Letter to All Federal Firearms Licensees – Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers*, at 1 (Sept. 27, 2022) (hereinafter "September 2022 Open Letter").  In the September 2022 Open Letter, ATF confirmed that 80 percent AR-type receivers—identical to ones sold before the Final Rule was issued—are *not* firearms if they lack "indexing or machining of any kind . . . in the area of the fire control cavity" and are "not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit."  *Id.* at 3 (emphasis in original).  The 2022 Open Letter clarifies ATF's understanding and interpretation of the Final Rule— including that the pre-Rule machining analysis still stands and the only pertinent change with respect to 80 percent frames and receivers is whether or not those items are "sold, distributed, or marketed" with accessories like a jig or template.

104.     Moreover, ATF's September 2022 Open Letter included the *exact same images* of un-machined 80 percent receivers used in the pre-Rule Ghost Gun Guidance to underscore that these receivers are *not* firearms.[145]   Indeed, the Ghost Gun Guidance, *supra* Section B.2, which was originally posted to ATF's website in 2015, remains accessible today.  *See Receiver Blanks,* ATF.gov, https://www.atf.gov/qa-category/receiver-blanks (last visited Oct. 10, 2022) (also attached as Ex. 20).

---

[143]  ATF, *Training Aid For The Definition Of Frame Or Receiver & Identification Of Firearms: Overview Of Final Rule 2021R-05F*  at 7 (2022), https://www.atf.gov/firearms/docs/guide/new-training-aid-overview-final-rule-2021r-05f-definition-frame-or-receiver-and/download.

[144]  *Id.* at 4-5.

[145]  *Compare* Images 6 and 7, *supra with* Image 18, *infra*.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC



**Firearm**

(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)



(if not sold, distributed, or marketed with any associated templates, jigs, molds, equipment, tools, instructions, or guides)

**Image 18:  Using the Same Photos from the 2015 Ghost Gun Guidance Documents, ATF Confirms in Its Open Letter that 80 Percent Receivers Sold Without Templates, Jigs, Molds, Equipment, Tools, Instructions, or Guides Are Not Considered Firearms**

105.    The September 2022 Open Letter clarifies ATF's view that classifications of AR-15 or M-16 unfinished receiver variants have not changed—as long as those items are sold without "associated templates, jigs, molds, equipment, tools, instructions, or guides."  Ex. 23 at 3.

106.    On December 27, 2022, ATF issued another Open Letter to all federal firearms licensees "to assist the firearms industry and the public in understanding whether a 'partially complete, disassembled, or nonfunctional' frame of a Polymer80, Lone Wolf, or similar semiautomatic, striker-fired pistol" is a firearm under the Final Rule.  Ex. 25, ATF, *Open Letter to All Federal Firearms Licensees – Impact of Final Rule 2021-05F on Partially Complete Polymer80, Lone Wolf, and Similar Semiautomatic Pistol Frames*, at 1 (Dec. 27, 2022) (hereinafter "December 2022 Open Letter").  In the December 2022 Open Letter, ATF concluded that certain partially complete striker-fired or "Glock-type" pistol frames that have "any kind of indexing or material removed from the front or rear fire control cavities for installation of the trigger mechanism and sear, or slide rail attachments to connect the trigger mechanism and sear to the frame," are firearms under the GCA, even when sold "without

any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials." *Id.* at 1, 9. ATF's determination in the December 2022 Open Letter applies to such frames sold by two ghost gun manufacturers—Polymer80 and Lone Wolf—and to "similar" frames. *Id.* at 1. The December 2022 Open Letter on its face does ***not*** apply to multiple other categories of widely used, equally dangerous, and materially indistinguishable weapons, including partially complete hammer-fired pistol frames. On information and belief, ATF has not applied the analysis of the December 2022 Open Letter to those types of materially indistinguishable firearms.

107.    Since the Final Rule took effect on August 24, 2022, ATF has issued several Classification Letters responding to requests for classification pursuant to the Final Rule. In each of these letters, which ATF issued between October 2022 and March 2023, ATF was asked to determine whether a particular product was a firearm under the GCA and Final Rule. In 23 of these letters (the "Post-Final Rule Classification Letters"), ATF concluded that a partially complete or 80 percent frame or receiver was not a firearm under the GCA and Final Rule. ATF analyzed the product at issue under the "machining operations" approach, which considers only what machining must still be performed on a submitted 80 percent receiver or frame to render a particular product capable of firing a projectile. Like ATF's pre-Final Rule Classification Letters, these letters make no mention of the ease with which a person could convert the product into a fully functional weapon or the time it would take.

108.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 313696) determining that a submitted partially complete AR receiver is not a firearm under the GCA, as implemented by the Final Rule.

109.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 315916) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

110.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 316248) determining that a submitted partially complete AR10-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

111.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 317036) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

112.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 318400) determining that a submitted partially complete AR10-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

113.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 320538) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

114.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 320540) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

115.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 320542) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

116.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321010) determining that a submitted partially complete AR-type receiver with upper assembly, buttstock, and grip is not a firearm under the GCA, as implemented by the Final Rule.

117.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321122) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

118.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321194) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

119.     On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321196) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

120.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321402) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

121.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321404) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

122.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321406) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

123.    On October 6, 2022, ATF issued a Classification Letter (FATD Case No. 321420) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

124.    On October 21, 2022, ATF issued a Classification Letter (FATD Case No. 322526) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

125.    On October 21, 2022, ATF issued a Classification Letter (FATD Case No. 322528) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

126.    On October 21, 2022, ATF issued a Classification Letter (FATD Case No. 322530) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

127.    On October 21, 2022, ATF issued a Classification Letter (FATD Case No. 322532) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

128.    On November 8, 2022, ATF issued a Classification Letter (FATD Case No. 322692) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

129.    On December 30, 2022, ATF issued a Classification Letter (FATD Case No. 324620) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

130.    On January 9, 2023, ATF issued a Classification Letter (FATD Case No. 324648) determining that a submitted partially complete AR-type receiver is not a firearm under the GCA, as implemented by the Final Rule.

131.    On March 21, 2023, ATF also issued a "Public Safety Advisory" that purported to explain ATF's "investigative priorities" regarding "possible willful efforts to violate the requirements of the Gun Control Act (GCA) as implemented the Final Rule." Ex. 26, ATF, *Public Safety Advisory to All Federal Firearms Licensees, And Firearm Parts, Components, and Accessories Manufacturers and Distributors* (March 21, 2023) ("March 2023 Public Safety Advisory").  The March 2023 Public Safety Advisory acknowledges that "some suppliers of partially complete frames or receivers appear to be structuring their transactions or coordinating with other persons or entities to sell, distribute, or otherwise make available, in ostensibly independent or separate transactions, the compatible templates, jigs, molds, equipment, tools, instructions, or guides needed to complete the partially complete frames or receivers to the same individuals who purchase a partially completed frame or receiver from the original supplier." *Id.*  The March 2023 Public Safety Advisory states: "When a supplier . . . intentionally fails to comply with the GCA's requirements, that may constitute a willful violation of the GCA." *Id.*  The March 2023 Public Safety Advisory thus effectively concedes that products like those ATF has *not* deemed to be firearms are "firearms" under the GCA.

132.    Upon information and belief, ATF will continue to provide ghost gun dealers with classification letters confirming that they may still make and sell 80 percent receivers and frames without abiding by the GCA's serial number, background check, and recordkeeping requirements.  In an interview with VICE News, one ghost gun dealer, Tactical Machining, stated that ATF "approved in writing" the company's ability to continue to sell unserialized 80 percent receivers so long as they did not sell the receivers bundled with jigs or tool kits.[146]

---

[146]  Keegan Hamilton, *A Simple Plastic Tool Is Undermining New Ghost Gun Rules*, VICE (Sept. 12, 2022), https://www.vice.com/en/article/epzb3a/ghost-gun-jig-tool ("'As we've been instructed, and our understanding here in

133.    Email discussions with ATF's counsel also confirm this understanding.  When asked whether 80 percent receivers could continue to be sold without serialization, background check, or recordkeeping requirements, Defendants referred Plaintiffs to a portion of the Final Rule stating that: "Companies that sell or distribute only unfinished frame or receiver billets or blanks, and not any associated jigs, templates, or similar tools to the same customer are not required to be licensed or to mark those articles with identifying information."[147]

134.    Defendants also directed Plaintiffs to two examples provided in the Final Rule— Example 1 and Example 4—illustrating circumstances under which the sale of a receiver blank would not be considered a frame or receiver.[148]  Both examples underscore that receiver blanks and jig and tool kits sold separately are not regulated as firearms under the GCA.  Example 1 states that a partially complete frame or receiver "sold, distributed, or possessed with a compatible jig or template" is a frame or receiver and thus, a firearm.  87 Fed. Reg. 24,739.  Example 4 states that an un-machined receiver that is "not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools" is *not* a receiver and thus, *not a firearm*.  *Id*.  But ghost gun consumers can easily and quickly machine receiver blanks so long as they have access to instructions for doing so and can purchase jigs, tool kits or CNC machines.  Indeed, that is the *entire point* of purchasing these products.  Unless and until ATF closes the Final Rule's loophole, unfinished ghost guns will continue to quickly proliferate and cause harm in communities across the country.

---

Orlando, the unfinished receiver, without a jig, instructions, or template is NOT A FIREARM,' Jusick's letter from the ATF said.  'The combination of such an item (unfinished receiver) with other parts (Excluding the Jig) does not reach the standard for Readily Convertible. In other words, your manufacture and selling of unfinished receivers with a lower parts kit does not meet the firearm threshold.'").

[147]  *See* Ex. 24, Email from Martin M. Tomlinson to Liesel N. Schapira (Sept. 3, 2022) (citing 87 Fed. Reg. 24,700).

[148]  *Id*.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

### E. ATF's Ghost Gun Actions Have Harmed and Will Continue to Harm Plaintiffs.

135.    ATF's final agency actions—including the Final Rule, the September 2022 Open Letter, the December 2022 Open Letter (to the extent it excludes categories of weapons that are firearms under the GCA), and the Post-Final Rule Classification Letters—have allowed and continue to allow ghost guns to proliferate, causing concrete injury to each of the named Plaintiffs.

136.    **State of California**.  Plaintiff State of California is an epicenter of the growing ghost gun epidemic.  As of 2020, the state was home to at least 18 of the then-estimated 80 current online ghost gun retailers—the most of any state—and more than double the number of retailers than existed in the State just six years before.[149]  As one of the states most affected by the proliferation of ghost guns, California has suffered, and will continue to suffer, concrete harm caused by ATF, including (1) significantly increased costs of policing and law enforcement; (2) interference with California's ability to enforce its laws with respect to firearms and firearm-related crime; and (3) harm to its quasi-sovereign interest in protecting the security and well-being of its residents.

137.    The proliferation of ghost guns increases the difficulty and costs of policing and law enforcement in California.  The California Department of Justice's Bureau of Firearms, which conducts enforcement investigations to confiscate firearms from prohibited persons, has documented an exponential increase in ghost gun seizures:  from 2015 to 2021, California's annual ghost gun seizures have increased from 26 to 12,388, representing a staggering 47,546% increase.[150]  This statistical evidence is consistent with the experience of California Bureau of Firearms agents in the field.[151]  As a result, in recent years, Bureau of Firearms staff have devoted an increasing amount of time providing training to law enforcement personnel statewide on ghost guns.  Given the insufficient

---

[149]  *See* Ex. 4 EVERYTOWN FOR GUN SAFETY, UNTRACEABLE: THE RISING SPECTER OF GHOST GUNS (May 14, 2020) at 12-14 (Everytown [for Gun Safety] undertook an investigation to better understand the size of the online marketplace for ghost guns and "uncovered a sample of 80 sellers offering unfinished frames and/or receivers for ghost guns."  According to Everytown's analysis of business registrations from these online sellers in 2020, approximately 18 were located in California.).

[150]  *See* Press Release, Attorney General of California, *Attorney General Bonta Announces Arrest Of Suspect With Illegal Ghost Guns, Machine Gun Kits, And Assault Weapons* (Oct. 7, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-arrest-suspect-illegal-ghost-guns-machine-gun.

[151]  *See State of Washington v. U.S. Dep't of State*, 2:20-cv-00111-RAJ (W.D. Wash. 2020), ECF No. 56 [Declaration of Blake Graham] ¶ 30.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

federal restrictions on 80 percent receivers and frames, this training has focused particularly on the circumstances in which the ghost guns assembled from such parts are noncompliant with state law.

138.    The California Department of Justice's Bureau of Investigation, which provides statewide expert investigative services combating multi-jurisdictional criminal organizations, has also noted a rise in ghost gun seizures in recent years.  In a 2022 multiagency operation, state and local law enforcement officers seized 58 firearms—including 12 ghost guns and ten assault weapons—in addition to cash and a variety of drugs in Central California.[152]  That operation resulted in a total of 88 felony arrests of individuals suspected of robberies, at least two homicides, and a host of other violent crimes.[153]  Similarly, in an ATF operation in April 2022, seven Los Angeles-area men were arrested and indicted for narcotics and ghost gun trafficking.[154]  With the methamphetamine and cocaine seized was a cache of more than 30 firearms, most of which were ghost guns and seven of which were automatic.[155]  These are just two examples of the many investigations in which state and federal law enforcement officers have seized ghost guns from persons involved in criminal activity in California.

139.    In addition, the transportation of untraceable firearms from other states into California makes California's local detective work solving crimes more difficult and amplifies the risk of violent attacks using these weapons.  Law enforcement agencies in California have reported recovering ghost guns at dramatically increased rates—including, most notably, a 7,225% increase from 2015 to 2021 in Santa Clara County, home of San Jose.[156]  In January 2020, the ATF special agent in charge of the Los Angeles Field Division stated that 41% of the Los Angeles Field Division's cases have involved

---

[152]  Press Release, Attorney General of California, *Attorney General Bonta Announces 90 Arrests as Part of a Multiagency Gang Takedown In Stockton* (June 2, 2022), https://oag.ca.gov/news/press-releases/attorney-general-bonta-announces-90-arrests-part-multiagency-gang-takedown.

[153]  *Id.*

[154]  Richard Winton, *Seven Men Charged With Gun Trafficking in Inland Empire, 'Ghost Guns' Among 30 Firearms Seized*, L.A. TIMES (Apr. 13, 2022), https://www.latimes.com/california/story/2022-04-13/gun-trafficking-charges-inland-empire-ghost-guns-seized.

[155]  *Id.*

[156]  Eli Wolfe, *UPDATE: San Jose Approves Ban On Ghost Guns*, SAN JOSE SPOTLIGHT (May 10, 2022), https://sanjosespotlight.com/san-jose-city-council-considers-banning-ghost-guns-homemade-firearms-weapons/.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-143**

ghost guns.[157]  He further noted that "[i]t concerns me as a law enforcement official that someone with rudimentary or basic skills can mass produce untraceable firearms in the comfort of their own home."[158]  California's law enforcement officers have good reason to be concerned.  In June 2019, a gunman used two self-assembled AR-15-style assault rifles to ambush Officer Tara O'Sullivan and her training officer, killing O'Sullivan.[159]  Two months later, a convicted felon—who would have been unable to legally purchase a firearm—used a semiautomatic ghost rifle to shoot three California Highway Patrol officers, killing Officer Andre Moye.[160]

140.    California's ghost gun epidemic has only worsened since those killings.  During the first half of 2021, the Los Angeles Police Department reported a nearly 300% increase in ghost gun seizures as compared to the same period in 2020.[161]  When compared to the rest of the United States, the urgency of California's ghost gun problem becomes clearer still:  in 2020, 65% of all ghost guns seized by ATF were seized in California.[162]  As ghost guns become more widespread, California's law enforcement personnel are forced not only to devote additional time and resources to solve or deter ghost gun-related crimes, but also to confront an ever-growing threat to their personal safety.

141.    ATF's refusal to regulate the sale of 80 percent receivers and frames has also required California to repeatedly take legislative action to attempt to close this deadly loophole.  California has constructed a comprehensive regulatory regime to protect its citizens from the dangers posed by firearms, including regulations that ensure that firearms sales and transfers are overseen by licensed firearms dealers, prohibit classes of dangerous people from possessing firearms, and prohibit the manufacture and possession of military-style firearms and large capacity magazines.  First, in 2016,

---

[157]  Brandi Hitt, *'Ghost Guns' Investigation:  Law Enforcement Seeing Unserialized Firearms on Daily Basis in SoCal*, ABC7 (Jan. 30, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits/5893043.

[158]  *See* Brandi Hitt, *Orange County Lawyer Faces Federal Charges, Accused of Selling 'Ghost Guns'*, ABC7 (Feb. 20, 2020), https://abc7.com/ghost-guns-california-gun-laws-kits-melinda-romines/5950623.

[159]  Sam Stanton, *Murder Charge Filed Against Adel Ramos In Death Of Sacramento Officer Tara O'Sullivan*, SACRAMENTO BEE (June 21, 2019), https://www.sacbee.com/news/local/article231840593.html.

[160]  Richard Winton & Mark Puente, *Rifle Used In Deadly Riverside Shooting Was Untraceable 'Ghost Gun,' Sources Say*, L.A. TIMES (Aug. 14, 2019), https://www.latimes.com/california/story/2019-08-14/rifle-used-in-deadly-riverside-shooting-was-untraceable-ghost-gun-sources-say.

[161]  Justin Ray, *'An Instrument Of Death': The Problem Of Ghost Guns In California*, L.A. TIMES (Nov. 15, 2021), https://www.latimes.com/california/newsletter/2021-11-15/ghost-guns-california-essential-california.

[162]  *Id.*

California enacted legislation requiring a self-assembled firearm to be engraved or permanently affixed with a unique serial number provided by the California Department of Justice, and requiring anyone in possession of an unserialized firearm to apply to the Department to serialize the firearm.[163] Then, in 2019, California enacted legislation to regulate ghost guns and the sale of 80 percent receivers and frames. Specifically, A.B. 879 required the sale of unfinished frames and receivers used to assemble ghost guns to be conducted through licensed dealers, pursuant to a California-only background check and sale record.[164]

142. California accelerated efforts to implement A.B. 879 due in part to the role of ghost guns in the tragic deaths of law enforcement officers Tara O'Sullivan and Andre Moye. In the wake of these devastating incidents, the Legislature approved $5.9 million in 2020-21 and $8.3 million in 2021-22 for the California Department of Justice's Bureau of Firearms and California Justice Information Services to retain additional staff and enhance the Department's existing background check systems.[165] These expenditures would have allowed the Department to implement A.B. 879 beginning July 1, 2022—three years earlier than originally planned.[166]

143. Then, informed by "continued" tragic ghost gun events that "caused enormous harm and suffering," California enacted A.B. 1621 just one day before A.B. 879 was to take effect.[167] A.B. 1621—which builds on the goals of much of A.B. 879—followed a flurry of ghost gun bans enacted by California's cities and localities and takes a comprehensive approach to regulating ghost guns. The new law extends preexisting law requiring serialization of unserialized firearms and greatly expands the definition of firearm precursor parts to include "any forging, casting, printing, extrusion, machined body or similar article [1] that has reached a stage in manufacture where it may readily be completed, assembled or converted to be used as the frame or receiver of a functional firearm, or [2] that is

---

[163] A.B. 857, adding CAL. PENAL CODE § 29180 (2019).

[164] A.B. 879 (Cal. 2019), amending CAL. PENAL CODE §§ 16170, 18010, 27585, and 30400, and adding §§ 16351 and 16352 (2019).

[165] S.B. 74 (Cal. 2020) (including referenced funding in item 0820-001-0001).

[166] S.B. 118 (Cal. 2020).

[167] A.B. 1621 (Cal. 2022).

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-145**

*marketed or sold to the public* to become or be used as the frame or receiver of a functional firearm once completed, assembled or converted."[168]

144. Under A.B. 1621, the sale or transfer of a firearm precursor part is generally prohibited, and anyone who currently possesses a firearm precursor part must apply to the California Department of Justice for a serial number for the part (in addition to requesting a serial number before self-manufacturing a firearm).[169] However, completed frames and receivers, as well as parts that are considered to be a firearm under the Final Rule, are treated as firearms (i.e. they may generally only be sold or transferred by a licensed firearm dealer after a background check).[170] Thus, under A.B. 1621, firearm parts that fall outside the scope of the Final Rule may no longer be sold or purchased in California and must be serialized. A.B. 1621 will require the California Department of Justice's Bureau of Firearms and California Justice Information Services to expend additional resources to implement the law.

145. ATF's final agency actions legalizing the sale of 80 percent frames and receivers at the federal level without these safeguards not only conflict with California's policies, but also threaten to disrupt California's carefully crafted regulatory scheme: when these items can be manufactured and sold in states across the country, and untraceable firearms can be made without consequences, ghost guns and the myriad dangers that attend them flow more freely across California's borders. ATF's actions thus frustrate the compelling ends served by California's firearms regulations.

146. Ghost guns built from 80 percent receivers and frames also threaten California's interest in protecting the security and well-being of its residents from untraceable weapons. The sale of these components enables Californians with criminal intent to obtain from outside the state firearms that they would otherwise be legally barred from purchasing in California—increasing the likelihood of gun violence and gun-related crime in California. Moreover, law enforcement must expend resources proactively monitoring California's borders to attempt to prevent 80 percent receivers and frames sold legally in other states from crossing into California.

---

[168] CAL. PEN. CODE § 16531(a) (2020) (emphasis added).

[169] CAL. PEN. CODE §§ 29180, 30400 (2020).

[170] CAL. PEN. CODE §§ 16519, 16520, 30400 (2020).

147.     On November 14, 2019, a student at Saugus High School in Santa Clarita, California allegedly used a .45-caliber semiautomatic ghost gun to kill two students and injure three others before fatally shooting himself.[171]  According to the United States Secret Service, the Saugus High School shooter was the youngest mass attacker in 2019.[172]  The two victims killed during the Saugus shooting were 15-year-old Gracie Anne Muehlberger, Plaintiff Bryan Muehlberger's daughter, and 14-year-old Dominic Blackwell, Plaintiff Frank Blackwell's son.[173]  Given the shooter's age, he would not have been able to legally obtain a "firearm," as defined under the GCA.  In addition, the shooter's deceased father was reportedly a gun enthusiast from whom law enforcement had seized more than 40 firearms after a series of incidents that led to him becoming disqualified from possessing firearms.  But despite being deemed unfit to own a firearm, authorities suspect the father turned to ghost guns—one of which landed in the hands of his underage son, the Saugus school shooter.[174]  When law enforcement searched the boy's home after the Saugus shooting, they found a collection of unregistered firearms,[175] including a gun assembled from a kit.[176]

148.     In April 2021, a man prohibited from possessing firearms used a ghost gun as he went on a rampage in San Diego's Gaslamp Quarter.[177]  The violence began after the shooter allegedly randomly targeted and executed 28-year-old Justice Boldin, a parking valet.  The shooter then confronted and shot four others "completely unprovoked," inflicting life-threatening injuries upon two

---

[171]  Dakin Andone, *The Gunman In The Saugus High School Shooting Used A 'Ghost Gun,' Sheriff Says*, CNN (Nov. 21, 2019), https://www.cnn.com/2019/11/21/us/saugus-shooting-ghost-gun/index.html

[172]  U.S. SECRET SERVICE NATIONAL THREAT ASSESSMENT CTR., MASS ATTACKS IN PUBLIC SPACES – 2019, at 13 (Aug. 2020), https://www.secretservice.gov/sites/default/files/reports/2020-09/MAPS2019.pdf.

[173]  Elizabeth Chou, *Hundreds Attend Memorial Service For Gracie Anne Muehlberger, 15, Killed In Saugus School Shooting*, LOS ANGELES DAILY NEWS (Nov. 23, 2019), https://www.dailynews.com/2019/11/23/celebration-of-life-set-for-gracie-anne-muehlberger-killed-in-saugus-school-shooting-in-santa-clarita/.

[174]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

[175]  Richard Winton, *Santa Clarita Shooting: Weapon Used In Saugus High Attack A 'Ghost Gun,' Sheriff Says*, L.A. TIMES (Nov. 21, 2019), https://www.latimes.com/california/story/2019-11-15/santa-clarita-shooting-teen-girls-wounded-at-saugus-high-school-recovering-suspect-in-critical-condition.

[176]  Dakin Andone, *supra* note 171.

[177]  Dennis Romero, Wilson Wong, & Bill Feather, '*Ghost Gun' Used in Random San Diego Shooting That Killed 1, Injured 4, Police Say*, NBC NEWS (Apr. 23, 2021), https://www.nbcnews.com/news/us-news/1-dead-4-injured-san-diego-shootings-suspect-arrested-n1265034.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-147**

men, at least one of whom would have died but for the efforts of a former combat medic who happened to be nearby.[178]

149.    This past February, a man used an AR-15-style ghost gun to shoot and kill his three daughters, their court-ordered chaperone, and himself at a Sacramento church.[179]  The shooter—who was subject to an involuntary mental health hold as recently as April 2021 and an ongoing domestic violence restraining order, and who was out on bail for charges including resisting arrest and battery of a police officer—was barred from possessing firearms.[180]  Nevertheless, the shooter was able to acquire a ghost gun and an illegal 30-round magazine and to use them to devastating effect during what should have been an ordinary supervised visitation.  His daughters were 13, ten, and nine years old.[181]

150.    The more 80 percent receivers and frames legally produced and the more ghost guns that are made, the more likely it is that people prohibited from gun ownership will be able to use firearms to commit crimes in California, implicating the security and well-being of California residents.

---

[178]  *Id.*

[179]  AP, *Investigators: Father Armed With Ghost Gun During Church Slaying of Daughters*, CBS NEWS (Mar. 6, 2022), https://www.cbsnews.com/sanfrancisco/news/investigators-father-armed-with-ghost-gun-during-church-slaying-of-daughters/.

[180]  *Id*.

[181]  *Id*.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

**ER-148**



**Image 19:  Ghost Gun Used in the Saugus High School Shooting[182]**

151.  **Bryan Muehlberger.**  Plaintiff Bryan Muehlberger is the father of a victim of fatal ghost gun violence.  Mr. Muehlberger lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County.  On November 14, 2019, Mr. Muehlberger received a call that his daughter, 15-year-old Gracie Anne Muehlberger, had been shot and killed in a shooting at Saugus High School.  Gracie was only 14 weeks into her high school career when her life was tragically taken.  The Saugus High School shooter opened fire on his classmates using a ghost gun that law enforcement officials believe he obtained from his father, who was legally prohibited from owning and possessing firearms.  Gracie and a fellow student, 14-year-old Dominic Blackwell, were murdered in the attack, while three other students were injured.  The attacker did not know Gracie or any of the other victims, all of whom were in the wrong place at the wrong time.  Gracie was shot one time in the back—the ghost gun was fired at point blank range, penetrating Gracie's backpack, entering her back, and ultimately puncturing her left lung before exiting through her left breast.  She dropped to the ground immediately, where she not only could not breathe due to the collapse of her left lung, but where she also drowned rapidly in her own blood, which filled her chest cavity completely.  Gracie likely suffered in pain for a minute or two before succumbing to her life-ending injury.

152.  Particularly following his daughter's death, Mr. Muehlberger lives in acute fear of ghost gun violence.  Mr. Muehlberger is especially vulnerable to the threat of ghost guns because Los Angeles County, where Mr. Muehlberger lives and works, has a significant and growing rate of ghost gun possession and violence.  In 2021, the Los Angeles Police Department announced that ghost guns

---

[182]  Ex. 5, Bill Whitaker, Ghost Guns: The Build-It-Yourself Firearms that Skirt Most Federal Gun Laws and Are Virtually Untraceable.

"accounted for 33 percent of all guns recovered by the department" and that "the number of ghost guns seized by the department increased 400 percent since 2017 and more than doubled from 2020 to 2021 alone."[183]

153.    Mr. Muehlberger's fear of ghost gun violence is a direct and reasonable response to the increased risk of violence he faces as a result of the proliferation of these untraceable weapons in the area he lives and works. Mr. Muehlberger works in Santa Monica, the same city where a shooter used a ghost gun to kill five people in 2013.[184] At the time of the Santa Monica shooting, Mr. Muehlberger was at his office, mere minutes from the scene of the crime. Because he drives through neighborhoods highly impacted by gun violence each day on his way to and from work, Mr. Muehlberger has become very cautious about getting into confrontations with strangers, fearing that those individuals may be carrying unregistered and dangerous ghost guns.

154.    Mr. Muehlberger has two other children; both recent graduates of Saugus High School. Mr. Muehlberger's sons are no strangers to the threat of gun violence: in addition to losing their sister in the Saugus High School ghost gun shooting, Mr. Muehlberger's older son experienced a school lockdown during his junior year at Saugus, after a fellow student threatened the use of a firearm. Mr. Muehlberger constantly worries that they, too, could become victims of ghost gun violence. When his sons spend time together or are in the same place at the same time, Mr. Muehlberger worries that he could lose both of them at once, were a dangerous individual to open fire with a ghost gun. Mr. Muehlberger's fear and anxiety is especially acute when he hears helicopters and ambulances, sounds which immediately bring him back to the moment he learned that his only daughter was shot and killed by a shooter using a ghost gun. Because of the grief he continues to experience following Gracie's death, and because of his fear surrounding his sons' safety, Mr. Muehlberger undergoes regular therapy to assist him in processing his ongoing trauma.

155.    Mr. Muehlberger's acute and ongoing fear of ghost gun violence is directly attributed to ATF's classifications of these weapons as not being "firearms" subject to the GCA. Were these

---

[183]  A.B. 1621 (Cal. 2022).

[184]  Stan Wilson, Josh Levs & Michael Martinez, *Santa Monica Shooting Victim Dies, Bringing Toll To 5*, CNN (June 9, 2013), https://www.cnn.com/2013/06/09/justice/california-college-gunman.

guns not generally available—particularly to prohibited purchasers or people who can access them without background checks—Mr. Muehlberger would not need to fear the ongoing risk of violence caused by ghost guns. ATF's failure to adequately regulate ghost guns has allowed the legal sale of untraceable 80 percent receivers and frames and has facilitated a rampant market for ghost guns that still plagues Southern California, where Mr. Muehlberger lives and works. ATF's statements about the Final Rule suggest that the agency will continue issuing precisely the kinds of Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items. Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Muehlberger and his family. If ATF adequately regulated 80 percent receivers and frames as firearms, ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by individuals like Mr. Muehlberger would be significantly reduced. Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms could be traced.

156. **Frank Blackwell.** Plaintiff Frank Blackwell is the father of a victim of fatal ghost gun violence. Mr. Blackwell lives in Santa Clarita, California, a city in Los Angeles County, and works in Los Angeles County. On November 14, 2019, Mr. Blackwell's son, 14-year-old Dominic Blackwell, was shot and killed by the same shooter at Saugus High School who murdered Gracie Anne Muehlberger.

157. Particularly following his son's death, Mr. Blackwell fears the threat of future violence committed with ghost guns. Mr. Blackwell's fear is a direct and reasonable response to the particular vulnerability to ghost gun violence that he faces as a result of living and working in Los Angeles County—where ghost gun possession and violence have been increasing exponentially. Because Mr. Blackwell is aware of the spread of ghost guns in Los Angeles County resulting from ATF's position on 80 percent receivers and frames, and has directly experienced the grave harm caused by ghost guns, he often fears that individuals that he and his family encounter in places like restaurants and coffee shops may be in possession of ghost guns.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

158.     In addition to Dominic, Mr. Blackwell has three children—one of whom currently attends Saugus High School.  Mr. Blackwell often worries that they, too, may become victims of ghost gun violence.  Mr. Blackwell experiences ongoing trauma, grief, and suffering as a result of Dominic's death at the hands of a shooter using a ghost gun and his ongoing fear for his other children's safety. Mr. Blackwell regularly attends therapy to assist him in processing this trauma.

159.     Mr. Blackwell's acute and ongoing fear of ghost gun violence is directly attributed to ATF's classifications of these weapons as not being "firearms" subject to the GCA.  Were these guns not generally available—particularly to prohibited purchasers or people who can access them without background checks—Mr. Blackwell would not need to fear the ongoing risk of ghost gun violence. ATF's failure to adequately regulate ghost guns has allowed the legal sale of untraceable 80 percent receivers and frames and has facilitated a rampant market for ghost guns that now plagues Southern California, where Mr. Blackwell lives and works.  ATF's statements about the Final Rule suggest that the agency will continue issuing precisely the kinds of Classification Letters that allow the legal sale of ghost gun components and cause manufacturers to continue producing these dangerous items. Together, ATF's actions allow 80 percent receivers and frames to enter the stream of commerce and become the ghost guns that threaten the lives of individuals like Mr. Blackwell and his family.  If ATF regulated 80 percent receivers and frames as firearms, ghost gun components could not legally be purchased by those ineligible to possess firearms, and the risk of violence faced by Mr. Blackwell would be significantly reduced and his fears, anxiety, and stressed ameliorated.  Dangerous people who cannot legally purchase a firearm would have more difficulty obtaining one, and would-be violent criminals could be deterred by the knowledge that their firearms can be traced.

160.     **Giffords Law Center.**  Plaintiff Giffords Law Center's core mission is to save lives from gun violence by shifting culture, changing policies, and challenging injustice.  ATF's arbitrary, capricious, and unlawful stance on ghost guns directly affects Giffords Law Center's interests and mission by permitting the proliferation of untraceable firearms that can be purchased by prohibited and dangerous persons and without any background check.  Giffords Law Center's ability to save lives is inhibited on a daily basis as a result of ATF's approval of the sale of ghost guns.  That ghost gun sales are unregulated requires Giffords Law Center to expend a substantial portion of its budget and

substantial human capital and resources to educate the public and combat the violence ghost guns cause. Addressing ghost guns and the violence they facilitate is currently among the organization's top policy and legislative priorities: in recent years, Giffords Law Center has contributed technical assistance to or monitored and analyzed over 100 state and federal bills pertaining to ghost guns. Giffords Law Center has also launched a series of specific ghost gun initiatives, including drafting proposed legislation, publishing white papers, and helping produce videos and other educational materials for the public.

161. ATF's actions on ghost guns have required Giffords Law Center to expend more resources and staff time because ATF's regulatory approach undermines every other firearm policy that Giffords Law Center advocates for. This includes the organization's core policy platform of supporting background check and licensing laws at the federal and state level. Background check laws and other efforts to ensure firearms are legally and responsibly possessed are impeded and undermined by ATF's choice to create a loophole by which buyers can evade all otherwise applicable firearm sales regulations. This loophole has forced Giffords Law Center to redouble its violence prevention efforts and direct even more resources into addressing gun violence even in states with strong firearm laws, like the organization's home state of California. Increasingly, these expenditures have come in the form of legal action, as co-counsel or an amicus in lawsuits seeking to vindicate state firearm laws and to protect Americans. In addition to this action, Giffords Law Center has, as pro bono counsel to the San Francisco District Attorney, joined the California Attorney General and San Francisco District Attorney in a lawsuit against ghost gun retailers—*see People v. Blackhawk Manufacturing Group, Inc.*, No. CGC-21-594577 (S.F. Sup. Ct. Oct. 13, 2021)—and filed an amicus brief in a case, like this one, challenging ATF's action on ghost guns.[185] *See Syracuse v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 1:20-cv-06885-GHW (S.D.N.Y. Jan. 2, 2021).[186] Giffords Law Center has made this issue an urgent priority based on the fact that, in California, for example, ghost guns range from

---

[185] Glenn Thrush, *San Francisco Sues Three Online Retailers For Selling 'Ghost Guns,'* N.Y. TIMES (Aug. 18, 2021) https://www.nytimes.com/2021/08/18/us/sf-ghost-guns.html.

[186] *Syracuse v. ATF: Challenging the ATF's Classification of Ghost Guns*, GIFFORDS L. CTR. (Dec. 12, 2020), https://giffords.org/lawcenter/amicus-brief/syracuse-v-atf-challenging-the-atfs-classification-of-ghost-guns/.

25 to 50% of all crime guns recovered—representing one of the single most dangerous loopholes undermining the state's laws.[187] Every day, more lives are lost to ghost guns despite Giffords Law Center's increased efforts and resource expenditures.

162.    In addition to its legislative and legal work, Giffords Law Center provides policy expertise and technical assistance in support of violence intervention programs in communities disproportionately impacted by gun violence and ghost gun violence.  Giffords Law Center also frequently partners with community-based organizations that provide direct support services to victims of gun violence.  While these intervention efforts have contributed to dramatic reductions in gun violence in cities such as Oakland, California in recent years, many of these cities are also experiencing a surge in the numbers of ghost guns recovered, meaning all of these hard-fought gains in community safety are being compromised by ATF's actions.  The risk of increased ghost gun violence and ATF's failure to regulate ghost gun sales have therefore contributed to increased expenditure of human and financial capital and resources by Giffords Law Center toward work supporting violence intervention programs and violence reduction work by community-based organizations.  In sum, ATF's actions have forced Giffords Law Center to adjust many of its organizational priorities and divert substantial resources to combat ghost guns and resulting violence.

163.    **Statutory standing**.  The interests of all named Plaintiffs—the State of California, Bryan Muehlberger, Frank Blackwell, and Giffords Law Center are within the zone of interests protected by the GCA.  In enacting the GCA, Congress found that the "ease with which any person can acquire firearms . . . is a significant factor in the prevalence of lawlessness and violent crime in the United States."  Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. No. 90-357, § 901(a)(2), 82 Stat. 197, 225.  All named Plaintiffs allege injury involving the increased likelihood of violent crime that ATF's actions have caused.  Therefore, all named Plaintiffs allege harm to interests within the zone of interests that the GCA protects.

---

[187]   Glenn Thrush, *'Ghost Guns': Firearm Kits Bought Online Fuel Epidemic Of Violence*, N.Y. TIMES (Jan. 26, 2022), https://www.nytimes.com/2021/11/14/us/ghost-guns-homemade-firearms.html.

**CLAIMS FOR RELIEF**

**COUNT ONE:  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
ATF's Ghost Gun Actions Are Not in Accordance with Law.**

164.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

165.    Individually and collectively, ATF's ghost gun determinations—including (i) the Final Rule, (ii) the Post-Final Rule Classification Letters, and (iii) additional explanatory materials interpreting the Final Rule, including the September 2022 Open Letter; the December 2022 Open Letter; the August 26, 2022 YouTube video and informational slide-deck, and the Ghost Gun Guidance—constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.[188]

166.    In the alternative, individually and collectively, ATF's ghost gun determinations implemented before the Final Rule took effect on August 24, 2022—including (i) pre-Final Rule Classification Letters, (ii) Ruling 2015-1, and (iii) the Ghost Gun Guidance—constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

167.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . not in accordance with law."  *Id.* § 706(2)(A).

168.    ATF's ghost gun determinations are "not in accordance with law" because they disregard the GCA.  The GCA provides that "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or ***is designed or may readily be converted*** to expel a projectile by the action of an explosive;" and includes "(B) ***the frame or receiver of any such weapon***."  18 U.S.C. § 921(a)(3) (emphases added).  Namely, unfinished 80 percent receivers and frames—sold as part of an assembly kit, with associated templates, or alone—fall within the statutory definition of firearms subject to the GCA's requirements.  They are "designed" to be "readily converted" into firearms, as is evident from their design and marketing, which emphasizes how "easy" it is for even a novice to use the "world's

---

[188] Defendants have agreed to produce to Plaintiffs any Classification Letter issued up to 30 days before summary judgment briefing begins in this case.  Plaintiffs reserve the right to challenge any subsequently produced Classification Letters.

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

fastest jig" to complete an 80% lower "in *under 30 minutes*."[189]  Yet 80 percent receivers and frames may still be purchased without serial numbers and background checks, in direct violation of the GCA, as a result of ATF's determinations.

169.    ***The Final Rule.***  ATF's Final Rule contravenes the plain text of the GCA.  Although it recognizes that 80 percent frames and receivers, when sold with jigs tool kits or other materials, are firearms under the GCA, ATF fails to acknowledge that an 80 percent receiver, whether sold with or without other products, is "readily convertible" to a fully functional weapon.  Any buyer can easily and legally purchase, without serialization or background check safeguards, an 80 percent receiver in one transaction and a jig or tool kit in another.  Or consumers can purchase machines to automate the conversion process in minutes.  Even a novice can "readily convert[]" an 80 percent component into a fully functioning firearm in hours or minutes.  Such receivers are therefore "firearms," and the Final Rule's failure to classify them as such conflicts with the GCA.

170.    ***Post-Final Rule Classification Letters***.  In at least 23 Classification Letters issued since the Final Rule took effect, ATF classified a partially complete frame or receiver that can be "readily converted" into a fully functioning weapon as not a firearm.  These products  are "firearms" under the plain text of the GCA.  ATF's exclusion of these products from the definition of "firearm" conflicts with the GCA.

171.    ***September 2022 Open Letter.***  ATF's September 2022 Open Letter reaffirms portions of the Final Rule that contravene the plain text of the GCA.  In the letter, ATF concludes based on its legally flawed machining analysis that "a partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity" is not a "frame or receiver" or "firearm." Ex. 23 at 1.  Because even a novice can "readily convert[]" a partially complete AR-type receiver into a fully functioning firearm, such receivers ***are*** "firearms."  ATF's exclusion of these products from the definition of "firearm" conflicts with the GCA.

172.    ***December 2022 Open Letter.***  In its December 2022 Open Letter, ATF concludes that, pursuant to the Final Rule, "partially complete Polymer80, Lone Wolf, and similar striker-fired

---

[189] *See, e.g.*, *Easy Jig Gen 3 Multi-Platform – AR-15, AR-9 And .308 80% Lower Ji*g, 80 PERCENT ARMS, https://www. 80percentarms.com/products/easy-jig-gen-3-multi-platform-ar-15-ar-9-and-308-80-lower-jig/ (last visited Oct. 11, 2022).

semiautomatic pistol frames . . . have reached a stage of manufacture where they 'may readily be completed, assembled, restored, or otherwise converted' to a functional frame," and are therefore firearms, "*even without* any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials." Ex. 25 at 1. The December 2022 Open Letter conflicts with the GCA to the extent it fails to include or extend to other categories of similar weapons, such as partially complete hammer-fired pistol frames, that are just as readily convertible into fully functional firearms. ATF's exclusion of these materially identical products from the definition of "firearm" conflicts with the GCA.

173. ***Pre-Final Rule Classification Letters, Ruling 2015-1, Ghost Gun Guidance.*** In the alternative, and to the extent the Final Rule is vacated, altered, or amended at any point, ATF's determinations reflected in its pre-Final Rule Classification Letters to Polymer80, Ruling 2015-1, and the Ghost Gun Guidance similarly disregard the GCA.

174. Each of the products in the pre-Final Rule Classification Letters constitutes a "firearm" under the plain text of the GCA. For example, the 2017 Polymer80 Letter states that the 80 percent receiver in question was not "sufficiently complete" because of the "machining operations" that were yet to be "completed." But at least one retailer of the 80 percent receiver at issue in the 2017 Polymer80 Letter markets it with the statement "***[i]t's amazing to think in just 10–15 minutes you can have a fully functioning Glock that you made at home.***"[190] It is difficult to conceive of what might possibly be "readily" converted to expel a projectile within the meaning of the GCA if an 80 percent receiver that requires only 10–15 minutes of labor does not. Similarly, consumers have reported that the product addressed in the November 2015 Polymer80 Letter could be converted into a fireable weapon in an hour or two. As one consumer said, it "[r]eally is that easy."[191] And the product addressed in the February 2015 Polymer80 letter was expressly advertised as "incredibly simple to drill and mill, and the material is forgiving."[192] Ruling 2015-1 and the Ghost Gun Guidance are no different; each permits products that are "***designed or may readily be converted*** to expel a

---

[190] *See supra* note 4.

[191] *See supra* note 105.

[192] *See* Polymer80 *80% Receiver and Jig Kit (AR-15),* 80% LOWERS, https://www.80-lower.com/products/Polymer80-lower-receiver-and-jig-kit-ar-15/ (last visited Oct. 19, 2022).

projectile" to be sold as *non*-firearms exempt from the GCA's requirements.  18 U.S.C. § 921(a)(3) (emphasis added).

175.    Plaintiffs have been and will continue to be impacted and injured by ATF's ghost gun determinations because, among other reasons, the firearms assembled from 80 percent receivers and frames have been used and in the future will be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff California and that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence.

**COUNT TWO:  Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A):
ATF's Ghost Gun Actions Are Arbitrary and Capricious.**

176.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

177.    Individually and collectively, ATF's ghost gun determinations—including (i) the Final Rule, (ii) the Post-Final Rule Classification Letters, and (iii) additional explanatory materials interpreting the Final Rule, including the September 2022 Open Letter; the December 2022 Open Letter; the August 26, 2022 YouTube video and informational slide-deck; and the Ghost Gun Guidance—constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

178.    In the alternative, individually and collectively, ATF's ghost gun determinations implemented before the Final Rule took effect on August 24, 2022—including (i) the Pre-Final Rule Classification Letters, (ii) Ruling 2015-1, and (iii) the Ghost Gun Guidance—constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

179.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusion found to be . . . arbitrary, capricious, an abuse of discretion."  *Id.* § 706(2)(A).

180.    The Final Rule arbitrarily deems as firearms only those 80 percent receivers and frames sold in kits or alongside jigs, templates, or similar aids, leaving 80 percent receivers and frames sold separately wholly unregulated.  This arbitrary line leaves open obvious and easily navigable loopholes

that run counter to the GCA's basic commands.  ATF's Final Rule is, therefore, arbitrary and capricious.

181.    Moreover, ATF's approval of the unregulated manufacture and sale of 80 percent receivers and frames used to build ghost guns "entirely fail[s] to consider an important aspect of the problem" that ATF was purporting to regulate.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  ATF has acknowledged serious problems with the current regulatory landscape, *see supra* ¶ 12, yet has failed to consider the ways in which the Final Rule will not abate those problems and may even contribute to the proliferation of untraceable firearms that impose costs across the country, including to the State of California and its law enforcement officers, Plaintiffs Bryan Muehlberger, Frank Blackwell, and other victims of ghost gun violence, and organizations expending limited resources to combat rising ghost gun violence, like Plaintiff Giffords Law Center.  ATF has also failed to consider that 80 percent receivers and frames may be easily and legally purchased separate from an assembly kit.

182.    ATF's post-Final Rule ghost gun determinations are also arbitrary and capricious.  The Post-Final Rule Classification Letters, the September 2022 Open Letter, and the December 2022 Open Letter (which leaves major categories of 80 percent frames and receivers unregulated) rely on ATF's legally flawed machining analysis and fail to consider important aspects of the ghost gun problem.

183.    Alternatively, should the Final Rule be vacated, altered, or amended at any point, ATF's ghost gun actions, including its pre-Final Rule Classification Letters, Ruling 2015-1, and Ghost Gun Guidance, constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

184.    Because they are contrary to the GCA and because of ATF's failure to consider "important aspect[s] of the problem," ATF's ghost actions are arbitrary and capricious.

185.    Plaintiffs have been and will continue to be impacted and injured by ATF's ghost gun determinations because, among other reasons, the firearms assembled from 80 percent receivers and frames have been and will continue to be used in connection with criminal activity that undermines the legitimate regulatory and law enforcement interests of Plaintiff State of California and

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

that has harmed and will foreseeably cause future harm to Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiffs respectfully request that the Court enter an order and judgment:

a. Declaring that 80 percent receivers and frames are "firearms" under the GCA, even when sold without a kit, template, or other materials, because they are "designed to" *and* "may readily be converted" into functional firearms with ease, *see* 18 U.S.C. § 921(a)(3);

b. Declaring null and void, with no force and effect, the portions of ATF's Final Rule, August 26, 2022 YouTube video and informational slide-deck, and Ghost Gun Guidance providing that 80 percent receivers and frames are not "firearms" under the GCA unless sold with a kit, template, or other materials;

c. Declaring null and void, with no force and effect, the Post-Final Rule Classification Letters providing that certain standalone 80 percent receivers and frames are not "firearms" under the GCA;

d. Declaring null and void, with no force and effect, the September 2022 Open Letter providing that certain standalone 80 percent receivers are not "firearms" under the GCA;

e. Declaring arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) the portions of ATF's Final Rule, the Post-Final Rule Classification Letters, the September 2022 Open Letter, the August 26, 2022 YouTube video and informational slide-deck, and the Ghost Gun Guidance providing that 80 percent receivers and frames are not "firearms" under the GCA unless sold with a kit, template, or other materials;

f. Declaring arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) the December 2022 Open Letter insofar as it excludes categories of ghost gun products that fall within the GCA's definition of "firearm";

g. In the alternative, declaring null, void, and with no force and effect ATF's pre-Final Rule Classification Letters, Ruling 2015-1, and the Ghost Gun Guidance finding that 80 percent receivers and frames are not "firearms" under the GCA;

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE NO. 3:20-CV-06761-EMC

h. In the alternative, declaring arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) ATF's pre-Final Rule Classification Letters, Ruling 2015-1, and the Ghost Gun Guidance finding that 80 percent receivers and frames are not "firearms" under the GCA;

i. Preliminarily and permanently enjoining Defendants from implementing and enforcing any agency action, decision, or guidance providing that 80 percent receivers and frames are not "firearms" under the GCA;

j. Awarding Plaintiffs their reasonable costs, including attorneys' fees, in bringing this claim;

k. Granting such other and further relief as this Court deems just and proper.

*Dated:* September 7, 2023 /s S. Clinton Woods

ROB BONTA
Attorney General of California
THOMAS S. PATTERSON
Senior Assistant Attorney General
R. MATTHEW WISE, SBN 238485
Supervising Deputy Attorney General
S. CLINTON WOODS, 246054
Deputy Attorney General
Clint.Woods@doj.ca.gov
455 Golden Gate Ave,
Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 510-3807
Facsimile: (415) 703-5843

*Attorneys for Plaintiff State of California, by and through Attorney General Rob Bonta*

/s Scott A. Edelman

GIBSON, DUNN & CRUTCHER LLP
SCOTT A. EDELMAN, SBN 116927
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
sedelman@gibsondunn.com
Telephone: (310) 357-8061
Facsimile: (310) 552-7041

LEE R. CRAIN, *pro hac vice*
ERICA PAYNE, *pro hac vice*
LIESEL SCHAPIRA, *pro hac vice*
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

*/s Avi Weitzman*

PAUL HASTINGS LLP
AVI WEITZMAN, *pro hac vice*
aviweitzman@paulhastings.com
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

*Attorneys for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to Prevent
Gun Violence*

*/s David M. Pucino*

GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
DAVID M. PUCINO, *pro hac vice*
223 West 38th St. # 90
New York, NY 10018
Telephone: (917) 680-3473

*Attorney for Plaintiffs Bryan Muehlberger,
Frank Blackwell, and Giffords Law Center to Prevent
Gun Violence*

SUPPLEMENTAL FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CASE
NO. 3:20-CV-06761-EMC



# EXHIBIT 6

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 164 of 294
Case 3:20-cv-06761-EMC  Document 177-6  Filed 09/07/23  Page 2 of 3
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 10 of 70



- 3 MAY 1983

CHARLETT:ddw,4-28-83

cc: SAC Office

FBA Office

C:F:TK:CHB
7540

Mr. Henry A. Roehrich
SGW, Incorporated
624 Old Pacific Highway SE
Olympia, Washington 98503

Dear Mr. Roehrich:

This refers to your letter of March 25, 1983, in which you ask about the status of an unfinished AR-15 type firearm receiver which you submitted for our examination.

Examination of the sample reveals that it is identifiable as the receiver of a firearm. It is basically complete except that the interior cavity has not been milled. For test purposes, the interior of the sample was drilled out using a 5/8 inch drill and then finished with a 1/2 inch rotary file. Approximately 75 minutes time was required to make the receiver functional.

Based on our examination, we have determined that the unfinished receiver as provided, is still a firearm subject to the provisions of the Gun Control Act of 1968. Should a customer of yours require unfinished receivers of this type, without conventional serial number or other markings, we would be happy to consider your request for a variance from the marking requirements in Title 27, Code of Federal Regulations (CFR), Part 178, Section 178.92.

An alternate form of identification may be approved only if it is determined that the proposed markings are reasonable under the particular circumstances involved, and will not hinder effective administration of the law and implementing regulations. Your customer must be a licensed manufacturer of firearms who will apply all required markings to the finished receiver. Further, it will be necessary for you to apply some sort of identifying mark to the unfinished receiver to identify SGW as the original manufacturer.

We trust that the foregoing has been responsive to your inqury. If you have further questions concerning this matter, please do not hesitate to contact us.

Sincerely yours,

Edward M. Owen, Jr.
Chief, Firearms Technology Branch

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 165 of 294
Case 3:20-cv-06761-EMC  Document 177-6  Filed 09/07/23  Page 3 of 3
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 11 of 70



**S.G.W. INC.**
624 OLD PACIFIC HWY. S.E.
OLYMPIA, WA. 98503
PHONE: (206) 456-3471

RIFLE BARRELS
CHAMBER REAMERS

LOWER RECEIVERS
GUNSMITHING

CAB

March 25, 1983

BATF
Federal Building
Washington, D.C.  20226

Attn: Mr. Edward M. Owen, Jr.
      Chief, Firearms Technology Branch

Subject: Status of unfinished Ar-15 Type Lower Receivers.

Dear Sir:

Enclosed is a sample unfinished AR-15 type Lower Receiver Forging.  You
will note that the area for the trigger, Hammer, and Disconnector is
basically still unmachined and solid.  It would require additional machining
to become functional.

A customer requests that we supply him with receiver forgings in this
machined condition without prior markings (identification) with serial No.
caliber and manufacturer's name.  He will then finish them under his
manufacturer's license and put on the required markings.

Would we be authorized to ship these unfinished forgings per sample supplied
without any prior markings?

Sincerely;

Henry A. Roehrich
SGW, Inc.
General Manager



# EXHIBIT 7

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 167 of 294
Case 3:20-cv-06761-EMC  Document 177-7  Filed 09/07/23  Page 2 of 3
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 15 of 70

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**CORRESPONDENCE APPROVAL AND CLEARANCE**

DEC 27 2002          903050:RDC
                     3311/2003-016

360
357.3846

Mr. Lane Browne
Mega Machine Shop, Incorporated
5323 Joppa S.W.
Tumwater, Washington 98512-8020

Dear Mr. Browne:

This refers to four AR-15 type lower receiver samples
that were received by this office on October 3, 2002,
for the purposes of examination and classification.

You indicate that each of the samples represents a
separate stage in the manufacturing process.  The
samples are labeled "OP-1," "OP-2," "OP-3," and "OP-
4."

Receiver sample "OP-1" is a solid casting having holes
drilled for the takedown pins, selector, hammer,
trigger, bolt catch, rear takedown pin retainer, and
magazine catch.  Further, the areas for the magazine
catch and bolt catch have been partially machined and
the rear ring threaded for the buffer tube.  Machining
of the interior cavity and magazine well has not been
made on this sample.

Receiver sample "OP-2," in addition to the operations
above, has had the magazine well and interior cavity
machined, trigger slot machined, trigger guard holes
drilled, and the slots for the magazine catch and bolt
catch completed.

Receiver sample "OP-3," in addition to the operations
above, has had the hole drilled in the receiver ring
for the buffer retainer.

| | INITIATOR | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER |
|---|---|---|---|---|---|---|---|
| CODE | 903050 | 903050 | | | | | |
| SURNAME | Clay | Bowed | | | | | |
| DATE | 12/4/02 | 12/27/02 | | | | | |

ATF F 9310.3A (7-97) (Formerly ATF/F 1325.8A, which may still be used)          *U.S. Government Printing Office: 2002 — 491-811/53553

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 168 of 294
Case 3:20-cv-06761-EMC   Document 177-7   Filed 09/07/23   Page 3 of 3
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 16 of 70

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
**CORRESPONDENCE APPROVAL AND CLEARANCE**

-2-

Mega Machine Shop, Inc.

Receiver sample "OP-4," in addition to the operations above, has had the hole for the grip screw drilled and tapped, and the markings applied. The left side of the magazine well is marked, in descending order, "DALPHON," "SHELTON, WA.," "MULTI-CALIBER," "MODEL B.F.D.," and "CDB 0806." "FIRE" and "SAFE" are marked adjacent to the safety selector hole.

We have determined that an AR-15 receiver can still function as a firearm receiver without a magazine opening or the threaded hole for the buffer tube. In addition, we previously examined an AR-15 style receiver in a similar condition to your receiver sample "OP-1" having the holes for the trigger and hammer pins, but with a solid interior. The interior cavity of the previously examined sample was finished in approximately 75 minutes time using a 5/8-inch drill and a rotary file. This receiver was determined to be a "firearm" as defined in Title 18, United States Code (U.S.C.), § 921(a)(3). Therefore, your sample "OP-1" is also a firearm as defined.

Receiver samples "OP-2," "OP-3," and "OP-4" are manufactured to the point where they will accept AR-15 type semiautomatic fire control components, the magazine catch, the bolt catch, both takedown pins, rear takedown pin retainer, and buffer tube. Therefore, each of these samples constitutes a "firearm" as defined in Title 18, U.S.C. § 921(a)(3).

We trust the foregoing has been responsive to your inquiry. If we can be of any further assistance, please contact us.

Sincerely yours,

Curtis H.A. Bartlett
Chief, Firearms Technology Branch

| | INITIATOR | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER | REVIEWER |
|---|---|---|---|---|---|---|---|
| CODE | | | | | | | |
| SURNAME | | | | | | | |
| DATE | | | | | | | |

ATF F 9310.3A (7-97) (Formerly ATF F 1325.6A, which may still be used)  *U.S. Government Printing Office: 2002 — 491-811/53553



# EXHIBIT 8

Case: 24-2701 08/29/2025 DktEntry: 28.1 Page 170 of 294
Case 3:20-cv-06761-EMC Document 177-8 Filed 09/07/23 Page 2 of 3
Case 1:14-cv-01211-JAM-SAB Document 23-2 Filed 01/09/15 Page 24 of 62



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

AUG **1 9** 2004

www.atf.gov

903050:RDC
3311/2004-564

Mr. Robert Serva
Dan Wesson Firearms
5169 Highway 12 South
Norwich, NY 13815

Dear Mr. Serva:

This refers to an unfinished 1911-type semiautomatic pistol frame sample, which was received
by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology
Branch (FTB), on July 25, 2004, for examination and classification.

Examination of the submitted unfinished frame revealed that the following machining operations
have been made, implementing these essential features:

- Slide stop crosspin holes.
- Sear pin hole.
- Hammer pin hole.
- Thumb safety pin hole.
- Main spring housing pin hole.
- Disconnector port.
- Stock screw bushing threads.
- Frame plunger tube mounting holes.
- Feed ramp.
- Barrel link surfaces.
- Frame interior passages/slots.
- Frame safety lever cutout.

In an accompanying letter, you note that the submitted slide rails have not been cut and that there
is an additional .015 inch of material left on top of the rail area. Additionally, you state that the
sides are approximately .004 inch in width.

The only critical operation yet to be made is the cutting of the slide rails. Although critical, this
work can be completed in a minimal amount of time by a competent individual having the
necessary equipment.

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 171 of 294
Case 3:20-cv-06761-EMC   Document 177-8   Filed 09/07/23   Page 3 of 3
Case 1:14-cv-01211-JAM-SAB   Document 23-2   Filed 01/09/15   Page 25 of 62

-2-

Mr. Robert W. Serva

Based on our review of the submitted frame, including the features enumerated above, FTB has
determined that the number and complexity of the operations made are sufficient to classify this
sample as a "firearm" as defined in 18 U.S.C. § 921(a)(3).

We trust the foregoing has been responsive to your inquiry.  If we can be of any further
assistance, please contact us.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch



# EXHIBIT 9



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

Martinsburg, WV  25401          903050:AG
www.atf.gov                     3311/2006-601

**APR 24 2006**

Mr. Justin Halford
312 Oxford Cove
Jonesboro, Arkansas  72404

Dear Mr. Halford:

This is in reply to your correspondence, dated January 26, 2006, along with you your submitted item, to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).  The submitted item is a partially machined AR-15 pattern receiver, which you have submitted for classification with respect to its status under the Gun Control Act (GCA) of 1968.

The FTB examination determined that the receiver would need the machining operations for the following holes or openings to enable it to be used as the receiver of a firearm:

- Machine pivot pin hole(s).
- Machine takedown pin hole(s).
- Machine trigger pin hole(s).
- Machine trigger opening in the bottom of the trigger/hammer recess.
- Machine hammer pin hole(s).

Additional minor machining or fitting operations may also be required.

For your information, previous determinations by FTB have classified as "firearms," receivers featuring less machining than your sample.  Since your sample is nearly complete, requiring only minor modifications to allow it to function as the frame or receiver of a firearm, it is a *firearm* as defined in 18 USC 921 (a)(3).

As you are aware, an AR-15 type receiver which has <u>absolutely no machining performed in the area of the trigger/hammer recess</u> might not be classified as a firearm.  Such a receiver could have **all** other machining operations performed, including the boring of pivot pin and takedown pin hole(s) and clearance for the takedown pin lug, but it must be completely solid and un-machined in the trigger/hammer recess area.  Your sample has been filled with clay by FTB to illustrate this area (see photo, next page).  If you are interested in having such a modified item formally classified, you must re-submit the prototype to FTB for examination.

-2-

Mr. Justin Halford

Please note that, absent an actual submission, this response cannot constitute a classification of a receiver having a solid trigger/hammer area.



We thank you for your inquiry, and trust that the foregoing has been responsive.

Sincerely yours,

Sterling Nixon
Chief, Firearms Technology Branch



# EXHIBIT 10

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 176 of 294
Case 3:20-cv-06761-EMC Document 177-10 Filed 09/07/23 Page 2 of 3
Case 1:14-cv-01211-JAM-SAB Document 23-2 Filed 01/09/15 Page 22 of 62



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg , West Virginia 25405*                903050:WJS
www.atf.gov                                        3311/2012-1201

Mr. Alan Aronstein                          **SEP 2 3 2012**
Hi-Standard Manufacturing Company
5151 Mitchelldale, Ste. B11
Houston, Texas 77902

Dear Mr. Aronstein:

This is in reference to your recent correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), with accompanying samples (see enclosed photos) for evaluation and classification per provisions of the Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3).

As background to our discussion, the GCA, § 921(a)(3), defines the term "**firearm**" to include:

*... (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [and] (B) the <u>frame or receiver</u> of any such weapon....*

Please note that any receiver-casting or receiver-blank that has been finished to the point at which it can be recognized as a firearm frame or receiver is a "firearm." Our Branch has held that in order <u>not</u> to be recognized as a "firearm," a semiautomatic-style receiver-blank or receiver-casting <u>must not have</u>: a) slide rails or slide rail indexing marks; b) a barrel seat; and c) more than two of any of the following four critical holes drilled—1) slide-stop pivot, 2) sear pivot, 3) disconnector, or 4) hammer pivot pin.

The FTB examination of your submitted <u>1911-type sample</u> found that is has had the following machining operations partially or fully completed:

- Casting from steel, the outside profile of which is generally to shape, with recess for the hammer slot and the magazine well.
- The ramp partially formed, partially machined.
- Relief cut in front strap for the magazine floor-plate.
- Thumb-safety detent area partially machined.
- Magazine-catch opening machined.
- Trigger-assembly opening machined.

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page: 177 of 294
Case 3:20-cv-06761-EMC  Document 177-10  Filed 09/07/23  Page 3 of 3
Case 1:14-cv-01211-JAM-SAB  Document 23-2  Filed 01/09/15  Page 23 of 62

-2-

Mr. Alan Aronstein

We noted that there is no barrel seat; there are no mounting pin holes for the hammer, trigger, sear or takedown pin; and no slide guide rails have been formed or indexed.

Further, the FTB examination of your target-pistol type sample disclosed that it has had the following machining operations partially or fully completed:

- Casting from steel, the outside profile of which is generally to shape, with recess for the hammer slot machined.
- Magazine well partially machined.
- Feed ramp formed and machined.
- Relief cut in front strap for the magazine floor-plate.
- Magazine-catch area on front strap machined.
- Opening for magazine-catch roller and roller pin machined.
- Trigger recess machined.
- Trigger stop-pin hole machined.
- Barrel seat partially machined.
- Barrel take-down pin hole machined.

We noted that there is a partially machined barrel seat; however, there are no mounting pin holes for the hammer, trigger, and sear, and no slide guide rails have been formed or indexed.

In conclusion, the FTB evaluation finds that the submitted Hi-Standard, 1911-type receiver blank and Hi-Standard, target-pistol type receiver blank are not "firearms" as defined.

In order to facilitate the return of your samples, please provide us with your FedEx account or a U.S. Postal Service, UPS, or other appropriate carrier return-shipping label within 30 days of the receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive.  Should you have any additional questions, do not hesitate to contact us.

Sincerely yours,

John R. Spencer
Chief, Firearms Technology Branch

Enclosure



# EXHIBIT 11

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 179 of 294
Case 3:20-cv-06761-EMC  Document 177-11  Filed 09/07/23  Page 2 of 3
Case 1:14-cv-01211-JAM-SAB  Document 1  Filed 07/31/14  Page 40 of 44



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_____

Martinsburg, WV 25405

www.atf.gov

903050: WJS
3311:300627

May 17, 2013

Mr. Doug Hughes
Operations Manager
Kenney Enterprises, Inc
4343 East Magnolia Street
Phoenix, AZ 85034

Dear Mr. Hughes,

This is in reference to your correspondence, with enclosed sample, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the submitted, partially completed
AR-type receiver your company is planning to manufacture.  Specifically, you wish to
know if this item would be classified as a "firearm" under the Gun Control Act of 1968
(GCA).

During the examination of your sample, FTB found that the following machining/drilling
operations performed on the submitted sample:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot detent pin holes drilled.
3. Selector-retainer hole drilled.
4. Magazine release and catch slots cut.
5. Trigger-guard holes drilled.
6. Rear of receiver drilled and threaded to accept buffer tube.
7. Buffer-retainer hole drilled.
8. Pistol-grip mounting area faced off, drilled, and threaded.
9. Magazine well completed.

The machining operations not yet performed are as follows:

1. Milling out of fire-control cavity.
2. Drilling of selector-lever hole.

Mr. Doug Hughes

   3.  Cutting of trigger slot.
   4.  Drilling of trigger pin hole.
   5.  Drilling of hammer pin hole.

The FTB examination of your submitted casting and diagrams found that your submitted item will not be sufficiently complete to be classified as the frame or receiver of a firearm and thus would <u>not</u> be a "firearm" as defined in the GCA.

In closing, we should point out that the information found in correspondence from our Branch is intended only for use by the addressed individual or company with regard to a specific scenario described within that correspondence.

To facilitate return of your sample, please provide FTB with the appropriate FedEx account information within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.  Please do not hesitate to contact us if additional information is needed.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch



# EXHIBIT 12

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV 25405*

www.atf.gov

903050:MCP
3311/302035

MAY 0 5 2014

Mr. Bradley Reece
Palmetto State Defense, LLC
555 East Suber Road
Greer, SC 29650

Dear Mr. Reece,

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB), which accompanied your prototype sample of an AR-10 type receiver blank your company intends to manufacture and market. Specifically, you requested an examination and classification of the submitted sample pursuant to the amended Gun Control Act of 1968 (GCA) and asked if it would be regulated as a "firearm" under the GCA.

As background, the GCA, 18 U.S.C. § 921(a)(3), defines the term "firearm" to include *any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and] ...the frame or receiver of any such weapon....*

*Note: FTB uses the following terms to describe certain items (also see citation, p.3)—*

*The term "**receiver blank**" is used to describe forgings, castings, or machined bodies (defense articles¹) such as AR-15 receiver castings, AK receiver flats, etc., in various stages of folding/machining which are not classified as firearms.*

*The term "**incomplete receiver**" is used to describe forgings, castings, or machined bodies (defense articles) which have been classified as firearms but are not completely machined for use as a functional firearm receiver.*

*The term "**receiver**" is used to describe functional firearms frames or receivers.*

Case 3:20-cv-06761-EMC/29/2025 Document 157-12 28 Filed 07/28 of 294 Page 3 of 3
Case 1:14-cv-01211-JAM-SAB Document 1 Filed 07/31/14 Page 30 of 44
Mr. Bradley Reese
Page 2

As you are aware, FTB has previously determined that an AR-10 type receiver blank which has no machining of any kind performed in the area of the trigger/hammer (fire-control) recess might not be classified as a firearm. Such a receiver blank could have **all** other machining operations performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-pin lug, but must be completely solid and un-machined in the fire-control recess area. We have determined that in order to be considered "completely solid and un-machined in the fire-control recess area," the takedown-pin lug clearance area must be no longer than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole.

Our examination of the submitted item confirmed that the receiver blank has been partially machined, including a takedown pin hole and clearance for the takedown-pin lug. Our examination confirmed that the takedown-pin lug clearance area is less than 1.6 inches, measured from immediately forward of the front of the buffer-retainer hole (see photos below). The sample is completely solid and un-machined in the fire-control recess area and, accordingly, is not a "firearm" as defined in the GCA.



**Submitted prototype sample**

To facilitate return of the submitted sample, please provide FTB with an appropriate FedEx or similar account number within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

ER-183



# EXHIBIT 13



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Office of the Director*

*Washington, DC  20226*

January 2, 2015

**18 U.S.C. 921(a)(3)(A) and (B):  DEFINITIONS (FIREARM)**
**18 U.S.C. 921(a)(10):  DEFINITIONS (MANUFACTURER)**
**18 U.S.C. 921(a)(11)(B):  DEFINITIONS (DEALER)**
**18 U.S.C. 921(a)(21)(A):  DEFINITIONS (ENGAGED IN THE BUSINESS)**
**18 U.S.C. 922(a)(1)(A):  LICENSE REQUIRED**
**18 U.S.C. 923(i):  IDENTIFICATION OF FIREARMS**
**27 CFR 478.92(a):  IDENTIFICATION OF FIREARMS**

*Any person (including any corporation or other legal entity) engaged in the business of performing machining, molding, casting, forging, printing (additive manufacturing) or other manufacturing process to create a firearm frame or receiver, or to make a frame or receiver suitable for use as part of a "weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," i.e., a "firearm," must be licensed as a manufacturer under the Gun Control Act of 1968 (GCA); identify (mark) any such firearm; and maintain required manufacturer's records.  A business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements of the GCA by allowing persons to perform manufacturing processes on firearms (including frames or receivers) using machinery or equipment under its dominion and control where that business controls access to, and use of, such machinery or equipment.  ATF Ruling 2010-10 is hereby clarified.*

**ATF Rul. 2015-1**

The Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has received inquiries from the public asking whether Federal Firearms Licensees (FFL), or unlicensed machine shops, may engage in the business of completing, or assisting in the completion of, the manufacture of firearm frames or receivers for unlicensed individuals without being licensed as a manufacturer of firearms.

Unlicensed individuals occasionally purchase castings or machined/molded or other manufactured bodies (sometimes referred to as "blanks," or "80% receivers") that have not yet reached a stage of manufacture in which they are classified as "firearm frames or receivers" under the Gun Control Act of 1968 (GCA) and implementing regulations.  Once purchased, these individuals may perform minor drilling and machining activities in or on the fire control area or other critical areas of the castings or machined/molded bodies sufficient to create a "firearm frame or receiver" under the law.  Although the frame or receiver may be sufficiently complete

- 2 -

to be classified and regulated as a "firearm," it generally requires substantial additional machining before it can accommodate fire control components such as a trigger, hammer, or sear and be used to expel projectiles. For instance, a casting of an AR-15 type receiver can be machined using common power tools so that it reaches a stage of manufacture that it would be classified as a "firearm frame or receiver," yet incapable of being assembled into a weapon that will expel projectiles. Unlicensed individuals propose to take either a blank, or a frame or receiver (not marked with a serial number or any other marks of identification) to a licensed dealer-gunsmith or machine shop for further machining and finishing so that it can be assembled into a complete or functional firearm as designed. The FFLs or unlicensed machine shops would then use their own equipment, such as a Computer Numeric Controlled (CNC) machine or other means, to finish the blank or frame or receiver into one that can be used to assemble a weapon capable of firing projectiles.

The GCA, 18 U.S.C. § 921(a)(1), defines a "person" to include "any individual, corporation, company, association, firm, partnership, society, or joint stock company." Section 921(a)(10), defines a "manufacturer" as any person engaged in the business of manufacturing firearms or ammunition for purposes of sale or distribution. As defined by section 921(a)(21)(A), the term "engaged in the business" means, as applied to a manufacturer of firearms, "a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured." Because "manufacturing" is not defined by the GCA, courts have relied on the ordinary meaning of the word, including actions to "make a product suitable for use." *See, e.g., Broughman v. Carver*, 624 F.3d 670, 675 (4th Cir. 2010). Section 921(a)(11)(B) defines a "dealer," in relevant part, as any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms." A person meeting this definition is commonly referred to as a "gunsmith."

Section 921(a)(3), defines a "firearm," in relevant part, as both a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" (921(a)(3)(A)), and the "frame or receiver of any such weapon" (921(a)(3)(B)). Under section 923(i), licensed manufacturers must identify each firearm manufactured by a serial number in the manner prescribed by regulation. Federal regulations at 27 CFR 478.92(a)(1) add that "a licensed manufacturer … must legibly identify each firearm manufactured … [b]y engraving, casting, stamping (impressing), or otherwise conspicuously placing … an individual serial number" on the frame or receiver, and certain additional information - the model (if designated), caliber/gauge, manufacturer's name, and place of origin on the frame, receiver, or barrel. Regulations further require the serial number to be at a minimum depth and print size, and the additional information to be at a minimum depth. Additionally, the serial number must be placed in a manner not susceptible of being readily obliterated, altered, or removed, and not duplicate any serial number placed by that manufacturer on any other firearm.

In ATF Ruling 2010-10 (approved December 27, 2010), ATF advised that licensed dealer-gunsmiths (type 01) may legally perform certain firearm manufacturing activities if specified conditions were met. Specifically, that ruling held that licensed gunsmiths could conduct such manufacturing activities if the firearms were: (1) not owned, in whole or in part, by the dealer-gunsmith; (2) returned by the dealer-gunsmith to the importer or manufacturer upon completion of the manufacturing processes, and not sold or distributed to any person outside the

manufacturing process; and (3) already properly identified / marked by the importer or manufacturer in accordance with Federal law and regulations.

ATF Ruling 2010-10 is based on two distinct but related premises. First, it recognizes that there are specific activities traditionally performed by gunsmiths, *i.e.*, repairing, modifying, embellishing, refurbishing, installing parts, or specialized finishing of functional frames or receivers. Such activities *do not* include, and the Ruling does not directly address the machining or other manufacturing processes required for the frame or receiver to be created or any steps to make it suitable for use in assembling a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." Second, the Ruling recognizes that, by transferring the firearm *only* to another FFL involved in the manufacturing process, there is no "sale or distribution of the firearm manufactured" requiring a manufacturer's license.

**Machining or Other Manufacturing of Frames or Receivers**

Because the GCA contains distinct definitions of "firearm," one can be a manufacturer of a "frame or receiver," and also a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive" that incorporates that frame or receiver. *See Broughman*, 624 F.3d at 676 n.4 ("That Broughman manufactures 'firearms' within the meaning of one statutory definition rather than another does not render him any less a manufacturer of 'firearms' within the meaning of the Act.") ATF Ruling 2010-10 assumes that licensed dealer-gunsmiths would perform certain activities on articles already classified as frames or receivers (*i.e.*, no machining or other processes required to allow it to be used to assemble a weapon), such as assembly and applying special coatings and treatments. Implicit is the understanding that the manufacture of the frame or receiver was completed (for example, having an existing fire-control cavity), and it was marked by a licensed manufacturer in accordance with Federal law and regulations.

However, when a person performs machining or other manufacturing process on a blank to make a firearm "frame or receiver," or on an existing frame or receiver to make it suitable for use[1] as part of a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," that person has performed a manufacturing operation other than what is contemplated by the GCA of dealer-gunsmiths, *i.e.*, persons described by section 921(a)(11)(B) as "engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms." In this context, "machining or other manufacturing process" includes making a frame or receiver, or taking *any* of the steps to make an existing frame or receiver functional – that is, suitable for use as part of a weapon that will expel a projectile by the action of an explosive.[2] For example, in an AR-type weapon, "machining or other manufacturing process" would include any activity that creates a fire-control-cavity as designed. Although such an article may be classified as a "receiver" when it is indexed, machining or other manufacturing process takes place to create a receiver when material is actually removed from the cavity so that the fire-control-components may actually be installed.

---

[1] *See Broughman* at 675 ("[T]he plain and ordinary meaning of the word 'manufacture' is 'to make into a product suitable for use.'" (quoting Merriam-Webster Online Dictionary (2010)) Consequently, the GCA required a manufacturer's license where a gunsmith assembled firearms from component parts.)

[2] For purposes of this Ruling, activities associated with tapping and mounting a scope are considered neither "machining" nor a "manufacturing process."

The activities discussed in ATF Ruling 2010-10 are not the manufacturing processes to create the firearm frame or receiver, or any of the steps that allow the frame or receiver to function when assembled into a complete weapon on behalf of non-licensed individuals. To the contrary, those gunsmithing activities are explicitly required to be done on behalf of a licensed manufacturer or importer who are required by 27 CFR 478.92(a)(2) to mark and serialize the frame or receiver prior to shipment to the gunsmith. As explained by the ruling, "[t]his will ensure that the frames or receivers can be traced by ATF in the event they are lost or stolen during the manufacturing process." This distinction is also legally significant because manufacturing processes that create essential features, depending on the type of firearm, are necessary for the frame or receiver to function as part of a complete "weapon." At this stage of production, the frame or receiver is different from one that a licensed gunsmith may receive and perform gunsmithing services because these manufacturing processes make the frame or receiver suitable for use in assembling a "weapon" under the GCA.

**Distribution of Firearms Manufactured**

Once the manufacturing processes have occurred and a frame or receiver has been made, however, to require licensing as a manufacturer, a person must still be engaged in the business through the "sale or distribution" of the firearms manufactured. ATF Ruling 2010-10 interpreted this phrase to exclude the transfer of firearms between Federal firearms licensees *who are involved in the manufacturing process*. The Ruling held, in part, that because the firearms manufactured were not "sold or distributed," the contracted gunsmiths did not satisfy this statutory requirement for licensing as manufacturers. Rather, that Ruling expressly prohibits licensed gunsmiths from distributing firearms outside the manufacturing process and requires them to be returned to the licensed manufacturer that initially produced and marked the frame or receiver. Underlying this analysis is the fact that the GCA provides special privileges to FFLs involved in firearms transactions with other FFLs. These include the authority to transfer firearms interstate, and to transfer firearms without a background check or completion of ATF Forms 4473 (Firearms Transaction Records). In light of this, no "distribution" occurs when a licensed manufacturer sends firearms to another FFL who performs contracted manufacturing activities and returns them.

ATF Ruling 2010-10 does recognize that gunsmiths may improve firearms by participating in the manufacturing process. However, none of the enumerated processes (*i.e.*, repairing, modifying, embellishing, refurbishing, installing parts, or specialized finishing) actually create a frame or receiver, or make an existing frame or receiver suitable for use in assembling a "weapon" capable of expelling a projectile. This is consistent with the traditional services that gunsmiths offer. Generally, licensed gunsmiths perform actions in repairing or improving firearms that are already complete weapons, or capable of being assembled as such. Gunsmiths do not perform the machining or other manufacturing processes to create frames or receivers, or make them suitable for use in assembling a weapon that can expel a projectile.

Although licensed gunsmiths return firearms to their customers after performing the contracted work, the GCA does not consider this to be a sale or distribution of the firearms manufactured. This is because the returned firearm has only been repaired or temporarily received for custom work – it has not been machined in a manner or otherwise created or made suitable for use as part of a weapon. However, when a licensed gunsmith takes in a frame or receiver to perform

machining or other manufacturing process, that gunsmith "distributes" a firearm to the customer upon return because that manufacturing activity results in the making of a different "frame or receiver" and also a "weapon … which will or is designed to or may readily be converted to expel a projectile" – both defined separately as a "firearm" under the GCA.

Further, permitting a licensed gunsmith to perform manufacturing processes on a frame or receiver on behalf of an unlicensed person would lead to an absurd result. If the above mentioned activities were permitted, firearms could be legally manufactured without any markings or serialization by dealer-gunsmiths who could avoid licensing as a manufacturer simply because his/her customer is unlicensed. For example, instead of purchasing marked and serialized receivers or complete weapons from licensed dealers, individuals might purchase unregulated castings or machined/molded bodies from a supplier, perform a minor machining or other operation sufficient to create a "firearm frame or receiver," contract with a gunsmith to perform necessary and substantial machining operations, and then assemble a complete weapon without marks of identification or records of production. Such activity runs contrary to a major purpose of the GCA in that it eliminates the ability of law enforcement to trace firearms used in crime, or stolen or lost firearms.

**Use of Manufacturing Machines, Tools, or Equipment**

An FFL or unlicensed machine shop may also desire to make available its machinery (*e.g.*, a computer numeric control or "CNC" machine), tools, or equipment to individuals who bring in raw materials, blanks, unfinished frames or receivers and/or other firearm parts for the purpose of creating operable firearms. Under the instruction or supervision of the FFL or unlicensed machine shop, the customers would initiate and/or manipulate the machinery, tools, or equipment to complete the frame or receiver, or entire weapon. The FFL or unlicensed machine shop would typically charge a fee for such activity, or receive some other form of compensation or benefit. This activity may occur either at a fixed premises, such as a machine shop, or a temporary location, such as a gun show or event.

A business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements under the GCA simply by allowing individuals to initiate or manipulate a CNC machine, or to use machinery, tools, or equipment under its dominion or control to perform manufacturing processes on blanks, unfinished frames or receivers, or incomplete weapons. In these cases, the business controls access to, and use of, its machinery, tools, and equipment. Following manufacture, the business "distributes" a firearm when it returns or otherwise disposes a finished frame or receiver, or complete weapon to its customer. Such individuals or entities are, therefore, "engaged in the business" of manufacturing firearms even though unlicensed individuals may have assisted them in the manufacturing process.

*Held,* any person (including any corporation or other legal entity) engaged in the business of performing machining, molding, casting, forging, printing (additive manufacturing) or other manufacturing process to create a firearm frame or receiver, or to make a frame or receiver suitable for use as part of a "weapon … which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," *i.e.*, a "firearm," must be licensed as a manufacturer under the GCA; identify (mark) any such firearm; and maintain required manufacturer's records.

*Held further,* a business (including an association or society) may not avoid the manufacturing license, marking, and recordkeeping requirements of the GCA by allowing persons to perform manufacturing processes on blanks or incomplete firearms (including frames or receivers) using machinery, tools, or equipment under its dominion and control where that business controls access to, and use of, such machinery, tools, or equipment.

*Held further*, this ruling is limited to an interpretation of the requirements imposed on persons under the GCA, and does not interpret the requirements of the National Firearms Act, 26 U.S.C. 5801 *et. seq.*

ATF Ruling 2010-10 is hereby clarified.

Date approved: January 2, 2015

B. Todd Jones
Director



# EXHIBIT 14



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV_
_25405_
www.atf.gov

FEB - 3 2015

907010:AG
3311/302663

Jason Davis, Esq.
The Law Offices of Davis & Associates
41593 Winchester Rd, Suite 200
Temecula, California 92591

Dear Mr. Davis,

This is in reference to your submitted item, an AR-15 pattern receiver casting, along with
supporting correspondence recently received by the Firearms Technology Industry
Services Branch (FTISB), Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).
You have submitted this item (see photo, last page) on behalf of your client, POLYMER
80, INC. (P80) for classification under the Gun Control Act of 1968 (GCA).

As you are aware, FTISB has previously determined that an AR-15 type receiver casting
which is completely solid in the area of the trigger/hammer (fire-control) recess might not
be classified as a firearm. Such a receiver casting could incorporate all other features of a
functional firearm receiver, including pivot-pin and takedown-pin hole(s) and clearance
for the takedown-pin lug, but must be completely solid in the fire-control recess area.
We have determined that in order to be considered "completely solid in the fire-control
recess area," the takedown-pin lug clearance area must be no longer than .800 inch,
measured from immediately forward of the front of the buffer-retainer hole. In addition,
ATF has held that "indexing" of the fire-control area, to include molding a polymer
receiver in stages instead of as a single (homogenous) piece, is sufficient to require
classification as a firearm receiver.

Our examination of the submitted item confirmed that the receiver casting has been cast
from black polymer, and includes several features of a complete AR-15 type receiver,
including a takedown pin hole and clearance for the takedown-pin lug. Our examination
confirmed that the takedown-pin lug clearance area is less than .800 inch, measured from
immediately forward of the front of the buffer-retainer hole. The sample has been cast
entirely from a single type of polymer, to include the fire control recess area.

Jason Davis, Esq.                                                    Page 2

The submitted item was cut into several pieces in order to observe the internal configuration. This operation revealed that the submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner.

Your current correspondence, as well as supplemental information you provided in a letter dated February 3, 2015, confirmed that the submitted item was cast using "a single shot of molten material."

Based on our examination of the submitted item and your description of the manufacturing process used to produce it, we have determined that this item is NOT a firearm receiver, or a firearm.

We thank you for your inquiry and trust the foregoing has been responsive to your request.

                          Sincerely yours,


                          Michael R. Curtis
      Acting Chief, Firearms Technology Industry Services Branch

Attachment



# EXHIBIT 15



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV 25405_

www.atf.gov

**NOV 0 2 2015**

907010:WJS
3311/303738

Mr. Jason Davis
The Law Offices of Davis & Associates
41593 Winchester Road, Suite 200
Temecula, California 92590

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of Alcohol,
Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry Services Branch
(FTISB). In your letter, you asked for a classification of an AR10-type item identified by you as
a "WARRHOGG BLANK" as well as a Glock-type "GC9 Blank" on behalf of your client,
Polymer 80, Incorporated (see enclosed photos). Specifically, you wish to know if these items
would be classified as a "firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **WARRHOGG BLANK** incorporates the following design features:

- _Magazine well._
- _Magazine catch._
- _Receiver extension/buffer tube._
- _Pistol grip area._
- _Pistol-grip screw hole._
- _Pistol grip upper receiver tension hole._
- _Pistol grip tension screw hole._
- _Bolt catch._
- _Front pivot-pin takedown hole._
- _Rear pivot-pin takedown hole._

As a part of your correspondence, you describe design features and the manufacturing process of
the submitted "WARRHOGG Blank" to include the following statements:

- 2 -

Mr. Jason Davis

- *The submitted WarrHogg .308 blank lower receiver blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm. This submitted item incorporates a solid fire control cavity area, and was cast in a homogenous manner using a "single shot of molten material."*

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...[and] ...the frame or receiver of any such weapon...*

Also, 27 CFR § 478.11 defines **"firearm frame or receiver."** *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR § 447.11, defines **"defense articles"** as—

*...Any item designated in § 447.21 or § 447.22. This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL § 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample, FTISB personnel found that the following machining operations or design features present or completed:

1. Front and rear pivot/take down pin holes.
2. Front and rear pivot/ take down detent retainer holes.
3. Front and rear pivot/take down lug clearance areas.
4. Selector-retainer hole.
5. Magazine-release and catch slots.
6. Trigger-guard formed.
7. Rear of receiver present and threaded to accept buffer tube.
8. Buffer-retainer hole.
9. Pistol-grip mounting area faced off and drilled, but not threaded.
10. Magazine well.
11. Receiver end-plate recess.

- 3 -

Mr. Jason Davis

Machining operations or design features not yet present or completed:

1. Complete removal of material from the fire-control cavity area.
2. Machining or indexing of selector-lever hole.
3. Machining or indexing of trigger slot.
4. Machining or indexing of trigger-pin hole.
5. Machining or indexing of hammer-pin hole.

As a part of this evaluation, FTISB personnel noted the following markings:

Left Side

- **308**
- **POLYMER80**

FTISB has determined that an AR-10 type receiver blank could have all other machining operations performed, including front receiver pivot-pin and rear take down pin hole and clearance for the front receiver lug and rear take down pin lug clearance area (not to exceed 1.60 inches), but must be completely solid and un-machined in the fire-control recess area. The rear take down pin lug clearance area must be no longer than 1.60 inches, measured from immediately forward of the front of the buffer-retainer hole.

The FTISB examination of your submitted item, found that the most forward portion of the rear take down pin lug clearance area measures approximately 1.32 inches in length, less the maximum allowable 1.60 inch threshold. As a result, the submitted item is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated AR10-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive; and thus, it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

As a part of your correspondence, you describe design features and the manufacturing process of the submitted "**CG or CG9**" to include the following statement:

- *The submitted GC9 blank is a solid core unibody design made out of a single casting without any core strengthening inserts. Moreover, it is void of any indicators that designate or provide guidance in the completion of the firearm.*

- 4 -

Mr. Jason Davis

Please note, while not indicated in the accompanying correspondence, the submitted CG or CG9 appears to have been made utilizing additive manufacturing or 3-D printing technology and not "made out of a single casting."

During the examination of your sample **"CG or CG9,"** FTISB personnel found that the following machining operations or design features present or completed:

1. Slide lock lever location indexed.
2. Upper portion of slide lock spring recess.
3. Trigger slot.
4. Capable of accepting Glock 17 trigger mechanism housing.
5. Capable of accepting Glock 17 trigger bar.
6. Capable of accepting Glock 17 locking block.
7. Magazine well.
8. Magazine catch.
9. Accessory rail.
10. Slide-stop lever recess.
11. Magazine catch spring recess.

Machining operations or design features not yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Locking block-pin hole machined or indexed.
3. Devoid of front or rear frame rails.
4. Barrel seat machined or formed.

As a result, the submitted "CG or CG9" is not sufficiently complete to be classified as the frame or receiver of a firearm; and thus, is not a "firearm" as defined in the GCA. Consequently, the aforementioned item is therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blank incorporating the aforementioned design features is not classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus it is not a "firearm" as defined in (GCA), 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR § 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

In conclusion, correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular

- 5 -

Mr. Jason Davis

issue or item. We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Also, this determination is relevant to the items as submitted. If the design, dimensions, configuration, method of operation, or utilized materials or processes such as changing from additive manufacturing to injection molding, this classification would be subject to review and require a submission to FTISB of an exemplar utilizing the new manufacturing process.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request. Please do not hesitate to contact us if additional information is needed.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosures

# Polymer 80, Inc. WARRHOGG Receiver Blank











Polymer 80, Inc; GC or CG9 Receiver Blank









Capable of Accepting Glock 17 Trigger Mechanism and Trigger Bar Assemblies



# Capable of Accepting Glock 17 Locking Block, Trigger Assembly and Slide Stop Lever



# Internal Frame Comparison to NFC Glock 17



Slide Rails on NFC Glock 17

Devoid of Frame Rails

# Frame Comparison to NFC Glock 17



Trigger Mechanism Housing Pin Hole

Devoid of Trigger Mechanism Pin Hole

# Frame Comparison to NFC Glock 17



Trigger-Pin Hole

Locking Block Pin Hole

Devoid of Locking Block and Trigger Pin Holes



# EXHIBIT 16



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

*Martinsburg, WV 25405*

www.atf.gov

JAN 1 8 2017

907010:WJS
3311/305402

Mr. Jason Davis
The Law Offices of Davis & Associates
27201 Puerta Real, Suite 300
Temecula, California 92691

Mr. Davis:

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Industry
Services Branch (FTISB). In your letter, you asked for a classification of two Glock-type
"PF940C Blank" on behalf of your client, Polymer 80 Incorporated (see enclosed
photos). Specifically, you wish to know if each of these items would be classified as a
"firearm" under the Gun Control Act of 1968 (GCA).

You state the submitted **PF940C** has critical machining operations not yet "implanted" as
follows:

- *Drilling of the locking left and right block pin holes.*
- *Drilling of the left and right trigger pin holes.*
- *Drilling of the left and right trigger housing pin holes.*
- *Cutting of the left and right rail slots to allow for slide installation.*
- *Machining of the side walls that block slide installation.*
- *Machining of the cross walls that block barrel and recoil spring installation.*

As a part of your correspondence, you describe design features and the manufacturing
process of the submitted "**PF940C**" to include the following statement:

• *The submitted PF940C blank is a solid core unibody design made out of a single
casting without any core strengthening inserts. Moreover, it is void of any indicators that
designate or provide guidance in the completion of the firearm.*

ER-215

Mr. Jason Davis                                              Page 2

For your reference in this matter, the amended Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term **"firearm"** *to include any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive…[and] …the frame or receiver of any such weapon…*

Also, 27 CFR Section 478.11 defines **"firearm frame or receiver"**. *That part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel.*

Also, the AECA, 27 CFR Section 447.11, defines **"defense articles"** as—

*…Any item designated in § 447.21 or § 447.22. This includes models, mockups, and other such items which reveal technical data directly relating to § 447.21 or § 447.22.*

The USMIL, Section 447.22, **FORGINGS, CASTINGS, and MACHINED BODIES** states:

*Articles on the U.S. Munitions Import List include articles in a partially completed state (such as forgings, castings, extrusions, and machined bodies) which have reached a stage in manufacture where they are clearly identifiable as defense articles. If the end-item is an article on the U.S. Munitions Import List, (including components, accessories, attachments and parts) then the particular forging, casting, extrusion, machined body, etc., is considered a defense article subject to the controls of this part, except for such items as are in normal commercial use.*

During the examination of your sample **"PF940C"**, FTISB personnel found that the following machining operations or design features present or completed:

1. Trigger slot.
2. Capable of accepting Glock 17 trigger mechanism housing.
3. Capable of accepting Glock 17 trigger bar.
4. Magazine well.
5. Magazine catch.
6. Accessory rail.
7. Slide-stop lever recess.
8. Magazine catch spring recess.

Machining operations or design features <u>not</u> yet present or completed:

1. Trigger-pin hole machined or indexed.
2. Trigger mechanism housing pin machined or indexed.
3. Locking block-pin hole machined or indexed.
4. Devoid of front or rear frame rails.
5. Barrel seat machined or formed.
6. Incapable of accepting Glock locking-block.

Mr. Jason Davis                                                                    Page 3

**Note:** *The dust cover, top of the barrel seat area and locking-block recess area became damaged during this evaluation.*

As a result of this FTISB evaluation, the submitted "**PF940C**" is <u>not</u> sufficiently complete to be classified as the frame or receiver of a firearm and thus is not a "firearm" as defined in the GCA. Consequently, the aforementioned items are therefore not subject to GCA provisions and implementing regulations.

To reiterate the conclusion of FTISB's evaluation, our Branch has determined that the submitted Polymer 80, Incorporated Glock-type receiver blanks incorporating the aforementioned design features are <u>not</u> classified as the frame or receiver of a weapon designed to expel a projectile by the action of an explosive, thus each of these items are <u>not</u> a "firearm" as defined in GCA, 18 U.S.C. § 921(a)(3)(B).

Please be aware, while not classified as a "firearm"; the submitted items are each classified as a "defense article" as defined in 27 CFR Section 447.11. The U.S. Department of State (USDS) regulates all exports from, and particular imports into, the United States. Firearms, parts, and accessories for firearms are all grouped as "defense articles" by the USDS and overseen by their Directorate of Defense Trade Controls. Information regarding import/export of defense articles can be found on their web site at www.pmddtc.state.gov.

Correspondence from our Branch is dependent upon the particular facts, designs, characteristics or scenarios presented. Please be aware that although other cases (submissions to our Branch) may appear to present identical issues, this correspondence pertains to a particular issue or item.  We caution applying this guidance in this correspondence to other cases, because complex legal or technical issues may exist that differentiate this scenario or finding from others that only appear to be the same.

Please be aware, this determination is relevant to the item as submitted.  If the <u>design</u>, <u>dimensions</u>, <u>configuration</u>, <u>method of operation</u>, <u>processes</u> or <u>utilized materials</u>, this classification would be subject to review and would require a submission to FTISB of a complete functioning exemplar.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request.

Sincerely yours,

Michael R. Curtis
Chief, Firearms Technology Industry Services Branch

Enclosure



PF940C Blank, Submitted 10/6/16

Devoid of Trigger Pin Hole

Devoid of Trigger Mechanism Pin Hole



PF940C Blank, Dust Cover Area Damaged

Un-Formed Barrel Seat

Devoid of Slide Rails



PF940C Blank, With Trigger Mechanism Housing and Slide Stop Lever

Damage to Locking Block Recess Area

PF940C Blank, Incapable of Accepting Glock Locking Block





# EXHIBIT 17

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 223 of 294
Case 3:20-cv-06761-EMC  Document 177-17  Filed 09/07/23  Page 2 of 11
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 54 of 70



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

---

*Martinsburg, WV  25405*

www.atf.gov

903050:WJS
3311/300833

July 15, 2013

Mr. Tilden Smith
80 Percent Arms
202 East Alton Avenue
Suite A
Santa Ana, CA 92707

Dear Mr. Smith,

This is in reference to your correspondence, with enclosed samples, to the Bureau of
Alcohol, Tobacco, Firearms and Explosives (ATF), Firearms Technology Branch (FTB).
In your letter, you asked for a classification of the partially completed AR-type receivers
your company is planning to manufacture (see enclosed photos).  Specifically, you want
to know if the three submitted items, identified as samples 1, 2, and 3 (and reviewed
below) would be classified as "firearms" under the Gun Control Act of 1968 (GCA).

**<u>SAMPLE #1</u>**

During the examination of this sample, FTB found that the following machining/drilling
operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine-release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 224 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 3 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 55 of 70

Mr. Tilden Smith                                                    Page 2

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Selector-lever hole drilled.
3. Cutting of trigger slot.
4. Drilling of trigger pin hole.
5. Drilling of hammer pin hole.

The FTB examination of your submitted casting found that **<u>SAMPLE #1</u>** is not sufficiently complete to be classified as the frame or receiver of a firearm and thus would <u>not</u> be a "firearm" as defined in the GCA.

### <u>SAMPLE #2</u>

During the examination of Sample #2, FTB observed that the following machining/drilling operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.
3. Magazine release and catch slots cut.
4. Rear of receiver drilled and threaded to accept buffer tube.
5. Buffer-retainer hole drilled.
6. Pistol-grip mounting area faced off and threaded.
7. Magazine well completed.
8. Trigger guard machined.
9. Receiver end-plate area machined.
10. Pistol-grip mounting area threaded.
11. Selector-lever detent hole drilled.
12. Selector-lever hole drilled.

The machining operations <u>not</u> yet performed are as follows:

1. Milling out of fire-control cavity.
2. Cutting of trigger slot.
3. Drilling of trigger pin hole.
4. Drilling of hammer pin hole.

The FTB examination of this casting found that **<u>SAMPLE #2</u>** is sufficiently complete to be classified as the frame or receiver of a firearm and thus **<u>is</u>** a "firearm" as defined in the GCA.

### <u>SAMPLE#3</u>

During the examination of this sample, FTB found that the following machining/drilling operations had been performed:

1. Front and rear assembly/pivot pin holes drilled.
2. Front and rear assembly/pivot-detent pin holes drilled.

Mr. Tilden Smith                                                    Page 3

   3.  Magazine-release and catch slots cut.
   4.  Rear of receiver drilled and threaded to accept buffer tube.
   5.  Buffer-retainer hole drilled.
   6.  Pistol-grip mounting area faced off and threaded.
   7.  Magazine well completed.
   8.  Trigger guard machined.
   9.  Receiver end-plate area machined.
 10.  Pistol-grip mounting area threaded.
 11.  Selector-lever detent hole drilled.
 12.  Hole machined into fire-control cavity; measuring approximately ¼ inch in diameter and approximately 9/16 inch deep.

The machining operations not yet performed are as follows:

   1.  Complete milling out of fire-control cavity.
   2.  Cutting of trigger slot.
   3.  Drilling of trigger pin hole.
   4.  Drilling of hammer pin hole.

The FTB examination of the submitted casting found that **SAMPLE #3** is sufficiently complete to be classified as the frame or receiver of a firearm and thus **is** a "firearm" as defined in the GCA.

In conclusion, we stress that the information found in correspondence from our Branch is intended only for use by the addressed individual or company with regard to a specific scenario described within that correspondence.

To facilitate return of your samples, please provide FTB with the appropriate FedEx account information within 60 days of receipt of this letter.

We thank you for your inquiry and trust the foregoing has been responsive to your evaluation request, noting that two findings did not meet your expectations.  Please do not hesitate to contact us if additional information is needed concerning our determinations.

Sincerely yours,

Earl Griffith
Chief, Firearms Technology Branch

Enclosure

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 226 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 5 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 57 of 70





80 Percent Arms AR-type Forgings
Submitted 4/30/2013

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 227 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 6 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 58 of 70





Sample #1, Photographs #1 and #2

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 228 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 7 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 59 of 70





Sample #1, Photograph #3 and #4

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 229 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 8 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 60 of 70





Sample #2, Photograph #1 and #2

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 230 of 294
Case 3:20-cv-06761-EMC  Document 177-17  Filed 09/07/23  Page 9 of 11
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 61 of 70





Sample #2, Photograph #3 and #4

Case: 24-2701, 08/29/2025, DktEntry: 28.1, Page 231 of 294
Case 3:20-cv-06761-EMC   Document 177-17   Filed 09/07/23   Page 10 of 11
Case 1:14-cv-01211-JAM-SAB   Document 19-3   Filed 01/09/15   Page 62 of 70





Sample #3, Photograph #1 and #2

Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 232 of 294
Case 3:20-cv-06761-EMC  Document 177-17  Filed 09/07/23  Page 11 of 11
Case 1:14-cv-01211-JAM-SAB  Document 19-3  Filed 01/09/15  Page 63 of 70





Sample #3, Photograph #3 and #4



# EXHIBIT 18



**U.S. Department of Justice**

Bureau of Alcohol, Tobacco,
Firearms and Explosives

_Martinsburg, WV  25405_

www.atf.gov

903050:GR
3311/301171

November 22, 2013

Mr. David Trease
President
TPM Arms, LLC
1000 West Bradley Avenue
Suite J
El Cajon, CA 92020

Dear Mr. Trease,

This is in reference to your correspondence to the Bureau of Alcohol, Tobacco, Firearms
and Explosives (ATF), along with a submitted
sample of an AR-15 type receiver blank, to determine if the machining operations
performed have reached a point in manufacturing for your item to be considered a
"firearm" under the amended Gun Control Act of 1968 (GCA).

As background, the GCA, 18 U.S.C. Section 921(a)(3), defines the term "**firearm**" as—

> ...(A) any weapon (including a starter gun) which will or is designed to or may
> readily be converted to expel a projectile by the action of an explosive; (B) the
> <u>frame or receiver</u> of any such weapon; (C) any firearm muffler or firearm
> silencer; or (D) any destructive device.  Such term does not include an antique
> firearm.

Our Branch has previously determined that an AR-15 type receiver which has <u>no
machining of any kind performed in the area of the trigger/hammer recess</u> might not be
classified as a firearm.  Such a receiver could have all other machining operations
performed, including pivot-pin and takedown-pin hole(s) and clearance for the takedown-
pin lug, but must be completely solid and un-machined in the trigger/hammer-recess area.

Mr. David Trease                                           Page 2

The FTB examination of your sample confirmed that the forging has been partially machined, with no machining of any kind performed in the area of the trigger/hammer recess. The machining operations performed for this sample include—

- Implementation of the magazine well.
- Threads cut for receiver extension.
- Holes drilled for front and rear takedown pins.
- Holes drilled for front takedown detent and spring.
- Hole drilled and machined for magazine catch.
- Hole drilled for bolt-catch plunger and spring.
- Hole drilled for magazine-release button and spring.
- Holes drilled for trigger guard.
- Hole drilled for buffer detent and spring.
- Hole drilled and tapped for pistol-grip screw.

Further, the trigger/hammer recess of your submitted sample is solid, and there are no index detents machined for the safety lever or the trigger/hammer pins (see photos below).



Case: 24-2701  08/29/2025  DktEntry: 28.1  Page 236 of 294
Case 3:20-cv-06761-EMC   Document 177-18   Filed 09/07/23   Page 4 of 4
Case 1:14-cv-01211-JAM-SAB   Document 23-1   Filed 01/09/15   Page 37 of 70

Mr. David Trease                                         Page 3



Based on our examination, FTB finds that the submitted item is not a "firearm" as
defined in the GCA.  Please note that this classification is based on the item received and
examined by our Branch.  Any changes to its characteristics would require re-evaluation
by FTB.

Please provide our Branch with a FedEx account number or common carrier shipping
label within 30 days so that we may return your forging.

We thank you for your inquiry and trust the foregoing is responsive to your request.

Sincerely yours,


Earl Griffith
Chief, Firearms Technology Branch

1  BRIAN M. BOYNTON
   Principal Deputy Assistant Attorney General
2

3  LESLEY FARBY
   Assistant Branch Director
4

5  DANIEL RIESS (Texas Bar No. 24037359)
   TAISA M. GOODNATURE (New York Bar No. 5859137)
6  JEREMY S.B. NEWMAN (Massachusetts Bar No. 688968)
   Trial Attorneys
7  United States Department of Justice
   Civil Division
8  Federal Programs Branch
   1100 L Street NW
9  Washington, DC 20005
   Telephone: (202) 532-3114
10 FAX: (202) 616-8460
   jeremy.s.newman@usdoj.gov
11

12 Attorneys for Federal Defendants

13                    UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                     SAN FRANCISCO DIVISION

16

17 STATE OF CALIFORNIA,                 )  Case No. 3:20-cv-06761-EMC
                           *et al.*      )
18         Plaintiffs,                   )  **DEFENDANTS' NOTICE OF MOTION AND**
                                         )  **MOTION FOR SUMMARY JUDGMENT;**
19         v.                            )  **[PROPOSED] ORDER**
   BUREAU OF ALCOHOL, TOBACCO,           )
20 FIREARMS, and EXPLOSIVES ("ATF"),     )
                           *et al.*,     )  Noting Date: January 25, 2024
21                                       )  Time:  4:30 p.m.
           Defendants.                   )  Place:  Courtroom 5, 17th Floor
22                                       )
                                         )
23 _____

24

25

26

27

28

'80%' receivers do actually meet the definition of a 'firearm' as defined in the Gun Control Act (GCA)." ATF, https://www.atf.gov/firearms/qa/are-some-items-being-marketed-non-firearm-unfinished-or-80-receivers-actually-considered, ATF Supp 000166.  This statement is consistent with the Rule's "readily" standard, and further belies Plaintiffs' unfounded allegation that ATF has "determined that 80 percent receivers and frames are not 'firearms' under the GCA."  Suppl. Am. Compl. ¶ 7.

*Post-Rule Classification Letters.*  In a series of classification letters addressing partially complete AR-type receivers, ATF faithfully applied the GCA and the Rule (including the "readily" standard and Example 4), as elucidated in the September 2022 Open Letter.  Plaintiffs challenge 23 classification letters in which ATF concluded that a partially complete AR-type receiver was not a receiver or a firearm under the GCA or the Rule.  *E.g.*, ATF Supp 000238-000242.[12]  Each letter begins by quoting the relevant portions of the GCA and the Rule, including the GCA's definition of "firearm," the Rule's general definition of "frame or receiver," the provision of the Rule addressing partially complete frames and receivers, and the Rule's definition of "readily."  *E.g.*, ATF Supp 000239-000240.  Each letter then, using language substantively identical to the September 2022 Open Letter's language, explains that an AR-type receiver without indexing or machining in the fire control cavity is not a firearm in the absence of supporting materials such as jigs.  *E.g.*, ATF Supp 000240.  Each letter then analyzes the product at issue, with photographs, and concludes that the product lacks indexing or machining in the fire control cavity.  *E.g.*, ATF Supp 000241.  On that basis, each letter concludes that ATF "has determined, based on the entire record before it, that the submitted sample may not 'readily be completed, assembled, restored or otherwise converted to function as a frame or receiver.'  Therefore, the submitted 'partially complete' AR-type receiver is not a '**firearm**' as defined in the GCA, 18 U.S.C. § 921(a)(3)."  *E.g.*, ATF Supp 000242.  The lawfulness of each of these letters follows directly from the lawfulness of the Rule's "readily" test, Example 4, and the September 2022 Open Letter's conclusion that an AR-type receiver blank without indexing or machining in the fire control cavity is not a firearm in the absence of supporting materials

---

[12] The other classification letters challenged by Plaintiffs are produced in the administrative record at ATF Supp 000221; ATF Supp 000243; ATF Supp 000273; ATF Supp 000318; ATF Supp 000323; ATF Supp 000328; ATF Supp 000333; ATF Supp 000348; ATF Supp 000353; ATF Supp 000363; ATF Supp 000368; ATF Supp 000383; ATF Supp 000388; ATF Supp 000393; ATF Supp 000408; ATF Supp 000438; ATF Supp 000443; ATF Supp 000448; ATF Supp 000453; ATF Supp 000468; ATF Supp 000496; ATF Supp 000502.

1   such as jigs.

2   Notably, Plaintiffs do not challenge (and apparently agree with) the dozens of classifications ATF

3   has issued concluding that a partially complete frame or receiver is a firearm.  In 23 letters classifying

4   partially complete AR-type or similar receivers, ATF has concluded that the product is a firearm because

5   it included machining in the fire control cavity, which rendered the product sufficiently easy to complete

6   to satisfy the "readily" test.[13]  ATF likewise classified two partially complete Glock-type pistol frames as

7   firearms, based on analysis echoed in the December 2022 Open Letter, because the simple operations

8   needed to complete the product could be performed quickly and easily.  *See* ATF Supp 000248; ATF Supp

9   000473.  Plaintiffs do not challenge these classifications and apparently agree with them.  The full set of

10  ATF's classifications, both the "firearm" classifications and the "not a firearm" classifications, shows that

11  ATF is correctly analyzing each partially complete frame or receiver to determine whether it may readily

12  be completed to a functional state.

13  **4.  The December 2022 Open Letter Is Lawful.**

14  In the December 2022 Open Letter, ATF determined that certain partially complete striker-fired

15  pistol frames manufactured by Polymer80 and Lone Wolf (and similar products manufactured by others)

16  are firearms because they may readily be completed into functional frames.  *See* December 2022 Open

17  Letter at 1.  Plaintiffs apparently agree with this determination that the products covered by the December

18  2022 Open Letter are firearms.  Yet they nonetheless argue that the letter "conflicts with the GCA to the

19  extent it fails to include or extend to other categories of similar weapons, such as partially complete

20  hammer-fired pistol frames, that are just as readily convertible into fully functional firearms," stating that

21  ATF's purported "exclusion of these materially identical products from the definition of 'firearm' conflicts

22  with the GCA."  Suppl. Am. Compl. ¶ 172.

23  Plaintiffs misunderstand the December 2022 Open Letter.  The letter addressed a discrete and

24  limited question: "whether a 'partially complete, disassembled, or nonfunctional' frame of a Polymer80,

25  Lone Wolf, or similar semiautomatic, striker-fired pistol . . . is . . . classified as a 'frame' or 'firearm' in

---

26   [13] *See* ATF Supp 000226; ATF Supp 000233; ATF Supp 000257; ATF Supp 000263; ATF Supp

27  000268; ATF Supp 000278; ATF Supp 000283; ATF Supp 000288; ATF Supp 000293; ATF Supp
    000298; ATF Supp 000303; ATF Supp 000308; ATF Supp 000313; ATF Supp 000338; ATF Supp

28  000358; ATF Supp 000378; ATF Supp 000398; ATF Supp 000403; ATF Supp 000418; ATF Supp
    000423; ATF Supp 000428; ATF Supp 000433; ATF Supp 000458.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, et al., <br><br> Defendants. | CIVIL CASE NO.: 3:20-CV-06761-EMC |

## DECLARATION OF DANIEL HOFFMAN

I, Daniel Hoffman, pursuant to 28 U.S.C. § 1746, declare and say as follows:

1. I am the Chief of the Firearms Technology Industry Services Branch (FTISB) and a Firearms Enforcement Officer (FEO) at the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have been in my current role for the past two years and employed with ATF's Firearms & Ammunition Technology Division (FATD) since January 2016. FATD provides expert technical support on firearms and ammunition to the Bureau, the firearms and ammunition industry, the general public, and other federal, state, local and foreign law enforcement agencies. The Division is the federal technical authority relating to firearms and ammunition and their classification under federal laws and regulations. FATD maintains an extensive firearms reference collection, firearms technical reference files, a reference library, and other firearms and ammunition resources. I base this report on my personal observations and experience with firearms, including privately made firearms (PMFs), over the past 29 years.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

ER-240

2. I served in the U.S. Army (Maryland National Guard) for 13-1/2 years, first as a small arms repairman and then in the infantry.  I attended Small Arms Repair School in Aberdeen, Maryland, where I was trained on 17 different military weapon systems in operation, troubleshooting, repair, and basic mechanics.  I spent the second part of my career in the Infantry, including two tours in Iraq, conducting over 250 combat missions.  One of my primary duties was as the platoon weapons sergeant, training my soldiers in the maintenance and operation of the unit machineguns.

3. In addition to my weapon systems training in the military, during my time with ATF, I have attended armorer courses covering over 30 different weapon platforms.  I have also toured over a dozen firearm and ammunition manufacturing facilities, being educated on firearm and ammunition manufacturing processes.

4. FATD has considerable expertise in classifying PMFs (often referred to as "ghost guns" when unmarked) and serves as ATF's subject matter experts on this topic.  I have personally built over a dozen PMFs, including AR-types, Glock-types, AK-types, and SIG 320-types.  Additionally, during the implementation of Final Rule 2021R-05F, the Rule at issue in this case (Final Rule), I led a team of FEOs tasked with building dozens of PMFs to determine whether partially complete frames and receivers may "readily," as that term is defined under 27 C.F.R. § 478.11, be completed, assembled, restored, or otherwise converted to function as a frame or receiver of a firearm.  In 2020, I developed ATF's initial PMF training presentation, and have provided it over a dozen times both internally to ATF and to external law enforcement agencies.

5. Specific to AR-type receivers, I represented ATF as a firearms expert in both *United States v. Roh*, SACR-14-167-JVS, Minute Order p. 6 (C.D. Cal. July 27, 2020), and *United States v. Rowold*, 429 F. Supp. 3d 469 (N.D. Ohio 2019).

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

6. Both cases involved AR-type receivers, and the defendants argued that the receiver of an AR-type firearm did not meet ATF's regulatory definition of "frame or receiver." These courts applied the previous definition of "frame" or "receiver" in a way that would leave most firearms in circulation in the United States without an identifiable frame or receiver. Specifically, under these district courts' holdings, the frames or receivers of approximately 90% of all firearms, including AR-type firearms, would fail to meet the "frame or receiver" regulatory definition. ATF began the process of updating the regulatory definition of the term "frame or receiver" as a result of these court decisions. 87 FR 24652, 24655 (Apr. 26, 2022).

7. In the past ten years, I have authored no publications.

8. I am being compensated for the study and testimony in this case according to my normal salary with ATF as Chief of FTISB. My salary is classified as GS-14 under the federal government's General Schedule Payscale.

9. Based on my firearms training, knowledge, and experience, I was tasked by ATF with providing technical assistance with the Final Rule.

### Technical Background

10. The vast majority of AR-type receivers are manufactured from aluminum (generally Aluminum 7075 or, more infrequently, Aluminum 6061). However, an AR-type receiver can also be constructed from polymer, either from a molding or, more recently, through additive manufacturing (3D printing).

11. Traditional aluminum AR-type receivers are generally manufactured by one of two processes. The most common process is known as forging, where a block of Aluminum 7075 is super-heated, then hammered into the raw shape of an AR-type receiver. As discussed herein, the forging of an AR-type receiver requires multiple additional machining processes to reach the stage of completion.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

**ER-242**

 

**AR-type Raw Forging**

12. Another common manufacturing process involves milling an aluminum AR-type receiver from an aluminum billet (a single block of metal).  The receiver is manufactured by milling the billet using a computer numerical control (CNC) machine or other type of machine to remove the excess material to form the receiver.  Unlike a forging, many of the machining processes occur as the receiver is being created, such as cutting the receiver extension ring and broaching (forming) the magazine well.

 

**Raw Aluminum Billet and AR-type receiver with magazine well, take down pin holes, and receiver extension ring completed**

13. Commercial polymer AR-type receivers are manufactured by liquid polymer being extruded into a mold.  Several of the necessary processes to manufacture an aluminum AR-type receiver are unnecessary with liquid polymer and specific molds.  For example, the use of a mold can be used to form the magazine well or the fire control cavity without further machining.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

**ER-243**

 

**Unfinished (left) and Finished (right) polymer AR-type receivers**

14. Finally, AR-type receivers are becoming more frequently made from additive manufacturing, better known as 3D printing. 3D printing continues to become more and more affordable, with the cost of printers constantly falling. The primary difference between a $150 and $2500 printer is often the speed at which it will print. Multiple AR-type receiver designs are publicly available as open-source code.

 

**3D printed AR-type receivers**

15. The majority of AR-type partially complete receivers are not utilized by the public to create PMFs, but rather are completed by licensed manufacturers, *i.e.*, federal firearms licensees. These manufacturers either manufacture these items or purchase them as unfinished, unregulated items, and then complete them to be sold as either serialized receivers or complete weapons.

16. Serializing firearms too early in their production could hinder the manufacturing processes of licensed manufacturers by requiring markings where additional material still needs to be

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

removed from the outside of the item to complete it.  These additional machining steps could then result in removal, alteration, or obliteration of the manufacturer's serial number, potentially in violation of 18 U.S.C. § 922(k) or 26 U.S.C. § 5861(g),(h) (NFA firearms).

**Application of the Final Rule**

17. The Final Rule amended the regulatory definition of "frame or receiver" with the addition of 27 C.F.R. § 478.12.   Section 478.12(a)(1) defines the term "frame" to mean: "the part of a handgun, or variants thereof, that provides housing or a structure for the component (*i.e.*, sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure." Section 478.12(a)(2) defines the term "receiver" to mean: "the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure."

18. In the Final Rule, ATF grandfathered the regulated component of AR-variant[1] firearms in 27 C.F.R. § 478.12(f)(1)(i) as follows: "AR-15/M-16 variant firearms: The receiver is the lower part of the weapon that provides housing for the trigger mechanism and hammer (i.e., lower receiver)."  Prior to the Final Rule, ATF had long classified the lower receiver as the "frame or receiver" of AR-variant firearms and had historically regulated the lower receiver as a

---

[1] The terms "variant" and "variants thereof" mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver. 27 C.F.R. § 478.12(a)(3).

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

firearm defined under 18 U.S.C. § 921(a)(3), requiring marking and recordkeeping. *See* 18 U.S.C. §§ 923(i), 923(g).  Changing the regulated component to the upper receiver, although consistent with the Final Rule's definition of "receiver," would have resulted in the creation of numerous non-serialized firearms consisting of a pre-final rule unmarked upper receiver with a post-final rule unmarked lower receiver.



**27 C.F.R. § 478.12(f)(1)(i), Figure 11**

19. Even though the lower receiver has been classified as the regulated AR-type "receiver," it technically falls under the regulatory definition of "frame" because the lower receiver "provides housing for the trigger mechanism and hammer."  Specifically, an AR-type lower receiver "provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer."  As illustrated below, the sear of an AR-type firearm is located on the trigger, which is housed in the lower receiver.




**AR-type fire control components showing trigger and hammer interaction**

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

**ER-246**

20. 27 C.F.R. § 478.12(c) addresses when a "[p]artially complete, disassembled, or nonfunctional frame or receiver" is regulated as a "frame" or "receiver." The terms "frame" and "receiver" shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver, i.e., to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be."

21. 27 C.F.R. § 478.12(c) also states: "The terms ['frame' and 'receiver'] shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material). When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit, or otherwise made available by the seller or distributor of the item or kit to the purchaser or recipient of the item or kit.

22. In an AR-type firearm, the fire control cavity provides housing or a structure for the trigger mechanism and hammer. The trigger initiates the firing cycle and releases the hammer. Once released, the hammer strikes an explosive primer at the rear of the ammunition cartridge to ignite propellant powder and expel a projectile (bullet) though a barrel. Accordingly, the fire control cavity of the lower receiver is the critical area when determining whether a partially complete AR-type receiver may readily be completed, assembled, restored, or otherwise converted to a function as a receiver. Simply put, without a fire control cavity, there is no

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

ER-247

place to install the trigger mechanism and hammer that allow an AR-type firearm (once assembled) to expel a projectile by the action of an explosive.

**ATF Classifications**

23. I have reviewed the Declaration of James Yurgealitis submitted in this case. The primary argument of Mr. Yurgealitis appears to be that ATF "fails to address" the "readily" analysis as set out in the Final Rule when ATF classified partially complete AR-15/M-16-type receivers. 27 C.F.R. § 478.11 defines the term "readily" as: *"A process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state. With respect to the classification of firearms, factors relevant in making this determination include the following:*

(1) Time, i.e., how long it takes to finish the process;

(2) Ease, i.e., how difficult it is to do so;

(3) Expertise, i.e., what knowledge and skills are required;

(4) Equipment, i.e., what tools are required;

(5) Parts availability, i.e., whether additional parts are required, and how easily they can be obtained;

(6) Expense, i.e., how much it costs;

(7) Scope, i.e., the extent to which the subject of the process must be changed to finish it; and

(8) Feasibility, i.e., whether the process would damage or destroy the subject of the process, or cause it to malfunction."

24. Mr. Yurgealitis's assertion that ATF did not perform the "readily" analysis is incorrect. The September 27, 2022 ATF Open Letter addressing the impact of the Final Rule on partially complete AR-15/M-16-variant receivers utilized and accurately reflected the results of analysis

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

of whether such partially complete receivers may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver under the Final Rule's definition of readily. Before the Letter was issued, FTISB had conducted dozens of firearm builds from partially complete AR-type receivers to determine when the partially complete or unfinished AR-type may readily be completed or otherwise converted to a functional state. FTISB completed partially complete AR-type receivers of both aluminum and polymer composition, using a variety of tools, such as drill presses, routers, and rotary tools, to create the fire control cavity. Additionally, FTISB utilized other manufacturing methods, such as 3D printing and desktop CNC machines, for comparison.

25. While time, ease, and expertise weighed heavily in the "readily" analysis, these factors were substantially affected by the available equipment (factor #4): specifically, fixtures/jigs that were designed to complete the partially complete AR-type receivers. These fixtures/jigs are specialized tools that identify the exact measurements and location of material necessary to be removed from the fire control cavity and that guide the drilling operations necessary to complete the receiver. FTISB determined that these fixtures/jigs greatly reduced the time (#1), ease (#2), expertise (#3), and expense (#6) necessary to complete the receiver, while greatly enhancing the feasibility (#8) of doing so without damaging the receiver.

26. These fixtures/jigs are unnecessary for licensed manufacturers to complete unfinished receivers into a functional receiver because they have the required expertise and specialized industrial equipment such as CNC machines. By contrast, the fixtures/jigs are essential for PMF builds, particularly by persons with no expertise. The Final Rule explicitly addressed partially complete frames or receivers sold with these fixtures. As described in ATF classification letters and the Final Rule, 27 C.F.R. § 478.92(c), any evaluations are specific to the partially complete AR-type receivers and any jigs or templates submitted or made available

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

ER-249

by the distributor to the purchaser of those items (whether or not in a kit configuration). In this regard, ATF made clear in the Final Rule, 27 C.F.R. § 478.92(c), that these items or kits must be provided to ATF with any classification request so that a proper classification can be made.

27. Prior to the issuance of ATF Open Letter to Federal Firearms Licensees on the Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers on September 27, 2022, FEOs in FTISB completed or attempted to complete numerous partially complete AR-type receivers with a fixture/jig. These builds averaged 1.5 – 3 hours to complete depending on the quality of the fixtures/jigs and the tools used and the experience of the FEO. The quality of the builds was lower than a receiver milled by a CNC machine. Nonetheless, once completed, they all functioned as an AR-type receiver by providing a proper housing for the trigger mechanism and hammer.

28. To help implement the Final Rule, FTISB also developed a standard procedure to assist FEOs in evaluating the tracked the factors under the "readily" definition to track the "readily" analysis of unfinished frames and receivers. FTISB developed a "Readily" Assembled Firearm Completion Form for this purpose.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

**ER-250**



### "Readily" Assembled Firearms Completion Form

**EXAMPLE ONLY - NOT AN ACTUAL EVALUATION**

| Date: 8/2/2022 | Time: 1000 | FEO assigned:Rondal Bleigh |
|---|---|---|
| Type of kit assembled: (AR, pistol, etc.):AR15 | | Brand:POLYMER80 |
| Firearm action type:semiautomatic | | Was kit "BBS" ready: Yes ☐No☒ |
| Caliber: 5.56 | Kit material:Polymer | |
| Time needed to complete build:3 hours | Cost of build: $$130 | |
| Number of parts (not included) needed to complete kit:10 | | |
| Level of skill required to complete build:Expert | Quality of kit:Average | |

Please list required tool(s) utilized in the completion of the build:drill press, brass hammer, punch, armorer wrench

Notes:kit does not include upper receiver or any finishing parts such as springs, take down pins etc. The level of expertise needed to complete, along with the tools make this well beyond the novice level.  This second attempt was successful, slowing the milling procedure down significantly produced quality results.  The weapon functioned and fired as designed.

**Example of FTISB "readily" analysis worksheet**

29. In addition to the completion of numerous AR-type partially complete receivers, ATF also evaluated the other manufacturing steps required to fully complete an AR-type forging.  These steps include completion of the receiver extension ring (as discussed below), the broaching (forming) of the magazine well, and completion of the take down pin holes.  In each instance, these steps did not affect the ability of the partially complete receiver to provide housing for the trigger mechanism and the hammer.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

**ER-251**

30. ATF also examined the broaching (forming) of the magazine well and determined that while such broaching forms a critical step in the completion of a functional semiautomatic firearm, this step was not necessary for an AR-type receiver with a milled fire control cavity and upper assembly installed being capable of expelling a projectile by the action of an explosive.  Put another way, without a magazine well, a user could still load a single round into the upper assembly and fire the weapon.  Thus, ATF determined that the manufacturing of the magazine well was not critical in determining when a partially complete AR-type receiver becomes a "receiver" or regulated "firearm."



**Broaching of an AR-type magazine well**

31. ATF examined the creation of the receiver extension ring, which allows the installation of a receiver extension (buffer tube) necessary for a traditional AR-type firearm to cycle.  However, newer AR-type designs utilize "captive recoil" systems which eliminates the need for the receiver extension ring.  As such, ATF determined that this process was also not critical in the determination as to when a partially complete AR-type receiver becomes a "receiver" or regulated "firearm."

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

ER-252

 

**Examples of AR-type firearms with captive recoil systems**

32. Lastly, ATF examined the drilling of the take down pin holes. While such drilling is a critical step in completing an AR-variant firearm, this step does not the affect the ability to provide housing or a structure for the trigger mechanism and hammer, or for the complete weapon, once assembled, to expel a projectile. Rather, the rear take down pin holds the upper assembly on the lower receiver, which could be accomplished through other methods, such as the use of zip-ties.



**Front and Rear Take Down Pins**

33. Mr. Yurgealitis also claims: "Each of the Challenged Classification Letters therefore applies a type of machining analysis, which classifies partially complete frames and receivers depending on which machining operations need to be performed in order to complete or convert the item. That machining analysis was used prior to the Final Rule." Mr. Yurgealitis is correct in the sense that the actual machining operations necessary to complete an AR-type "non-

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

ER-253

firearm" receiver "billet" or "blank" to become an AR-type "firearm" receiver did not change with implementation of the Final Rule. What changed was ATF's adherence to the "readily" criteria laid out in the Final Rule. In applying the Rule to a partially complete frame or receiver, the machining operations necessary for its completion are highly relevant to the time and ease with which it can be rendered functional. For example, if a product has many complex machining operations left to be performed before it is functional, it is likely to take a longer time to complete and be more difficult to complete. By contrast, if the product requires only a small number of simple operations, it is more likely to be easier to complete, and to take a shorter time to do so. In applying the "readily" standard, therefore, ATF must examine which machining operations must be performed to make the product a completed, functional frame or receiver. ATF must also examine whether an item has been indexed to indicate precisely where holes should be drilled, because such indexing makes it both easier and less time-consuming for an item to be completed., Additionally, as explained above, ATF's "readily" analysis includes an examination of jigs, templates, and tools made available by the distributor of the partially complete AR-type receivers to make that determination. In summary, the "readily" analysis confirmed that ATF's previous classification of unfinished AR-type receivers was correct when not accompanied with a fixture/jig.

34. Mr. Yurgealitis also states that the products in ATF's Classification Letters found not to be "firearms" are materially indistinguishable from the items ATF found to be firearms. This argument fails to consider that the submissions to ATF requested a determination whether the submitted AR-type partially completed receiver is a "firearm" while maintaining a solid fire control cavity, which (as explained earlier) is the critical area. ATF clearly explained the proper measurement of the takedown pin area to the submitters in the classification letters: "ATF has determined that drilling or milling a standard .800 inch takedown pin area, <u>measured</u>

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

**ER-254**

from immediately forward of the front of the buffer retainer hole, next to the fire control cavity, does not impact the ability of the fire control cavity to house the trigger mechanism and hammer." ATF set a definitive line based on the necessary drilling or milling required for the takedown pin area to not impact the fire control cavity. While this may seem "indistinguishable" to the unacquainted individual, it makes perfect sense; removal of any additional material would impact the fire control cavity's ability to accept the applicable fire control components.

35. Similarly, Mr. Yurgealitis also claims: "ATF's use of 0.8 inch takedown pin areas and 1.6 inch takedown pin lug clearance areas as a factor in determining whether a partially complete frame or receiver is classified as a firearm is arbitrary." However, ATF delineated this reasonable measurement so that manufacturers of non-firearm blanks and firearm receivers alike know when they have created a regulated item when they mill out that area. The rear lug area has been determined not to encroach into the critical fire control area, and as such has been allowed to be machined without being a "firearm." This rear lug area allows upper and lower AR assemblies to be "fitted" to ensure compatibility. In AR-10 type partially complete receivers, this rear lug area has been extended to 1.600 inches as the receiver is longer and the critical fire control area resides further forward.

 

**Rear lug area allows upper and lower to ensure fit**

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

36. The establishment of the .800 inch standard in the rear lug area is not an "arbitrary" analysis. As described in relevant part in 27 C.F.R. § 478.12(c), "[a] blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jig, templates, equipment, or tools such that it may readily be completed is not a receiver." The rear lug area does not encroach into the critical interior area. Therefore, an AR-15 type receiver with a takedown pin area of .800 inches or less does not have critical interior areas that have been indexed, machined, or formed; such an item that is sold without instructions, jigs, templates, equipment or tools allowing it to readily be completed is not a "receiver."

37. Mr. Yurgealitis states: "Generally, converting a partially complete receiver into a firearm requires completing just a few steps with common household tools" and that the "conversion process can take one to three hours." Nowhere in Mr. Yurgealitis's declaration does he describe completing an AR-type receiver himself. Nor does he articulate the steps or "household tools" necessary to complete an unfinished receiver using the "readily" analysis.

38. In my personal experience, having completed multiple partially complete AR-type receivers, this is not the simple process Mr. Yurgealitis describes. I completed my first AR-type receiver in the fall of 2017, using a compatible AR-type fixture (*e.g.*, a jig), a hand drill, and a drill press. The initial drilling of the fire control cavity took me approximately three hours. However, the dimensions on the cavity were not to specification, and I needed another hour and a half to get the receiver into a functional state. Even at four and a half hours, and with my considerable experience with firearms, the completed receiver build quality was substandard, with the fire control cavity not being cut to exact specifications. This shows that the process to complete a partially complete AR-type "non-firearm" receiver is not nearly as easy as Mr. Yurgealitis' contends.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT –
CASE NO. 3:20-CV-06761-EMC

39. Lastly, Mr. Yurgealitis states: "ATF does not at all assess whether the products under analysis were sold or distributed with 'jigs, templates, equipment, or tools.'"  This statement is incorrect.  Each post-Final Rule classification letter provides: "The classification does not apply if any templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials are sold, distributed, possessed with the item, or otherwise made available by the seller or distributor of the item to the purchaser or recipient of the item, as set forth in 27 C.F.R. § 478.12(c).  ATF would require a separate and complete submission encompassing any such material in order to provide a separate classification on any such changes or additional material or combination of materials."  ATF's evaluations were specific to the partially complete AR-type receivers without available and compatible jigs.  ATF makes it clear that if the products being analyzed were sold or distributed with jigs, templates, equipment, or other such materials, its classification is subject to change.

## Conclusion

40. ATF applied the "readily" analysis as described in Final Rule 2021R-05F when it determined whether partially complete AR-type receivers had reached a stage of manufacture to be considered "receivers," or regulated "firearms."  I disagree with the assertion that the partially complete AR-type receivers determined to be "non firearms" at issue in this case are easily completed with common household tools in a few hours.  Based on my experience, the completion of an unfinished AR-type receiver without a compatible fixture / jig to correctly mill a solid fire control cavity is extremely difficult and would require many hours by a skilled machinist to complete.[2]

---

[2] It should be noted that only one of the shootings addressed in Mr. Yurgealitis's declaration involved a privately made firearm—the one used in Santa Monica, California in 2013. That firearm was directly linked to the *United States v. Roh* case, in which I served as an expert witness. That firearm

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

I declare under penalty of perjury pursuant to 18 U.S.C. § 1746 that the foregoing is correct and true to the best of my knowledge.

DATED: December 7, 2023

_____
DANIEL HOFFMAN
Chief, Firearms Technology Industry
Services Branch

---

was manufactured on a $50,000 CNC machine, not with common household tools. The Department of Justice was unable to successfully prosecute that case due to the court's finding that the previous definition of "frame or receiver" did not encompass the lower receiver.

DECLARATION OF DANIEL HOFFMAN IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT – CASE NO. 3:20-CV-06761-EMC

ER-258

1

2

3

4 UNITED STATES DISTRICT COURT

5 NORTHERN DISTRICT OF CALIFORNIA

6

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case No. 20-cv-06761-EMC |
| Plaintiffs. | |
| v. | **JUDGMENT IN A CIVIL CASE** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, et al., | |
| Defendants. | |

**( )  Jury Verdict.**  This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**(X)  Decision by Court.**  This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.  IT IS SO ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment is granted in part and denied in part and Plaintiffs' Motion for Summary Judgment is granted in part and denied in part.

**IT IS SO ORDERED AND ADJUDGED**

Dated: 3/4/2024

Mark B. Busby, Clerk of Court

Vicky Ayala
Deputy Clerk

United States District Court
Northern District of California

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

JEREMY S.B. NEWMAN (Massachusetts Bar No. 688968)
DANIEL RIESS (Texas Bar No. 24037359)
Trial Attorneys
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW, Room 12106
Washington, DC 20005
Telephone: (202) 353-3098
FAX: (202) 616-8460
daniel.riess@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*<br><br>       Plaintiffs,<br><br>  v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES ("ATF"), *et al.*,<br><br>       Defendants. | Case No. 3:20-cv-06761-EMC<br><br>**NOTICE OF APPEAL** |

     PLEASE TAKE NOTICE that Defendants Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF); Steven Dettelbach, in his official capacity as Director of ATF; the United States Department of Justice; and Merrick Garland, in his official capacity as Attorney General of the United States, hereby appeal to the United States Court of Appeals for the Ninth Circuit from the Court's Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment; and Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment [ECF No. 207] and Judgment [ECF No. 208].

1

2    DATED: April 26, 2024                    Respectfully submitted,

3

4                                             BRIAN M. BOYNTON
                                              Principal Deputy Assistant Attorney General
5
                                              LESLEY FARBY
6                                             Assistant Branch Director

7                                             */s/ Daniel Riess*
                                              JEREMY S.B NEWMAN
8                                             DANIEL RIESS
                                              Trial Attorneys
9
10                                            *Attorneys for Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

ADRMOP,APPEAL,CLOSED,STAYED

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:20–cv–06761–EMC

State of California et al v. Bureau of Alcohol, Tobacco, Firearms, and Explosives et al
Assigned to: Judge Edward M. Chen
Case in other court:  for the Ninth Circuit, 24–02701
Cause: 05:702 Administrative Procedure Act

Date Filed: 09/29/2020
Date Terminated: 03/04/2024
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**State of California**                    represented by   **R. Matthew Wise**
Office of the Attorney General
Department of Justice
1300 I Street, Suite 125
Sacramento, CA 95814
(916) 210–6046
Fax: (916) 324–8835
Email: Matthew.Wise@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean Clinton Woods**
Office of the Attorney General
California Department of Justice
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102
415–510–3807
Fax: 415–703–5480
Email: clint.woods@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott Alan Edelman**
Gibson, Dunn & Crutcher LLP
2000 Avenue of the Stars
Suite 1200n
Suite 1200n
Los Angeles, CA 90067–4700
310–557–8061
Email: sedelman@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bryan Muehlberger**                    represented by   **Avi Weitzman**
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
212–318–6000
Email: aviweitzman@paulhastings.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jillian Nicole London**
Gibson, Dunn & Crutcher LLP
2000 Avenue of the Stars, Suite 1200N
Los Angeles, CA 90067–4700
213–229–7671
Email: jlondon@gibsondunn.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Crain**
Gibson Dunn and Crutcher LLP
200 Park Avenue 47
New York, NY 10166
212–351–2454
Email: lcrain@gibsondunn.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Liesel Schapira**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212–351–6349
Email: lschapira@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David M Pucino**
Giffords Law Center to Prevent Gun
Violence
223 W 38th St Unit 90
New York, NY 10018
917–524–7816
Email: dpucino@giffords.org
*ATTORNEY TO BE NOTICED*

**Erica Payne**
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
212–351–4000
Fax: 212–351–4035
Email: EPayne@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hannah Elizabeth Shearer**
Giffords Law Center to Prevent Gun
Violence
268 Bush Street #555
San Francisco, CA 94104
415–433–2062
Email: hshearer@giffords.org
*TERMINATED: 01/06/2022*

**John Adam Skaggs**
Giffords Law Center to Prevent Gun
Violence
244 Madison Avenue
Suite 147
New York, NY 10016
917–680–3473
Email: askaggs@giffords.org
*TERMINATED: 03/28/2022*
*PRO HAC VICE*

**Kaylie L Springer**
Gibson, Dunn and Crutcher, LLP
200 Park Avenue
Floor 47

New York, NY 10166
212–351–6311
Email: KSpringer@gibsondunn.com
*TERMINATED: 04/22/2022*
*PRO HAC VICE*

**Scott Alan Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vivek R Gopalan**
Gibson, Dunn and Crutcher LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105
(415) 393–8285
Email: vgopalan@gibsondunn.com
*TERMINATED: 01/06/2021*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Frank Blackwell**                    represented by  **Avi Weitzman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jillian Nicole London**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Crain**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Liesel Schapira**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erica Payne**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hannah Elizabeth Shearer**
(See above for address)
*TERMINATED: 01/06/2022*

**John Adam Skaggs**
(See above for address)
*TERMINATED: 03/28/2022*
*PRO HAC VICE*

**Kaylie L Springer**
(See above for address)
*TERMINATED: 04/22/2022*
*PRO HAC VICE*

**Scott Alan Edelman**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Vivek R Gopalan**
(See above for address)
*TERMINATED: 01/06/2021*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Giffords Law Center to Prevent Gun Violence** | represented by | **Avi Weitzman**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Jillian Nicole London**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lee Crain**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Liesel Schapira**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David M Pucino**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erica Payne**
(See above for address)
*TERMINATED: 09/11/2024*
*PRO HAC VICE*

**Hannah Elizabeth Shearer**
(See above for address)
*TERMINATED: 01/06/2022*

**John Adam Skaggs**
(See above for address)
*TERMINATED: 03/28/2022*
*PRO HAC VICE*

**Kaylie L Springer**
(See above for address)
*TERMINATED: 04/22/2022*
*PRO HAC VICE*

**Scott Alan Edelman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vivek R Gopalan**
(See above for address)
*TERMINATED: 01/06/2021*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bureau of Alcohol, Tobacco, Firearms, and Explosives**

represented by **Daniel D. Mauler**
U.S. Department of Justice
Civil Division – Federal Programs Branch
20 Massachusetts Ave, NW
Room 6141
Washington, DC 20530
202–616–0773
Email: dan.mauler@usdoj.gov
*TERMINATED: 04/06/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Joseph Soskin**
US Dept of Justice
Office of the Assistant Attorney General,
Civil Division
RFK Main Justice Building
Room 3416
Washington, DC 20530
202–514–1500
Email: Eric.Soskin@usdoj.gov
*TERMINATED: 12/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. B. Newman**
DOJ–Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
202–532–3114
Email: jeremy.s.newman@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Craigmyle**
Office of General Counsel
Civil Division, Federal Programs Branch
5140 O'Neill HOB
Washington, DC 20515
202–430–0470
Email: bradley.craigmyle@fcc.gov
*TERMINATED: 03/21/2023*

**Daniel Martin Riess**
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
202–353–3098
Fax: 202–616–8460
Email: Daniel.Riess@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
DOJ–Civ
Civil Division, Federal Programs Branch
1100 L St., N.W.
Room 12504
Washington, DC 20530
202–353–4556
Email: martin.m.tomlinson@usdoj.gov
*TERMINATED: 03/22/2023*

**Defendant**

**Regina Lombardo**
*in her official capacity as Acting Deputy*
*Director of Bureau of Alcohol, Tobacco,*
*Firearms & Explosives*
*TERMINATED: 10/20/2022*

represented by **Daniel D. Mauler**
(See above for address)
*TERMINATED: 04/06/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Joseph Soskin**
(See above for address)
*TERMINATED: 12/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Craigmyle**
(See above for address)
*TERMINATED: 03/21/2023*

**Daniel Martin Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**Michael R Curtis**
*Chief, Firearms Technology Industry*
*Services Branch of Bureau of Alcohol,*
*Tobacco, Firearms & Explosives*
*TERMINATED: 10/20/2022*

represented by **Daniel D. Mauler**
(See above for address)
*TERMINATED: 04/06/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Joseph Soskin**
(See above for address)
*TERMINATED: 12/29/2020*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Craigmyle**
(See above for address)
*TERMINATED: 03/21/2023*

**Daniel Martin Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**United States Department of Justice**

represented by **Daniel D. Mauler**
(See above for address)
*TERMINATED: 04/06/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Joseph Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremy S. B. Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Craigmyle**
(See above for address)
*TERMINATED: 03/21/2023*

**Daniel Martin Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**William P. Barr**
*in his official capacity as Attorney*
*General of the United States*
*TERMINATED: 10/20/2022*

represented by **Daniel D. Mauler**
(See above for address)
*TERMINATED: 04/06/2021*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Eric Joseph Soskin**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bradley Craigmyle**
(See above for address)
*TERMINATED: 03/21/2023*

**Daniel Martin Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**Merrick B. Garland**
*in his official capacity*

represented by **Jeremy S. B. Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Riess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**Steven Dettelbach**
*in his official capacity*

represented by **Jeremy S. B. Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Riess**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Defendant**

**Daniel Hoffman**
*in his official capacity*

represented by **Jeremy S. B. Newman**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Martin Tomlinson**
(See above for address)
*TERMINATED: 03/22/2023*

**Amicus**

**District of Columbia**

represented by **Alacoque Hinga Nevitt**
Office of the Attorney General for the
District of Columbia
400 6th Street NW
Washington, DC 20001
202–717–1368
Email: alacoque.nevitt@dc.gov
*ATTORNEY TO BE NOTICED*

**Amicus**

**Everytown for Gun Safety Support
Fund**

represented by **Kathleen R. Hartnett**
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111–4004
(415) 693–2071
Fax: (415) 693–2222
Email: khartnett@cooley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Intervenor**

**Zachary Fort**

represented by **George M. Lee**
Seiler Epstein LLP
1 Embarcadero Center
Ste 1200
San Francisco, CA 94111
415–979–0500
Email: gml@seilerepstein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody James Wisniewski**
FPC Action Foundation
5550 Painted Mirage Road
Ste 320
Las Vegas, NV 89149
615–955–4306
Email: cwi@fpcafhq.org
*ATTORNEY TO BE NOTICED*

**Erin M Erhardt**
National Rifle Association
11250 Waples Mill Road

Fairfax, VA 80247
720–584–4578
Email: eerhardt@nrahq.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Frederick Barton**                    represented by    **George M. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody James Wisniewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin M Erhardt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**BlackHawk Manufacturing Group,**      represented by    **George M. Lee**
**Inc.**                                                  (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody James Wisniewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin M Erhardt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Firearms Policy Coalition, Inc.**     represented by    **George M. Lee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cody James Wisniewski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Erin M Erhardt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Polymer80, Inc.**                     represented by    **Germain Labat**
1875 Century Park East
Ste 1900
Los Angeles, CA 90067
323–880–4520
Email: germain.labat@gmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J. McGuire**

**ER-270**

Greenspoon Marder LLP
Litigation
1345 Avenue of the Americas
Suite 2200
New York, NY 10105
212–524–5040
Fax: 212–524–5050
Email: James.McGuire@gmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Francis Olsen**
The Law Office of John F. Olsen
800 West El Camino Real, Suite 180
Mountain View, CA 94040
(858) 412–4515
Email: jolsen@jfolsenlaw.com
*TERMINATED: 07/29/2022*

**Mark Berube**
Barton LLP
711 Third Avenue
14th Floor
New York, NY 10017
212–687–6262
Fax: 212–687–3667
Email: mark.berube@gmlaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/29/2020 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400, receipt number 0971–14998646.). Filed byFrank Blackwell, Bryan Muehlberger, Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Civil Cover Sheet, # 19 Summons, # 20 Summons, # 21 Summons, # 22 Summons, # 23 Summons)(Gopalan, Vivek) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 2 | Rule 7.1 Disclosures by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger *(Giffords Law Center has no parent corporation or publicly held corporation owning 10% or more of its stock.)* (Gopalan, Vivek) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 3 | Certificate of Interested Entities by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger *(Other than the named parties, there is no such interest to report.)* (Gopalan, Vivek) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 4 | MOTION for leave to appear in Pro Hac Vice *(Avi Weitzman)* ( Filing fee $ 310, receipt number 0971–14999062.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing)(Weitzman, Avi) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 5 | MOTION for leave to appear in Pro Hac Vice *(Lee Crain)* ( Filing fee $ 310, receipt number 0971–14999178.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing)(Crain, Lee) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 6 | MOTION for leave to appear in Pro Hac Vice *(Kaylie Springer)* ( Filing fee $ 310, receipt number 0971–14999435.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing, # 2 Certificate of Good Standing)(Springer, Kaylie) (Filed on 9/29/2020) (Entered: 09/29/2020) |

| | | |
|---|---|---|
| 09/29/2020 | 7 | MOTION for leave to appear in Pro Hac Vice *(Liesel Schapira)* ( Filing fee $ 310, receipt number 0971−14999476.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing)(Schapira, Liesel) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/29/2020 | 8 | NOTICE of Appearance by R. Matthew Wise (Wise, R.) (Filed on 9/29/2020) (Entered: 09/29/2020) |
| 09/30/2020 | 9 | Case assigned to Magistrate Judge Jacqueline Scott Corley. <br><br> Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening. <br><br> Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5−1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 10/14/2020. (anjS, COURT STAFF) (Filed on 9/30/2020) (Entered: 09/30/2020) |
| 09/30/2020 | 10 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 12/24/2020. Initial Case Management Conference set for 12/31/2020 01:30 PM. (mclS, COURT STAFF) (Filed on 9/30/2020) (Entered: 09/30/2020)** |
| 09/30/2020 | 11 | Summons Issued as to William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Attachments: # 1 Regina Lombardo, # 2 Michael R. Curtis, # 3 Department of Justice, # 4 William Barr)(mclS, COURT STAFF) (Filed on 9/30/2020) (Entered: 09/30/2020) |
| 09/30/2020 | 12 | NOTICE of Appearance by Hannah Elizabeth Shearer (Shearer, Hannah) (Filed on 9/30/2020) (Entered: 09/30/2020) |
| 10/05/2020 | 13 | CERTIFICATE OF SERVICE by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger re 10 Initial Case Management Scheduling Order with ADR Deadlines, 4 MOTION for leave to appear in Pro Hac Vice *(Avi Weitzman)* ( Filing fee $ 310, receipt number 0971−14999062.), 11 Summons Issued as to USA, 7 MOTION for leave to appear in Pro Hac Vice *(Liesel Schapira)* ( Filing fee $ 310, receipt number 0971−14999476.), 1 Complaint,, 3 Certificate of Interested Entities, 2 Certificate of Interested Entities, 5 MOTION for leave to appear in Pro Hac Vice *(Lee Crain)* ( Filing fee $ 310, receipt number 0971−14999178.), 6 MOTION for leave to appear in Pro Hac Vice *(Kaylie Springer)* ( Filing fee $ 310, receipt number 0971−14999435.), 9 Case Assigned by Intake,,, (Gopalan, Vivek) (Filed on 10/5/2020) (Entered: 10/05/2020) |
| 10/09/2020 | 14 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 310, receipt number 0971−15045557.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing)(Skaggs, John) (Filed on 10/9/2020) (Additional attachment(s) added on 10/13/2020: # 2 Flattened PDF) (elyS, COURT STAFF). (Entered: 10/09/2020) |
| 10/09/2020 | 15 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, State of California.. (Gopalan, Vivek) (Filed on 10/9/2020) (Entered: 10/09/2020) |
| 10/13/2020 | 16 | **CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE:** The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned. <br><br> ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE−NOTICED FOR |

| | | |
|---|---|---|
| | | HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED. *This is a text only docket entry; there is no document associated with this notice.* (ahm, COURT STAFF) (Filed on 10/13/2020) (Entered: 10/13/2020) |
| 10/13/2020 | 17 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Edward M. Chen for all further proceedings. Magistrate Judge Jacqueline Scott Corley no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 10/13/2020. (Attachments: # 1 Notice of Eligibility for Video Recording)(mbcS, COURT STAFF) (Filed on 10/13/2020) (Entered: 10/13/2020)** |
| 10/15/2020 | 18 | **Order by Judge Edward M. Chen granting 4 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 10/15/2020 | 19 | **Order by Judge Edward M. Chen granting 5 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 10/15/2020 | 20 | **Order by Judge Edward M. Chen granting 6 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 10/15/2020 | 21 | **Order by Judge Edward M. Chen granting 7 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 10/15/2020 | 22 | **Order by Judge Edward M. Chen granting 14 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 10/15/2020 | 23 | **CASE MANAGEMENT CONFERENCE ORDER IN REASSIGNED CASE: Initial Case Management Conference set for 1/21/2021 09:30 AM by Videoconference. Joint Case Management Statement due by 1/14/2021. Signed by Judge Edward M. Chen on 10/15/2020. (afmS, COURT STAFF) (Filed on 10/15/2020) (Entered: 10/15/2020)** |
| 11/24/2020 | 24 | MOTION to Intervene filed by Zachary Fort, Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc.. Responses due by 12/8/2020. Replies due by 12/15/2020. (Attachments: # 1 Memorandum of Points and Authorities, # 2 Declaration of Zachary Fort, # 3 Declaration of Frederick Barton, # 4 Declaration of Tilden Smith, # 5 Declaration of Brandon Combs, # 6 Proposed Answer, # 7 Proposed Order)(Lee, George) (Filed on 11/24/2020) (Entered: 11/24/2020) |
| 11/24/2020 | 25 | Corporate Disclosure Statement by BlackHawk Manufacturing Group, Inc. (Lee, George) (Filed on 11/24/2020) (Entered: 11/24/2020) |
| 11/24/2020 | 26 | Corporate Disclosure Statement by Firearms Policy Coalition, Inc. (Lee, George) (Filed on 11/24/2020) (Entered: 11/24/2020) |
| 11/24/2020 | 27 | **CLERK'S NOTICE SETTING MOTION FOR HEARING: Motion Hearing re: 24 MOTION to Intervene set for 1/14/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. Briefing deadlines remain unchanged. (*This is a text–only entry generated by the court. There is no document associated with this entry.*) (afmS, COURT STAFF) (Filed on 11/24/2020) (Entered: 11/24/2020)** |
| 11/30/2020 | 28 | NOTICE of Appearance by Eric Joseph Soskin *on Behalf of Federal Defendants* (Soskin, Eric) (Filed on 11/30/2020) (Entered: 11/30/2020) |
| 11/30/2020 | 29 | MOTION to Dismiss filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. Motion Hearing set for 1/14/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 12/14/2020. Replies due by 12/21/2020. (Attachments: # 1 Proposed Order)(Soskin, Eric) (Filed on 11/30/2020) (Entered: 11/30/2020) |
| 11/30/2020 | 30 | CERTIFICATE OF SERVICE by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger re 17 Order Reassigning Case, Case |

| | | |
|---|---|---|
| | | Assigned/Reassigned *Judge Chen Standing Orders* (Crain, Lee) (Filed on 11/30/2020) (Entered: 11/30/2020) |
| 12/01/2020 | 31 | MOTION for leave to appear in Pro Hac Vice, (Filing Fee: $317.00, receipt number 0971–15259053) filed by Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Attachments: #(1) CO Certificate of Good Standing)(Wisniewski, Cody) (Filed on 12/1/2020) (Entered: 12/01/2020) |
| 12/02/2020 | 32 | MOTION for Extension of Time to File Response/Reply as to 24 MOTION to Intervene *(Unopposed)* filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Declaration of Avi Weitzman, # 2 Proposed Order)(Weitzman, Avi) (Filed on 12/2/2020) (Entered: 12/02/2020) |
| 12/02/2020 | 33 | **Order by Judge Edward M. Chen granting 32 Motion for Extension of Time to File Response/Reply re 24 MOTION to Intervene . Responses due by 12/15/2020. Replies due by 12/22/2020.(afmS, COURT STAFF) (Filed on 12/2/2020) (Entered: 12/02/2020)** |
| 12/04/2020 | 34 | *Joint Stipulation and [Proposed] Order to Extend Deadline Re: Motion to Dismiss Briefing Schedule re 29 MOTION to Dismiss* filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Declaration of Avi Weitzman, Avi) (Filed on 12/4/2020) (Entered: 12/04/2020) |
| 12/04/2020 | 35 | **ORDER GRANTING 34 STIPULATION TO EXTEND DEADLINE FOR PLAINTIFFS OPPOSITION TO MOTION TO DISMISS AND BRIEFING SCHEDULE. Opposition due 12/30/2020; reply due 1/11/2021; hearing set 1/28/2021 at 1:30 PM before Judge Edward M. Chen by videoconference. Signed by Judge Edward M. Chen on 12/4/2020.(afmS, COURT STAFF) (Filed on 12/4/2020) (Entered: 12/04/2020)** |
| 12/04/2020 | 36 | **CLERK'S NOTICE SETTING MOTION HEARING: Responses due by 12/30/2020. Replies due by 1/11/2021. Motion Hearing 29 set for 1/28/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**Genera l Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Responses due by 12/30/2020. Replies due by 1/11/2021. Motion Hearing set for 1/28/2 021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen.** *(This is a text–only entry generated by the court. There is no document associated with this entry.)* **29 MOTION to Dismiss (afmS, COURT STAFF) (Filed on 12/4/2020) (Entered: 12/04/2020)** |
| 12/07/2020 | 37 | **Order by Judge Edward M. Chen granting 31 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 12/7/2020) (Entered: 12/07/2020)** |
| 12/08/2020 | 38 | OPPOSITION/RESPONSE to (re 24 MOTION to Intervene) filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Soskin, Eric) (Filed on 12/8/2020) (Entered: 12/08/2020) |
| 12/09/2020 | 39 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971–15294128.) filed by Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Supplement Certificate of Good Standing)(Pucino, David) (Filed on 12/9/2020) (Entered: 12/09/2020) |
| 12/10/2020 | 40 | ADR Certification (ADR L.R. 3–5 b) of discussion of ADR options *ADR Certification by Parties and Counsel* (Wise, R.) (Filed on 12/10/2020) (Entered: 12/10/2020) |

| 12/10/2020 | 41 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *ADR Certification by Parties and Counsel* (Wise, R.) (Filed on 12/10/2020) (Entered: 12/10/2020) |
|---|---|---|
| 12/10/2020 | 42 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *(Blackwell)* (Weitzman, Avi) (Filed on 12/10/2020) (Entered: 12/10/2020) |
| 12/10/2020 | 43 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *(Giffords Law Center)* (Weitzman, Avi) (Filed on 12/10/2020) (Entered: 12/10/2020) |
| 12/10/2020 | 44 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options *(Muehlberger)* (Weitzman, Avi) (Filed on 12/10/2020) (Entered: 12/10/2020) |
| 12/11/2020 | 45 | **Order by Judge Edward M. Chen granting 39 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 12/11/2020) (Entered: 12/11/2020)** |
| 12/15/2020 | 46 | OPPOSITION/RESPONSE to (re 24 MOTION to Intervene ) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Proposed Order, # 2 Declaration of Avi Weitzman, # 3 Exhibit A – BlackHawk Man. Grp. webpage, # 4 Exhibit B – BlackHawk Man. Grp. webpage, # 5 Exhibit C – License List, # 6 Exhibit D – BlackHawk Man. Grp. webpage, # 7 Exhibit E – BlackHawk Man. Grp. webpage, # 8 Exhibit F – BlackHawk Man. Grp. webpage)(Weitzman, Avi) (Filed on 12/15/2020) (Entered: 12/15/2020) |
| 12/21/2020 | 47 | MOTION to Intervene filed by Polymer80, Inc.. Motion Hearing set for 1/28/2021 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M. Chen. Responses due by 1/4/2021. Replies due by 1/11/2021. (Attachments: # 1 Supplement Memo of Points and Authorities in Support of Motion, # 2 Declaration Declaration of D. Borges in Support of Motion, # 3 Proposed Order Proposed Order)(Olsen, John) (Filed on 12/21/2020) (Entered: 12/21/2020) |
| 12/22/2020 | 48 | **CLERK'S NOTICE MOVING HEARING FROM 1/14/2021 TO 1/28/2021 RE 24 MOTION TO INTERVENE: Hearing date set 1/14/2021 is vacated and rescheduled for 1/28/2021 at 1:30PM in San Francisco, – Videoconference Only before Judge Edward M. Chen re 24 MOTION to Intervene . Briefing deadlines remain unchanged. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and reb roadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/ zoom/.<br><br>**Motion Hearing set for 1/28/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. Brief deadlines remain unchanged. *(This is a text−only entry generated by the court. There is no document associated with this entry.)*(afmS, COURT STAFF) (Filed on 12/22/2020) (Entered: 12/22/2020)** |
| 12/22/2020 | 49 | REPLY (re 24 MOTION to Intervene ) filed byFrederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Wisniewski, Cody) (Filed on 12/22/2020) (Entered: 12/22/2020) |
| 12/29/2020 | 50 | NOTICE of Substitution of Counsel by Daniel D. Mauler (Mauler, Daniel) (Filed on 12/29/2020) (Entered: 12/29/2020) |
| 12/29/2020 | 51 | STIPULATION WITH PROPOSED ORDER re 47 MOTION to Intervene – *Joint Stipulation and [Proposed] Order to Extend Deadline for Plaintiffs' Opposition to Polymer80's Motion to Intervene and Briefing Schedule* filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Declaration of Avi Weitzman)(Weitzman, Avi) (Filed on 12/29/2020) (Entered: 12/29/2020) |
| 12/30/2020 | 52 | **Order as Modified by Judge Edward M. Chen granting 51 Stipulation to Extend Deadline for Plaintiffs' Opposition to Polymer80's Motion to Intervene and Briefing Schedule. Briefing extended as follows: opposition due 1/14/2021; reply** |

| | | |
|---|---|---|
| | | due 1/21/2021; hearing on all motions rescheduled from 1/28/2021 to 2/25/2021 at 1:30PM before Judge Edward M. Chen.(afmS, COURT STAFF) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/30/2020 | | Set/Reset Deadlines as to 47 MOTION to Intervene . Responses due by 1/14/2021. Replies due by 1/21/2021. (afmS, COURT STAFF) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/30/2020 | | Set/Reset Deadlines as to 24 MOTION to Intervene , 47 MOTION to Intervene , 29 MOTION to Dismiss . Motion Hearing set for 2/25/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. (afmS, COURT STAFF) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/30/2020 | 53 | MOTION for Leave to File *Response in Support of Federal Defendants' Motion to Dismiss* filed by Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Attachments: # 1 Proposed Response, # 2 Proposed Order)(Wisniewski, Cody) (Filed on 12/30/2020) Modified on 1/4/2021 (mclS, COURT STAFF). (Entered: 12/30/2020) |
| 12/30/2020 | 54 | OPPOSITION/RESPONSE (re 29 MOTION to Dismiss ) */ PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Proposed Order)(Weitzman, Avi) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/30/2020 | 55 | Declaration of AVI WEITZMAN in Support of 54 Opposition/Response to Motion, */ DECLARATION OF AVI WEITZMAN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* filed byFrank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Related document(s) 54 ) (Weitzman, Avi) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/30/2020 | 56 | Request for Judicial Notice re 54 Opposition/Response to Motion, */ PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS* filed byFrank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Proposed Order)(Related document(s) 54 ) (Weitzman, Avi) (Filed on 12/30/2020) (Entered: 12/30/2020) |
| 12/31/2020 | 57 | MOTION for Leave to File *Amicus Brief* filed by District of Columbia. (Attachments: # 1 Exhibit Multistate Amicus Brief in Support of Plaintiffs)(Nevitt, Alacoque) (Filed on 12/31/2020) (Entered: 12/31/2020) |
| 01/01/2021 | 58 | OPPOSITION/RESPONSE (re 53 MOTION for Leave to File *Response in Support of Federal Defendants' Motion to Dismiss* ) filed byFrank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, State of California. (Attachments: # 1 Declaration of A. Weitzman)(Weitzman, Avi) (Filed on 1/1/2021) (Entered: 01/01/2021) |
| 01/04/2021 | 59 | OPPOSITION/RESPONSE (re 47 MOTION to Intervene ) *(Federal Defendants' Notice of Non–Opposition to Polymer80's Motion to Intervene)* filed byWilliam P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Mauler, Daniel) (Filed on 1/4/2021) (Entered: 01/04/2021) |
| 01/04/2021 | 60 | Statement *of RECENT DECISION IN SUPPORT OF PLAINTIFFS' OPPOSITIONS TO ZACHARY FORT, FREDERICK BARTON, BLACKHAWK MANUFACTURING GROUP, INC., AND FIREARMS POLICY COALITION, INC.'S (1) MOTION TO INTERVENE 24 AND (2) MOTION FOR LEAVE 53* by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Exhibit A – Memorandum Order and Opinion)(Weitzman, Avi) (Filed on 1/4/2021) Modified on 1/5/2021 (mclS, COURT STAFF). (Entered: 01/04/2021) |
| 01/05/2021 | | Electronic filing error. Document not properly linked. [err102]Corrected by Clerk's Office. No further action is necessary. Re: 60 Statement, filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (mclS, COURT STAFF) (Filed on 1/5/2021) (Entered: 01/05/2021) |

| 01/05/2021 | 61 | **CLERK'S NOTICE: Hearing set for 29 Motion to Dismiss on 2/25/2021 is temporarily vacated. Briefing deadlines remain unchanged. Motion hearings re: 24 and 47 are to be heard initially on 2/25/2021. Initial Case Management Conference set for 1/21/2021 is vacated and rescheduled for 2/25/2021 01:30 PM in San Francisco, – Videoconference Only. Joint Case Management Statement due by 2/18/2021. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (afmS, COURT STAFF) (Filed on 1/5/2021) Modified on 1/5/2021 (afmS, COURT STAFF). (Entered: 01/05/2021)** |
|---|---|---|
| 01/06/2021 | 62 | NOTICE of Substitution of Counsel by Jillian Nicole London (London, Jillian) (Filed on 1/6/2021) (Entered: 01/06/2021) |
| 01/06/2021 | 63 | NOTICE of Appearance by Jillian Nicole London *for Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence* (London, Jillian) (Filed on 1/6/2021) (Entered: 01/06/2021) |
| 01/11/2021 | 64 | REPLY (re 29 MOTION to Dismiss ) filed byWilliam P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Mauler, Daniel) (Filed on 1/11/2021) (Entered: 01/11/2021) |
| 01/11/2021 | 65 | Statement of Non–Opposition re 56 Request for Judicial Notice, filed byWilliam P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Related document(s) 56 ) (Mauler, Daniel) (Filed on 1/11/2021) (Entered: 01/11/2021) |
| 01/14/2021 | 66 | OPPOSITION/RESPONSE (re 47 MOTION to Intervene ) – *PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO POLYMER80, INC.'S MOTION TO INTERVENE* filed byFrank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Proposed Order)(Weitzman, Avi) (Filed on 1/14/2021) (Entered: 01/14/2021) |
| 01/15/2021 | 67 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971–15448918.) filed by Polymer80, Inc.. (Attachments: # 1 Certificate of Good Standing)(Berube, Mark) (Filed on 1/15/2021) (Entered: 01/15/2021) |
| 01/15/2021 | 68 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number 0971–15450991.) filed by Polymer80, Inc.. (Attachments: # 1 Certificate of Good Standing)(McGuire, James) (Filed on 1/15/2021) (Entered: 01/15/2021) |
| 01/19/2021 | 69 | **Order by Judge Edward M. Chen granting 67 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 1/19/2021) (Entered: 01/19/2021)** |
| 01/19/2021 | 70 | **Order by Judge Edward M. Chen granting 68 Motion for Pro Hac Vice.(afmS, COURT STAFF) (Filed on 1/19/2021) (Entered: 01/19/2021)** |
| 01/19/2021 | 71 | STIPULATION WITH PROPOSED ORDER re 47 MOTION to Intervene filed by Polymer80, Inc.. (Attachments: # 1 Declaration of John Olsen in Support of Stipulation to Extend Time)(Olsen, John) (Filed on 1/19/2021) Modified on 1/19/2021 (mclS, COURT STAFF). (Entered: 01/19/2021) |
| 01/19/2021 | 72 | **Order by Judge Edward M. Chen granting 71 Stipulation to Extend Deadline for Polymer80, Inc.'s Reply in Further Support of its Motion to Intervene. Reply due 1/25/2021.(afmS, COURT STAFF) (Filed on 1/19/2021) (Entered: 01/19/2021)** |
| 01/25/2021 | 73 | REPLY (re 47 MOTION to Intervene ) filed byPolymer80, Inc.. (Olsen, John) (Filed on 1/25/2021) (Entered: 01/25/2021) |
| 02/16/2021 | 74 | **CLERK'S NOTICE RESCHEDULING MOTIONS HEARING AND INITIAL CASE MANAGEMENT CONFERENCE: Due to Court unavailability, hearings re: 24 MOTION to Intervene , and 47 MOTION to Intervene and Initial Case Management Conference set for 2/25/2021 are vacated and RESCHEDULED for 2/26/2021 at 09:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. Joint Case Management Statement due by 2/19/2021. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* This proceeding will be held via a Zoom webinar.** |

| | | |
|---|---|---|
| | | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc |
| | | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
| | | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. Joint Case Management Statement due by 2/19/2021. Initial Case Management Conference set for 2/26/2021 09:30 AM in San Francisco, – Videoconference Only. Motion Hearing set for 2/26/2021 09:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. (afmS, COURT STAFF) (Filed on 2/16/2021) (Entered: 02/16/2021) |
| 02/19/2021 | 75 | CASE MANAGEMENT STATEMENT *(Joint)* filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Weitzman, Avi) (Filed on 2/19/2021) (Entered: 02/19/2021) |
| 02/26/2021 | 76 | TRANSCRIPT ORDER for proceedings held on 02/26/2021 before Judge Edward M. Chen by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, for Court Reporter Jo Ann Bryce. (Weitzman, Avi) (Filed on 2/26/2021) (Entered: 02/26/2021) |
| 02/26/2021 | 79 | **Minute Entry for proceedings held before Judge Edward M. Chen:** <br><br> **Motion Hearing held on 2/26/2021 re 47 MOTION to Intervene filed by Polymer80, Inc., 24 MOTION to Intervene filed by BlackHawk Manufacturing Group, Inc., Zachary Fort, Firearms Policy Coalition, Inc., Frederick Barton ; taking under submission.** <br><br> **Total Time in Court: 1 Hour.** <br> **Court Reporter: JoAnn Bryce.** <br><br> **Plaintiffs' Attorneys: Lee Crain, R. Matthew Wise, John Skaggs. Intervenors' Attorneys: John Olsen, Cody James Wisniewski, George Lee, James McGuire Defendants' Attorney: Daniel Mauler, Leslie Farber.** <br><br> **Attachment: Minute Order. (afmS, COURT STAFF) (Date Filed: 2/26/2021) (Entered: 03/01/2021)** |
| 02/28/2021 | 77 | Transcript of Proceedings held on 2/26/21, before Judge Edward M. Chen. Court Reporter Jo Ann Bryce, Official Reporter, telephone number 59 510–910–5888, joann_bryce@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction after 90 days. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 76 Transcript Order ) Release of Transcript Restriction set for 6/1/2021. (Related documents(s) 76 ) (jabS, COURTSTAFF) (Filed on 2/28/2021) (Entered: 02/28/2021) |
| 02/28/2021 | 78 | TRANSCRIPT ORDER for proceedings held on 02/26/2021 before Judge Edward M. Chen by Polymer80, Inc., for Court Reporter Jo Ann Bryce. (Olsen, John) (Filed on 2/28/2021) (Entered: 02/28/2021) |
| 03/19/2021 | 80 | Statement re 53 MOTION for Leave to File *Response in Support of Federal Defendants' Motion to Dismiss,* 24 MOTION to Intervene , 66 Opposition/Response to Motion, *of Recent Decision in Support of: (1) Plaintiffs Opposition to Zachary Fort, Frederick Barton, BlackHawk Manufacturing Group, Inc., and Firearms Policy Coalition, Inc.s (the Applicants) Motion to Intervene (Dkt. 24); (2) Plaintiffs Opposition to Applicants Motion for Leave to File a Response in Support of Defendants Motion to Dismiss (Dkt. 53); and (3) Plaintiffs Opposition to Polymer 80, Inc.s Motion to Intervene (Dkt. No. 66).* by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Exhibit A – Memorandum Opinion and Order)(Weitzman, Avi) (Filed on 3/19/2021) (Entered: 03/19/2021) |

| 03/22/2021 | 81 | Response to 80 STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7–3.d filed byPolymer80, Inc. (Related document(s) 47 , 80 ) (Olsen, John) (Filed on 3/22/2021) Modified on 3/23/2021 (mclS, COURT STAFF). (Entered: 03/22/2021) |
|---|---|---|
| 04/06/2021 | 82 | NOTICE of Substitution of Counsel by Bradley Craigmyle (Craigmyle, Bradley) (Filed on 4/6/2021) (Entered: 04/06/2021) |
| 04/09/2021 | 83 | **ORDER OF TEMPORARY STAY OF CASE. Status Conference re: 24 , 27 , and 29 set for 5/27/2021 10:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar. Signed by Judge Edward M. Chen on 4/9/2021.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Status Conference set for 5/27/2021 10:30 AM in San Francisco, – Videoconference Only be fore Judge Edward M. Chen. (afmS, COURT STAFF) (Filed on 4/9/2021) (Entered: 04/10/2021)** |
| 04/21/2021 | 84 | TRANSCRIPT ORDER for proceedings held on 02/26/2021 before Judge Edward M. Chen by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice, for Court Reporter Jo Ann Bryce. (Craigmyle, Bradley) (Filed on 4/21/2021) (Entered: 04/21/2021) |
| 05/19/2021 | 85 | **CLERK'S NOTICE CHANGING TIME OF STATUS CONFERENCE FROM 10:30AM TO 1:30PM: Time of Status Conference is reset for 5/27/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.< /b> Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.**<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Status Conference set for 5/27/2021 01:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen. (This is a text–only entry generated by the court. There is no document associated with this entry.)(afmS, COURT STAFF) (Filed on 5/19/2021) (Entered: 05/19/2021)** |
| 05/20/2021 | 86 | STIPULATION WITH PROPOSED ORDER *to Stay Case and to Vacate Case Management Conference* filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Craigmyle, Bradley) (Filed on 5/20/2021) (Entered: 05/20/2021) |
| 05/20/2021 | 87 | RESPONSE re 86 STIPULATION WITH PROPOSED ORDER *to Stay Case and to Vacate Case Management Conference* by Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Wisniewski, Cody) (Filed on 5/20/2021) (Entered: 05/20/2021) |
| 05/21/2021 | 88 | **ORDER by Judge Edward M. Chen granting 86 Stipulation to Stay Case and to Vacate Case Management Conference. Joint status report thirty days after ATF issues the final rule updating the Court on whether further proceedings are necessary and, if so, proposing a schedule for continuing the litigation. Status** |

| | | |
|---|---|---|
| | | Conference set for 5/27/2021 is vacated. (afmS, COURT STAFF) (Filed on 5/21/2021) (Entered: 05/21/2021) |
| 05/26/2021 | 89 | **CLERK'S NOTICE: On May 21, 2021, the Court granted Plaintiffs' and Defendants' joint stipulation staying the case until ATF issues a final rule governing the products at issue. Docket No. 88 . The Court also approved the parties' proposal to file a joint status report thirty (30) days after the final rule is issued, "updating the Court on whether further proceedings are necessary and, if so, proposing a schedule for continuing the litigation." Id.** <br><br> **In response to the stipulation, applicants in intervention Zachary Fort, Frederick Barton, Blackhawk Manufacturing Group, Inc., and Firearms Policy Coalition, Inc. ("Blackhawk "), did not oppose the stay. Docket No. 87 at 2–3. Blackhawk requested, however, that its pending motion to intervene (Docket No. 24 ) be granted, that it "be included in the discussions surrounding and filing of any joint status reports," and that "the parties be required to provide a joint status report within 120 days of the stay order," rather than within thirty (30) days of ATF's promulgation of the final rule. See Docket No. 87 at 2–3.** <br><br> **The Court declines to grant Applicants' motion to intervene at this time. It will conduct a status conference with Plaintiffs, Defendants, and all applicants in intervention (including Blackhawk and Polymer80, Inc.) on September 9, 2021. At the hearing, the parties will address whether and how the applicants' motions to intervene remain viable in light of ATF's anticipated final rule and the case's changed circumstances. The parties' joint status report shall be filed within thirty (30) days of ATF's promulgation of the final rule, as before. The Court will determine whether applicants in intervention should be included in the filing of the status report after the hearing on September 9, 2021.** <br><br> **(This is a text–only entry generated by the court. There is no document associated with this entry.) (afmS, COURT STAFF) (Filed on 5/26/2021) (Entered: 05/26/2021)** |
| 05/26/2021 | 90 | **CLERK'S NOTICE SETTING STATUS CONFERENCE FOR 9/9/2021 AT 10:30AM: Status Conference set for 9/9/2021 10:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. Joint Status Report due within thirty days of ATF issuing a final rule. (This is a text–only entry generated by the court. There is no document associated with this entry.) (afmS, COURT STAFF) (Filed on 5/26/2021) Modified on 6/2/2021 (afmS, COURT STAFF). (Entered: 05/26/2021)** |
| 06/03/2021 | 91 | STIPULATION WITH PROPOSED ORDER *to Reschedule September 9, 2021 Status Conference* filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Craigmyle, Bradley) (Filed on 6/3/2021) (Entered: 06/03/2021) |
| 06/04/2021 | 92 | **ORDER by Judge Edward M. Chen granting 91 Stipulation to Reschedule September 9, 2021 Status Conference. Status Conference set for 9/9/2021 is vacated and rescheduled for 10/7/2021 10:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. Joint Status Report due within thirty days of ATF issuing a final rule. (afmS, COURT STAFF) (Filed on 6/4/2021) Modified on 6/7/2021 (afmS, COURT STAFF). (Entered: 06/06/2021)** |
| 09/27/2021 | 93 | **CLERK'S NOTICE CONVERTING STATUS CONFERENCE TO ZOOM: Status Conference set for 10/7/2021 10:30 AM in San Francisco, – Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar. Joint Status Report due within thirty days of ATF issuing a final rule.** <br><br> **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts. gov/emc <br><br> **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |

| | | |
|---|---|---|
| | | *Zoom Guidance and Setup:* https://www.cand.uscourts.gov/zoom/. |
| | | **Status Conference set for 10/7/2021 10:30 AM in San Francis co, – Videoconference Only before Judge Edward M. Chen.** (*This is a text–only entry generated by the court. There is no document associated with this entry.*)(afmS, COURT STAFF) (Filed on 9/27/2021) (Entered: 09/27/2021) |
| 10/07/2021 | 94 | **Minute Entry for proceedings held before Judge Edward M. Chen:** **Status Conference held on 10/7/2021. See pdf image for further details. Joint Status Report due by 3/29/2022. Status Conference set for 4/5/2022 02:30 PM in San Francisco, – Videoconference Only before Judge Edward M. Chen.** **Total Time in Court: 14 Minutes.** **Court Reporter: Ana Dub.** **Plaintiff Attorneys: Lee Crain, Liesel Schapira, Matthew Wise.** **Defendant Attorneys: Bradley Craignyle, John Olsen, Cody Wisniewski, George Lee, Mark Arabie.** **Attachment: Minute Order.** (afmS, COURT STAFF) (Date Filed: 10/7/2021) (Entered: 10/11/2021) |
| 10/29/2021 | 95 | TRANSCRIPT ORDER for proceedings held on 10/07/2021 before Judge Edward M. Chen by Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort, for Court Reporter Ana Dub. (Wisniewski, Cody) (Filed on 10/29/2021) (Entered: 10/29/2021) |
| 11/21/2021 | 96 | Transcript of Remote Zoom Video Conference Proceedings held on 10/7/2021 before Judge Edward M. Chen. Court Reporter Ana Dub, RDR, RMR, CRR, CSR No. 7445, telephone number 415–290–1651/ana_dub@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date, it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 95 Transcript Order, ) Release of Transcript Restriction set for 2/19/2022. (Related documents(s) 95 ) (amd, COURT STAFF) (Filed on 11/21/2021) (Entered: 11/21/2021) |
| 12/11/2021 | 97 | TRANSCRIPT ORDER for proceedings held on 10/07/2021 before Judge Edward M. Chen for Court Reporter Ana Dub. (rjd, COURT STAFF) (Filed on 12/11/2021) (Entered: 12/11/2021) |
| 01/06/2022 | 98 | NOTICE of Change In Counsel by Hannah Elizabeth Shearer (Shearer, Hannah) (Filed on 1/6/2022) (Entered: 01/06/2022) |
| 01/31/2022 | 99 | NOTICE of Appearance by Martin Tomlinson (Tomlinson, Martin) (Filed on 1/31/2022) (Entered: 01/31/2022) |
| 01/31/2022 | | Electronic filing error. **NOTICE TO COUNSEL:** Martin Tomlinson. The docket shows a different address from what is appearing on the document (dkt. #: 99 Notice of Appearance filed by United States Department of Justice, Regina Lombardo, Michael R Curtis, Bureau of Alcohol, Tobacco, Firearms, and Explosives, William P. Barr). Please update your personal profile on ECF. (jml, COURT STAFF) (Filed on 1/31/2022) (Entered: 02/01/2022) |
| 02/01/2022 | 100 | NOTICE of Appearance by Daniel Martin Riess (Riess, Daniel) (Filed on 2/1/2022) (Entered: 02/01/2022) |
| 02/01/2022 | | Electronic filing error. **NOTICE TO COUNSEL:** Daniel Riess. The docket shows a different address from what is appearing on the document (dkt. #: 100 Notice of Appearance fi led by United States Department of Justice, Regina Lombardo, Michael R Curtis, Bureau of Alcohol, Tobacco, Firearms, and Explosives, William P. Barr). Please update your personal profile on ECF. (jml, COURT STAFF) (Filed on 2/1/2022) (Entered: 02/01/2022) |

| | | |
|---|---|---|
| 03/28/2022 | 101 | NOTICE of Change In Counsel by John Adam Skaggs (Skaggs, John) (Filed on 3/28/2022) (Entered: 03/28/2022) |
| 03/29/2022 | 102 | Joint Status Report by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, Bureau of Alcohol, Tobacco, Firearms, and Explosives. (Weitzman, Avi) (Filed on 3/29/2022) Modified on 3/30/2022 (cjl, COURT STAFF). (Entered: 03/29/2022) |
| 03/30/2022 | 103 | NOTICE of Appearance by Sean Clinton Woods (Woods, Sean) (Filed on 3/30/2022) (Entered: 03/30/2022) |
| 03/30/2022 | 104 | CLERK'S NOTICE CONTINUING STATUS CONFERENCE SET FOR 4/5/2022.<br><br>In light of the 102 Joint Status Report filed on 3/29/2022, the Status Conference previously set for 4/5/2022 is reset to 5/17/2022 at 02:30 PM by Videoconference Only before Judge Edward M. Chen. This proceeding will be held via a Zoom webinar. Joint Status Report due by 5/10/2022.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>< I> *(This is a text−only entry generated by the court. There is no document associated with this entry.)*(bxs, COURT STAFF) (Filed on 3/30/2022) (Entered: 03/30/2022) |
| 04/22/2022 | 105 | NOTICE of Change In Counsel by Avi Weitzman */ Withdrawal of Kaylie Springer* (Weitzman, Avi) (Filed on 4/22/2022) (Entered: 04/22/2022) |
| 05/10/2022 | 106 | JOINT STATUS REPORT by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, Bureau of Alcohol, Tobacco, Firearms and Explosives, Marvin G. Richardson, Daniel Hoffman, United States Department of Justice and Merrick B. Garland . (Weitzman, Avi) (Filed on 5/10/2022) Modified on 5/11/2022 (jml, COURT STAFF). (Entered: 05/10/2022) |
| 05/13/2022 | 107 | CLERK'S NOTICE CONTINUING STATUS CONFERENCE. Status Conference set for 5/17/2022, is being continued to 9/20/2022, at 2:30 PM in San Francisco, − Videoconference Only before Judge Edward M. Chen. Joint Status Report due by 9/13/2022.<br><br>*(This is a text−only entry generated by the court. There is no document associated with this entry.)* (vla, COURT STAFF) (Filed on 5/13/2022) (Entered: 05/15/2022) |
| 06/29/2022 | 108 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC−17306319.) filed by Frederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Attachments: # 1 Appendix Certificate of Good Standing)(Erhardt, Erin) (Filed on 6/29/2022) (Entered: 06/29/2022) |
| 07/21/2022 | 109 | **Order by Judge Edward M Chen Granting 108 Motion for Pro Hac Vice as to Erin M. Erhardt.(vla, COURT STAFF) (Filed on 7/21/2022) (Entered: 07/21/2022)** |
| 07/26/2022 | 110 | NOTICE of Appearance by Germain Labat *for Polymer80, Inc.* (Labat, Germain) (Filed on 7/26/2022) (Entered: 07/26/2022) |
| 07/29/2022 | 111 | NOTICE of Change In Counsel by John Francis Olsen *and Ferdinand IP, LLP* (Olsen, John) (Filed on 7/29/2022) (Entered: 07/29/2022) |
| 08/31/2022 | 112 | NOTICE of Appearance *for Plaintiffs Bryan Muehlberger, Frank Blackwell, and Giffords Law Center to Prevent Gun Violence.* by Scott Alan Edelman (Edelman, Scott) (Filed on 8/31/2022) Modified on 8/31/2022 (jml, COURT STAFF). (Entered: |

| | | 08/31/2022) |
|---|---|---|
| 09/13/2022 | 113 | Unopposed MOTION for *Two−Day Extension for Parties to File Joint Status Report* filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Regina Lombardo, United States Department of Justice. (Attachments: # 1 Proposed Order)(Tomlinson, Martin) (Filed on 9/13/2022) Modified on 9/14/2022 (jml, COURT STAFF). (Entered: 09/13/2022) |
| 09/14/2022 | 114 | **Order by Judge Edward M Chen GRANTING 113 Motion for Extension of Time to File.(vla, COURT STAFF) (Filed on 9/14/2022) (Entered: 09/14/2022)** |
| 09/14/2022 | 115 | CLERK'S NOTICE SETTING ZOOM HEARING. Status Conference set for 9/20/2022, at 2:30 PM in San Francisco, − Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc **General Order 58.** Persons granted access to court pro ceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* **(vla, COURT STAFF) ( Filed on 9/14/2022) (Entered: 09/14/2022)** |
| 09/15/2022 | 116 | JOINT STATUS REPORT by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives and United States Department of Justice. (Attachments: # 1 Exhibit A − Polymer80 80% Pistol Blanks, # 2 Exhibit B − Polymer80 Product Changes, # 3 Exhibit C − 80 Percent Arms Blog, # 4 Exhibit D − Vice News, # 5 Exhibit E − Hearing Excerpt)(Edelman, Scott) (Filed on 9/15/2022) Modified on 9/16/2022 (kkp, COURT STAFF). (Entered: 09/15/2022) |
| 09/20/2022 | 121 | **Minute Entry for proceedings held before Caseload Rebalancing Judge: Status Conference held on 9/20/2022.** Total Time in Court: 35 Minutes. Court Reporter: Ronelle Corbey. (vla, COURT STAFF) (Date Filed: 9/20/2022) (Entered: 10/09/2022) |
| 09/21/2022 | 117 | TRANSCRIPT ORDER for proceedings held on September 20, 2022 before Judge Edward M Chen by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, for Court Reporter not listed − San Francisco. (Crain, Lee) (Filed on 9/21/2022) (Entered: 09/21/2022) |
| 09/23/2022 | 118 | Transcript of Proceedings held on 9/20/2022, before Judge Edward M. Chen. Court Reporter/Transcriber Ronelle F. Corbey, telephone number 509−458−5283, email ronelle_corbey@waed.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. Redaction Request due 10/14/2022. Redacted Transcript Deadline set for 10/24/2022. Release of Transcript Restriction set for 12/22/2022. (Corbey, Ronelle) (Filed on 9/23/2022) (Entered: 09/23/2022) |
| 10/04/2022 | 119 | STIPULATION WITH PROPOSED ORDER setting deadline for Plaintiffs to file Amended Complaint and set briefing schedule on Motions to Dismiss (if any) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, United States Department of Justice, State of California, Polymer80, Inc., Zachary Fort, Firearms Policy Coalition, Inc., Black Hawk Manufacturing Group, Inc., Frederick Barton. (Edelman, Scott) (Filed on 10/4/2022) Modified on 10/5/2022 (cjl, COURT STAFF). (Entered: 10/04/2022) |

| | | |
|---|---|---|
| 10/06/2022 | 120 | **Order. Signed 10/6/2022 by Judge Edward M Chen granting 119 Stipulated Briefing Schedule.**<br><br>Amended Complaint due by 10/20/2022.<br>Dispositive Motion to Dismiss due by 11/18/2022.<br>Applicants in Intervention Amicus Brief due by 12/2/2022.<br>Responses/Opposition to Motion to Dismiss due by 12/21/2022.<br>Replies to Motion to Dismiss due by 1/12/2023.<br>(klh, COURT STAFF) (Filed on 10/6/2022) (Entered: 10/06/2022) |
| 10/20/2022 | 122 | FIRST AMENDED COMPLAINT against Bureau of Alcohol, Tobacco, Firearms, and Explosives, United States Department of Justice, Merrick Garland, Steven Dettelbach, Daniel Hoffman. Filed byFrank Blackwell, Bryan Muehlberger, Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24)(Edelman, Scott) (Filed on 10/20/2022) Modified on 10/21/2022 (jml, COURT STAFF). (Entered: 10/20/2022) |
| 11/15/2022 | 123 | STIPULATION WITH PROPOSED ORDER for Page Extension Applicable to Defendants' Motion to Dismiss and Plaintiffs' Opposition filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, et al., State of California, et al., and Zachary Fort, et al.. (Riess, Daniel) (Filed on 11/15/2022) Modified on 11/16/2022 (kkp, COURT STAFF). (Entered: 11/15/2022) |
| 11/15/2022 | 124 | **Order by Judge Edward M Chen granting 123 Stipulation for Page Extension Applicable to Defendants' Motion to Dismiss and Plaintiffs' Opposition. (bxs, COURT STAFF) (Filed on 11/15/2022) (Entered: 11/15/2022)** |
| 11/18/2022 | 125 | MOTION to Dismiss for Lack of Jurisdiction filed by William P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Steven Dettelbach, Merrick Garland, Daniel Hoffman, Regina Lombardo, United States Department of Justice. Motion Hearing set for 1/26/2023 04:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 12/21/2022. Replies due by 1/12/2023. (Attachments: # 1 Proposed Order)(Tomlinson, Martin) (Filed on 11/18/2022) (Entered: 11/18/2022) |
| 11/18/2022 | | Reset Hearing as to 125 MOTION to Dismiss for Lack of Jurisdiction Motion Hearing set for 1/26/2023 at **01:30 PM** by Videoconference Only before Judge Edward M Chen. (bxs, COURT STAFF) (Filed on 11/18/2022) (Entered: 11/18/2022) |
| 12/02/2022 | 126 | Brief re 125 MOTION to Dismiss for Lack of Jurisdiction *as Amici Curiae in support of Defendants' Motion* filed byFrederick Barton, BlackHawk Manufacturing Group, Inc., Firearms Policy Coalition, Inc., Zachary Fort. (Related document(s) 125 ) (Wisniewski, Cody) (Filed on 12/2/2022) (Entered: 12/02/2022) |
| 12/16/2022 | 127 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 317, receipt number ACANDC–17830222.) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Certificate of Good Standing)(Payne, Erica) (Filed on 12/16/2022) (Entered: 12/16/2022) |
| 12/16/2022 | 128 | **Order by Judge Edward M Chen granting 127 Motion for Pro Hac Vice as to Erica Payne. (bxs, COURT STAFF) (Filed on 12/16/2022) (Entered: 12/16/2022)** |
| 12/21/2022 | 129 | OPPOSITION/RESPONSE (re 125 MOTION to Dismiss for Lack of Jurisdiction ) filed by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger. (Attachments: # 1 Proposed Order Denying Motion to Dismiss)(Edelman, Scott) (Filed on 12/21/2022) Modified on 12/22/2022 (jml, COURT STAFF). (Entered: 12/21/2022) |
| 01/12/2023 | 130 | REPLY (re 125 MOTION to Dismiss for Lack of Jurisdiction ) filed byBureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice. (Attachments: # 1 Exhibit 1)(Riess, Daniel) (Filed on 1/12/2023) (Entered: 01/12/2023) |

| 01/23/2023 | 131 | NOTICE of Appearance by Jeremy S. B. Newman (Newman, Jeremy) (Filed on 1/23/2023) (Entered: 01/23/2023) |
|---|---|---|
| 01/26/2023 | 132 | **CLERK'S NOTICE SETTING ZOOM HEARING.**<br><br>Motion Hearing as to 125 MOTION to Dismiss for Lack of Jurisdiction set for 1/26/2023 at 1:30 PM before Judge Edward M Chen. This proceeding will be held via a Zoom webinar.<br><br>ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG IN TO ZOOM NO LATER THAN 2:20 PM.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text– only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 1/26/2023) (Entered: 01/26/2023) |
| 01/26/2023 | 134 | **Minute Entry for proceedings held before Judge Edward M Chen: Motion Hearing held on 1/26/2023 re 125 MOTION to Dismiss for Lack of Jurisdiction.**<br><br>Digital Recording Time: 1:35–2:35. (vla, COURT STAFF) (Date Filed: 1/26/2023) Modified on 2/2/2023: Matter transcribed by Ana Dub. (rjd, COURT STAFF). (Entered: 01/31/2023) |
| 01/27/2023 | 133 | TRANSCRIPT ORDER for proceedings held on January 26, 2023 before Judge Edward M Chen by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, for Court Reporter not listed – San Francisco. (Crain, Lee) (Filed on 1/27/2023) (Entered: 01/27/2023) |
| 02/09/2023 | 135 | **ORDER by Judge Edward M. Chen granting in part and denying in part 125 Defendants' Motion to Dismiss. Expedited briefing schedule set for intervention motions. (emclc2, COURT STAFF) (Filed on 2/9/2023) (Entered: 02/09/2023)** |
| 02/22/2023 | 136 | Notice of Withdrawal of Motion *to Intervene* (Erhardt, Erin) (Filed on 2/22/2023) (Entered: 02/22/2023) |
| 02/23/2023 | 137 | Notice of Withdrawal of Motion *TO INTERVENE OF POLYMER80, INC.* (Labat, Germain) (Filed on 2/23/2023) Modified on 2/24/2023 (jml, COURT STAFF). (Entered: 02/23/2023) |
| 02/23/2023 | 138 | ANSWER to Amended Complaint byWilliam P. Barr, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Michael R Curtis, Steven Dettelbach, Merrick Garland, Daniel Hoffman, Regina Lombardo, United States Department of Justice. (Tomlinson, Martin) (Filed on 2/23/2023) (Entered: 02/23/2023) |
| 02/27/2023 | 139 | CLERK'S NOTICE SCHEUDULING STATUS CONFERENCE VIA ZOOM.<br><br>Status Conference set for 3/28/2023 at 2:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. Joint Status Report due by 3/21/2023. This proceeding will be held via a Zoom webinar.<br><br>**ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG IN TO ZOOM NO LATER THAN 2:20 PM.**<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of |

| | | court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
| | | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |
| | | **S** *(This is a text−only entry generated by the court. There is no document associated with this entry.)* **(vla, COURT STAFF) (Filed on 2/27/2023) (Entered: 02/27/2023)** |
| 03/21/2023 | 140 | NOTICE of Change In Counsel by Bradley Craigmyle *(Withdrawal)* (Craigmyle, Bradley) (Filed on 3/21/2023) (Entered: 03/21/2023) |
| 03/21/2023 | 141 | JOINT STATUS REPORT by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Edelman, Scott) (Filed on 3/21/2023) Modified on 3/22/2023 (jml, COURT STAFF). (Entered: 03/21/2023) |
| 03/22/2023 | 142 | NOTICE of Change In Counsel by Martin Tomlinson *Withdrawal of Martin M. Tomlinson as Counsel for Defendants* (Tomlinson, Martin) (Filed on 3/22/2023) (Entered: 03/22/2023) |
| 03/28/2023 | 143 | **Minute Entry for proceedings held before Judge Edward M Chen:Status Conference held on 3/28/2023.** |
| | | Status Conference set for 5/16/2023, at 2:30 PM in San Francisco, − Videoconference Only before Judge Edward M Chen. |
| | | This proceeding will be held via a Zoom webinar. |
| | | ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG IN TO ZOOM NO LATER THAN 2:20 PM. |
| | | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc |
| | | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
| | | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |
| | | **Total Time in Court: 13 Minutes. Court Reporter: Lee−Anne Shortridge.** |
| | | (vla, COURT STAFF) (Date Filed: 3/28/2023) (Entered: 04/10/2023) |
| 04/18/2023 | 144 | NOTICE *of Conventional Filing of Administrative Record* by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice (Attachments: # 1 Exhibit Certification of Administrative Record)(Newman, Jeremy) (Filed on 4/18/2023) Modified on 4/18/2023 (jml, COURT STAFF). (Entered: 04/18/2023) |
| 04/18/2023 | | Received one USB drive re 144 NOTICE of Conventional Filing of Administrative Record. (wsn, COURT STAFF) (Filed on 4/18/2023) (Entered: 04/24/2023) |
| 04/27/2023 | 145 | *Stipulated Protective Order* filed by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Edelman, Scott) (Filed on 4/27/2023) Modified on 4/28/2023 (jml, COURT STAFF). (Entered: 04/27/2023) |
| 05/09/2023 | 146 | Joint Status Report by Giffords Law Center to Prevent Gun Violence, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Edelman, Scott) (Filed on 5/9/2023) Modified on 5/10/2023 (anj, COURT STAFF). (Entered: 05/09/2023) |

| 05/15/2023 | 147 | **Order by Judge Edward M Chen GRANTING 145 STIPULATED PROTECTIVE ORDER.(vla, COURT STAFF) (Filed on 5/15/2023) (Entered: 05/15/2023)** |
|---|---|---|
| 05/16/2023 | 174 | **Minute Entry for proceedings held before Judge Edward M Chen: Status Conference held on 5/16/2023.**<br><br>Total Time in Court: 18 Minutes.<br><br>Court Reporter: Scott Coniam. (vla, COURT STAFF) (Date Filed: 5/16/2023) (Entered: 08/28/2023) |
| 05/19/2023 | 148 | STIPULATION WITH PROPOSED ORDER *to Set Briefing Schedule for Plaintiffs' Motion to Compel Completion of the Administrative Record and for Leave to Take Targeted Discovery* filed by Giffords Law Center to Prevent Gun Violence, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Edelman, Scott) (Filed on 5/19/2023 Modified on 5/19/2023 (jml, COURT STAFF). (Entered: 05/19/2023) |
| 05/30/2023 | 149 | **Order. Signed 5/30/2023 by Judge Edward M Chen granting 148 Stipulation to Set Briefing Schedule for Plaintiffs' Motion to Compel Completion of Administrative Record & for Leave to Take Targeted Discovery.**<br><br>Motion/Opening Brief due by 6/8/2023.<br>Responses/Opposition due by 6/22/2023.<br>Replies due by 6/29/2023.<br><br>Motion Hearing set for 7/13/2023 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen.(klh, COURT STAFF) (Filed on 5/30/2023) (Entered: 05/30/2023) |
| 05/30/2023 | 150 | **ORDER GRANTING 145 STIPULATED PROTECTIVE ORDER. Signed by Judge Edward M. Chen on 5/30/2023. (vla, COURT STAFF) (Filed on 5/30/2023) (Entered: 05/30/2023)** |
| 06/08/2023 | 151 | MOTION to Compel *Completion of the Administrative Record and for Leave to Conduct Limited Discovery* filed by Giffords Law Center to Prevent Gun Violence. Motion Hearing set for 7/13/2023 01:30 PM in San Francisco, Courtroom 05, 17th Floor before Judge Edward M Chen. Responses due by 6/22/2023. Replies due by 6/29/2023. (Attachments: # 1 Declaration of Lee R. Crain, # 2 Exhibit A to L. Crain Declaration, # 3 Exhibit B to L. Crain Declaration, # 4 Exhibit C to L. Crain Declaration, # 5 Exhibit D to L. Crain Declaration, # 6 Exhibit E to L. Crain Declaration, # 7 Exhibit F to L. Crain Declaration, # 8 Proposed Order)(Edelman, Scott) (Filed on 6/8/2023) (Entered: 06/08/2023) |
| 06/16/2023 | 152 | STIPULATION WITH PROPOSED ORDER *for Administrative Relief Permitting Parties to Appear Virtually for July 13 Hearing* filed by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Crain, Lee) (Filed on 6/16/2023) Modified on 6/20/2023 (jml, COURT STAFF). (Entered: 06/16/2023) |
| 06/22/2023 | 153 | OPPOSITION/RESPONSE (re 151 MOTION to Compel *Completion of the Administrative Record and for Leave to Conduct Limited Discovery* ) filed byBureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman. (Newman, Jeremy) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/22/2023 | 154 | **CLERK'S NOTICE ADVANCING TIME OF MOTION HEARING.**<br><br>Motion Hearing as to 151 MOTION to Compel *Completion of the Administrative Record and for Leave to Conduct Limited Discovery* reset from 7/13/2023, at 1:30 PM to 7/13/2023, at 12:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar.<br><br>ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 12:20 PM. |

|  |  | The Joint Stipulation at [Dkt. 152] is Deemed Moot as Thursdays are this Court's remote Civil Law and Motion Calendar via Zoom. |
|--|--|--|
|  |  | **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc |
|  |  | **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. |
|  |  | **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. |
|  |  | *(This is a text–only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 6/22/2023) (Entered: 06/22/2023) |
| 06/29/2023 | 155 | REPLY (re 151 MOTION to Compel *Completion of the Administrative Record and for Leave to Conduct Limited Discovery* ) filed byGiffords Law Center to Prevent Gun Violence. (Edelman, Scott) (Filed on 6/29/2023) (Entered: 06/29/2023) |
| 07/10/2023 | 156 | STATUS REPORT by Giffords Law Center to Prevent Gun Violence and State of California . (Edelman, Scott) (Filed on 7/10/2023) Modified on 7/11/2023 (jml, COURT STAFF). (Entered: 07/10/2023) |
| 07/10/2023 | 157 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7–3.d filed byBureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # 1 Exhibit 1 – VanDerStok Opinion & Order, # 2 Exhibit 2 – VanDerStok Final Judgment, # 3 Exhibit 3 – Blue Mountains Biodiversity Project v Jeffries)(Related document(s) 151 ) (Newman, Jeremy) (Filed on 7/10/2023) (Entered: 07/10/2023) |
| 07/11/2023 | 158 | AMENDED STATUS REPORT by Giffords Law Center to Prevent Gun Violence and State of California. (Edelman, Scott) (Filed on 7/11/2023) Modified on 7/11/2023 (jml, COURT STAFF). (Entered: 07/11/2023) |
| 07/13/2023 | 159 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # 1 Exhibit 1 – Notice of Appeal, VanDerStok v. Garland)(Newman, Jeremy) (Filed on 7/13/2023) (Entered: 07/13/2023) |
| 07/13/2023 | 161 | **Minute Entry for proceedings held before Judge Edward M Chen: Motion Hearing held on 7/13/2023 re 151 MOTION to Compel *Completion of the Administrative Record and for Leave to Conduct Limited Discovery***<br><br>Status Conference set for 7/27/2023, at 1:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar.<br><br>ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 1:20 PM.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Digital Recording Time: 12:31 – 12:57. (vla, COURT STAFF) (Date Filed: 7/13/2023) Proceedings Transcribed by Dipti Patel (Liberty Transcripts) dbpatel1180@gmail.com. (bns, COURT STAFF). (Entered: 07/17/2023)** |
| 07/14/2023 | 160 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1 – Emergency Motion for Stay Pending Appeal, VanDerStok v. Garland, # 2 Exhibit 2 – Declaration of Matthew P. Varisco in Support of Emergency Motion for Stay Pending Appeal)(Newman, Jeremy) (Filed on 7/14/2023) (Entered: 07/14/2023) |
| 07/17/2023 | 162 | TRANSCRIPT ORDER for proceedings held on July 13, 2023 before Judge Edward M Chen by Frank Blackwell, Giffords Law Center to Prevent Gun Violence, Bryan Muehlberger, for Court Reporter not listed – San Francisco. (Crain, Lee) (Filed on 7/17/2023) (Entered: 07/17/2023) |
| 07/18/2023 | 163 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # 1 Exhibit 1 – Order Granting Administrative Stay, VanDerStok v. Garland, # 2 Exhibit 2 – Motion for Stay Pending Appeal, VanDerStok v. Garland (5th Cir.))(Newman, Jeremy) (Filed on 7/18/2023) (Entered: 07/18/2023) |
| 07/26/2023 | 164 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # 1 Exhibit 1 – VanDerStok v. Garland, Order on Motion to Stay Pending Appeal)(Newman, Jeremy) (Filed on 7/26/2023) (Entered: 07/26/2023) |
| 07/26/2023 | 165 | Transcript of Proceedings held on 7/13/23, before Judge Edward M. Chen. Court Reporter/Transcriber Liberty Transcripts/Dipti Patel, telephone number (847) 848–4907. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 162 Transcript Order, ) Redaction Request due 8/16/2023. Redacted Transcript Deadline set for 8/28/2023. Release of Transcript Restriction set for 10/24/2023. (Related documents(s) 162 ) (Patel, Dipti) (Filed on 7/26/2023) (Entered: 07/26/2023) |
| 07/27/2023 | 170 | **Minute Entry for proceedings held before Judge Edward M Chen:**<br><br>Status Conference held on 7/27/2023.<br><br>Status Conference set for 10/17/2023 at 2:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar.<br><br>ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 1:20 PM.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Total Time in Court: 1:43–2:10 27 Minutes.**<br>**Court Reporter: Scot Coniam.**<br><br>(jlg, COURT STAFF) (Date Filed: 7/27/2023) (Entered: 08/09/2023) |
| 07/28/2023 | 166 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # 1 Exhibit 1 – Supreme Court Stay Application, VanDerStok v. Garland, # 2 Exhibit 2 – Appendix)(Newman, Jeremy) (Filed on 7/28/2023) (Entered: 07/28/2023) |
| 07/31/2023 | 167 | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. |

| | | |
|---|---|---|
| | | (Newman, Jeremy) (Filed on 7/31/2023) (Entered: 07/31/2023) |
| 08/04/2023 | <u>168</u> | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # <u>1</u> Exhibit 1 – Extension of Supreme Court Administrative Stay)(Newman, Jeremy) (Filed on 8/4/2023) (Entered: 08/04/2023) |
| 08/08/2023 | <u>169</u> | STATUS REPORT by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Attachments: # <u>1</u> Exhibit 1 – Supreme Court Stay Order)(Newman, Jeremy) (Filed on 8/8/2023) (Entered: 08/08/2023) |
| 08/10/2023 | <u>171</u> | STATUS REPORT by Giffords Law Center to Prevent Gun Violence. (Edelman, Scott) (Filed on 8/10/2023) (Entered: 08/10/2023) |
| 08/18/2023 | <u>172</u> | JOINT STATUS REPORT by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Edelman, Scott) (Filed on 8/18/2023) Modified on 8/21/2023 (jml, COURT STAFF). (Entered: 08/18/2023) |
| 08/21/2023 | 173 | CLERK'S NOTICE ADVANCING STATUS CONFERENCE HEARING DATE. Status Conference reset from 10/17/2023 to 8/29/2023, at 2:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar. **ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 2:20 PM.** **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (vla, COURT STAFF) (Filed on 8/21/2023) (Entered: 08/21/2023) |
| 08/29/2023 | <u>175</u> | **Minute Entry for proceedings held before Judge Edward M Chen: Status Conference held on 8/29/2023.** Joint Status Report due by 11/21/2023. Status Conference set for 11/28/2023, at 2:30 PM in San Francisco, – Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar. ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 2:20 PM. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. **Total Time in Court: 28 Minutes. Court Reporter: Kelly Shainline. (vla, COURT STAFF) (Date Filed: 8/29/2023) (Entered: 09/06/2023)** |

| 09/07/2023 | 176 | STIPULATION WITH PROPOSED ORDER *Regarding Summary Judgment Briefing Schedule* filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice, State of California and Giffords Law Center to Prevent Gun Violence. (Newman, Jeremy) (Filed on 9/7/2023) Modified on 9/8/2023 (jml, COURT STAFF). (Entered: 09/07/2023) |
|---|---|---|
| 09/07/2023 | 177 | *Supplemental First Amended Complaint for Declaratory Relief and Injunctive Relief* against Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. Filed by Bryan Muehlberger, Frank Blackwell, Giffords Law Center to Prevent Gun Violence. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27 (Redline First Amended Complaint against Supplemental))(Edelman, Scott) (Filed on 9/7/2023) Modified on 9/8/2023 (jml, COURT STAFF). (Entered: 09/07/2023) |
| 09/08/2023 | 178 | **Order by Judge Edward M Chen GRANTING AS MODIFIED 176 STIPULATION REGARDING SUMMARY JUDGMENT BRIEFING SCHEDULE.(vla, COURT STAFF) (Filed on 9/8/2023) (Entered: 09/08/2023)** |
| 09/28/2023 | 179 | NOTICE *of Filing of Certified Supplemental Administrative Record* by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice (Attachments: # 1 ATF Supp 1–357, # 2 ATF Supp 358–506, # 3 ATF Supp 507–631, # 4 ATF Supp 632–789)(Riess, Daniel) (Filed on 9/28/2023) Modified on 9/28/2023 (jml, COURT STAFF). (Entered: 09/28/2023) |
| 10/03/2023 | 180 | STIPULATION WITH PROPOSED ORDER *Regarding Page Limits for Defendants' Motion for Summary Judgment* filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice, the State of California and Giffords Law Center to Prevent Gun Violence. (Newman, Jeremy) (Filed on 10/3/2023) Modified on 10/3/2023 (jml, COURT STAFF). (Entered: 10/03/2023) |
| 10/05/2023 | 181 | **Order by Judge Edward M Chen GRANTING 180 STIPULATION REGARDING PAGE LIMITS FOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT. (vla, COURT STAFF) (Filed on 10/5/2023) (Entered: 10/05/2023)** |
| 10/05/2023 | 182 | MOTION for Summary Judgment filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. Motion Hearing set for 1/25/2024 01:30 PM in San Francisco, – To be determined before Judge Edward M Chen. Responses due by 10/26/2023. Replies due by 12/7/2023. (Attachments: # 1 Proposed Order)(Newman, Jeremy) (Filed on 10/5/2023) (Entered: 10/05/2023) |
| 10/24/2023 | 183 | STIPULATION WITH PROPOSED ORDER *Regarding Page Limits for Plaintiffs' Combined Brief in Support of Plaintiffs' Cross–Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment* filed by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Crain, Lee) (Filed on 10/24/2023) Modified on 10/24/2023 (jml, COURT STAFF). (Entered: 10/24/2023) |
| 10/26/2023 | 184 | OPPOSITION/RESPONSE (re 182 MOTION for Summary Judgment ) *and Plaintiffs' Cross–Motion for Summary Judgment* filed byGiffords Law Center to Prevent Gun Violence. (Attachments: # 1 Proposed Order)(Edelman, Scott) (Filed on 10/26/2023) (Entered: 10/26/2023) |
| 10/26/2023 | 185 | Declaration of Lee R. Crain in Support of 184 Opposition/Response to Motion, filed byGiffords Law Center to Prevent Gun Violence. (Related document(s) 184 ) (Edelman, Scott) (Filed on 10/26/2023) (Entered: 10/26/2023) |

| | | |
|---|---|---|
| 10/26/2023 | 186 | Declaration of James E. Yurgealitis in Support of 184 Opposition/Response to Motion, filed byGiffords Law Center to Prevent Gun Violence. (Related document(s) 184 ) (Edelman, Scott) (Filed on 10/26/2023) (Entered: 10/26/2023) |
| 10/26/2023 | 187 | Declaration of Laura Cutilletta in Support of 184 Opposition/Response to Motion, filed byGiffords Law Center to Prevent Gun Violence. (Related document(s) 184 ) (Edelman, Scott) (Filed on 10/26/2023) (Entered: 10/26/2023) |
| 10/26/2023 | 188 | Declaration of Salvador Gonzalez in Support of 184 Opposition/Response to Motion, filed byGiffords Law Center to Prevent Gun Violence. (Related document(s) 184 ) (Edelman, Scott) (Filed on 10/26/2023) (Entered: 10/26/2023) |
| 11/14/2023 | 189 | **Order by Judge Edward M Chen GRANTING 183 STIPULATION REGARDING PAGE LIMITS FOR PLAINTIFFS' COMBINED BRIEF IN SUPPORT OF PLAINTIFFS' CROSS–MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.(vla, COURT STAFF) (Filed on 11/14/2023) (Entered: 11/14/2023)** |
| 11/21/2023 | 190 | JOINT STATUS REPORT by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Crain, Lee) (Filed on 11/21/2023) Modified on 11/22/2023 (jml, COURT STAFF). (Entered: 11/21/2023) |
| 11/27/2023 | 191 | **CLERK'S NOTICE VACATING STATUS CONFERENCE.** The Court HEREBY VACATES the status conference set for 11/28/2023. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (vla, COURT STAFF) (Filed on 11/27/2023) (Entered: 11/27/2023) |
| 12/01/2023 | 192 | NOTICE of Appearance by Kathleen R. Hartnett *for Amicus Curiae Everytown for Gun Safety Support Fund* (Hartnett, Kathleen) (Filed on 12/1/2023) (Entered: 12/01/2023) |
| 12/01/2023 | 193 | ADMINISTRATIVE MOTION File Amicus Curiae Brief filed by Everytown for Gun Safety Support Fund. Responses due by 12/5/2023. (Attachments: # 1 Exhibit A – Amicus Brief, # 2 Proposed Order)(Hartnett, Kathleen) (Filed on 12/1/2023) (Entered: 12/01/2023) |
| 12/04/2023 | 194 | **Order by Judge Edward M Chen GRANTING 193 UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF EVERYTOWN FOR GUN SAFETY SUPPORT FUND AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.(vla, COURT STAFF) (Filed on 12/4/2023) (Entered: 12/04/2023)** |
| 12/06/2023 | 195 | STIPULATION WITH PROPOSED ORDER *Regarding Page Limits for Defendants' Closing Summary Judgment Brief* filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice, State of California and Giffords Law Center to Prevent Gun Violence. (Newman, Jeremy) (Filed on 12/6/2023) Modified on 12/6/2023 (jml, COURT STAFF). (Entered: 12/06/2023) |
| 12/06/2023 | 196 | **Order by Judge Edward M Chen GRANTING 195 STIPULATION REGARDING PAGE LIMITS FOR DEFENDANTS' CLOSING SUMMARY JUDGMENT BRIEF.(vla, COURT STAFF) (Filed on 12/6/2023) (Entered: 12/06/2023)** |
| 12/07/2023 | 197 | REPLY (re 182 MOTION for Summary Judgment ) *and Opposition to Plaintiffs' Cross–Motion for Summary Judgment* filed byBureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice. (Riess, Daniel) (Filed on 12/7/2023) (Entered: 12/07/2023) |
| 12/07/2023 | 198 | Declaration of Daniel Hoffman in Support of 197 Reply to Opposition/Response, filed byBureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice. (Related document(s) 197 ) (Riess, |

| | | |
|---|---|---|
| | | Daniel) (Filed on 12/7/2023) (Entered: 12/07/2023) |
| 01/02/2024 | 199 | STIPULATION WITH PROPOSED ORDER *Regarding Page Limits for Plaintiffs' Combined Reply Brief in Further Support of Plaintiffs' Cross−Motion for Summary Judgment* filed by Giffords Law Center to Prevent Gun Violence, State of California, Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Daniel Hoffman, United States Department of Justice, and Merrick B. Garland. (Crain, Lee) (Filed on 1/2/2024) Modified on 1/3/2024 (jml, COURT STAFF). (Entered: 01/02/2024) |
| 01/04/2024 | 200 | MOTION to Continue *Summary Judgment Hearing* filed by Bureau of Alcohol, Tobacco, Firearms and Explosives, Steven Dettelbach, Merrick Garland, Daniel Hoffman, United States Department of Justice. (Newman, Jeremy) (Filed on 1/4/2024) (Entered: 01/04/2024) |
| 01/04/2024 | 201 | **Order by Judge Edward M Chen GRANTING 199 STIPULATION REGARDING PAGE LIMITS FOR PLAINTIFFS' COMBINED REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFFS' CROSS−MOTION FOR SUMMARY JUDGMENT.(vla, COURT STAFF) (Filed on 1/4/2024) (Entered: 01/04/2024)** |
| 01/04/2024 | 202 | REPLY *In Further Support Of Plaintiffs' Cross−Motion for Summary Judgment* (re 182 MOTION for Summary Judgment ) filed by Giffords Law Center to Prevent Gun Violence and State of California. (Attachments: # 1 Declaration of Lee R. Crain)(Crain, Lee) (Filed on 1/4/2024) Modified on 1/5/2024 (jml, COURT STAFF). (Entered: 01/04/2024) |
| 01/08/2024 | 203 | CLERK'S NOTICE RESCHEDULING MOTION HEARING. Motion Hearing as to 182 MOTION for Summary Judgment reset from 1/25/2024 to 1/31/2024, at 2:30 PM in San Francisco, − Videoconference Only before Judge Edward M Chen. This proceeding will be held via a Zoom webinar. ALL COUNSEL PARTICIPATING IN THE HEARING ARE REQUIRED TO LOG INTO ZOOM NO LATER THAN 2:20 PM. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/emc **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. *(This is a text−only entry generated by the court. There is no document associated with this entry.)*(vla, COURT STAFF) (Filed on 1/8/2024) (Entered: 01/08/2024) |
| 02/01/2024 | 204 | TRANSCRIPT ORDER for proceedings held on 01/31/2024 before Judge Edward M Chen by Giffords Law Center to Prevent Gun Violence, for Court Reporter Kelly Shainline. (Crain, Lee) (Filed on 2/1/2024) (Entered: 02/01/2024) |
| 02/09/2024 | 205 | Transcript of Proceedings held on 1/31/2024, before Judge Edward M. Chen. Court Reporter/Transcriber Kelly Shainline, Official Court Reporter, telephone number (510) 828−9404, E−mail kelly_shainline@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 204 Transcript Order ) Release of Transcript Restriction set for 5/9/2024. (Related documents(s) 204 ) (Shainline, Kelly) (Filed on 2/9/2024) (Entered: 02/09/2024) |
| 02/13/2024 | 206 | TRANSCRIPT ORDER for proceedings held on 1/31/2024 before Judge Edward M Chen by State of California, for Court Reporter Kelly Shainline. (Woods, Sean) (Filed on 2/13/2024) (Entered: 02/13/2024) |

| 02/26/2024 | 207 | **ORDER by Judge Edward M. Chen granting in part and denying in part 182 Defendants' Motion for Summary Judgment; and granting in part and denying in part 184 Plaintiffs' Motion for Summary Judgment. (emclc2, COURT STAFF) (Filed on 2/26/2024) (Entered: 02/26/2024)** |
|---|---|---|
| 03/04/2024 | 208 | CLERK'S JUDGMENT. (vla, COURT STAFF) (Filed on 3/4/2024) (Entered: 03/04/2024) |
| 04/26/2024 | 209 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by Bureau of Alcohol, Tobacco, Firearms, and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice. Appeal of Order on Motion for Summary Judgment, 207, Clerk's Judgment 208 (Appeal fee FEE WAIVED.) (Riess, Daniel) (Filed on 4/26/2024) (Entered: 04/26/2024) |
| 04/29/2024 | 210 | USCA Case Number 24–2701 for the Ninth Circuit for 209 Notice of Appeal to the Ninth Circuit, filed by Merrick Garland, United States Department of Justice, Steven Dettelbach, Bureau of Alcohol, Tobacco, Firearms, and Explosives. (jml, COURT STAFF) (Filed on 4/29/2024) (Entered: 05/06/2024) |
| 09/11/2024 | 211 | NOTICE of Withdrawal filed by Erica Payne, no longer appearing on behalf of Giffords Law Center to Prevent Gun Violence in this case */ Notice of Change (Withdraw) in Counsel* (Payne, Erica) (Filed on 9/11/2024) (Entered: 09/11/2024) |