**No. 24-2701**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

STATE OF CALIFORNIA, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:20-cv-0676
Hon. Edward M. Chen

---

**APPELLEES' ANSWERING BRIEF**

---

Lee R. Crain
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
lcrain@gibsondunn.com

*Attorney for Appellee Giffords
Law Center to Prevent Gun
Violence*

Rob Bonta
ATTORNEY GENERAL OF
CALIFORNIA
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3807

*Attorney for Appellee State of
California*

*[Additional Counsel Listed on Next Page]*

Gregg Costa
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6649
gcosta@gibsondunn.com

Avi Weitzman, *pro hac vice*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
aviweitzman@paulhastings.com

David M. Pucino, *pro hac vice*
GIFFORDS LAW CENTER TO
PREVENT GUN
VIOLENCE
244 Madison Ave Ste 147
New York, NY 10016
Telephone: (917) 524-7816

*Attorneys for Appellee Giffords
Law Center to Prevent Gun
Violence*

Thomas S. Patterson
SENIOR ASSISTANT ATTORNEY
GENERAL
R. Matthew Wise, 238485
SUPERVISING DEPUTY ATTORNEY
GENERAL
S. Clinton Woods, 246054
DEPUTY ATTORNEY GENERAL
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3807
Clint.Woods@doj.ca.gov

*Attorneys for Appellee State of
California, by and through
Attorney General Rob Bonta*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................... 1

JURISDICTIONAL STATEMENT ..................................... 5

ISSUES PRESENTED ........................................................ 5

PERTINENT STATUTES AND REGULATIONS............................ 6

STATEMENT OF THE CASE............................................ 6

   A.  Congress Passes the Gun Control Act.................................. 6

   B.  A Ghost-Gun Epidemic Sweeps the United States............... 8

   C.  ATF's 2022 Final Rule Creates a Loophole For Certain Partially Complete AR-type Receivers................................ 11

   D.  Defendants' Failure to Regulate AR-type Receivers Injures Plaintiffs.................................................................. 20

SUMMARY OF ARGUMENT ........................................... 26

STANDARD OF REVIEW ................................................. 29

ARGUMENT...................................................................... 29

   I. ATF's Actions Were Arbitrary and Capricious...................... 29

      a.   ATF Failed to Consider Relevant Factors That Its Own Final Rule Required It to Consider................ 32

      b.   ATF's Treatment of Jigs and Tools Was Unreasonable and Unexplained................................... 41

      c.   The District Court Did Not Abuse Its Discretion in Ordering the Final Rule Vacated ............................. 47

i

II. Plaintiffs Have Standing ....................................................... 53

    a.     California Has Standing ................................................ 54

    b.     GLC Independently Has Standing............................... 63

CONCLUSION .................................................................................. 76

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abramski v. United States,*
573 U.S. 169 (2014) ....................................................... 7

*Air Alliance Houston v. Envt'l Prot. Agency,*
906 F.3d 1049 (D.C. Cir. 2018) .................................... 59

*All. for the Wild Rockies v. Petrick,*
68 F.4th 475 (9th Cir. 2023) .....................................29, 30, 38, 43

*All. for the Wild Rockies v. U.S. Forest Serv.,*
907 F.3d 1105 (9th Cir. 2018)................................47, 49

*Ariz. All. for Retired Ams. v. Mayes,*
117 F.4th 1165 (9th Cir. 2024)..................................... 75

*Ariz. All. for Retired Ams. v. Mayes,*
130 F.4th 1177 (9th Cir. 2025)..................................... 75

*California ex rel. Becerra v. U.S. Dep't of Interior,*
381 F. Supp. 3d 1153 (N.D. Cal. 2019) ....................... 46

*Biden v. Nebraska,*
600 U.S. 477 (2023) ..................................................... 63

*Bondi v. VanDerStok,*
604 U.S. 458 (2025)................................1, 2, 7, 8, 9, 52

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ....................................... 61

*California v. Bureau of Land Mgmt.,*
612 F. Supp. 3d 925 (N.D. Cal. 2020) ....................56, 58

*California v. Ross,*
358 F. Supp. 3d 965 (N.D. Cal. 2018) ....................58, 60

iii

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ....................................................................... 58

*Coeur Alaska, Inc. v. Se. Alaska Conserv. Council,*
    557 U.S. 261 (2009) ....................................................................... 48

*Confederated Tribes & Bands of Yakima Indian Nation v. F.E.R.C.,*
    746 F.2d 466 (9th Cir. 1984) ................................................... 30, 32

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
    603 U.S. 799 (2024) ....................................................................... 49

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    675 F. Supp. 3d 1112 (D. Idaho 2023) ......................................... 49

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) ....................................................... 43

*Ctr. For Biological Diversity v. U.S. Dep't of the Interior,*
    144 F.4th 296 (D.C. Cir. 2025) ..................................................... 76

*Daniels-Hall v. Nat'l Educ. Ass'n,*
    629 F.3d 992 (9th Cir. 2010) ......................................................... 57

*Dep't of Com. v. New York,*
    588 U.S. 752 (2019) ........................................................... 60, 63, 72

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    591 U.S. 1 (2020) ........................................................................... 31

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ..................................... 64, 65, 67, 75

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024) ........................... 65, 67, 69, 70, 71, 72, 73, 75

iv

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)...............................................64, 70, 71, 72, 73

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010)..................................................... 40

*Immigrant Defs. Law Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025) .........................................69, 70, 75

*Iowa v. Wright*,
    __ F. 4th __, 2025 WL 2554549 (8th Cir. Sept. 5,
    2025)...................................................................................... 63

*Kapa'a v. Trump*,
    __ F. Supp. 3d __, 2025 WL 2300605 (D. Haw. Aug. 8,
    2025).................................................................................... 51

*Leonard v. Clark*,
    12 F.3d 885 (9th Cir. 1993)..................................................54, 63

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973).................................................................. 71

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................... 54

*Massachusetts v. EPA*,
    549 U.S. 497 (2007).................................................................. 46

*Mecinas v. Hobbs*,
    30 F.4th 890 (9th Cir. 2022) ...................................................... 54

*Michigan v. E.P.A.*,
    576 U.S. 743 (2015).............................................................30, 32

*Mont. Wildlife Fed. v. Haaland*,
    127 F.4th 1 (9th Cir. 2025) ...............................................29, 47, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................30, 31, 40, 42, 45

*Nairne v. Landry*,
    151 F.4th 666 (5th Cir. 2025) ................................................69, 76

*Nat. Res. Def. Council v. E.P.A.*,
    526 F.3d 591 (9th Cir. 2008)...................................................... 30

*Nat'l Ass'n for Gun Rts. v. Lamont*,
    685 F. Supp. 3d 63 (D. Conn. 2023)........................................... 10

*Nat'l Urb. League v. Ross*,
    977 F.3d 770 (9th Cir. 2020)..................................................... 46

*New Jersey v. Trump*,
    131 F.4th 27 (1st Cir. 2025)..................................................... 63

*North Carolina v. E.P.A.*,
    531 F.3d 896 (D.C. Cir. 2008) ................................................... 52

*Ohio v. EPA*,
    603 U.S. 279 (2024).................................................29, 32, 36, 38

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015)...................................................4, 51

*Refugee & Immigrant Ctr. For Educ. & Legal Servs. v. Noem*,
    __ F. Supp. 3d. __, 2025 WL 1825431 (D.D.C. July 2, 2025)........................................................................ 51

*Republican Nat'l Comm'n v. N.C. State Bd. of Elec.*,
    120 F.4th 390 (4th Cir. 2024) ................................................... 76

*Satanic Temple v. Labrador*,
    149 F.4th 1047 (9th Cir. 2025).........................................73, 74, 75

vi

*Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*,
  486 F.3d 638 (9th Cir. 2007) ....................................................... 48

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) ..................................................................... 60

*Teixeria v. Cty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ...................................................... 57

*Tex. Tribune v. Caldwell Cnty.*,
  121 F.4th 520 (5th Cir. 2024) .................................................... 76

*Trump v. CASA, Inc.*,
  145 S. Ct. 2540 (2025) ................................................................. 51

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
  441 F.3d 416 (6th Cir. 2006) ................................................37, 40

*United States v. Smith*,
  477 F.2d 399 (8th Cir. 1973) ...................................................... 40

*United States v. Texas*,
  599 U.S. 670 (2023) ...........................................................61, 62, 71

*United States v. TRW Rifle 7.62x51mm Caliber*,
  447 F.3d 686 (9th Cir. 2006) ...................................................... 40

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ..........................................64, 65, 75

*W. Watersheds Project v. Bernhardt*,
  392 F. Supp. 3d 1225 (D. Or. 2019) ........................................... 39

*Walter O. Boswell Mem'l Hosp. v. Heckler*,
  749 F.2d 788 (D.C. Cir. 1984) ...............................................46, 47

*Yakima Valley Cablevision v. F.C.C.*,
  794 F.2d 737 (D.C. Cir. 1986) .................................................... 46

vii

## Statutes

5 U.S.C. § 706(2) ...................................................................4, 29, 48

18 U.S.C. § 921 ....................................................................1, 3, 7, 8

28 U.S.C. § 1331 ............................................................................ 5

Brady Handgun Violence Prevention Act, Pub. L. No.
103-159, 107 Stat. 1536 (1993) .................................................... 7

Cal. Pen. Code § 16531 .................................................................. 56

Cal. Pen. Code § 30400 ................................................................. 56

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat.
1213 ......................................................................................... 6

## Regulations

27 C.F.R. § 478.11.............................. 13, 17, 31, 33, 35, 36, 37, 42, 45

27 C.F.R. § 478.12.................................................3, 12, 13, 33, 41, 43

## Other Authorities

Assembly Bill 857 (Cal. 2016) ........................................................ 56

Assembly Bill 1621 (Cal. 2022) ...................................................... 56

Brief for ATF, *Bondi v. VanDerStok*,
604 U.S. 458 (2025) (No. 23-852) ................................................. 8

*Definition of "Frame or Receiver" and Identification of
Firearms*,
87 Fed. Reg. 24,652 (Apr. 26, 2022) . 8, 9, 11, 33, 34, 42, 44, 46, 52

## INTRODUCTION

The Gun Control Act of 1968 ("GCA") defines the term "firearm" broadly. *Bondi v. VanDerStok*, 604 U.S. 458, 462 (2025). The definition includes "any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). Even frames and receivers, the core building-blocks of handguns and rifles respectively, are regulated as "firearms"—products that can be sold only with a background check and a serial number. *Id.* The GCA's definition of "firearm" is designed to capture "everything from run-of-the-mill rifles to novelty umbrella guns" because broad coverage is essential to the Act's twin goals: (1) keep firearms out of the hands of those who should not have them, and (2) ensure that law enforcement can identify and trace firearms used in crimes. *See VanDerStok*, 604 U.S. at 462-63.

This case is about a particular class of firearms—do-it-yourself ("DIY") weapons called "ghost guns," and specifically, the particularly deadly AR-type semi-automatic variants. Sold "partially complete," these weapons are purchased without a

background check or serial number. But with the help of commonly available tools, a buyer can assemble them to fire a projectile in as little as a few hours. 1-SER-160-61, 167-69. These weapons are called "ghost guns" because they lack the serial number law enforcement ordinarily uses to trace a firearm's ownership.

As the Supreme Court recently recognized, the ghost-gun market has exploded. *See VanDerStok*, 604 U.S. at 463. That's due in large part to ghost guns' popularity with criminals who purchase from "[s]ome manufacturers and dealers" who "take the position" that certain partially complete frames and receivers fall outside of the GCA's broad scope because they are not at a sufficient stage of manufacture to qualify as "frames" or "receivers" within the meaning of the GCA. *Id.* at 463-64. The burgeoning ghost-gun marketplace has caused a surge in ghost-gun-related crimes across the country, which police departments have had limited success curtailing because ghost guns, definitionally, cannot be traced. *Id*. at 464. Plaintiff California has suffered an outsized share of the ghost-gun epidemic—it accounted for around half of all unserialized ghost guns recovered nationwide from crime scenes between 2017 and 2023.

2

In 2022, the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF")[1] promulgated a new rule to address the scourge of ghost guns. The rule ensured that "partially complete . . . frame[s] or receiver[s] . . . that [are] designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver" would fall within the statutory definition of "frame" or "receiver" and, hence, "firearm" (the "Final Rule"). *See Definition of "Frame or Receiver" and Identification of Firearms*, 27 C.F.R. § 478.12(c); *see also* 18 U.S.C. § 921(a)(3). In the Final Rule, ATF stated that it would determine whether a partially complete frame or receiver was "readily converted" to function as a frame or receiver based on eight factors—including, among others, the time, ease, and expertise required to render a product fireable.

Instead, ATF categorically excluded a particular class of AR-type ghost-gun products from the definition of "firearm" without even attempting to apply these factors. ATF arbitrarily excluded partially complete AR-type receivers when those products are not

---

[1] ATF and the individual defendants are collectively referred to as "Defendants" or "ATF."

3

sold in the same transaction as jigs and tools that facilitate their conversion—disregarding evidence that those exact tools are easily accessible elsewhere. As the district court recognized, ATF ignored important aspects of the problem and lacked a satisfactory explanation for its course of action. *See* ER-037-40, 043-47. Defendants advance no compelling arguments to the contrary on appeal.

To redress the Final Rule's deficiencies, the district court vacated ATF's determinations. The Administrative Procedure Act ("APA") is clear: Courts should, by default, set aside unlawful agency actions. 5 U.S.C. § 706(2); *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015). To succeed, Defendants must demonstrate that equity *demands* the alternative remedy of remand without vacatur—a standard they cannot meet given the serious risk of real-world harm to Plaintiffs and innocent Americans posed by this loophole.

Defendants also argue that Plaintiffs lack standing. But ATF's failure to properly regulate partially complete AR-type receivers inflicts concrete injury (1) on California by predictably increasing the

4

number of crimes that will be committed with ghost guns, and (2) on the Giffords Law Center to Prevent Gun Violence ("GLC") by interfering with its core activities predating the Final Rule, including anti-gun-violence community intervention programs and direct services to survivors. Recent decisions from the Supreme Court and this Court confirm that both Plaintiffs have standing.

In short, ATF provides no basis to reject the district court's thorough, well-reasoned ruling on appeal. This Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. The district court correctly held that Plaintiffs have standing to sue under Article III. Plaintiffs do not contest this Court's appellate jurisdiction or the timeliness of this appeal. Appellants' Opening Brief ("AOB") 3.

## ISSUES PRESENTED

The issues presented are:

1. Whether the district court: (a) correctly held arbitrary and capricious ATF's determinations that partially complete receivers that are not machined or indexed and not sold with jigs or tools are

not "firearms" within the meaning of the GCA; and (b) abused its discretion in vacating ATF's challenged determinations, rather than ordering remand without vacatur.

2. Whether the district court correctly found that *either* California or GLC has standing to challenge ATF's determination that partially complete AR-type receivers that are not machined or indexed and not sold with jigs or tools are not "firearms" within the meaning of the GCA.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are contained in the addendum of Appellants' opening brief.

## STATEMENT OF THE CASE

### A.    Congress Passes the Gun Control Act

President Lyndon B. Johnson signed the GCA into law in 1968 in the wake of a series of political assassinations. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213. Congress concluded that then-existing gun control measures made it too easy for "criminals to acquire largely untraceable guns" and "evade state laws regulating in-person sales simply by purchasing guns through

6

the mail." *VanDerStok*, 604 U.S. at 462.  To that end, the GCA reflects "twin goals"—first, "to keep guns out of the hands of criminals and others who should not have them," and second, to "assist law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).

Accordingly, the GCA: (i) bans sales of guns to people convicted of felonies, people addicted to drugs, minors, and individuals with serious mental illnesses; (ii) requires that all firearms dealers obtain a federal firearms license; (iii) prohibits the importation of firearms "with no sporting purpose;" and (iv) mandates that all firearms be serialized.   18 U.S.C. §§ 921 *et seq.*   Subsequent amendments mandate that all licensed firearm importers, manufacturers, and dealers conduct a background check on a putative purchaser before transferring a firearm.  *See* Brady Handgun Violence Prevention Act, Pub. L. No. 103-159*,* 107 Stat. 1536 (1993).

To achieve its aims, Congress defined the term "firearm" broadly. *VanDerStok*, 604 U.S. at 462.  The definition includes "any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," as well as "the

7

frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3). The broad definition is designed to capture "everything from run-of-the-mill rifles to novelty umbrella guns," *VanDerStok*, 604 U.S. at 463, because a limited interpretation would "invit[e] . . . evasion" of the GCA, *see* Brief for ATF at 17, *VanDerStok*, 604 U.S. 458 (No. 23-852). The rationale is straightforward: If a product will or is designed to or may readily be converted into an operable firearm, it will almost certainly become capable of inflicting violence.

## B.    A Ghost-Gun Epidemic Sweeps the United States

In recent years, there has been an explosion in DIY "ghost guns" that are designed specifically to circumvent gun safety laws like the GCA. *See* 87 Fed. Reg. 24,652, 24,656 (Apr. 26, 2022); *see id.* at 24,689 (explaining that ghost guns "undermine the GCA's comprehensive regulatory scheme"). When Congress passed the GCA, "the milling equipment, materials needed, and designs were far too expensive for individuals to make firearms practically or reliably on their own." *Id.* at 24,688. But "[w]ith the introduction of new technologies . . . that is no longer true"—today, companies sell ghost guns that amateurs can assemble into functioning firearms

8

within hours, with little-to-no prior experience. *VanDerStok*, 604 U.S. at 463. One such product is an "80%" or "partially complete" frame or receiver—the core component of a functional gun. 87 Fed. Reg. at 24,652, 24,663; *see also* 1-SER-153-61. Ghost guns are uniquely attractive to criminals and others who are legally prohibited from buying firearms or who intend to use firearms to commit a crime because they are unserialized, easy to assemble, and may be purchased without a background check. *See VanDerStok*, 604 U.S. at 463; 1-SER-38-40.

"[P]olice departments around the Nation have confronted an explosion of crimes involving these ghost guns" and "efforts to trace the ownership of these weapons . . . have proven almost entirely futile." *VanDerStok*, 604 U.S. at 464 (cleaned up); *see also* 1-SER-39-40. The number of ghost guns recovered from crime scenes has steadily increased since 2016. *See* 87 Fed. Reg. at 24,656. Many of these crimes were committed by people with criminal records or severe mental illness, the very people the GCA prohibits from buying or possessing firearms. *See, e.g.*, 1-SER-20-30, 40, 68-69.

9

Many of the ghost guns flooding the country are AR-15 rifles. AR-type rifles are semi-automatic rifles that fire with little recoil, which facilitates rapid and accurate firing. 1-SER-152, 155-57. The availability of these untraceable guns causes particular concern because "[a]ssault weapons [including AR-type rifles] have been used to perpetrate approximately one-third of all of the high fatality mass shootings in the past three decades, and between 2014 and the end of 2022, that number has increased to approximately half." *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 99-100 (D. Conn. 2023); *see also* 1-SER-152, 156-57. Many of the deadliest mass shootings in America over the past decade have involved AR-type rifles, including mass shootings at Sandy Hook, Parkland, Las Vegas, Sutherland Springs, Aurora, Boulder, and Uvalde. *See* 1-SER-156-57.

A person can construct a functional, unserialized AR-type rifle by purchasing and finishing a partially complete AR-type receiver. A retailer named Juggernaut Tactical, for example, offers an "AR-15 80% Lower Receiver" for sale on its website. *See* 1-SER-199, 205. All that's needed to purchase is a credit card and a shipping address.

10

*See* 1-SER-177. The "main steps" to convert a partially complete AR-type receiver into a functional one are "removing excess material (either aluminum or polymer depending on the product purchased) and drilling a small number of holes for various pins." 1-SER-160-61. To facilitate that process, many vendors sell jigs, which are inexpensive and reusable tools that make drilling accurate pinholes easier. 1-SER-161. It takes as little as one to three hours to complete the weapon, especially when using jigs or other common and easily accessible tools. *See* 1-SER-160-61; *see also* ER-240-50 (ATF's expert testifying that AR-type receivers "average[] 1.5-3 hours to complete" with jigs).

## C. ATF's 2022 Final Rule Creates a Loophole For Certain Partially Complete AR-type Receivers

Following two devastating mass shootings in Boulder, Colorado and Atlanta, Georgia, the federal government announced plans in March 2021 to "issue a proposed rule to help stop the proliferation of ghost guns." *See* 1-SER-76-77. ATF published the Final Rule in April 2022. 87 Fed. Reg. 24,652. In the Final Rule's preamble, ATF explains that the rule is designed to address the

11

urgent "problem of untraceable firearms being acquired and used by violent criminals and terrorists." *Id.* at 24,658. ATF adds that "maintaining the status quo" with respect to partially complete frames and receivers is not possible because "the GCA requires that all firearms be regulated." *Id.* at 24,724. In the Final Rule, ATF defines the statutory term "receiver" as the "part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(2).



*See* 27 C.F.R. § 478.12(f)(1)(i). The definition includes any partially complete frame or receiver "that is designed to or may readily be

12

completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c).

The Final Rule defines "readily" as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." *Id.* § 478.11. It lists eight factors "relevant" to "the classification of firearms" and the determination of whether a product can "readily" be converted: (1) the time it would take for a product to be converted; (2) the ease with which a product can be converted; (3) the expertise required to convert a product; (4) the equipment required to convert a product; (5) the availability of any parts needed to convert a product; (6) the expense associated with converting a product; (7) the scope of changes needed to convert a product; and (8) the feasibility of converting a product without damaging or destroying it. *Id.*

The Final Rule provides several examples that show how ATF would classify certain partially complete frames and receivers. *See id.* § 478.12(c). Relevant here, Example 4 states: "A billet or blank of an AR-15 variant receiver without critical interior areas having

13

been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is *not* a receiver." *Id.* (emphasis added).

Since the Final Rule took effect, ATF has taken other actions that reiterate, clarify, or apply Example 4 of the Final Rule:

***September 2022 Open Letter.*** On September 27, 2022, ATF issued an open letter (the "September 2022 Open Letter") titled "Impact of Final Rule 2021-05F on Partially Complete AR-15/M-16 Type Receivers" to "further assist the firearms industry and the public in understanding" whether certain partially complete AR-15 style receivers are "firearms" under the GCA. 2-SER-321-27. The September 2022 Open Letter reiterated that "a partially complete AR-type receiver with no indexing or machining of any kind performed in the area of the fire control cavity" is *not* a firearm so long as it is not sold "with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit." 2-SER-321; *see also* 2-SER-237 (standalone partially complete AR-type receivers "without critical interior areas having

14

been indexed, machined, or formed" are not receivers); 1-SER-8 (linking to ATF-published explanatory video stating same).

The photos below, which were published in the September 2022 Open Letter, illustrate the indexing and machining that, in ATF's view, distinguish a firearm from a non-firearm:

 

2-SER-323, 325.

***Post-Rule Classification Letters.*** ATF subsequently issued 55 classification letters in response to industry members' requests for classification under the Final Rule. Classification letters are letters ATF issues to industry members that contain "the agency's official position" with respect to whether particular products qualify as "firearms under Federal firearms laws." 1-SER-132. In 23 of those 55 classification letters, ATF determined that an AR-type partially complete receiver, submitted without any jigs or other

15

tools, was *not* a "firearm" within the meaning of the GCA (the "Challenged Classification Letters"). *See* 2-SER-328-32, 338-47, 357-446, 457-67.

When classifying the AR-type receivers addressed in the Challenged Classification Letters, ATF failed to apply the Final Rule's multi-factor analysis. *See, e.g.,* ER-238; 2-SER-221, 238-32. Instead, ATF concluded that each of these products was *per se* not a "firearm" because (1) "[t]he forward edge of the takedown pin lug clearance area of th[e] sample item does not measure more than .800 inch immediately forward of the front of the buffer retainer hole;" and (2) other than the takedown pin area, there is "no indexing or machining of any kind performed in the area of the fire control cavity." *E.g.*, 2-SER-330-31. Indeed, the sole and determinative factor that ATF apparently used to decide whether a given product is a firearm is whether the drilling of the takedown-pin area on a

16

submitted product exceeds 0.800 inches (or 1.600 inches for AR-10 products).[2]

ATF's binary, categorical machining approach eschewed its own eight factors "relevant" to determining the appropriate "classification of firearms" based on whether the product is "readily" convertible. *See* 27 C.F.R. § 478.11. ATF failed to analyze the "time" it took to "convert" any of the products in the Challenged Classification Letters into fireable, AR-type weapons. *See id.* In fact, of the 55 post-Final Rule classification letters, ATF only twice considered the "time" it would take to complete or convert a submitted product within the meaning of the term "readily" in the Final Rule. Both of these classification letters addressed Glock-style frames, and in both ATF concluded that those frames *were* firearms

---

[2] *Compare* 2-SER-336 (determining that a partially complete AR-type receiver was a firearm because "[t]he forward edge of the takedown pin lug clearance area of th[e] sample *does measure more than .800 inch*" (emphasis in original)), *with* 2-SER-341 (determining that a partially complete AR-type receiver was not a firearm because "[t]he forward edge of the takedown pin lug clearance area of th[e] sample does not measure more than .800 inch").

17

because they could be quickly converted into operable firearms.[3] ATF has never explained why time was a relevant factor as to these two Glock-style frames but not the AR-type receivers addressed in the Challenged Classification Letters.

The Challenged Classification Letters also ignored the ease with which ghost gun purchasers could obtain jigs or tools separately from a ghost-gun receiver. Although the Challenged Classification Letters quoted the Final Rule's requirement that ATF "consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold distributed or possessed with the item or kit," *see, e.g.*, 2-SER-339, none of the post-Final Rule classification letters recognize or analyze how easily a buyer could obtain those items in a separate transaction or from prior use. ATF instead appeared to consider jigs and tools relevant to its analysis only if they were sold directly in conjunction with the AR-type ghost-

---

[3] *See* 2-SER-452-55 (explaining that the time taken to complete the submitted products is "far less than required to fall within the meaning of the term 'readily,'" and that completion times could be between "10 to 30 minutes"); 2-SER-352-53 ("[C]ompletion time of less than 10 minutes . . . [is] far less than [what is] required to fall within the meaning of the team 'readily' in the Final Rule.").

gun frame. For instance, in the Classification Letters that *did* find a partially complete AR-type receiver to constitute a "firearm" under the GCA, ATF explained that its "determination can change if [the at-issue receiver] is sold, distributed, marketed, possessed, or otherwise made available with any associated templates, jigs, molds, equipment, tools, instructions, or guides, such as within a receiver parts kit." *E.g.*, 2-SER-335.

Although ATF considered jigs or tools to be relevant only if "sold, distributed, marketed, possessed, or otherwise made available" with the frame, *see, e.g.*, *id.*, Defendants concede that "jigs and tools may be purchased separately from sources other than the seller or distributor of the receiver with ease." ER-043; *see also* 2-SER-222. In fact, many ghost-gun retailers sell jigs and tools to facilitate drilling accurate pinholes. 1-SER-160, 194; *see also* 1-SER-034. Instructions and templates are also readily accessible online—often for free—which facilitate the conversion of a partially complete frame into an operable AR-type firearm. 1-SER-165, 167-70; *see also* 1-SER-191. The Challenged Classification Letters do not acknowledge this market reality.

19

### D. Defendants' Failure to Regulate AR-type Receivers Injures Plaintiffs

*The State of California.* The ghost-gun epidemic is particularly acute in California. Of the approximately 74,000 suspected ghost guns recovered in the United States between 2018 and 2023, 34,700 of them—or nearly half—were recovered in California. *See* 1-SER-137. California law enforcement officials reported that, during 2020 and 2021, ghost guns "accounted for 25 to 50 percent of [all] firearms recovered at crime scenes." 1-SER-40, 199. Since 2018, "approximately 15-20% of the ghost guns recovered statewide were made with AR-style receivers." 2-SER-216. California law also requires the State government to serialize these recovered, unserialized guns, so each recovered ghost gun generates costs that "would not have been necessary if the weapons recovered . . . were already serialized pursuant to federal law." 2-SER-216, 217.

*Giffords Law Center.* GLC is a "nonprofit organization whose core mission is to save lives from gun violence." 1-SER-198. GLC is "dedicated to identifying, supporting, and defending sensible

20

solutions that will prevent further gun violence in America." *Id.* GLC was formed 30 years ago after a mass shooting at a California law firm killed eight individuals. *Id.* Today, it is one of the nation's leading legal and policy organizations dedicated to identifying, supporting, and defending sensible solutions to gun violence in the United States. *Id.*

In support of its mission, GLC heavily invests in both direct services and advocacy related to gun violence prevention. GLC provides "policy expertise and technical assistance to violence intervention programs" in disproportionately impacted communities and "partners with community-based organizations that provide direct support services to victims of gun violence." 1-SER-202. GLC also has a "core policy platform of supporting background checks and licensing laws at the federal and state level." 1-SER-200. While those efforts have "helped reduce gun violence" in the cities where GLC operates, "many of these cities have experienced a recent surge in the numbers of ghost guns recovered." 1-SER-202. That is in part because ATF's actions "heighten the risk of ghost gun violence in these communities." *Id.* Specifically, ATF's decision to "create (and

21

preserve) a loophole through which buyers and sellers can evade legal requirements applicable to 'firearms'" undermines GLC's efforts to support violence intervention programs and community-based organizations and necessitates GLC's advocacy for "state and federal background check laws." *Id*. By allowing "the continued proliferation of untraceable firearms," ATF's actions "directly affect GLC's interests and compromise GLC's core mission of saving lives from gun violence" by undermining the effectiveness of its core direct services and advocacy. 1-SER-200.

### E. The District Court Holds That Plaintiffs Have Standing and ATF Acted Arbitrarily and Capriciously

Plaintiffs commenced this action in September 2020. After the federal government announced its plans to promulgate a new ghost-gun rule in March 2021, this action was stayed pending the promulgation of that rule. In October 2022, Plaintiffs filed an Amended Complaint alleging that Example 4 and ATF's subsequent actions carving out AR-type receivers from the GCA's definition of "firearm" were (1) contrary to the plain language of the GCA, and (2) arbitrary and capricious. *See* 2-SER-470-73. Plaintiffs then

22

supplemented the Complaint to include in their claim the Challenged Classification Letters. ER-083-85. In October 2023, ATF moved for summary judgment. 2-SER-219. Plaintiffs opposed and cross-moved for summary judgment on their APA claims. 1-SER-6. The parties' briefing focused their dispute on the Example 4 carveout for AR-type partially complete receivers and ATF's related determinations. *See* ER-010-11.

Following oral argument, the district court held that both California and GLC have standing and that ATF acted arbitrarily and capriciously in violation of the APA. ER-005. It granted Plaintiffs' motion in part by holding that ATF acted arbitrarily and capriciously "with respect to its categorical determinations that AR-type partially complete receivers that are not indexed or machined and not sold with, *e.g.*, a jig or tools are not firearms for purposes of the GCA." ER-005.

*APA.* The district court concluded that ATF's actions were arbitrary and capricious. ER-005; *see also* ER-037-40, 043-47. It was "apparent from Example 4, the Open Letter, and the Classification Letters" that ATF was categorically excluding from the definition of

23

"firearm" any "receiver blank without indexing or machining" that was not sold with jigs, even if those were available from "other sources." ER-027. The court agreed with Plaintiffs that ATF's actions were arbitrary and capricious because they "were made without taking into account all relevant data." ER-037. The court further held that ATF acted arbitrarily and capriciously by determining that an 80 percent AR-15 type receiver sold *without* the jigs or tools necessary to convert it into an operable firearm is *not* a "firearm" within the meaning of the GCA, while the same 80 percent receiver sold *with* the same jigs and tools *is* a "firearm." ER-043-47.

The court subsequently turned to the appropriate remedy for ATF's arbitrary and capricious actions. ER-047-49. It declared Example 4 and ATF's related agency actions unlawful and enjoined their enforcement, vacated Example 4, the September 2022 Open Letter, and the Challenged Classification Letters, and remanded for further proceedings consistent with its opinion. ER-049. Explaining that vacatur is the presumptive remedy under the APA, it concluded that remand without vacatur—the exception—was inappropriate here because it was "questionable whether the deficiencies identified

24

by the Court [could] be redressed on remand," especially considering the many post-hoc justifications that ATF had provided to attempt to explain its arbitrary and capricious determinations, and because the vacatur would not cause unwarranted disruption given the court's limited holding. ER-048.

***Standing.*** The district court held that "Plaintiffs have submitted unrebutted evidence that they have suffered an injury in fact." ER-019, 22. Specifically, it found that "the alleged loophole in the new ATF final rule" "gives rise to California's injuries" by leaving certain ghost guns unregulated, and the same facts also support that GLC "has sustained an injury in fact." ER-021-22. The district court first reasoned that "it is predictable that crimes will be committed in California with AR-type ghost guns because ghost guns are commonly used in crimes and a notable percentage of the ghost guns recovered in the state are AR-type ghost guns" and "that a significant portion of the AR-type ghost guns used in crimes will have been assembled using partially complete AR-type receivers that are not deemed firearms" under Example 4. ER-021. The district court further recognized that ATF had issued the 23 Challenged

Classification Letters approving unregulated sales of such parts, and manufacturers continued to sell the parts while explaining how to obtain the jig kits necessary to convert them into operable firearms. ER-021-22.

The court entered its final judgment in March 2024, ER-259, and Defendants timely appealed, ER-260.

## SUMMARY OF ARGUMENT

The district court's holdings below should be affirmed. The court correctly concluded that ATF violated the APA, properly exercised its discretion in vacating the offending agency actions, and correctly determined that both California and GLC had standing.

**1.** ATF's challenged actions were arbitrary and capricious in at least two significant ways.

*First*, in determining that partially complete AR-type receivers are not receivers or firearms, ATF failed to consider relevant factors, violated its own regulation, and failed to explain its decisions. ATF's failure to consider the factor of time is especially problematic because it is undisputed that partially complete AR-type receivers

26

can be completed to be fully operable—and thus lethal—within at most just a few hours.

*Second*, ATF failed to address the widespread availability of jigs and other tools, which indisputably make it faster and easier to finish a partially complete receiver. ATF determined that such receivers are not "readily" finished so long as they are not *sold with* jigs or other tools, even if those aids are readily available from third parties. In so doing, ATF failed to consider an important aspect of the problem, did not sufficiently explain its decision, and ignored obvious alternatives—namely, defining all partially complete receivers as firearms given the availability of jigs and other tools.

Because ATF's actions were arbitrary and capricious, the APA required them to be held unlawful and set aside. The district court did not abuse its discretion by ordering vacatur, which is the presumptive remedy in the Ninth Circuit unless equity *demands* otherwise. Principles of equity do not demand allowing the unrestricted distribution of partially complete AR-type receivers to criminals and other prohibited persons; nor do they demand ignoring

27

the predictable increase in crime that would result from ATF's unlawful determinations.

**2.** The district court also held, based on Plaintiffs' unrebutted evidence, that California and GLC have standing. But so long as at least one of them does, this Court can affirm on the merits because an Article III case or controversy only requires that one plaintiff has standing. Here, both do.

As one of the states hit hardest by the ghost-gun epidemic, California has standing because ATF's refusal to regulate partially complete AR-type receivers has required California to incur increased expenditures to implement and accelerate the implementation of legislation regulating such ghost-gun parts. In addition, ATF's failure to regulate these receivers has required California to increase expenditures of time, money, and resources to train law enforcement personnel statewide on ghost guns.

GLC has standing because the challenged actions perceptibly impair its preexisting core activities in pursuit of its mission. ATF's refusal to regulate partially complete AR-type receivers frustrates and interferes with GLC's community-violence-intervention services

28

by inundating the communities GLC serves with untraceable weapons available to those who render them most dangerous.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*.  AOB 15. The district court's chosen remedy is reviewed for abuse of discretion. *Mont. Wildlife Fed. v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

## ARGUMENT

### I.    ATF's Actions Were Arbitrary and Capricious

ATF's classifications of partially complete AR-type receivers as not receivers or firearms—classifications that completely exempt those items from regulation—were arbitrary and capricious, *see* 5 U.S.C. § 706(2)(A), because they were not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (citation omitted); *see All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 493 (9th Cir. 2023) ("[T]he touchstone of arbitrary and capricious review under the APA is reasoned decisionmaking." (quotation marks omitted)).

29

"An agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Nat. Res. Def. Council v. E.P.A.*, 526 F.3d 591, 602 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This means that "agency action is lawful only if it rests 'on a consideration of the relevant factors.'" *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015). And agency action that fails to "comply with [the agency's] own regulations" similarly is arbitrary and capricious. *Confederated Tribes & Bands of Yakima Indian Nation v. F.E.R.C.*, 746 F.2d 466, 474 (9th Cir. 1984).

To be reasonably explained, the agency must have "articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Wild Rockies*, 68 F.4th at 493 (cleaned up). Notably, agencies must explain their decisions *during* the rulemaking process instead of

30

providing "*post hoc* rationalizations;" "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50; *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) ("[J]udicial review of agency action . . . is limited to the grounds that the agency invoked when it took the action." (internal quotation omitted)).

ATF's determinations not to regulate partially complete AR-type receivers were arbitrary and capricious in two respects. *First*, "ATF's determinations regarding partially complete receivers that are not machined or indexed and not sold with jigs or tools . . . were made without taking into account all relevant data, including the factors listed in 27 C.F.R. § 478.11 ([ATF's *own* regulation defining] 'readily' for purposes of 'readily converted')." ER-047. *Second*, "ATF has failed to explain why it is not regulating such partially complete receivers given that jigs and tools are easily obtainable," and it appears not to have considered this important aspect of the problem. ER-047. On appeal, as below, ATF provides only *post hoc* rationalizations that are divorced from the facts that were before the agency.

31

### a. ATF Failed to Consider Relevant Factors That Its Own Final Rule Required It to Consider

ATF's determinations regarding partially complete AR-type receivers that "are not machined or indexed and not sold with jigs or tools" were arbitrary and capricious because, as the district court correctly held, they "were made without taking into account all relevant data." ER-047. ATF concluded that such items are not regulatable "receivers," yet it failed to consider all eight factors that ATF's own final rule defines as relevant to the analysis. That failure was arbitrary and capricious thrice over, because ATF failed to consider "the relevant factors," *Michigan*, 576 U.S. at 750, "reasonably explain[]" its assessment of those factors, *Ohio*, 603 U.S. at 292, or "comply with" its "own regulations," *Confederated Tribes*, 746 F.2d at 474.

Under the Final Rule, "a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may *readily* be completed, assembled, restored, or otherwise converted to function as a frame or receiver" is a "frame" or "receiver" subject to the requirements of the GCA. 27

32

C.F.R. § 478.12(c). As ATF acknowledges, whether a product may be "readily converted" to a functional receiver depends on "'how quickly and easily an item' may be converted into functional status." AOB 28 (quoting 87 Fed. Reg. at 24,668). The "factors relevant in making this determination" are, according to ATF's own Final Rule, (1) time, (2) ease, (3) expertise required, (4) equipment required, (5) parts availability, (6) expense, (7) scope of required changes, and (8) feasibility. 27 C.F.R. § 478.11.

Despite the regulation's mandate to consider these factors in determining whether partially complete AR-type receivers sold without instructions, jigs, templates, equipment, or tools can readily be converted into a functioning receiver, 27 C.F.R. § 478.12(c), ATF ignored or at a minimum failed to explain how its determinations reflect these factors. Virtually none of the challenged determinations provide any concrete facts regarding, among other things, the time, ease, or expertise required to turn the specific product at issue into a functioning firearm. Instead, ATF applies a rigid, binary test that draws a line "between AR-15-type blanks with

no machining (not readily converted) and blanks with partial machining (readily converted)." AOB 31.

ATF's primary response—on appeal and in the district court—is that "'how quickly and easily an item' may be converted into functional status 'is largely determined by which machining operations still nee[d] to be performed' on the item." *Compare* AOB 28 (quoting 87 Fed. Reg. at 24,668) *with* ER-038-39 (rejecting ATF's argument that the required machining is relevant to time, ease, and the other regulatory factors). The district court correctly rejected that *post hoc* argument: The fact that "machining operations are relevant to, *e.g.*, time does not establish that ATF considered the actual time it takes to convert the kind of partially complete receiver at issue into a functional one, including when jigs and tools are available." ER-039 (quotation omitted). The Administrative Record lacks a satisfactory explanation for ATF's conclusion that "'a partially complete frame or receiver alone is not a frame or receiver if it still requires performance of certain machining operations.'" AOB 28 (citing 87 Fed. Reg. at 24,668). Indeed, ATF cites nothing in the Administrative Record demonstrating how ATF's binary

34

machining test accounts for the eight factors the Agency must consider.

ATF instead relies on just one 2013 classification letter "in which ATF detailed the additional 'machining operations' required to convert such a blank into a functional receiver." AOB 28 (citing ER-179-80). This letter, issued nearly a decade before the challenged determinations, merely states ATF's conclusion that because certain machining/drilling operations were not yet performed, the item "would *not* be a 'firearm' as defined in the GCA." ER-180. The letter contains no further analysis or basis for the conclusion that the absence of these actions necessarily indicates that a given product is not readily convertible. It makes no reference to time, ease, expertise, equipment, parts availability, expense, scope, or feasibility, the factors supposedly relevant to the implementation of the Final Rule. 27 C.F.R. § 478.11.

ATF *now* asserts that it concluded in the letter that the item should not be classified as a receiver because "correctly completing these multiple machining steps required sufficient time and skill." AOB 29; *id.* at 32 (arguing that "more time" is required to complete

35

"additional machining operations"). But ATF cannot justify the determinations that Plaintiffs have challenged here merely by retroactively inserting into the letter references to some of the § 478.11 factors. *Ohio*, 603 U.S. at 292. There is no evidence that ATF ever considered time when it made its determinations about AR-type receivers; it appears instead that ATF picked a heuristic based on machining steps without considering how much time the machining would take for different receivers. Similarly, neither the Challenged Classification Letters nor Example 4 in the Final Rule contains any explanation as to *why* a lack of "indexing or machining" is sufficient to determine that a product is not "readily" convertible under the § 478.11 factors.

The district court emphasized the fact that the challenged determinations "do not reflect how long it takes to convert the contested partially complete receivers into functional ones." ER-038. In other words, ATF "fail[ed] to address time"—a "particularly troubling" shortcoming given that time is "the first factor identified in 27 C.F.R. [§] 478.11" and "clearly one of the most important factors in assessing 'readily.'" ER-039. While the Final Rule "does refer to

36

the factor of time in some instances," ATF's determination in Example 4 contains no reference to the time it would take to convert such partially finished AR-type receivers into functioning weapons. ER-038. Nor do the Challenged Classification Letters "make any mention of time." *Id*.[4] As the district court correctly observed, "any evaluation of time should take into account the object at issue." ER-039 (citing *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416 (6th Cir. 2006)).

ATF thus failed to consider, in violation of 27 C.F.R. § 478.11 and agencies' general obligation to consider relevant factors, the fact that the partially complete AR-type receivers in the Challenged Classification Letters can be converted into fully functional receivers in "just a few hours." ER-038. At a minimum, ATF failed to provide

---

[4] Of the 55 post-Final Rule Classification Letters ATF produced below, ATF only twice considered the time it would take to complete or convert the submitted product "within the meaning of the term 'readily' in the Final Rule," finding the products at issue were firearms. But both of those letters—in which ATF concluded the products at issue were firearms—*addressed pistol frames, not AR-type receivers*. *See* 2-SER-452-55 (explaining that one submitted frame could be completed "within minutes" and others had a "completion time of 10 to 30 minutes"); 2-SER-352-53 (similar).

37

a "satisfactory explanation" why such items should not be considered regulatable "receivers" despite the speed with which they can be converted to functional. *Wild Rockies*, 68 F.4th at 493.

ATF cites just one instance in which it claims that "ATF expressly pointed to the relatively small amount of time that partially machined receivers take to be converted to functional." AOB 31 (citing ER-167-68). This 2002 classification letter simply noted that the "interior cavity" of an AR-15 receiver "was finished in approximately 75 minutes," and that the receiver "was determined to be a 'firearm.'" ER-168. Even on its own terms, the 2002 letter does not say that ATF's firearm classification was based on the short amount of time required to convert the receiver. More fundamentally, this 2002 letter identifying a part that *was* a firearm does nothing to prove that ATF considered time as a factor in its determinations *two decades later* that *other* partially finished receivers were *not* firearms. There is no indication that the challenged determinations—each of which needed to be reasonable and reasonably explained, *Ohio*, 603 U.S. at 292—relied on the 2002 letter or otherwise considered the relevant factors. The 2002 letter

38

only confirms that if any partially complete AR-type receivers in the Challenged Classification Letters could be converted within 75 minutes, they are readily complete.  ER-168.

Lacking express evidence that ATF considered time, ATF claims that it considered this factor "implicitly."  AOB 31-32.  This argument is an "improper *post hoc* rationalization[]."  *W. Watersheds Project v. Bernhardt*, 392 F. Supp. 3d 1225, 1248 (D. Or. 2019).  And although "additional machining operations" "will necessarily require more time to complete," AOB 32, ATF failed in each of the challenged determinations to consider or explain *how much* more time, expertise, etc. those steps would require.  It is undisputed that "with the assistance of available tools . . ., it can take just a few hours to convert a partially completed receiver into a fully functional one."  *See* ER-038 n.13.

Defendants contend in their briefing that "[e]ven apart from the time to complete that process, it is clear that properly milling out the fire control cavity—without any indexing or dimpling demonstrating where the necessary precise drilling must occur— requires substantial skill and expertise."  AOB 32.  But regardless of

39

how apparent Defendants believe this conclusion to be, the Administrative Record does not reflect a basis for it. These *post hoc* rationalizations "serve only to underscore the absence of an adequate explanation in the administrative record itself," *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010), and this Court should "not accept" them, *State Farm*, 463 U.S. at 50. Had ATF properly considered factors like time, it may have reached different determinations, as it is undisputed that "with the assistance of available tools . . . it can take just a few hours to convert a partially completed receiver into a fully functional one." ER-038 n.13.[5] ATF's

---

[5] This Court and others applying the time factor to the analogous National Firearms Act ("NFA") have found that the ordinary meaning of "readily restored" encompasses a length of time of a few hours. *See, e.g.*, *United States v. TRW Rifle 7.62x51mm Caliber*, 447 F.3d 686, 692 (9th Cir. 2006) ("A two-hour restoration process using ordinary tools, including a stick weld, is within the ordinary meaning of 'readily restored.' As to the temporal component, two hours, while not an insignificant amount of time, is still within a range that may properly be considered 'with fairly quick efficiency,' 'without needless loss of time,' or 'reasonably fast.'"); *One TRW*, 441 F.3d at 425 ("[N]o reasonable juror could conclude" that a "weapon [that] could be converted into an automatic weapon in a matter of hours" was not a "machinegun under [the NFA].""); *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973) (holding that an eight-hour conversion amounted to "readily restored" under the NFA.).

failure to consider the relevant factors required by its own Final Rule rendered the challenged determinations arbitrary and capricious.

### b. ATF's Treatment of Jigs and Tools Was Unreasonable and Unexplained

ATF's distinction between unfinished AR-type receivers "sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools," 27 C.F.R. § 478.12(c), and those sold, distributed, or possessed without those items is arbitrary and capricious. As the court explained below, it "makes no sense to say that a partially complete receiver that is not machined or indexed and is not sold with a jig or tools is not a firearm even where jigs and tools are easy to obtain (i.e., can easily be purchased separately)." ER-043. Nothing in the Administrative Record shows that ATF considered the undisputed ease with which the purchaser of a partially complete AR-type receiver can obtain jigs or tools from a third party (or even the same seller in a separate transaction) and thereafter quickly and easily convert the receiver into a functioning firearm. That failure renders ATF's determinations in Example 4

41

and the Challenged Classification Letters arbitrary and capricious in at least three ways.

*First*, ATF "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. ATF's job was to determine whether AR-type partially complete receivers that are not sold or possessed with jigs or other tools can "readily" be finished for use as firearms based on factors like time and ease. 27 C.F.R. § 478.11. ATF points to nothing in the Administrative Record suggesting that ATF considered the fact that the widespread availability of jigs and tools from third parties makes partially complete AR-type receivers "readily" convertible even if they are not sold with jigs or tools.

Defendants emphasize in their briefing the significant role that indexing in the fire-control cavity plays in reducing the skill and expertise needed to complete a partially complete receiver. AOB 32. But Defendants also admit that "'a template or jig . . . can serve *the same purpose as indexing*, making' it relatively 'efficien[t], quic[k], and eas[y]' to convert the receiver into a functional one." AOB 33 (citing 87 Fed. Reg. at 24,668-89). This is true *regardless of whether*

42

*the jig or template is purchased in the same transaction as the receiver*. As Defendants previously acknowledged, these products are "available . . . elsewhere in the marketplace." 1-SER-4. ATF's approach—only to consider jigs and tools if they were "sold, distributed, or possessed with" an unfinished receiver, 27 C.F.R. § 478.12(c)—thus ignores the critical and undisputed fact that jigs and tools are readily available in the market and fails to account for this fact in the eight-factor analysis. *See, e.g.*, *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012) (agency action was arbitrary and capricious where agency did not consider evidence that could have impacted its opinion).

*Second*, ATF failed to "articulate[] a satisfactory explanation for" its decision to exclude from regulation partially complete AR-type receivers not sold with jigs or tools, *Wild Rockies*, 68 F.4th at 493, because ATF "failed to explain why it is not regulating such partially complete receivers given that jigs and tools are easily obtainable," ER-047. ATF now claims that it "reasonably concluded that it could not feasibly consider the entire universe of possible jigs, templates, instructions, and other materials that a purchaser might

43

separately acquire." AOB 34. But that *post hoc* rationalization does *not* appear in the Administrative Record. ATF never explained how or why considering the availability of jigs or other tools from third parties would be "infeasible." AOB 34.

ATF argues that its decision not to consider tools and jigs available from third parties "reflects practical realities and provides 'clarity' to regulated parties on the Rule's applications." AOB 33 (citing 87 Fed. Reg. 24,678). ATF quotes a portion of the Final Rule noting that that a commenter asserted that "'no one' would be able to 'predict'" what jigs and tools ATF will rely on in any given case. AOB 33 (citing 87 Fed. Reg. at 24,699). ATF's *conclusion* was that it would only consider jigs and tools the seller "provides, or makes available to the purchaser." *Id.* at 34 (citing 87 Fed. Reg. at 24,700). But ATF never said that the *reason* for its decision was some commenters' concern for predictability, nor did it *explain* how the

44

concern for predictability justified its conclusion. *See* ER-045-46 n.17.[6]

What's more, even if a concern for predictability or the worry that "it would be infeasible" to consider jigs or tools available from third parties *were* apparent in the Administrative Record, this supposed explanation *still* would be insufficient. AOB 34. ATF allegedly based its decision on the predictability and feasibility *of regulation* rather than speed, ease, and the other factors in 27 C.F.R. § 478.11 related *to the conversion process.* ATF thus would have "relied on factors" that it should not have "consider[ed]." *State Farm*, 463 U.S. at 43; *see also* ER-045-46 n.17 (holding that ATF's feasibility and predictability considerations "are not clearly sanctioned by the GCA and do not fall within the ambit of the ATF

---

[6] ATF suggests that the district court "failed to properly engage with ATF's reasonable explanation that it would be infeasible to take into account any specialty jigs, templates, tools, or other materials that exist in the world." AOB 34. They are wrong. As the district court correctly found, "ATF did not expressly assert that these concerns [about feasibility] were the *basis* for its line-drawing that Plaintiffs are now challenging." ER-045-46 n.17 (emphasis added). ATF's feasibility-based justification does not merely fall short of "ideal clarity," AOB 34—it was nonexistent.

45

regulation on 'readily convertible'"). As the district court explained, "[t]o be valid, any line drawing done by an agency must be consistent with the statute/regulation at issue." ER-045-46 (citing *Massachusetts v. EPA*, 549 U.S. 497, 527, 532-33, 535 (2007).

*Third*, ATF did not fulfill the APA's requirement to "consider reasonably obvious alternative . . . rules and explain its reasons for rejecting alternatives in sufficient detail to permit judicial review." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 797 (D.C. Cir. 1984); *see also Nat'l Urb. League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020). Such a failure by "an agency to consider obvious alternatives has led uniformly to reversal." *Yakima Valley Cablevision v. F.C.C.*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986); *see also California ex rel. Becerra v. U.S. Dep't of Interior*, 381 F. Supp. 3d 1153, 1168 (N.D. Cal. 2019) (same).

ATF argues that its decision not to consider tools and jigs available from third parties "reflects practical realities and provides 'clarity' to regulated parties on the Rule's applications." AOB 33 (citing 87 Fed. Reg. 24,678). But there was an obvious, reasonable alternative ATF could have adopted that would have provided clarity

46

to regulated parties while also accounting for the reality that jigs and tools are widely available: ATF could have determined that *all* partially complete AR-type receivers are regulatable receivers regardless of whether they are sold with jigs or other tools. At minimum, ATF failed to "explain its reasons for rejecting" this "alternative[] in sufficient detail to permit judicial review." *Walter O. Boswell*, 749 F.2d at 797.

### c. The District Court Did Not Abuse Its Discretion in Ordering the Final Rule Vacated

After it concluded that ATF had acted arbitrarily and capriciously, the district court properly ordered vacatur of Example 4 and ATF's related determinations and remanded to the agency for further proceedings. *See Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (district court's vacatur "is reviewed for abuse of discretion"). Vacatur is the presumptive APA remedy unless "equity demands" the rule "be left in place while the agency reconsiders or replaces the action." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). ATF's equitable arguments do not suffice: ATF did not show that substantial

47

disruption would result from vacatur of the limited actions challenged here or that ATF was likely to redress its actions' deficiencies on remand. Equity does not compel the continued unchecked sale of unmarked, readily completed AR-type receivers.

The APA provides that a "reviewing court *shall* . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Given this plain text, "vacatur is the presumptive remedy under the APA," and remand without vacatur is proper "only in limited circumstances." ER-048. Longstanding Ninth Circuit precedent confirms this standard. *See, e.g.*, *Mont. Wildlife*, 127 F.4th at 50 ("[V]acatur and remand is the default remedy under the APA."); *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007), *overruled on other grounds by Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*, 557 U.S. 261 (2009). In seeking to sweep aside this precedent, ATF claims that vacatur is a "new and radically different remedy" that Congress did not intend. AOB 35. But "the federal courts have long understood § 706(2) to authorize vacatur of

48

unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring).

As ATF concedes, AOB 36, the burden is on the agency to establish that equity "demands" remand without vacatur. *See Wild Rockies*, 907 F.3d at 1121 (A "regulation that is not promulgated in compliance with the APA" is automatically "invalid." (cleaned up)); *see also Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 675 F. Supp. 3d 1112, 1118 (D. Idaho 2023) (agency bears the burden of proving entitlement to remand without vacatur). ATF cannot meet that burden. Far from misunderstanding vacatur as "automatic or compelled," AOB 36, the district court reasonably (indeed, correctly) concluded that equity demands remand without vacatur here, *see* ER-047-49. Defendants have failed to show an abuse of its discretion for three reasons.

*First*, it was "questionable" that the "deficiencies identified by the Court [could] be redressed on remand" in the face of ATF's "problematic" "post-hoc explanations." ER-048. For example, ATF

49

suggested that the regulation's loophole could be addressed through criminal charges of conspiracy against sellers who attempt to structure sales transactions of AR-type receivers separately from the jigs and tools used to finish the receivers. 2-SER-222; *see also* AOB 37-39. But aside from the fact that ATF never identified this purported solution at the time it enacted the Final Rule, criminal law would be inapplicable to the "situation most likely to be encountered in the marketplace"—i.e., "a consumer buying a partially complete receiver and a jig/tools from two different, nonconspiring suppliers." ER-045. The district court reasonably concluded that explanations of this nature would not cure the unreasonableness of ATF's determinations even if ATF offered them on remand.

*Second*, the district court correctly concluded that vacatur would not be "substantially disruptive" because the "vast corpus of ATF's regulation of ghost guns and constituent parts remains untouched." ER-048-49. ATF cites no record evidence to support any quantification of its speculation about "public safety consequences" or "financial burdens." AOB 39. ATF had its opportunity to build a

50

record to support these arguments and argue for remand without vacatur; it failed to do so.[7] *Post hoc* justifications like these are insufficient to support the reasonableness of Example 4 and the Challenged Classification Letters; they also do not compel remand without vacatur. *See Pollinator*, 806 F.3d at 532-33 (vacating and remanding where agency did not support its final action with substantial evidence).

*Third*, ATF offers the bare assertion that "plaintiffs' asserted harms are relatively insubstantial" in comparison to the speculative "confusion" of gun manufacturers. AOB 37, 39. To the contrary, leaving the challenged actions in place would cause serious and irreparable harms by allowing the continued sale of partially

---

[7] ATF's passing reference to *Trump v. CASA*, AOB 36-37, is unavailing. "Nothing" the Court said in *CASA* addressed "the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2554 n.10 (2025). Accordingly, post-*CASA* courts in this Circuit and beyond have uniformly agreed that the Court's holding in *CASA* does not disturb the longstanding consensus that vacatur of agency action is a proper—indeed, the presumptive—remedy under the APA. *See, e.g.*, *Kapa'a v. Trump*, __ F. Supp. 3d __, 2025 WL 2300605, at *17-18 (D. Haw. Aug. 8, 2025); *Refugee & Immigrant Ctr. For Educ. & Legal Servs. v. Noem*, __ F. Supp. 3d. __, 2025 WL 1825431, at *50-51 (D.D.C. July 2, 2025).

51

complete AR-type receivers without serialization or a background check. *See VanDerStok*, 604 U.S. at 464; *see also* 87 Fed. Reg. at 24,658 (explaining that the Final Rule was adopted to address the "homeland security threat" posed by the "wide availability of ghost guns"). The district court found that "crimes will be committed in California with AR-type ghost guns" if ATF's challenged actions are not vacated. ER-021. The court was well within its discretion to consider that harm greater than a speculative disruption to the manufacturing pipeline for AR-type rifles.

ATF argues that the public would be harmed by requiring manufacturers to serialize "too early in their production," AOB 39, but ATF already requires manufacturers to serialize the exact same products at the exact same point if they happen to be sold with jigs or tools. ATF does not articulate what harm could come from extending an existing requirement to virtually identical products.

In any event, "the threat of disruptive consequences cannot save a rule when its fundamental flaws foreclose [the agency] from promulgating the same standards on remand." *North Carolina v. E.P.A.*, 531 F.3d 896, 929 (D.C. Cir. 2008) (quotation omitted).

Vacatur is the only appropriate remedy to prevent a predictable increase in crimes committed with unregistered, unserialized AR-type rifles created using the parts that ATF refused to regulate.

## II.    Plaintiffs Have Standing

The district court correctly held that both California and GLC have standing.  California—one of the states hit hardest by the ghost-gun epidemic—has standing because ATF's arbitrary and capricious determination that certain partially complete receivers are not "firearms" under the GCA has required California to take necessary measures to fill the regulatory gap left by ATF, including allocating millions of dollars statewide to mitigate the harm caused by ATF's failure to properly regulate partially complete receivers. And GLC has standing because ATF's challenged actions perceptibly impair GLC's core business of direct community-violence intervention by inundating the communities that GLC serves with untraceable weapons available to those who render them most dangerous.  But even if the district court had erred as to one of the two Plaintiffs in this case, this Court should still affirm.  "[O]nce the court determines that one plaintiff has standing, it need not decide

53

the standing of the others," *Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993); *see also Mecinas v. Hobbs*, 30 F.4th 890, 897 (9th Cir. 2022); ER-056 ("[O]nly one plaintiff need have standing in order for the case to proceed.").[8]

### a. California Has Standing

**1.** As the district court correctly determined, California has standing to sue because it has shown numerous "concrete and particularized" injuries resulting from ATF's determination that certain partially complete receivers are not covered as "firearms" under the GCA. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). As one of the states hit hardest by the ongoing ghost-gun epidemic, California's injuries include increased expenditures of time, money, and resources to train law enforcement personnel

---

[8] ATF argues that the district court "did not actually conclude that plaintiffs had met their burden to demonstrate the requisite non-speculative injury" because "it [was] only Defendants . . . who [were] moving for summary judgment on standing." AOB 26. Not so. The district court explicitly reached the issue of California and GLC's standing, holding that "Plaintiffs have submitted unrebutted evidence that they have suffered an injury in fact and thus Defendants are not entitled to summary judgment," ER-019, and that "the record evidence of injuries to the Plaintiffs *establishes standing*," ER-022 (emphasis added).

statewide on ghost guns, and additional expenditures to implement and accelerate implementation of necessary State legislation regulating ghost-gun parts. *See* 2-SER-214-18; *see also* 1-SER-80, 100-02.

ATF's determination that partially complete AR-type receivers are not covered as "firearms" under the GCA has led to a proliferation of ghost guns in California. *See supra* at 21-22. California is home to nearly a quarter of the ghost-gun retailers Plaintiffs are aware of, and the number of ghost-gun seizures in the State has increased dramatically in recent years—indeed, 65 percent of all ghost guns seized by ATF in 2020 were seized in California. 1-SER-137; 2-SER-216-17. California's residents, including law enforcement officers and children, have repeatedly been victimized in recent years in devastating incidents involving ghost guns. *See generally* 1-SER-37-74.

ATF's determinations that partially complete AR-type receivers are not covered as "firearms" under the GCA has required California to take necessary measures "to fill the regulatory gap left by" ATF's decision not to regulate them. *California v. Bureau of*

55

*Land Mgmt.*, 612 F. Supp. 3d 925, 935 (N.D. Cal. 2020), *appeal voluntarily dismissed*, No. 20-16157 (9th Cir. Sept. 19, 2025); *see also* ER-067.  Since 2016, the State has enacted several relevant ghost-gun-related statutes to ameliorate the negative law enforcement effects of ghost guns.  2-SER-215-16.  In particular, Assembly Bill 857 (Cal. 2016) requires self-assembled firearms to be stamped with unique serial numbers provided by the California Department of Justice and requires those possessing unserialized firearms to apply to the Department for serial numbers.  *Id.*  As ghost-gun violence continued to escalate throughout the state, the Legislature enacted Assembly Bill 1621 (Cal. 2022), which expands the definition of "firearm precursor part" to include any precursor part that has reached a stage in manufacture where it may be readily converted into a firearm or is marketed or sold to the public for use as the frame or receiver of a firearm.  Cal. Pen. Code §§ 16531, 30400.  AB 1621 also generally prohibits the sale or transfer of all firearm precursor parts that are not covered by the Final Rule, such as the partially complete AR-type receivers directly at issue here.  *Id*.

56

To implement these reasonable safety measures, the California Legislature has allocated millions of dollars statewide. 2-SER-217. These costs are reflected in a Budget Change Proposal ("BCP") approved by the Legislature in 2023, which allocated $2,762,000 in expenditures from the General Fund during the 2023-24 fiscal year, along with an additional $2,518,000 in 2024-25, and $1,153,000 in 2025-26.[9] 2-SER-217-18; *see also* 1-SER-101. Among other uses for the aforementioned funds, the BCP approved the addition of ten California Bureau of Firearms ("BOF") positions to handle such tasks as processing applications to add FMBUS (Firearm Manufactured by Unlicensed Subject) numbers to unserialized firearm precursor parts and firearms, and enforcing criminal penalties for possession of unserialized firearms. *Id.* In recent years, California has incurred hundreds of thousands of dollars in costs to

---

[9] The approved BCP can be located on the Department of Finance website at https://tinyurl.com/yrfurnud. This information is judicially noticeable because it is information "made publicly available by [a] government entit[y]" and "is not subject to reasonable dispute." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998-99 (9th Cir. 2010); *see also Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676 n.6 (9th Cir. 2017).

process applications to serialize unregulated firearm precursor parts and firearms. Specifically, BOF records confirm that California has spent nearly $370,000 since 2018 administering its Unique Serial Number Application ("USNA") program, which requires BOF to run a background check and generate a unique serial number for all self-made weapons and unserialized weapons recovered by state and local law enforcement agencies, and for all firearm precursor parts which are not otherwise regulated by federal law. 2-SER-217.

California would not have been required to expend these funds if ATF had properly regulated these firearm precursor parts as firearms under the GCA. *Id*. "These additional expenditures, which constitute a direct injury to the State of California, are sufficient to establish injury-in-fact for standing purposes." *California v. Ross*, 358 F. Supp. 3d 965, 1004-05 (N.D. Cal. 2018) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (standing may be based on "reasonably incur[red] costs to mitigate or avoid" a "substantial risk" of harm)), *vacated and remanded on other grounds*, 139 S. Ct. 2778 (2019); *see California v. BLM*, 612 F. Supp. 3d at 935 ("Monetary expenditures to mitigate and recover from

58

harms that could have been prevented absent [the challenged conduct] are precisely the kind of 'pocketbook' injury that is incurred by the state itself." (quoting *Air Alliance Houston v. Envt'l Prot. Agency*, 906 F.3d 1049, 1059-60 (D.C. Cir. 2018))).

In addition, California has reasonably increased its expenditures on policing and law enforcement in an attempt to mitigate the harm caused by ATF's failure to properly regulate certain partially complete receivers. 1-SER-100-02; 2-SER-215, 217. California has undertaken significant efforts to educate law enforcement agencies and dealers within the state on how to apply state law where the Final Rule leaves gaps in regulation. In 2022 alone, California expended nearly $20,000 to generate multiple guidebooks and informational documents for public distribution explaining the application of state law in regulating the sale, manufacture, and possession of federally unregulated precursor parts. 2-SER-215-16.

ATF argues that California has failed to show that any of their injuries are traceable to products left unregulated by the Final Rule. AOB 25. But California need only prove—as it has done here—that

59

it reasonably incurred costs to avoid a "substantial risk" of harm caused by ATF's failure to regulate certain partially complete receivers. *Ross*, 358 F. Supp. 3d at 1004-05; *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). California's continued outlays of millions of dollars annually would not be necessary but for the Final Rule's failure to regulate the specific products at issue here—partially complete AR-type receivers—which constitute a significant percentage of the ghost guns recovered by California law enforcement agencies. 2-SER-216.

ATF's argument also misses the mark because, as the district court acknowledged, *see* ER-058, California's "ability to point to a specific instance" where a partially complete AR-type receiver was sold standalone and then used in a crime "has been hampered by the very fact of" the Final Rule, which permits such receivers to be sold unserialized, making them impossible to trace. In any event, California's theory of standing relies on the "substantial risk" of harm it will suffer if ATF does not regulate partially complete AR-type receivers, and "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588

60

U.S. 752, 768 (2019). It is predictable that, if ATF does not regulate such receivers under the GCA, third parties will continue to make and sell them to evade serialization and licensing laws. Indeed, "[t]he entire point of buying an 80 percent receiver standalone is to avoid regulation, which requires, *inter alia*, serialization which enables law enforcement to track sales." ER-060. Considering the increasing number of ghost-gun seizures in the State, *see supra* at 21-22, California has shown "with reasonable probability" that if ATF does not regulate partially complete AR-type receivers, the State will continue to incur significant expenditures to address the ghost-gun problem. *See California v. Azar*, 911 F.3d 558, 571–72 (9th Cir. 2018) (finding standing where there was a "reasonable probability" that a chain of events would "result in economic harm to the [plaintiff] states"). California has met its burden to establish Article III standing.

**2.** In arguing the contrary, ATF mistakenly relies on *United States v. Texas*, 599 U.S. 670 (2023). There, the Supreme Court held that states generally lack standing to challenge Executive decisions not to arrest or prosecute certain alleged immigration infractions.

61

*Id*. at 674.  Contrary to ATF's position, the *Texas* Court did not hold that states can never cite monetary injuries to establish an injury in fact.  Quite the opposite, as the Court observed that "[m]onetary costs are of course an injury."  *Id*. at 676.  But the *Texas* plaintiffs lacked standing not for lack of injury, but because their asserted injury was not traditionally *redressable* by a federal court.  *Id*.  The Court also noted the lack of history and tradition of federal courts directing the Executive to change its arrest and prosecution patterns, *id*. at 677, which reflected the Executive's exclusive power to determine whether to engage in prosecutions, *id*. at 679.

But Plaintiffs here are not suing to encourage ATF to stop selectively enforcing the law.  Rather, Plaintiffs alleged and the district court agreed that ATF's implementation of the Final Rule was arbitrary and capricious.  *See, e.g.*, ER-047 ("ATF failed to explain why it is not regulating such partially complete receivers given that jigs and tools are easily obtainable.").  Unlike the asserted injury in *Texas*, this injury was redressable through the district court's vacatur of that portion of the Final Rule.  ER-049.  And here, there is a long history and tradition of states bringing similar APA

62

challenges against federal agencies. *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752; *Biden v. Nebraska*, 600 U.S. 477 (2023).

ATF cites no case interpreting *Texas* to preclude state standing in an APA challenge to a similar rulemaking. Indeed, sister circuits have declined to extend the holding in *Texas* to similar challenges to federal regulations. *See, e.g., New Jersey v. Trump*, 131 F.4th 27, 36 (1st Cir. 2025); *Iowa v. Wright*, __ F. 4th __, 2025 WL 2554549, at *8 (8th Cir. Sept. 5, 2025) ("commonsense economic inferences" resulting from fuel economy rule established harms to states even though they were not directly regulated, and such harms were traceable to the rule and redressable by a decision vacating and remanding the rule). This Court should do the same and hold that California has established Article III standing here.

### b. GLC Independently Has Standing

Because California unquestionably has standing, this Court need not assess GLC's standing. *See, e.g.*, *Leonard*, 12 F.3d at 888. But if the Court reaches the issue, it should affirm the district court's holding that GLC independently has standing.

63

**1.** Following the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), this Court has repeatedly held that an organizational plaintiff suffers an injury in fact sufficient for standing when a government action "has perceptibly impaired [its] ability to carry out [its] missions," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018-19 (9th Cir. 2013) (quotation omitted). In other words, an organization can demonstrate "standing by showing that the challenged practices have perceptibly impaired [their] ability to provide the services they were formed to provide." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 765-66 (9th Cir. 2018) (quotation omitted). Thus, organizations dedicated to providing legal aid to asylum seekers had standing to challenge a rule that "significantly discourage[d] a large number of those individuals from seeking asylum given their ineligibility." *Id.* And an organization that offered "transportation and shelter to unauthorized aliens" had standing to challenge a state law that might deter its staff from performing those "core activities." *Valle*, 732 F.3d at 1018.

GLC readily meets that standard. ATF's refusal to regulate certain partially completed AR-type receivers as firearms "perceptibly impair[s]" GLC's ability "to provide the services [it was] formed to provide," *E. Bay*, 932 F.3d at 765-66, including by "directly affect[ing] and interfere[ing] with" GLC's "core business activities," *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024)—all in "frustration of its mission," *Valle*, 732 F.3d at 1018. The district court therefore correctly determined that GLC has standing "to sue on [its] own behalf for injuries [it] ha[s] sustained." *Alliance*, 602 U.S. at 393.

GLC's "core mission is to save lives from gun violence." 1-SER-198. In furtherance of that mission—and dating to long before the challenged ATF actions—GLC provides numerous services aimed at preventing gun violence: It "has provided policy expertise and technical assistance to violence intervention programs in communities disproportionately impacted by gun violence, including ghost gun violence," and "partner[ed] with community-based organizations that provide direct support services to victims of gun violence." 1-SER-202; *see* ER-022. GLC provides a wide range of

65

direct services to practitioners, advocates and cities seeking to implement or expand community-based violent intervention and prevention ("CVI"), including technical assistance, report writing, coalition building, and advocacy and policymaking expertise. *See* 1-SER-198, 200. GLC also produces and shares a host of "education materials related to ghost guns to educate the public on the threat they pose and support efforts to address that threat," including state-by-state guidance and other resources to further the efficacy of other CVI programs. 1-SER-201-02. An interrelated and "mission-critical effort[]"—which long predates ATF's challenged actions[10]—is GLC's "core policy platform of supporting background check and licensing laws at the federal and state level" in general. 1-SER-200. This support for background check and licensing laws goes hand in hand with GLC's CVI efforts by ensuring that firearms are responsibly possessed and are traceable, safeguards that can never be applied to ghost guns. *See* 1-SER-198-200. The proliferation of ghost guns—

---

[10] GLC has been advocating common sense gun reform, including comprehensive background checks, for many years. *See*, *e.g.*, 1-SER-208-10.

66

furthered by ATF's arbitrary and capricious classification of certain partially complete receivers—undoes _years of GLC's CVI efforts and related advocacy_ for universal background checks and more stringent licensing by flooding the streets of the communities GLC serves with weapons specifically designed to circumvent the background check and licensing requirements for which GLC has long advocated.

ATF's refusal to regulate partially complete AR-type receivers therefore frustrates and interferes with GLC's "core business activities," _Alliance_, 602 U.S. at 395—"perceptibly impair[ing]" GLC's "ability to provide [] services." _E. Bay_, 932 F.3d at 765. The record is replete with evidence establishing an injury to GLC's activities: As the district court found, "since 2018 approximately 15-20% of the ghost guns recovered [in California] were made with AR-style receivers," and "California law enforcement officials estimated that ghost guns [generally] accounted for 25 to 50 percent of all firearms recovered at crime scenes over the previous 18 months." ER-020-021. It is "predictable that crimes will be committed in California with AR-type ghost guns because ghost guns are

67

commonly used in crimes and a notable percentage of the ghost guns recovered in the state are AR-type ghost guns." ER-021. And "[t]his likelihood is supported by the supplemental administrative record" reflecting "more than twenty Classification Letters . . . concluding that a partially complete AR-type receiver was not a firearm." ER-021. In short, ATF's refusal to regulate is likely to enable more violent crimes to be committed with unregistered AR-type ghost guns.

Because ATF's actions will lead to more unregistered ghost guns in the hands of would-be violent criminals, they undermine the "sensible measures" that GLC has taken to reduce gun violence and thereby "undermine every other firearm policy" that GLC supports through direct services or advocacy. 1-SER-202. GLC's community-intervention and direct-support services will be impaired, and GLC's advocacy for universal background checks and serialization will be rendered all but pointless. *See id*. It is more difficult for GLC to reduce or prevent violence through its longstanding, ongoing community-intervention efforts when there are more unregistered guns in the hands of people who should not have them, and there

will be more victims of gun violence who will need GLC's direct support services. Thus, ATF's actions "directly affect[] and interfere[] with" GLC's "core business activities." *Alliance*, 602 U.S. at 395; *see Immigrant Defs. Law Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025) (rejecting the government's contention that harm was "speculative" when the challenged conduct "would impede [the organization's] ability to provide the "core activities [] which remain the same apart from, prior to, and after" the challenged conduct). And evincing this perceptible impairment, GLC—to make its services as effective as they would be had ATF properly regulated AR-type receivers—has needed to "redoubl[e] its violence prevention efforts" in Oakland and other cities where GLC had previously helped reduce gun violence. 1-SER-202. These cities "experienced a recent surge in the numbers of ghost guns recovered"—requiring GLC to invest more time and money into its pre-existing activities in order to produce the same positive outcomes. 1-SER-202; *see Nairne v. Landry*, 151 F.4th 666, 681-82 (5th Cir. 2025) ("[A]dditional time and effort spent addressing the challenged provisions was enough to establish standing because it frustrated the organizations' normal []

69

activities," "forced[ing] [them] to reallocate staff and launch new initiatives to mitigate the effects").

In short, the partially complete AR-type receivers that ATF permits to be sold without a background check and serialization impede GLC's CVI efforts and related advocacy and render them perceptively more difficult and expensive to achieve. "Such concrete and demonstrable injury to [GLC's] activity—with the consequent drain on the organization's resources" from ghost-gun-specific education, research and other initiatives—"constitutes far more than simply a setback to [GLC's] abstract social interests;" it interferes with and undermines GLC's core business. *Havens*, 455 U.S. at 379; *see Noem*, 145 F.4th at 988 (organization suffered a cognizable injury where, to "avoid abandoning a core constituency and undermining its mission," it had to and would have to expend resources "to counteract and offset" the challenged conduct).

**2.** Invoking the Supreme Court's recent decision in *Alliance*, ATF argues that plaintiffs cannot establish standing based on their diversion of resources in response to ATF's actions. *See* AOB 13, 20-22. That's wrong. *Alliance* specifically confirmed that organizations

70

have standing to challenge actions that "directly affect and interfere with" their "core business activities." 602 U.S. at 395. *Alliance* reiterated the longstanding Article III principle that organizations may "sue on their own behalf for injuries they have sustained[.]" *Alliance*, 602 U.S. at 393. *Alliance* did not—nor did it purport to—change the requirements of organizational standing. And the Court expressly affirmed the *Havens* pathway to organizational standing for mixed advocacy and direct services organizations like GLC, distinguishing the facts of *Havens* from those in *Alliance*. 602 U.S. at 395.[11]

---

[11] Relying on *United States v. Texas*, 599 U.S. 670 and *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), ATF argues that the district court erred in granting GLC standing because "plaintiffs generally lack any 'judicially cognizable interest' in how the government enforces laws against third parties." AOB 12. ATF also argues GLC "cannot even claim that ATF's choice will impose any—even indirect—costs on the organization" that would constitute "cognizable injuries" in light of *Texas* and *Alliance*. AOB 21. Both arguments are contrary to the record and fail as a matter of law. Neither *Texas* nor *Linda R.S.* forecloses standing where an organizational plaintiff is not directly regulated. To the contrary, *Alliance* explicitly preserved standing for "unregulated parties from government regulation" like GLC, holding that both causation and injury-in-fact requirements are satisfied as long as evidence shows that it is "likely that the

In *Alliance*, the Court held that "an organization that has not
suffered a concrete injury caused by a defendant's action cannot
spend its way into standing simply by expending money to gather
information and advocate against the defendant's action." *Alliance*,
602 U.S. at 394.   Relying on *Havens*, the plaintiffs in that case
contended that FDA's approval of mifepristone caused them to incur
"costs to oppose FDA's actions" by conducting their own studies on
mifepristone to "better inform their members and the public about
mifepristone's risks." *Id.*  The Supreme Court rejected this theory of
standing, explaining that it "would mean that all the organizations
in America would have standing to challenge almost every federal
policy that they dislike, provided they spend a single dollar opposing
those policies. *Havens* does not support such an expansive theory of
standing." *Id.*

In contrast, the plaintiff organization in *Havens* (HOME)
established its standing because "[c]ritically, HOME not only was an

---

government's regulation or lack of regulation of someone else will
cause a concrete and particularized injury in fact to the unregulated
plaintiff."  602 U.S. at 385 n.2; *see also Dep't of Com. v. New York*,
588 U.S. at 768.

issue-advocacy organization, but also operated a housing counseling service." *Alliance,* 602 U.S. at 395. Therefore, "when Havens gave HOME's employees false information about apartment availability," it "perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers," *id.* (quoting *Havens*, 455 U.S. at 379), and, thus, "directly affected and interfered with HOME's core business activities," *Alliance*, 602 U.S. at 395. Unlike HOME, the plaintiffs in *Alliance* did not provide direct services, nor had they suffered "any similar impediment to th[eir] advocacy businesses." *Id.*

Thus, as this Court recently recognized, *Alliance* did *not* change the principle that an organization has standing when the government's action has "a direct effect on the organization's core activities." *Satanic Temple v. Labrador*, 149 F.4th 1047, 1054 (9th Cir. 2025) (noting that the plaintiffs in *Alliance* "had not shown" or "sufficiently alleged" an "effect on their core activities"), *as amended* (Sept. 2, 2025). In *Satanic Temple*, this Court considered "challenges to Idaho's laws criminalizing abortion brought by a religious association—The Satanic Temple ("TST")—that supports abortion as

73

an exercise of personal sovereignty and bodily autonomy." *Id.* at 1048. The Court noted that *Alliance* "clarified and limited the resources theory of organizational standing," but it explained that Ninth Circuit precedent already held that "an organization cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *Id.* at 1054 (quotation omitted). Thus, TST could not establish standing simply by spending resources "in response to the bans on abortion in Idaho and other states." *Id.* (explaining that TST only began providing direct abortion services *after* the challenged laws went into effect in response to those laws).

But an organization *can* establish standing by showing an effect on its "pre-existing core mission" and activities in support of that mission—which, in TST's case, meant showing that the laws would "curtail TST's ability to support its members' beliefs or provide information or advocacy or abortion." *Id.* (noting that before the challenged laws went into effect, TST's "programs were focused on education and advocacy"). This Court was careful to note that TST had not alleged that its pre-existing education and advocacy

74

activities "ha[d] been impeded or stopped;" only then did the Court conclude that TST could not "establish standing based on a diversion of resources and frustration of mission theory." *Id.* *Satanic Temple* therefore confirms this Circuit's rule—both before and after *Alliance*—that an organization has standing to challenge actions that impair its preexisting activities in furtherance of its mission. *See, e.g.*, *Valle*, 732 F.3d at 1018-19 ("ability to carry out their missions"); *E. Bay*, 932 F.3d at 765 ("services [they were] formed to provide"); *Alliance*, 602 U.S. at 395 ("core business activities"); *see also Noem*, 145 F.4th at 988-89 (holding post-*Alliance* that a legal advocacy organization had standing to challenge government policy that "impede[d] [the organization's] attorneys' ability to represent clients).[12] This Court's approach in *Satanic Temple* is consistent with every other Circuit Court to have considered the impact of

---

[12] Although a divided panel of this Court recently purported to overrule a swath of Ninth Circuit precedent applying organizational standing prior to *Alliance*, *see Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1172-78 (9th Cir. 2024), this Court vacated that opinion for rehearing *en banc*, *Ariz. All. for Retired Ams. v. Mayes*, 130 F.4th 1177 (9th Cir. 2025). The *en banc* Court heard argument on June 25, 2025, and no decision has yet been issued.

*Alliance* on organizational standing.[13]  That approach confirms the

district court correctly concluded that GLC has standing.

## CONCLUSION

The Court should affirm.


Dated:  October 29, 2025                    Respectfully submitted,


                                            *s/ Matthew Wise*

                                            ROB BONTA
                                            Attorney General of California
                                            THOMAS S. PATTERSON
                                            Senior Assistant
                                            Attorney General
                                            R. MATTHEW WISE, 238485
                                            Supervising Deputy
                                            Attorney General
                                            S. CLINTON WOODS, 246054
                                            Deputy Attorney General
                                            Clint.Woods@doj.ca.gov
                                            455 Golden Gate Ave., Suite
                                            11000
                                            San Francisco, CA 94102-7004
                                            Telephone: (415) 510-3807
                                            Facsimile: (415) 703-5843

                                            *Attorneys for Appellee State of*
                                            *California, by and through*
                                            *Attorney General Rob Bonta*

---

[13] *See, e.g.*, *Republican Nat'l Comm'n v. N.C. State Bd. of Elec.* ("*RNC*"), 120 F.4th 390, 396-97 (4th Cir. 2024); *Tex. Tribune v. Caldwell Cnty.*, 121 F.4th 520, 526-27 (5th Cir. 2024); *Nairne*, 151 F.4th at 681-82; *Ctr. For Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025).

*s / Lee R. Crain*

LEE R. CRAIN
GIBSON, DUNN &
CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
lcrain@gibsondunn.com
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

GREGG COSTA
GIBSON, DUNN &
CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
gcosta@gibsondunn.com
Telephone: (346) 718-6649

AVI WEITZMAN, *pro hac vice*
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
aviweitzman@paulhastings.com
Telephone: (212) 318-6000
Facsimile: (212) 752-3620

DAVID M. PUCINO*, pro hac vice*
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90 New
York, NY 10018 Telephone:
(917) 680-3473

*Attorneys for Plaintiff-Appellee
Giffords Law Center to Prevent
Gun Violence*

77

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

The undersigned attorney or self-represented party states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:


*s/ Lee R. Crain*

Lee R. Crain

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** <u>24-2701</u>

I am the attorney or self-represented party.

**This brief contains 13,947 words,** including 26 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                                     *Rev. 12/01/22*

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** s/ Lee R. Crain _____     **Date** 10/29/2025 ____

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                           *Rev. 12/01/22*

## RULE 25-5(F) ATTESTATION

In accordance with Ninth Circuit Rule 25-5(f), I hereby attest that all other parties on whose behalf this document is submitted concur in its content.

*Dated*: October 29, 2025

s/ *Lee R. Crain*

Lee R. Crain