**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

STATE OF CALIFORNIA; BRYAN MUEHLBERGER; FRANK BLACKWELL; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,

*Plaintiffs - Appellees*,

v.

UNITED STATES BUREAU OF ALCOHOL TOBACCO FIREARMS & EXPLOSIVES; ROBERT CEKADA, in his official capacity as Director of ATF; DOJ - UNITED STATES DEPARTMENT OF JUSTICE; TODD W. BLANCHE, Attorney General, in his official capacity as Attorney General of the United States,

*Defendants - Appellants*.

No. 24-2701

D.C. No. 3:20-cv-06761-EMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted March 12, 2026
San Francisco, California

Filed August 21, 2026

Before: Consuelo M. Callahan, Holly A. Thomas, and Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Callahan

## SUMMARY*

**Gun Control Act / Standing**

The panel vacated the district court's order granting summary judgment and remanded with instructions to dismiss for lack of standing a case brought by the State of California and the Giffords Law Center to Prevent Gun Violence (GLC) challenging a Final Rule enacted by the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).

The Final Rule effectively extended the reach of the Gun Control Act (GCA), which regulates a wide range of activities involving firearms, to cover some frames and receivers that previously went unregulated because they were either partially complete, disassembled, or nonfunctional. The Final Rule offered some nonexclusive examples. Relevant to this litigation, Example 4 stated that

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a "billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." 27 C.F.R. § 478.12(c). Plaintiffs challenged the regulation's failure to extend the GCA to even more partially complete firearm receivers that they think should be included.

The panel held that Plaintiffs lacked standing. California argued that Example 4 caused it to increase financial expenditures to accelerate implementation of State legislation regulating ghost gun parts, and to train law enforcement on ghost guns. GLC argued that that ATF's insufficient regulation of ghost guns frustrated GLC's core mission and required it to divert resources to combat the proliferation of ghost guns and ghost gun violence. The panel held that their arguments failed because their evidence did not factually establish the requisite causal link between Example 4 and their claimed injuries. Accordingly, the panel vacated the district court's order and remanded with instructions to dismiss the case without prejudice for lack of standing.

---

## COUNSEL

Lee R. Crain (argued), Gibson Dunn & Crutcher LLP, New York, New York; Scott A. Edelman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Gregg Costa, Gibson Dunn & Crutcher LLP, Houston, Texas; S. Clinton Woods, Deputy Attorney General; R. Matthew Wise, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California

Attorney General; Office of the California Attorney General, San Francisco, California; David M. Pucino, Giffords Law Center to Prevent Gun Violence, New York, New York; Avi Weitzman, Paul Hastings LLP, New York, New York; for Plaintiffs-Appellees.

Sean R. Janda (argued), Bradley Hinshelwood, and Courtney L. Dixon, Attorneys, Appellate Staff, Civil Division; Brett A. Shumate, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Craig H. Missakian, United States Attorney, Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Defendants-Appellants.

Andrew Nellis, Everytown Law, Washington, D.C., for Amici Curiae Everytown for Gun Safety Support Fund and Brady Center To Prevent Gun Violence.

Rupa Bhattacharyya and Mary B. McCord, Institute for Constitutional Advocacy & Protection, Georgetown University Law Center, Washington, D.C., for Amici Curiae United States Conference of Mayors, The Major Cities Chiefs Association, and The Police Executive Research Forum.

Perry R. Cao, Assistant Attorney General; Ashwin P. Phatak, Principal Deputy Solicitor General; Caroline S. Van Zile, Solicitor General; Brian L. Schwalb, District of Columbia Attorney General; Office of the District of Columbia Attorney General, Washington, D.C.; Benjamin M. Shultz, Assistant Attorney General; Jeremy Feigenbaum, Solicitor General; Matthew J. Platkin, New Jersey Attorney General; Office of the New Jersey Attorney General, Trenton, New Jersey; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the

Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawaii Attorney General, Office of the Attorney General Hawaii, Honolulu, Hawaii; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae District of Columbia, New Jersey, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, and Washington.

# OPINION

CALLAHAN, Circuit Judge:

The Gun Control Act (GCA) regulates a wide range of activities involving firearms. Under the GCA, firearm frames and receivers themselves qualify as firearms subject to the statute's regulations. This case concerns a recently enacted federal regulation that, among other things, effectively extended the GCA's reach to cover some frames and receivers that previously went unregulated because they were either partially complete, disassembled, or nonfunctional.

Plaintiffs challenge the regulation's failure to extend the GCA to even more partially complete firearm receivers that they think should be included. We must decide whether Plaintiffs have standing to raise their challenge. They do not.

## I

### A

In 1968, Congress adopted the GCA to regulate the "interstate traffic in firearms." Pub. L. 90-618, 82 Stat. 1213. The statute, as relevant here, imposes various background check, licensing, recordkeeping, and serialization requirements upon those who import, make, or deal in firearms. 18 U.S.C. §§ 922(t), 923(a), 923(i), 923(g)(1)(A). It defines a firearm as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler; or (D) any destructive device." *Id.* § 921(a)(3). But the GCA leaves undefined several key terms. For instance, it does not define the terms readily,

frame, or receiver. Instead, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) defines these terms by regulation, subject to approval by the Attorney General. 27 C.F.R. § 478.11 (defining readily); *id.* § 478.12 (defining frame and receiver).

A regulation defines the term readily as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 27 C.F.R. § 478.11. To determine whether a "weapon . . . may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), requires consideration of a variety of specific factors. 27 C.F.R. § 478.11 (providing a nonexclusive list of relevant factors, such as "how long it takes to finish the process" and "how difficult it is to do so").

In 2022, ATF completed formal rulemaking proceedings to "remove and replace" earlier definitions of the terms frame and receiver after finding that the earlier definitions "fail[ed] to capture the full meaning of those terms." 87 Fed. Reg. 24652. ATF acknowledged that the prior definitions "[did] not describe the frame or receiver of most firearms currently in circulation in the United States." *Id.* The problem was, in part, that the former definitions failed to account for the fact that "[t]oday, companies are able to make and sell weapon parts kits that individuals can assemble into functional firearms in their own homes." *Bondi v. VanDerStok*, 604 U.S. 458, 463 (2025). These homemade firearms built from deconstructed parts, sometimes called "ghost guns," were not subject to the GCA's regulatory requirements and thus were functionally untraceable. *Id.* This led to "an explosion of crimes involving these ghost guns." *Id.* (citation modified).

ATF thus enacted its Final Rule, which addresses this serious issue by expanding several regulatory definitions, including the terms frame and receiver. 87 Fed. Reg. 24652. The Final Rule provides in relevant part:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.
>
> (2) The term "receiver" means the part of a rifle, shotgun, or projectile other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component or structure.

27 C.F.R. § 478.12(a)(1), (2).

The Final Rule further states that "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]" *Id.*

§ 478.12(c). The Final Rule, however, clarifies that the terms frame and receiver "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.*

To illustrate its intended meaning, the Final Rule offers some nonexclusive examples of partially complete, disassembled, or nonfunctional frames and receivers that it covers as well as a few that it does not. *Id.* For instance, Example 2 provides that "[a] partially complete billet or blank of a frame or receiver with one or more template holes drilled or indexed in the correct location is a frame or receiver, as a person with common hand tools may readily complete the billet or blank to function as a frame or receiver." *Id.* In contrast, and relevant to this litigation, Example 4 states that "[a] billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." *Id.*

Applying the Final Rule, ATF subsequently made numerous determinations and representations that—consistent with Example 4—certain unfinished receivers are not covered by the Final Rule. In each instance, ATF found that the unfinished receiver at issue (1) had not yet reached a sufficient "stage of manufacture where [it was] clearly identifiable as an unfinished component part of a weapon," and (2) was not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed. *See id.*

**B**

Plaintiffs are the State of California and the Giffords Law Center to Prevent Gun Violence (GLC). Following the enactment of the Final Rule and Example 4, California states that it had to increase its "expenditures of time, money, and resources to train law enforcement personnel statewide on ghost guns, and [made] additional expenditures to accelerate implementation of necessary State legislation regulating ghost-gun parts." GLC, "a nonprofit organization whose core mission is to save lives from gun violence[,]" explains that to combat the negative effects of Example 4, it has needed "to invest more time and money into its pre-existing activities[.]"

Alleging violations of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, Plaintiffs sued ATF, the ATF Director, the Department of Justice, and the Attorney General (referred to collectively as "ATF"). Plaintiffs do not seek to vacate the Final Rule; to the contrary, they assert that the Final Rule must cover *more* early-stage firearm receivers, even if not sold together with any other parts, tools, or related items. Plaintiffs therefore challenge only Example 4 and ATF's subsequent determinations and representations based on Example 4 (referred to collectively as "Example 4"). Plaintiffs argue that Example 4 is an unlawful restriction of the proper scope of the Final Rule and the GCA.

In Count One of their operative complaint, Plaintiffs claim that Example 4 violates the APA because it is "not in accordance with law." *See* 5 U.S.C. § 706(2)(A). As they see it, Example 4 conflicts with the GCA because the unfinished receivers at-issue "fall within the statutory definition of firearms subject to the GCA's requirements."

In Count Two, Plaintiffs assert that Example 4 runs afoul of the APA because it is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). They argue that Example 4 draws an "arbitrary line [that] leaves open obvious and easily navigable loopholes that run counter to the GCA's basic commands" and that ATF, in adopting Example 4, "entirely fail[ed] to consider an important aspect of the problem" that it sought to address.

The parties filed cross-motions for summary judgment. ATF argued that Plaintiffs lacked Article III standing, and all parties argued that they were entitled to summary judgment on the merits of Plaintiffs' APA claims. The District Court first held that Plaintiffs each had standing. Next, it granted summary judgment for ATF on Count One and granted summary judgment for Plaintiffs on Count Two. Finally, as a remedial measure, it declared Example 4 unlawful, vacated it, and remanded the matter to ATF. ATF timely appealed.

**II**

We have jurisdiction under 28 U.S.C. § 1291, and review de novo a district court's grant of summary judgment and its determination on Article III standing. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021). Our review begins, and ends, with standing. We hold that Plaintiffs lack standing because Plaintiffs have not shown that Example 4 caused their asserted injuries. So we vacate the district court's order and remand with instructions to dismiss the case.

**A**

Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies." A case or

controversy exists only if a plaintiff has standing to bring a suit—this is "a bedrock constitutional requirement" that we apply "to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing serves to protect "a single basic idea—the idea of separation of powers." *Id.* The Constitution assigns the judiciary a "limited" role, and "[b]y ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'" *Id.* at 675-76 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). If a plaintiff lacks standing, then "a dispute is not a proper case or controversy, [and] the courts have no business deciding it, or expounding the law in the course of doing so." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

To prove standing, "a plaintiff must show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* (quoting *Clapper*, 568 U.S. at 409). A plaintiff must prove each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, a plaintiff "must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation modified).

A plaintiff "has standing to challenge federal action that directly harms [its] economic interests or interferes with its operations as a service provider, market participant, or employer." *Washington v. FDA*, 108 F.4th 1163, 1174 (9th Cir. 2024) (collecting cases). Even so, a plaintiff "cannot manufacture standing merely by inflicting harm on [itself]

based on [its] fears of hypothetical future harm[.]" *Clapper*, 568 U.S. at 416; *see also FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 382-83 (2024) (explaining that a plaintiff who has not itself suffered a direct and concrete injury cannot "manufacture its own standing" by spending money in response to a disfavored government regulation).

When, as here, a plaintiff's alleged harm results only as an indirect effect of the government's "allegedly unlawful regulation (or lack of regulation) of *someone else*," "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *see also Hippocratic Med.*, 602 U.S. at 382-83; *Washington*, 108 F.4th at 1175. In such a case, proving causation requires a plaintiff to demonstrate that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Hippocratic Med.*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)) (internal quotation marks omitted). The causation requirement does not permit courts to accept links that are too "speculative" or "attenuated," and the "causation inquiry can be heavily fact dependent and a question of degree[.]" *Hippocratic Med.*, 602 U.S. at 383-384 (internal quotation marks omitted). The Supreme Court has directed us to be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413).

**B**

**1**

At summary judgment, California argued that Example 4 caused it to increase financial expenditures "to accelerate implementation of State legislation regulating ghost gun

parts, as well as increased expenditures of time, money, and resources to train law enforcement personnel statewide on ghost guns." For its part, GLC argued that ATF's insufficient regulation of ghost guns frustrates GLC's core mission and requires the organization to divert resources to combat the proliferation of ghost guns and ghost gun-related violence. *Id.* at 37-40. Both Plaintiffs maintain their respective arguments before us.[1] Their arguments each fail because their evidence does not factually establish the

[1] In its operative complaint, California also asserted standing based on Example 4's "interference with California's ability to enforce its laws with respect to firearms and firearm-related crime" and "harm to its quasi-sovereign interest in protecting the security and well-being of its residents." But California abandoned these alternative standing theories in both its summary judgment briefing before the District Court and its briefing before us.

To the extent that California's argument about increased expenditures may be read to have encompassed the state's separate theory that Example 4 interferes with its ability enforce its firearms laws, California cites no precedent in support of that theory. Nor does California argue that Example 4 encroaches on its ability to govern, for example by preempting or nullifying state law. Thus, under our precedent, that theory clearly fails. *See Washington*, 108 F.4th at 1177 ("We have never held that a logistical burden on law enforcement constitutes a cognizable Article III injury. Holding otherwise would greatly expand state standing to challenge any federal action that allegedly increases crime or disorder, or imposes indirect compliance costs for state law enforcement."); *see also id.* (explaining that the Supreme Court, in rejecting an analogous "novel standing argument," noted that "holding otherwise would lead to an increase in 'complaints in future years about alleged Executive Branch under-enforcement' of other laws, including 'drug laws, gun laws, obstruction of justice laws, or the like.'" (quoting *Texas*, 599 U.S. at 681)).

requisite causal link between Example 4 and their claimed injuries.[2]

From the start, Plaintiffs' causation arguments face strong headwinds because Example 4 does not directly affect either of them. Their asserted injuries here arise only indirectly. So they must offer sufficient evidence to show that Example 4 will cause "a predictable chain of events leading from the government action to the asserted injury." *Hippocratic Med.*, 602 U.S. at 385. Plaintiffs contend that "[i]t is predictable that, if ATF does not regulate [partially complete receivers] under the GCA, then "third parties will continue to make and sell them to evade serialization and licensing laws." They also state that, as the district court found, "it is predictable that crimes will be committed in California" using ghost guns built with partially complete receivers, "because ghost guns are commonly used in crimes and a notable percentage of ghost guns recovered in the state" use those early-stage receivers.

To tie their new expenditures to Example 4, Plaintiffs must show that Example 4 will predictably increase the spread and unlawful use of ghost guns made from the relevant partially made receivers.[3] California's evidence consists of a declaration submitted by a Special Agent

[2] ATF argues that Plaintiffs have not met both the injury in fact and causation elements of standing. Because we conclude that Plaintiffs have not shown that their asserted injuries are fairly traceable to Example 4, we need not consider ATF's alternative argument that the injuries are not legally cognizable for standing purposes.

[3] Plaintiffs' argument appears to rest on the proposition that even if the Final Rule stops or decreases the spread and unlawful use of ghost guns generally, Plaintiffs can still be harmed by an increase of a specific subcategory of ghost guns. We assume without deciding that their theory is valid.

Supervisor from the state's Department of Justice, documents supporting claims made in the declaration, and a host of news stories about ghost gun violence and prevalence. All told, the evidence demonstrates the increasing spread of ghost guns and ghost gun violence, and various expenditures made by California between 2016 and 2023 to implement and improve state regulation of ghost guns.

California's evidence falls short because it speaks to the problem of ghost guns generally, offering no data regarding the specific unregulated products subject to Example 4. The declaration asserts that "the vast majority of these ghost guns were assembled using commercially-available firearms precursor parts," including "approximately 15-20%" of ghost guns made with unfinished receivers *possibly* subject to Example 4, but California's evidence fails to distinguish products that are now regulated under the GCA by the Final Rule from those that are not.

Additionally, California's evidence focuses almost exclusively on expenditures that California made to combat the growth of ghost guns from 2016 to 2022, a period pre-dating the Final Rule. During that time, the Final Rule was not in effect, and any ghost gun-related harm that California sought to address cannot be attributed to Example 4. *Cf. California*, 593 U.S. at 676 (citation modified) (rejecting the states' declarations showing costs caused by an extant regulatory regime). And California's only evidence relating to ghost guns postdating the Final Rule seems to cut against its causation theory. California's proffered declaration points to only one post-Final Rule data point, which concerns ghost guns recovered by law enforcement in Los Angeles County. The declaration reports that in July 2021, 9% of the total firearms recovered were ghost guns, but that

"[i]n 2022 through January 2023, the percentage of ghost guns recovered account[ed] for approximately 5 to 8% of firearms recovered each month." This suggests that, in California's largest county, the Final Rule caused a decrease in the prevalence of ghost guns—at least as measured by the share of ghost guns recovered out of total firearms recovered—which is the *opposite* trend that California's theory requires. On this record, "[n]either logic nor intuition suggests" the contrary inference that California asks us to make with respect to Example 4 products. *California*, 593 U.S. at 676.

In sum, California's stated costs are not fairly traceable to Example 4. The state's attempt to connect its costs to Example 4 rests on evidence that does not adequately demonstrate that "third parties will likely react in predictable ways" that cause injury to California. *Hippocratic Med.*, 602 U.S. at 383 (quoting *California*, 593 U.S. at 675). That does not suffice for Article III standing.[4]

**2**

GLC's theory of harm, which relies on a declaration submitted by its chief of staff along with supporting records, has the same causation flaws as does California's theory. GLC's evidence does not isolate Example 4 products from

[4] California argues that it can avoid the causation requirement's usual strictures by simply showing that "it reasonably incurred costs to avoid a 'substantial risk' of harm caused by ATF's failure to regulate certain partially complete receivers." But even a substantial risk of harm does not do away with California's burden to provide "concrete facts showing that [ATF's] actual action has caused the substantial risk of harm." *Clapper*, 568 U.S. at 114 n.5. Nor can California show a risk of harm by "rely[ing] on speculation about the 'unfettered choices made by independent actors not before the courts.'" *Id.* (quoting Lujan, 504 U.S. at 562).

ghost guns generally, much less show how the Final Rule and Example 4 will work together to predictably cause an uptick in harm caused by ghost guns made from the relevant unfinished receivers, to which GLC claims it must respond. Nearly all of its documented expenditures and activities also predate the Final Rule. Accordingly, for the same reasons as California, GLC fails to establish causation and thus lacks standing. *See id.; California*, 593 U.S. at 676.

**III**

Although California and GLC expended resources to combat the spread and use of ghost guns after enactment of the Final Rule, those expenditures were based on their predictions that Example 4 would cause increased use by third parties of the products at issue in an unlawful manner. But we cannot "endorse standing theories that rest on speculation about the decisions of independent actors . . . particularly speculation about future unlawful conduct." *Dep't. of Comm.*, 588 U.S. at 768 (citation modified). Because California and GLC assert theories that rest on such speculation, neither has standing here. We thus vacate the district court's order and remand with instructions to dismiss the case for lack of standing.

**VACATED and REMANDED with instructions to dismiss without prejudice for lack of standing.**