No. 24-2701

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

---

STATE OF CALIFORNIA, et al.,

*Plaintiffs-Appellees*,

v.

UNITED STATES BUREAU OF ALCOHOL, TOBACCO, FIRE-ARMS AND EXPLOSIVES, et al.,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:20-cv-06761
Hon. Edward M. Chen

---

# PETITION FOR PANEL REHEARING

---

Lee Crain
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
lcrain@gibsondunn.com

*Attorney for Appellee Giffords Law Center to Prevent Gun Violence*

Rob Bonta
ATTORNEY GENERAL OF CALIFORNIA
455 Golden Gate Ave.
Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3807

*Attorney for Appellee State of California*

*[Additional Counsel Listed on Next Page]*

Gregg Costa
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6649
gcosta@gibsondunn.com

Emily R. Sauer
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7704
esauer@gibsondunn.com

*Attorneys for Appellee Giffords Law Center to Prevent Gun Violence*

Thomas S. Patterson
SENIOR ASSISTANT ATTORNEY GENERAL
R. Matthew Wise, 238485
SUPERVISING DEPUTY ATTORNEY GENERAL
S. Clinton Woods, 246054
DEPUTY ATTORNEY GENERAL
455 Golden Gate Ave.
Suite 11000
San Francisco, CA 94102
Telephone: (415) 510-3807
Clint.Woods@doj.ca.gov

*Attorneys for Appellee State of California, by and through Attorney General Rob Bonta*

# TABLE OF CONTENTS

Page

INTRODUCTION AND RULE 40 STATEMENT ............................ 1

BACKGROUND ........................................................................ 4

REASONS FOR GRANTING REHEARING .................................... 9

I. The Court Overlooked the Applicable Standard at Summary Judgment and Ordered the Wrong Remedy ............................ 9

II. The Court Overlooked Evidence Establishing Causation...... 16

CONCLUSION ........................................................................ 22

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 1, 10, 11, 14, 15

*Ariz. All. for Retired Ams. v. Mayes*,
186 F.4th 622 (9th Cir. 2026) ........ 21

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024) ........ 15

*Cent. Delta Water Agency v. United States*,
306 F.3d 938 (9th Cir. 2002) ........ 1, 10

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) ........ 2, 11, 12, 15, 16, 17, 21, 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........ 10, 14, 16

*Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*,
471 F.3d 277 (1st Cir. 2006) ........ 15, 16

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........ 21

*Munoz-Mendoza v. Pierce*,
711 F.2d 421 (1st Cir. 1983) ........ 16

*Teamsters Loc. Union No. 117 v. Wash. Dep't of Corr.*,
789 F.3d 979 (9th Cir. 2015) ........ 13

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
865 F.2d 1539 (9th Cir. 1989) ........ 10, 12

*Washington v. FDA*,
108 F.4th 1163 (9th Cir. 2024) .......... 18

### Statutes

18 U.S.C. § 921(a)(3) .......... 4

### Regulations

27 C.F.R. § 478.12(c) .......... 1, 4, 18

87 Fed. Reg. 24,652 (Apr. 26, 2022) .......... 4

## INTRODUCTION AND RULE 40 STATEMENT

The panel held that Plaintiffs lack standing to challenge the Bureau of Alcohol, Tobacco, Firearms, and Explosives' (ATF) decision to exempt a category of the most dangerous and lethal AR-type ghost guns from its Final Rule. *See* 27 C.F.R. § 478.12(c)(4) (Example 4). Respectfully, that conclusion misapprehends the applicable standard, the record, and Plaintiffs' claim in two material respects.

*First*, the panel should grant rehearing to remand the question of standing to the district court. The panel resolved a fact-bound causation question against Plaintiffs on a summary judgment record in which ATF alone moved on standing. In that posture, Plaintiffs "need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements," *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002), with "all justifiable inferences . . . drawn in [their] favor," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). On rehearing, the panel should construe all the facts in the light most favorable to Plaintiffs. Those facts demonstrate that there is at least a triable issue as to whether Plaintiffs' increased expenditures to

combat the rise of ghost guns in California were caused by ATF's failure to regulate AR-type receivers subject to Example 4.

*Second*, the panel overlooked that the record contains ample evidence about the "predictable ways" "third parties will likely react" to Example 4. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Retailers' advertising and ATF's own letters demonstrate that third parties have already reacted in ways that have caused and will continue to cause Plaintiffs' injuries. For example, retailers market standalone AR-type receivers specifically in reliance on Example 4—noting that ATF has expressly declared those products unregulated, so the product is "not a firearm" and does not need to be registered or serialized. ER-106. And manufacturers have written directly to ATF for permission to sell AR-type ghost guns without background checks. ATF has responded to at least 23 of those post-Rule requests, confirming to industry members that their standalone AR-type receivers fall outside the Gun Control Act (GCA). 2-SER-328–32, 2-SER-338–47, 2-SER-357–446, 2-SER-457–67. That evidence, which the panel did not address, speaks directly

to the effects of Example 4—the only regulation that exempts AR-type receivers from a "firearm" designation.

Although the panel held that Plaintiffs lacked precise "data regarding the specific unregulated products subject to Example 4," Op. 16, the panel overlooked both the submitted evidence specific to Example 4 as well as *why* granular data on Example 4 products is difficult to collect: the products subject to Example 4 are *unregulated* and *untraceable*. To be clear, Article III does not require the product-level data that the Rule's own operation suppresses. But even if it did, *amici* supplied precisely that information in evidence that was published after summary judgment was briefed below: updated data published in 2024 and 2025 showing a clear increase in California of unserialized long-gun recoveries, *see* Dkt. 39.1 at 12—the category that includes the components "subject to Example 4," Op. 16. The panel's opinion did not address that recent data, which is directly responsive to the panel's opinion and which the panel can and should consider.

The Court should grant panel rehearing, apply the proper standard of review, credit the overlooked record evidence, and hold

that Plaintiffs established standing. At a minimum, it should hold that Plaintiffs raised a genuine dispute of material fact on causation and remand to the district court to resolve it.

## BACKGROUND

This case concerns ATF's 2022 Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms." 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, 479). The Final Rule sought to modernize the regulatory definition of a firearm and clarify that parts kits readily convertible to functional weapons—or to functional "frames" or "receivers" of weapons—are subject to the same regulations as traditional firearms. *See* 27 C.F.R. § 478.12(c); *see also* 18 U.S.C. § 921(a)(3). To that end, the Final Rule defines "frames" and "receivers" to include "partially complete" frames and receivers that are "designed to or may readily be completed . . . to function as a frame or receiver." 27 C.F.R. § 478.12(c).

Without explanation, and contrary to the GCA, ATF *excluded* "AR-15 variant receiver[s]" from its definition of firearm "frames" or "receivers." 27 C.F.R. § 478.12(c), Example 4. Plaintiffs sued ATF, explaining that Example 4 resulted in a deadly loophole: as long as

AR-type partially complete receivers remained unregulated, the proliferation of ghost guns—the weapon of choice for individuals who cannot pass a background check—would continue. ER-085–93 (¶¶ 1-17). Plaintiffs' Administrative Procedure Act (APA) lawsuit alleged that Example 4 and ATF's related agency actions are "not in accordance with" the GCA and are "arbitrary and capricious" because ATF "le[ft] open obvious and easily navigable loopholes that run counter to the GCA's basic commands." ER-155–58 (¶¶ 164-80).

The parties cross-moved for summary judgment. ER-016. In its motion, ATF mounted "a factual attack on standing" directed at whether Plaintiffs had demonstrated an injury in fact traceable to Example 4 specifically. ER-019. The district court granted in part and denied in part Plaintiffs' and ATF's cross-motions for summary judgment, vacating ATF's Example 4 from the Final Rule and remanding it to ATF for further proceedings. ER-049.

The district court's opinion rejected ATF's factual attack on standing, making two critical observations: first, that "it is only Defendants who are moving for summary judgment on standing," and second, that "Plaintiffs have submitted unrebutted evidence that

they have suffered an injury in fact." ER-019. The district court relied on that evidence in finding that "it is . . . predictable that a significant portion of the AR-type ghost guns used in crimes will have been assembled using . . . the partially complete AR-type receivers described in Example 4." ER-021. The court explained that "a reasonable jury could infer that, because California has not dismantled or otherwise walked back its regulatory scheme put in place to fill in the gap left by the final rule, the gap is still significant." ER-022. The court concluded that "the record evidence of injuries to the Plaintiffs establishes standing" and that "[a]t bottom, the fact of, and not the precise magnitude of, the harms alleged by Plaintiffs is what counts for standing." *Id.*

The record evidence included detailed declarations specifying Plaintiffs' injuries traceable to the AR-type receivers exempted by Example 4 in the Final Rule. Special Agent Gonzalez of the California Department of Justice, Bureau of Firearms, attested that "since 2018 approximately 15-20% of the ghost guns recovered statewide were made with AR-style receivers"—the very firearms subject to Example 4. 2-SER-216 (¶ 20); ER-020 (crediting the same).

Gonzalez further documented that ghost gun recoveries by California law enforcement agencies have increased dramatically for the past few years. 2-SER-216 (¶ 13). California submitted evidence of concrete financial expenditures, including millions of dollars in legislative appropriations to implement Assembly Bills 857, 879, and 1621—each enacted to close the federal regulatory gap, including the AR-type receivers exempted by Example 4. 2-SER-215–17; ER-062–63.

GLC's Chief of Staff, Laura Cutilletta, similarly attested that ATF's actions had frustrated its core platform of universal background checks and community violence prevention by allowing "buyers and sellers [to] evade legal requirements applicable to 'firearms,'" requiring GLC to "redoubl[e] its violence prevention efforts" in cities like Oakland and other communities where GLC had previously helped reduce gun violence but which "experienced a recent surge in the numbers of ghost guns recovered." 1-SER-202 (¶ 15). GLC specifically noted that in fall 2023, sellers began to advertise AR-type receivers as items that can be "ship[ped] right to your front door with

no [Federal Firearms License] required," 1-SER-205—a license requiring a background check before any firearm sale, 1-SER-199.

On appeal in this Court, *amici curiae* Everytown Law Center and the Brady Campaign to Prevent Gun Violence supplied additional evidence with updated data about the recoveries of ghost guns since the issuance of the Final Rule. Dkt. 39.1 at 11–12. *Amici* explained, based on new data published during the pendency of this appeal (and thus not available to the parties while briefing summary judgment), that although ghost gun recoveries have decreased *overall* since the Final Rule was implemented, those "decreasing recoveries . . . are attributable almost entirely to reduced numbers of unserialized, home-assembled handguns," not "[r]ecoveries of unserialized long guns." *Id.* at 12. Instead, the data showed a clear increase in California of unserialized long-gun recoveries—the category that includes the ghost guns subject to Example 4. *Id.*

On appeal, the panel held that neither California nor GLC had standing because "Plaintiffs have not shown that their asserted injuries are fairly traceable to Example 4." Op. 15 n.2. The panel did not address Plaintiffs' evidence of injury. *Id.* According to the panel,

Plaintiffs' causation evidence only "speaks to the problem of ghost guns generally," focuses "exclusively on expenditures that California made to combat the growth of ghost guns from 2016 to 2022," and suggests that "in California's largest county, the Final Rule caused a decrease in the prevalence of ghost guns." Op. 16–17. The panel vacated the district court's order, remanding with instructions to dismiss without prejudice. Op. 18.

## REASONS FOR GRANTING REHEARING

### I. The Court Overlooked the Applicable Standard at Summary Judgment and Ordered the Wrong Remedy

For the reasons set forth in Part II, Plaintiffs have submitted evidence sufficient to establish standing. But even if the Court ultimately disagrees that Plaintiffs' evidence establishes standing, it should nonetheless grant rehearing to apply the required standard of review to the evidence Plaintiffs, as non-movants, submitted on summary judgment. Applying that proper standard, Plaintiffs' evidence must be viewed in the light most favorable to them, and in that light, it at least establishes a genuine issue of fact for trial. The

Court should therefore, at a minimum, remand for further proceedings on causation.

The parties cross-moved for summary judgment in the district court, but only ATF moved on standing. ER-005, ER-017. To defeat ATF's motion, Plaintiffs "need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Cent. Delta Water Agency*, 306 F.3d at 947; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (comparing standards of evidence for standing required at summary judgment versus at trial).

To establish a genuine question of material fact as to the standing elements, Plaintiffs must submit evidence "which for purposes of the summary judgment motion will be taken to be true," *Lujan*, 504 U.S. at 561 (citation modified), and "all justifiable inferences are to be drawn in [Plaintiffs'] favor," *Anderson*, 477 U.S. at 255. "A justifiable inference is not necessarily the most likely inference or the most persuasive inference." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (internal citation and quotation marks omitted). "Rather, an inference as to another

material fact may be drawn in favor of the nonmoving party . . . if it is rational or reasonable." *Id.* (internal citation and quotation marks omitted).

As this Court and the district court recognized, whether ATF's failure to regulate firearms in Example 4 caused Plaintiffs' injuries is "'heavily fact dependent and a question of degree[.]'" Op. 13 (quoting *Hippocratic Med.*, 602 U.S. at 383-84); ER-017 (recognizing that ATF mounted a "factual" attack on standing at summary judgment); *Anderson*, 477 U.S. at 255 ("[T]he weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). The relevant question, then, is whether the facts, viewed in the light most favorable to Plaintiffs and with "*all justifiable inferences* drawn in their favor," *Anderson*, 477 U.S. at 255 (emphasis added), could permit a reasonable factfinder to find "a predictable chain of events" connecting Example 4 to Plaintiffs' asserted injuries, *Hippocratic Med.*, 602 U.S. at 385.

Plaintiffs have established at least that much here. As explained further below, *see infra* Part II, Plaintiffs have demonstrated a "predictable chain of events" connecting ATF's failure to regulate

firearms in Example 4 to the unrebutted evidence of Plaintiffs' injuries. That evidence includes post-Final Rule advertisements marketing AR-type receivers to consumers precisely because ATF has declared them unregulated and at least 23 ATF classification letters confirming to manufacturers that those receivers fall outside the GCA background-check, serialization, and recordkeeping requirements. *See infra* at 17–20. Taken as true, this evidence requires the rational and reasonable inference that Example 4 is part of a "predictable chain" of events resulting in Plaintiffs' injuries. *United Steelworkers of Am.*, 865 F.2d at 1542; *Hippocratic Med.*, 602 U.S. at 383-84.

The panel's opinion did not draw this rational inference because it failed to credit any of Plaintiffs' evidence, and if anything, construed that evidence *against* the non-movant. For example, based on a single data point—the share of recovered ghost guns in Los Angeles County from "2022 through January 2023"—the panel concluded that the Final Rule "caused a decrease in the prevalence of ghost guns." Op. 17. But that ignores evidence that "decreasing recoveries of ghost guns since the issuance of the Final Rule are

attributable almost entirely to reduced numbers of unserialized, home-assembled *handguns*," not "unserialized *long guns*" such as AR-15 type weapons. Dkt. 39.1 at 12 (emphasis added).[1] And even without that specific evidence, a declining share of recoveries in a single county over the course of a single year says nothing about the overall "prevalence" of ghost guns in California, let alone the particular effect the Example 4 loophole will have on the ghost gun market

[1] Although appellate review ordinarily is confined to the district court record, the panel can and should consider the facts supplied by *amici* here, where the new data referenced was unavailable to the parties on summary judgment and where the government had ample opportunity on appeal to address it. The underlying record was developed a little over one year after the Final Rule was effective, *see* 1-SER-147, 1-SER-196, 2-SER-213, and the updated data concerning Example 4 products is directly relevant to the question before the Court, *see Teamsters Loc. Union No. 117 v. Wash. Dep't of Corr.*, 789 F.3d 979, 986 (9th Cir. 2015) (permitting record supplementation "for the limited purpose of confirming" evidence of "job-related harms" for standing on an appeal of summary judgment, in part because it was "in the interest[] of justice and efficiency" where a case has been pending for many years (internal quotation marks omitted)). At a minimum, the panel should take judicial notice of the evidence's existence under Federal Rule of Evidence 201, as it supports that a triable issue of material fact exists as to standing, and remand for a trial on standing where Plaintiffs can move to supplement the record and the parties can litigate standing on a complete record.

or the other evidence Plaintiffs put into the record below. *See infra* at 17–20. In construing this data point to support ATF on a causation question that is "heavily fact dependent and a question of degree," Op. 13, the opinion drew an inference against the non-movant that is not permitted at summary judgment, *see Anderson*, 477 U.S. at 255; *see also Lujan*, 504 U.S. at 561.

The opinion made the same error when it described California's evidence as establishing that "approximately 15-20%" of the ghost guns recovered in various California counties were "made with unfinished receivers *possibly* subject to Example 4." Op. 16 (emphasis in original). The "possibly" qualifier does not appear in the declaration. *See* 2-SER-216 (stating "since 2018 approximately 15-20% of the ghost guns recovered statewide were made with AR-style receivers"). Yet the opinion nevertheless concluded that California's evidence "falls short." Op. 16. This was error: Even if the figure were ambiguous as to how many of the recovered ghost guns were made with unfinished receivers subject to Example 4—and for the reasons discussed in Part II, *infra*, it is not—such ambiguity is not a failure of proof, but rather a question of fact to be resolved in Plaintiffs' favor

in opposing summary judgment. *Anderson*, 477 U.S. at 255. Indeed—as the district court recognized—if anything, the loophole Example 4 leaves open makes it *more* likely that AR-type ghost guns will become the ghost gun of choice, and the facts have borne that out, *see, e.g.*, 1-SER-199, 1-SER-205; 2-SER-328–32, 2-SER-338–47, 2-SER-357–446, 2-SER-457–67; Dkt. 39.1 at 12.

Thus, to the extent the Court holds there is not sufficient evidence to conclusively grant summary judgment for Plaintiffs, there is at least a genuine issue of fact as to whether Plaintiffs' evidence demonstrates a "predictable chain of events" connecting Example 4 to Plaintiffs' asserted injuries, *Hippocratic Med.*, 602 U.S. at 385. Therefore, at a minimum, the Court should vacate the district court's summary judgment order and remand for it to resolve the factual dispute about causation. *See Bowen v. Energizer Holdings*, *Inc.*, 118 F.4th 1134, 1143 (9th Cir. 2024) ("If the existence of jurisdiction turns on disputed factual issues, and those jurisdictional disputes are not intertwined with the merits of the claim, then it falls to the district court to resolve those factual disputes itself." (cleaned up)); *Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc.*, 471

F.3d 277, 283 (1st Cir. 2006) (reviewing trial court's factual findings on standing after trial for clear error and affirming that plaintiffs had standing to bring administrative action); *Munoz-Mendoza v. Pierce*, 711 F.2d 421, 425 (1st Cir. 1983) (holding, in an APA case, that "[t]he court must resolve any genuine disputed factual issue concerning standing, either through a pretrial evidentiary proceeding or at trial itself").

## II. The Court Overlooked Evidence Establishing Causation

The panel's decision misapprehended Plaintiffs' theory of standing and, as a result, overlooked the record evidence establishing the "predictable" chain of harm that a regulatory loophole for ghost guns produces. *Hippocratic Med.*, 602 U.S. at 383. As the panel recognized, for Plaintiffs to demonstrate standing based on an "indirect effect of the government's 'allegedly unlawful regulation (or lack of regulation) of someone else,'" proving causation requires Plaintiffs "to demonstrate that 'third parties will likely react in predictable ways that in turn will likely injure the plaintiffs.'" Op. 13 (emphasis omitted) (first quoting *Lujan*, 504 U.S. at 562; and then

quoting *Hippocratic Med.*, 602 U.S. at 383). Here, Plaintiffs' injuries flow from the predictable effects of Example 4, a regulatory loophole in the market for ghost guns. And to the extent the record lacked robust "data regarding the specific unregulated products subject to Example 4," Op. 16, that is precisely *because* Example 4 products are unregulated and thus largely untraceable. Requiring such specific data from Plaintiffs imposes a burden Article III does not demand.

The predictable chain of events that establishes Plaintiffs have standing is as follows: (1) a regulatory loophole exempts a category of firearms from the GCA's requirements; (2) criminals and others who cannot pass a background check obtain those exempted, untraceable firearms; and (3) Plaintiffs suffer injury as a result, including increased policing and law-enforcement costs, diversion of resources to combat ghost guns instead of other types of firearms, and expenses of enacting and implementing state legislation to fill the federal regulatory gap. The unrebutted record supports each link in that causal chain.

*First*, the loophole exists. Example 4 exempts from the GCA the partially complete AR-type receivers used to build AR-style ghost

guns. *See* 27 C.F.R. § 478.12(c), Example 4. That the Final Rule brought other categories of ghost guns within the regulatory scheme does not diminish the predictable consequences of the exemption that remains. If anything, it makes the loophole more consequential, funneling the broader market purchasing ghost guns away from the products the Final Rule took off the market and towards purchasing the products Example 4 exempts. In other words, if ATF regulates only *some* firearms and not others, criminals who cannot purchase regulated firearms will filter their purchases to the unregulated firearms that remain on the market. And that flow directly "interferes with [Plaintiffs'] operations as a . . . market participant" in combating the spread of unregulated firearms. *Washington v. FDA*, 108 F.4th 1163, 1174 (9th Cir. 2024); Op. 12.

*Second*, the panel recognized that Plaintiffs presented unrebutted evidence "demonstrat[ing] the increasing spread of ghost guns and ghost gun violence," as well as "various expenditures made by California between 2016 and 2023 to implement and improve state regulation of ghost guns." Op. 16. But the panel overlooked that this record demonstrates the "predictabl[e] increase" and

"spread" of "ghost guns made from the relevant partially made receivers" in Example 4. Op. 15.

Specifically, the record includes post-Final Rule advertisements that trade on the Example 4 exemption itself, enticing consumers to purchase AR-type receivers precisely because they are among the ghost gun products that remain unregulated, and at least 23 classification letters in which ATF confirmed that manufacturers may sell (and therefore advertise) those receivers as exempt from the GCA's background-check, serialization, and recordkeeping requirements. *See, e.g.*, ER-106 (marketing an AR-style lower receiver based on ATF's representation that it is "not a firearm," meaning "NO Registering . . . NO FFL Required"); 1-SER-199, 1-SER-205 (advertising the ability to "ship [an AR-15 80% Lower Receiver] right to your front door" because it is "not considered [as a] firearm[] by ATF"); *see also* 2-SER-328–32, 2-SER-338–47, 2-SER-357–446, 2-SER-457–67.

Further, the panel ignored evidence that "decreasing recoveries of ghost guns since the issuance of the Final Rule are attributable almost entirely to reduced numbers of unserialized, home-assembled

handguns" and *not* "unserialized long guns" such as AR-type weapons. Dkt. 39.1 at 12. While the summary judgment record below was submitted in October 2023, *amici's* brief provided updated, post-Final Rule statistics specific to California from reports released by the California Department of Justice in 2024 and 2025. *See id.* at 9 n.23, 10 n.25. This undisputed data—which Defendants had a full and fair opportunity to respond to on appeal—is directly responsive to the panel's opinion and its holding that Plaintiffs lack standing. *See* Op. 16 (finding that Plaintiffs lacked precise "data regarding the specific unregulated products subject to Example 4").

Far from speculation as the opinion claims, Op. 17 n.4, 18, these post-Final Rule advertisements, agency letters, and updated ghost gun recovery data are direct evidence of how third parties are acting and will continue to act. They demonstrate that manufacturers, sellers, and consumers are in fact exploiting the loophole to skirt the GCA's requirements, "distinguish[ing] [the] products" that are not regulated by the Final Rule. Op. 16.

*Third*, the record details at length the harm Plaintiffs have suffered after the Final Rule, which the panel's opinion did not address.

After the Final Rule took effect, among other actions, the California Legislature appropriated millions of dollars to implement AB 1621—the statute extending state law to the parts that Example 4 leaves unregulated. 2-SER-217–18 (¶ 18); *see Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–55 (2010) (increased costs due to the "reasonable probability" that petitioners' product may infect their crops, "are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis"). And for GLC, its work reducing violence in communities has been undercut by the "recent surge in the numbers of ghost guns recovered." 1-SER-202 (¶ 15). Had ATF classified unfinished AR-type receivers as firearms, "GLC could devote fewer of its limited resources to combatting ghost guns." 1-SER-203 (¶ 19); *see Ariz. All. for Retired Ams. v. Mayes*, 186 F.4th 622, 633 (9th Cir. 2026) (en banc) (holding, even after *Hippocratic Medicine*, that "a diversion of resources may be evidence of an injury" even if "not itself an injury-in-fact"). This is precisely the sort of non-speculative, predictable chain of effects that this Court's precedent contemplates.

To the extent Plaintiffs lacked "data regarding the specific unregulated products subject to Example 4," Op. 16, the panel overlooked the explanation for that absence and demanded more from Plaintiffs than they must prove to establish standing. Plaintiffs' ability to marshal relevant evidence has been hampered by the very fact of the Final Rule itself, which permits those receivers to move through commerce unserialized and renders them untraceable. ER-058; AB 60. Under the panel's reasoning, the more completely a regulatory carve-out hampers traceability, the more thoroughly it will be insulated from Article III review—because the plaintiff can rarely produce the product-level data that the carve-out's own operation suppresses. Article III requires proof only that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs," *Hippocratic Med.*, 602 U.S. at 383—not the level of particularity demanded by the opinion.

## CONCLUSION

The Court should grant panel rehearing.

Dated: October 5, 2026

Respectfully submitted,

*s/ Lee R. Crain*

## CERTIFICATE OF COMPLIANCE

I certify that this petition complies with the word limit of Circuit Rule 40-1(b) because it contains 4,153 words, excluding portions exempted under Federal Rule of Appellate Procedure 32(f). I also certify that the petition complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and (6) because it has been prepared in 14-point New Century Schoolbook font.

Dated: October 5, 2026

*s/ Lee. R. Crain*

Lee R. Crain

## RULE 25-5(F) ATTESTATION

In accordance with Ninth Circuit Rule 25-5(f), I hereby attest that all other parties on whose behalf this document is submitted concur in its content.

Dated: October 5, 2026

*s/ Lee R. Crain*

Lee R. Crain

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF CALIFORNIA; BRYAN MUEHLBERGER; FRANK BLACKWELL; GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,<br><br>*Plaintiffs - Appellees*,<br><br>v.<br><br>UNITED STATES BUREAU OF ALCOHOL TOBACCO FIREARMS & EXPLOSIVES; ROBERT CEKADA, in his official capacity as Director of ATF; DOJ - UNITED STATES DEPARTMENT OF JUSTICE; TODD W. BLANCHE, Attorney General, in his official capacity as Attorney General of the United States,<br><br>*Defendants - Appellants*. | No. 24-2701<br><br>D.C. No. 3:20-cv-06761-EMC<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted March 12, 2026
San Francisco, California

Filed August 21, 2026

Before: Consuelo M. Callahan, Holly A. Thomas, and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Callahan

---

## SUMMARY*

---

### Gun Control Act / Standing

The panel vacated the district court's order granting summary judgment and remanded with instructions to dismiss for lack of standing a case brought by the State of California and the Giffords Law Center to Prevent Gun Violence (GLC) challenging a Final Rule enacted by the U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF).

The Final Rule effectively extended the reach of the Gun Control Act (GCA), which regulates a wide range of activities involving firearms, to cover some frames and receivers that previously went unregulated because they were either partially complete, disassembled, or nonfunctional. The Final Rule offered some nonexclusive examples. Relevant to this litigation, Example 4 stated that

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a "billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." 27 C.F.R. § 478.12(c). Plaintiffs challenged the regulation's failure to extend the GCA to even more partially complete firearm receivers that they think should be included.

The panel held that Plaintiffs lacked standing. California argued that Example 4 caused it to increase financial expenditures to accelerate implementation of State legislation regulating ghost gun parts, and to train law enforcement on ghost guns. GLC argued that that ATF's insufficient regulation of ghost guns frustrated GLC's core mission and required it to divert resources to combat the proliferation of ghost guns and ghost gun violence. The panel held that their arguments failed because their evidence did not factually establish the requisite causal link between Example 4 and their claimed injuries. Accordingly, the panel vacated the district court's order and remanded with instructions to dismiss the case without prejudice for lack of standing.

---

## COUNSEL

Lee R. Crain (argued), Gibson Dunn & Crutcher LLP, New York, New York; Scott A. Edelman, Gibson Dunn & Crutcher LLP, Los Angeles, California; Gregg Costa, Gibson Dunn & Crutcher LLP, Houston, Texas; S. Clinton Woods, Deputy Attorney General; R. Matthew Wise, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, California

Case: 24-2701, 10/21/2026, DktEntry: 62.1, (34 of 43)



Attorney General; Office of the California Attorney General, San Francisco, California; David M. Pucino, Giffords Law Center to Prevent Gun Violence, New York, New York; Avi Weitzman, Paul Hastings LLP, New York, New York; for Plaintiffs-Appellees.

Sean R. Janda (argued), Bradley Hinshelwood, and Courtney L. Dixon, Attorneys, Appellate Staff, Civil Division; Brett A. Shumate, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Craig H. Missakian, United States Attorney, Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Defendants-Appellants.

Andrew Nellis, Everytown Law, Washington, D.C., for Amici Curiae Everytown for Gun Safety Support Fund and Brady Center To Prevent Gun Violence.

Rupa Bhattacharyya and Mary B. McCord, Institute for Constitutional Advocacy & Protection, Georgetown University Law Center, Washington, D.C., for Amici Curiae United States Conference of Mayors, The Major Cities Chiefs Association, and The Police Executive Research Forum.

Perry R. Cao, Assistant Attorney General; Ashwin P. Phatak, Principal Deputy Solicitor General; Caroline S. Van Zile, Solicitor General; Brian L. Schwalb, District of Columbia Attorney General; Office of the District of Columbia Attorney General, Washington, D.C.; Benjamin M. Shultz, Assistant Attorney General; Jeremy Feigenbaum, Solicitor General; Matthew J. Platkin, New Jersey Attorney General; Office of the New Jersey Attorney General, Trenton, New Jersey; Philip J. Weiser, Colorado Attorney General, Office of the Colorado Attorney General, Denver, Colorado; William Tong, Connecticut Attorney General, Office of the

Connecticut Attorney General, Hartford, Connecticut; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Anne E. Lopez, Hawaii Attorney General, Office of the Attorney General Hawaii, Honolulu, Hawaii; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Aaron M. Frey, Maine Attorney General, Office of the Maine Attorney General, Augusta, Maine; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Andrea J. Campbell, Massachusetts Attorney General, Office of the Massachusetts Attorney General, Boston, Massachusetts; Dana Nessel, Michigan Attorney General, Office of the Michigan Attorney General, Lansing, Michigan; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Aaron D. Ford, Nevada Attorney General, Office of the Nevada Attorney General, Carson City, Nevada; Letitia James, New York Attorney General, Office of the New York Attorney General, New York, New York; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Peter F. Neronha, Rhode Island Attorney General, Office of the Rhode Island Attorney General, Providence, Rhode Island; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; for Amici Curiae District of Columbia, New Jersey, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, Oregon, Rhode Island, Vermont, and Washington.

# OPINION

CALLAHAN, Circuit Judge:

The Gun Control Act (GCA) regulates a wide range of activities involving firearms. Under the GCA, firearm frames and receivers themselves qualify as firearms subject to the statute's regulations. This case concerns a recently enacted federal regulation that, among other things, effectively extended the GCA's reach to cover some frames and receivers that previously went unregulated because they were either partially complete, disassembled, or nonfunctional.

Plaintiffs challenge the regulation's failure to extend the GCA to even more partially complete firearm receivers that they think should be included. We must decide whether Plaintiffs have standing to raise their challenge. They do not.

## I

### A

In 1968, Congress adopted the GCA to regulate the "interstate traffic in firearms." Pub. L. 90-618, 82 Stat. 1213. The statute, as relevant here, imposes various background check, licensing, recordkeeping, and serialization requirements upon those who import, make, or deal in firearms. 18 U.S.C. §§ 922(t), 923(a), 923(i), 923(g)(1)(A). It defines a firearm as: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler; or (D) any destructive device." *Id.* § 921(a)(3). But the GCA leaves undefined several key terms. For instance, it does not define the terms readily,

frame, or receiver. Instead, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) defines these terms by regulation, subject to approval by the Attorney General. 27 C.F.R. § 478.11 (defining readily); *id.* § 478.12 (defining frame and receiver).

A regulation defines the term readily as "[a] process, action, or physical state that is fairly or reasonably efficient, quick, and easy, but not necessarily the most efficient, speediest, or easiest process, action, or physical state." 27 C.F.R. § 478.11. To determine whether a "weapon . . . may readily be converted to expel a projectile by the action of an explosive," 18 U.S.C. § 921(a)(3)(A), requires consideration of a variety of specific factors. 27 C.F.R. § 478.11 (providing a nonexclusive list of relevant factors, such as "how long it takes to finish the process" and "how difficult it is to do so").

In 2022, ATF completed formal rulemaking proceedings to "remove and replace" earlier definitions of the terms frame and receiver after finding that the earlier definitions "fail[ed] to capture the full meaning of those terms." 87 Fed. Reg. 24652. ATF acknowledged that the prior definitions "[did] not describe the frame or receiver of most firearms currently in circulation in the United States." *Id.* The problem was, in part, that the former definitions failed to account for the fact that "[t]oday, companies are able to make and sell weapon parts kits that individuals can assemble into functional firearms in their own homes." *Bondi v. VanDerStok*, 604 U.S. 458, 463 (2025). These homemade firearms built from deconstructed parts, sometimes called "ghost guns," were not subject to the GCA's regulatory requirements and thus were functionally untraceable. *Id.* This led to "an explosion of crimes involving these ghost guns." *Id.* (citation modified).

ATF thus enacted its Final Rule, which addresses this serious issue by expanding several regulatory definitions, including the terms frame and receiver. 87 Fed. Reg. 24652. The Final Rule provides in relevant part:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.
>
> (2) The term "receiver" means the part of a rifle, shotgun, or projectile other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component or structure.

27 C.F.R. § 478.12(a)(1), (2).

The Final Rule further states that "[t]he terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver[.]" *Id.*

§ 478.12(c). The Final Rule, however, clarifies that the terms frame and receiver "shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.*

To illustrate its intended meaning, the Final Rule offers some nonexclusive examples of partially complete, disassembled, or nonfunctional frames and receivers that it covers as well as a few that it does not. *Id.* For instance, Example 2 provides that "[a] partially complete billet or blank of a frame or receiver with one or more template holes drilled or indexed in the correct location is a frame or receiver, as a person with common hand tools may readily complete the billet or blank to function as a frame or receiver." *Id.* In contrast, and relevant to this litigation, Example 4 states that "[a] billet or blank of an AR-15 variant receiver without critical interior areas having been indexed, machined, or formed that is not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed is not a receiver." *Id.*

Applying the Final Rule, ATF subsequently made numerous determinations and representations that—consistent with Example 4—certain unfinished receivers are not covered by the Final Rule. In each instance, ATF found that the unfinished receiver at issue (1) had not yet reached a sufficient "stage of manufacture where [it was] clearly identifiable as an unfinished component part of a weapon," and (2) was not sold, distributed, or possessed with instructions, jigs, templates, equipment, or tools such that it may readily be completed. *See id.*

### B

Plaintiffs are the State of California and the Giffords Law Center to Prevent Gun Violence (GLC). Following the enactment of the Final Rule and Example 4, California states that it had to increase its "expenditures of time, money, and resources to train law enforcement personnel statewide on ghost guns, and [made] additional expenditures to accelerate implementation of necessary State legislation regulating ghost-gun parts." GLC, "a nonprofit organization whose core mission is to save lives from gun violence[,]" explains that to combat the negative effects of Example 4, it has needed "to invest more time and money into its pre-existing activities[.]"

Alleging violations of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, Plaintiffs sued ATF, the ATF Director, the Department of Justice, and the Attorney General (referred to collectively as "ATF"). Plaintiffs do not seek to vacate the Final Rule; to the contrary, they assert that the Final Rule must cover *more* early-stage firearm receivers, even if not sold together with any other parts, tools, or related items. Plaintiffs therefore challenge only Example 4 and ATF's subsequent determinations and representations based on Example 4 (referred to collectively as "Example 4"). Plaintiffs argue that Example 4 is an unlawful restriction of the proper scope of the Final Rule and the GCA.

In Count One of their operative complaint, Plaintiffs claim that Example 4 violates the APA because it is "not in accordance with law." *See* 5 U.S.C. § 706(2)(A). As they see it, Example 4 conflicts with the GCA because the unfinished receivers at-issue "fall within the statutory definition of firearms subject to the GCA's requirements."

In Count Two, Plaintiffs assert that Example 4 runs afoul of the APA because it is "arbitrary and capricious." *See* 5 U.S.C. § 706(2)(A). They argue that Example 4 draws an "arbitrary line [that] leaves open obvious and easily navigable loopholes that run counter to the GCA's basic commands" and that ATF, in adopting Example 4, "entirely fail[ed] to consider an important aspect of the problem" that it sought to address.

The parties filed cross-motions for summary judgment. ATF argued that Plaintiffs lacked Article III standing, and all parties argued that they were entitled to summary judgment on the merits of Plaintiffs' APA claims. The District Court first held that Plaintiffs each had standing. Next, it granted summary judgment for ATF on Count One and granted summary judgment for Plaintiffs on Count Two. Finally, as a remedial measure, it declared Example 4 unlawful, vacated it, and remanded the matter to ATF. ATF timely appealed.

**II**

We have jurisdiction under 28 U.S.C. § 1291, and review de novo a district court's grant of summary judgment and its determination on Article III standing. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021). Our review begins, and ends, with standing. We hold that Plaintiffs lack standing because Plaintiffs have not shown that Example 4 caused their asserted injuries. So we vacate the district court's order and remand with instructions to dismiss the case.

**A**

Article III of the Constitution limits the federal judicial power to "Cases" and "Controversies." A case or

controversy exists only if a plaintiff has standing to bring a suit—this is "a bedrock constitutional requirement" that we apply "to all manner of important disputes." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing serves to protect "a single basic idea—the idea of separation of powers." *Id.* The Constitution assigns the judiciary a "limited" role, and "[b]y ensuring that a plaintiff has standing to sue, federal courts 'prevent the judicial process from being used to usurp the powers of the political branches.'" *Id.* at 675-76 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)). If a plaintiff lacks standing, then "a dispute is not a proper case or controversy, [and] the courts have no business deciding it, or expounding the law in the course of doing so." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

To prove standing, "a plaintiff must show that she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* (quoting *Clapper*, 568 U.S. at 409). A plaintiff must prove each element of standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, a plaintiff "must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation modified).

A plaintiff "has standing to challenge federal action that directly harms [its] economic interests or interferes with its operations as a service provider, market participant, or employer." *Washington v. FDA*, 108 F.4th 1163, 1174 (9th Cir. 2024) (collecting cases). Even so, a plaintiff "cannot manufacture standing merely by inflicting harm on [itself]

based on [its] fears of hypothetical future harm[.]" *Clapper*, 568 U.S. at 416; *see also FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 382-83 (2024) (explaining that a plaintiff who has not itself suffered a direct and concrete injury cannot "manufacture its own standing" by spending money in response to a disfavored government regulation).

When, as here, a plaintiff's alleged harm results only as an indirect effect of the government's "allegedly unlawful regulation (or lack of regulation) of *someone else*," "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *see also Hippocratic Med.*, 602 U.S. at 382-83; *Washington*, 108 F.4th at 1175. In such a case, proving causation requires a plaintiff to demonstrate that "third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Hippocratic Med.*, 602 U.S. at 383 (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)) (internal quotation marks omitted). The causation requirement does not permit courts to accept links that are too "speculative" or "attenuated," and the "causation inquiry can be heavily fact dependent and a question of degree[.]" *Hippocratic Med.*, 602 U.S. at 383-384 (internal quotation marks omitted). The Supreme Court has directed us to be "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Murthy*, 603 U.S. at 57 (quoting *Clapper*, 568 U.S. at 413).

**B**

**1**

At summary judgment, California argued that Example 4 caused it to increase financial expenditures "to accelerate implementation of State legislation regulating ghost gun

parts, as well as increased expenditures of time, money, and resources to train law enforcement personnel statewide on ghost guns." For its part, GLC argued that ATF's insufficient regulation of ghost guns frustrates GLC's core mission and requires the organization to divert resources to combat the proliferation of ghost guns and ghost gun-related violence. *Id.* at 37-40. Both Plaintiffs maintain their respective arguments before us.[1] Their arguments each fail because their evidence does not factually establish the

[1] In its operative complaint, California also asserted standing based on Example 4's "interference with California's ability to enforce its laws with respect to firearms and firearm-related crime" and "harm to its quasi-sovereign interest in protecting the security and well-being of its residents." But California abandoned these alternative standing theories in both its summary judgment briefing before the District Court and its briefing before us.

To the extent that California's argument about increased expenditures may be read to have encompassed the state's separate theory that Example 4 interferes with its ability enforce its firearms laws, California cites no precedent in support of that theory. Nor does California argue that Example 4 encroaches on its ability to govern, for example by preempting or nullifying state law. Thus, under our precedent, that theory clearly fails. *See Washington*, 108 F.4th at 1177 ("We have never held that a logistical burden on law enforcement constitutes a cognizable Article III injury. Holding otherwise would greatly expand state standing to challenge any federal action that allegedly increases crime or disorder, or imposes indirect compliance costs for state law enforcement."); *see also id.* (explaining that the Supreme Court, in rejecting an analogous "novel standing argument," noted that "holding otherwise would lead to an increase in 'complaints in future years about alleged Executive Branch under-enforcement' of other laws, including 'drug laws, gun laws, obstruction of justice laws, or the like.'" (quoting *Texas*, 599 U.S. at 681)).

requisite causal link between Example 4 and their claimed injuries.[2]

From the start, Plaintiffs' causation arguments face strong headwinds because Example 4 does not directly affect either of them. Their asserted injuries here arise only indirectly. So they must offer sufficient evidence to show that Example 4 will cause "a predictable chain of events leading from the government action to the asserted injury." *Hippocratic Med.*, 602 U.S. at 385. Plaintiffs contend that "[i]t is predictable that, if ATF does not regulate [partially complete receivers] under the GCA, then "third parties will continue to make and sell them to evade serialization and licensing laws." They also state that, as the district court found, "it is predictable that crimes will be committed in California" using ghost guns built with partially complete receivers, "because ghost guns are commonly used in crimes and a notable percentage of ghost guns recovered in the state" use those early-stage receivers.

To tie their new expenditures to Example 4, Plaintiffs must show that Example 4 will predictably increase the spread and unlawful use of ghost guns made from the relevant partially made receivers.[3] California's evidence consists of a declaration submitted by a Special Agent

---

[2] ATF argues that Plaintiffs have not met both the injury in fact and causation elements of standing. Because we conclude that Plaintiffs have not shown that their asserted injuries are fairly traceable to Example 4, we need not consider ATF's alternative argument that the injuries are not legally cognizable for standing purposes.

[3] Plaintiffs' argument appears to rest on the proposition that even if the Final Rule stops or decreases the spread and unlawful use of ghost guns generally, Plaintiffs can still be harmed by an increase of a specific subcategory of ghost guns. We assume without deciding that their theory is valid.

Supervisor from the state's Department of Justice, documents supporting claims made in the declaration, and a host of news stories about ghost gun violence and prevalence. All told, the evidence demonstrates the increasing spread of ghost guns and ghost gun violence, and various expenditures made by California between 2016 and 2023 to implement and improve state regulation of ghost guns.

California's evidence falls short because it speaks to the problem of ghost guns generally, offering no data regarding the specific unregulated products subject to Example 4. The declaration asserts that "the vast majority of these ghost guns were assembled using commercially-available firearms precursor parts," including "approximately 15-20%" of ghost guns made with unfinished receivers *possibly* subject to Example 4, but California's evidence fails to distinguish products that are now regulated under the GCA by the Final Rule from those that are not.

Additionally, California's evidence focuses almost exclusively on expenditures that California made to combat the growth of ghost guns from 2016 to 2022, a period pre-dating the Final Rule. During that time, the Final Rule was not in effect, and any ghost gun-related harm that California sought to address cannot be attributed to Example 4. *Cf. California*, 593 U.S. at 676 (citation modified) (rejecting the states' declarations showing costs caused by an extant regulatory regime). And California's only evidence relating to ghost guns postdating the Final Rule seems to cut against its causation theory. California's proffered declaration points to only one post-Final Rule data point, which concerns ghost guns recovered by law enforcement in Los Angeles County. The declaration reports that in July 2021, 9% of the total firearms recovered were ghost guns, but that

"[i]n 2022 through January 2023, the percentage of ghost guns recovered account[ed] for approximately 5 to 8% of firearms recovered each month." This suggests that, in California's largest county, the Final Rule caused a decrease in the prevalence of ghost guns—at least as measured by the share of ghost guns recovered out of total firearms recovered—which is the *opposite* trend that California's theory requires. On this record, "[n]either logic nor intuition suggests" the contrary inference that California asks us to make with respect to Example 4 products. *California*, 593 U.S. at 676.

In sum, California's stated costs are not fairly traceable to Example 4. The state's attempt to connect its costs to Example 4 rests on evidence that does not adequately demonstrate that "third parties will likely react in predictable ways" that cause injury to California. *Hippocratic Med.*, 602 U.S. at 383 (quoting *California*, 593 U.S. at 675). That does not suffice for Article III standing.[4]

**2**

GLC's theory of harm, which relies on a declaration submitted by its chief of staff along with supporting records, has the same causation flaws as does California's theory. GLC's evidence does not isolate Example 4 products from

[4] California argues that it can avoid the causation requirement's usual strictures by simply showing that "it reasonably incurred costs to avoid a 'substantial risk' of harm caused by ATF's failure to regulate certain partially complete receivers." But even a substantial risk of harm does not do away with California's burden to provide "concrete facts showing that [ATF's] actual action has caused the substantial risk of harm." *Clapper*, 568 U.S. at 114 n.5. Nor can California show a risk of harm by "rely[ing] on speculation about the 'unfettered choices made by independent actors not before the courts.'" *Id.* (quoting Lujan, 504 U.S. at 562).

ghost guns generally, much less show how the Final Rule and Example 4 will work together to predictably cause an uptick in harm caused by ghost guns made from the relevant unfinished receivers, to which GLC claims it must respond. Nearly all of its documented expenditures and activities also predate the Final Rule. Accordingly, for the same reasons as California, GLC fails to establish causation and thus lacks standing. *See id.; California*, 593 U.S. at 676.

## III

Although California and GLC expended resources to combat the spread and use of ghost guns after enactment of the Final Rule, those expenditures were based on their predictions that Example 4 would cause increased use by third parties of the products at issue in an unlawful manner. But we cannot "endorse standing theories that rest on speculation about the decisions of independent actors . . . particularly speculation about future unlawful conduct." *Dep't. of Comm.*, 588 U.S. at 768 (citation modified). Because California and GLC assert theories that rest on such speculation, neither has standing here. We thus vacate the district court's order and remand with instructions to dismiss the case for lack of standing.

**VACATED and REMANDED with instructions to dismiss without prejudice for lack of standing.**